# 21-2939-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————•———————

CHARLES OAKLEY,

*Plaintiff-Appellant,*

– v. –

JAMES DOLAN, in his individual capacity, in his professional capacity,
MSG NETWORKS, INC., MADISON SQUARE GARDEN COMPANY,
MSG SPORTS & ENTERTAINMENT, LLC,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 3 (Pages A-1 to A-196)

DECLAN T. CONROY
RANDY M. MASTRO
AKIVA SHAPIRO
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Defendants-Appellees*

JAMES A. WALDEN
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
(212) 335-2031

*Attorneys for Defendants-Appellees*

NELSON A. BOXER
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
(212) 370-0330

– and –

DOUGLAS H. WIGDOR
RENAN F. VARGHESE
WIGDOR LLP
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

*Attorneys for Plaintiff-Appellant*

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Complaint, filed September 12, 2017 ........................ A-16

Transcript of Proceedings held before the
Honorable Richard J. Sullivan, dated
January 12, 2018.................................................. A-37

Amended Complaint, filed February 9, 2018 ............ A-91

Declaration of Sarah L. Kushner, for Defendants, in
Support of Motion to Dismiss Amended
Complaint, filed March 30, 2018......................... A-116

Exhibit 2.a to Kushner Declaration -
Video (CD-ROM Hardcopy) ................................. A-121

Exhibit 6 to Kushner Declaration -
Video (CD-ROM Hardcopy) ................................. A-122

Exhibit 7 to Kushner Declaration -
Misdemeanor, dated March 31, 2017, in *The
People of the State of New York v. Charles
Oakley*, New York County Indictment No.
17-cv-06903 ............................................................ A-123

Exhibit 8 to Kushner Declaration -
Official Trespass Notice, dated August 4, 2017..... A-126

Exhibit 9 to Kushner Declaration -
Excerpts of Pleadings, in *Oakley v. Aria Resort &
Casino, LLC et al.*, Nevada, Clark County, Case
No. A-11-641182-C ............................................... A-128

ii

**Page**

Exhibit 10 to Kushner Declaration -
Complaint, dated July 12, 2011, in *Oakley v. The
City of Henderson et al.*, Nevad,a Clark County,
Case No. A-11-644871-C.......................................  A-144

Exhibit 11 to Kushner Declaration -
Charles Oakley Website Information.....................  A-148

Exhibit 12 to Kushner Declaration -
Rebound Institute "About Us" .............................  A-158

Exhibit 13 to Kushner Declaration -
Rebound Institute Twitter Account .......................  A-166

Exhibit 14 to Kushner Declaration -
Madison Square Garden Ticket Standard
Language.............................................................  A-181

Exhibit 15 to Kushner Declaration -
E-mails between Doug Wigdor and Randy M.
Mastro  ...............................................................  A-183

Declaration of Jim Walden, for Defendants, in
Support of Motion to Dismiss Amended
Complaint, filed March 30, 2018..........................  A-192

Declaration of Renan F. Varghese, for Plaintiff, in
Opposition to Motion to Dismiss Amended
Complaint, filed May 24, 2018.............................  A-195

Exhibit 1 to Varghese Declaration -
Transcript of Proceedings held before the
Honorable Richard J. Sullivan, dated
January 12, 2018.................................................  A-197

Letter from Gibson, Dunn & Crutcher LLP to the
Honorable Richard J. Sullivan, filed
December 7, 2020................................................  A-252

iii

                                                                    **Page**

Letter from Petrillo Klein & Boxer LLP to the
    Honorable Richard J. Sullivan, filed
        December 11, 2020 ................................................ A-255

Letter from Petrillo Klein & Boxer LLP to the
    Honorable Richard J. Sullivan, filed
        December 11, 2020 ................................................ A-258

    Exhibit A to Letter -
    Redlined Second Amended Complaint .................. A-261

    Exhibit B to Letter -
    Second Amended Complaint, dated
        December 11, 2020 ................................................ A-290

Letter from Gibson, Dunn & Crutcher LLP to the
    Honorable Richard J. Sullivan, filed
        December 17, 2020 ................................................ A-313

Transcript of Proceedings held before the
    Honorable Richard J. Sullivan, dated
        December 22, 2020 ................................................ A-316

Declaration of Randy M. Mastro, for Defendants, in
    Support of Motion to Dismiss the Amended
        Complaint, filed January 22, 2021 ....................... A-361

    Exhibit 1 to Mastro Declaration -
    Video (CD-ROM Hardcopy) ................................ A-365

    Exhibit 2.a to Mastro Declaration -
    Video (CD-ROM Hardcopy) ................................ A-366

    Exhibit 2.b to Mastro Declaration -
    Video (CD-ROM Hardcopy) ................................ A-367

    Exhibit 3 to Mastro Declaration -
    Video (CD-ROM Hardcopy) ................................ A-368

iv

**Page**

Exhibit 4 to Mastro Declaration -
Video (CD-ROM Hardcopy) ................................. A-369

Exhibit 5.a to Mastro Declaration -
Video (CD-ROM Hardcopy) ................................. A-370

Exhibit 5.b to Mastro Declaration -
Video (CD-ROM Hardcopy) ................................. A-371

Exhibit 5.c to Mastro Declaration -
Video (CD-ROM Hardcopy) ................................. A-372

Exhibit 5.d to Mastro Declaration -
Video (CD-ROM Hardcopy) ................................. A-373

Exhibit 6 to Mastro Declaration -
Madison Square Garden Ticket Standard
Language................................................................. A-374

Defendants' Rule 56.1 Statement of Undisputed
Material Facts in Support of their Motion for
Summary Judgment, filed January 22, 2021 ........ A-376

Declaration of Renan F. Varghese, for Plaintiff, in
Support of Motion to File a Second Amended
Complaint, filed January 22, 2021 ........................ A-390

Exhibit A to Varghese Declaration -
Redlined Second Amended Complaint, ................. A-391

Exhibit B to Varghese Declaration -
Second Amended Complaint, dated
December 11, 2020 ................................................ A-419

Plaintiff's Response to Defendant's Statement of
Undisputed Facts Pursuant to Local Civil Rule
56.1, filed February 19, 2021................................ A-441

v

**Page**

Declaration of Douglas H. Wigdor, for Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021........................................... A-485

Declaration of Renan F. Varghese, for Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021........................................... A-491

    Exhibit A to Varghese Declaration -
    New York Knicks Twitter ...................................... A-492

Declaration of Charles Oakley, Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021........................................... A-495

Declaration of Declan T. Conroy, for Defendants, in
    Support of Motion for Summary Judgment, filed
    February 19, 2021 .................................................. A-499

    Exhibit 1 to Conroy Declaration -
    Video (CD-ROM Hardcopy) ................................. A-501

Defendants' Response to Plaintiff's Additional
    Material and Disputed Issues of Fact, filed
    March 9, 2021 ........................................................ A-502

Notice of Appeal, filed November 24, 2021 .............. A-541

A-1

Query    Reports    Utilities    Help    Log Out

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:17-cv-06903-RJS

Oakley v. Dolan et al
Assigned to: Judge Richard J. Sullivan
Cause: 42:12132 Americans with Disabilities Act - Discrimination

Date Filed: 09/12/2017
Date Terminated: 11/08/2021
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel & Slander
Jurisdiction: Federal Question

**Plaintiff**

**Charles Oakley**                          represented by  **Alex Jeffrey Hartzband**
Faruqi & Faruqi, LLP
685 Third Avenue
Ste 26th Floor
New York, NY 10017
212-983-9330
Email: ahartzband@faruqilaw.com
*TERMINATED: 01/19/2018*

**Kenneth Daniel Walsh**
Wigdor LLP
85 Fifth Avenue
5th fl.
New York, NY 10003
(212)-257-6800
Fax: (212)-257-6845
Email: kwalsh@wigdorlaw.com
*ATTORNEY TO BE NOTICED*

**Nelson Andrew Boxer**
Petrillo Klein & Boxer LLP
655 Third Ave, 22nd Floor
New York, NY 10017
212-370-0338
Fax: 212-370-0391
Email: nboxer@pkbllp.com
*ATTORNEY TO BE NOTICED*

**Renan F Varghese**
Wigdor LLP
85 Fifth Avenue
5th fl.
New York, NY 10003
(212) 257-6824
Fax: (212) 257-6845
Email: rvarghese@wigdorlaw.com
*ATTORNEY TO BE NOTICED*

**Douglas Holden Wigdor**
Wigdor LLP
85 Fifth Avenue
5th fl.
New York, NY 10003
212-239-9292
Fax: 212-239-9001
Email: dwigdor@wigdorlaw.com
*ATTORNEY TO BE NOTICED*

V.

A-2

**Defendant**

**James Dolan**
*in his individual capacity*

represented by **Jim Walden**
Walden Macht & Haran LLP
250 Vesey
27th Floor
New York, NY 10281
212-335-2031
Fax: 212-335-2040
Email: jwalden@wmhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue
New York, NY 10166
212-351-5391
Fax: 212-351-5328
Email: rmastro@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Akiva Shapiro**
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166
(212) 351-3830
Fax: (212) 351-4035
Email: ashapiro@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Declan T. Conroy**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue
New York, NY 10166
(212)-351-2480
Fax: (212)-817-9480
Email: dconroy@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Grace Elizabeth Hart**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue
New York, NY 10166
212-351-6372
Email: GHart@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Milton L. Williams , Jr**
Walden Macht & Haran LLP
250 Vesey St
27th Floor
New York, NY 10281
212-335-2030
Fax: 212-335-2040
Email: mwilliams@wmhlaw.com
*ATTORNEY TO BE NOTICED*

**Sarah L. Kushner**
DOJ-USAO
1 Saint Andrews Plaza
New York, NY 10001
212-637-2676
Email: skushner@gibsondunn.com
*TERMINATED: 12/21/2020*

**Defendant**

A-3

2/8/22, 10:54 AM                                    SDNY CM/ECF NextGen Version 1.6

**James Dolan**                                     represented by **Jim Walden**
*in his professional capacity*                                     (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Randy M. Mastro**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Akiva Shapiro**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Declan T. Conroy**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Grace Elizabeth Hart**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Milton L. Williams , Jr**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Sarah L. Kushner**
                                                                   (See above for address)
                                                                   *TERMINATED: 12/21/2020*

**Defendant**

**MSG Networks, Inc.**                              represented by **Jim Walden**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Randy M. Mastro**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Akiva Shapiro**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Declan T. Conroy**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Grace Elizabeth Hart**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Milton L. Williams , Jr**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Sarah L. Kushner**
                                                                   (See above for address)
                                                                   *TERMINATED: 12/21/2020*

**Defendant**

**The Madison Square Garden Company**               represented by **Jim Walden**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

A-4

**Randy M. Mastro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Akiva Shapiro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Declan T. Conroy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grace Elizabeth Hart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L. Williams , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah L. Kushner**
(See above for address)
*TERMINATED: 12/21/2020*

**Defendant**
**MSG Sports & Entertainment, LLC**                    represented by **Jim Walden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Akiva Shapiro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Declan T. Conroy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grace Elizabeth Hart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Milton L. Williams , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah L. Kushner**
(See above for address)
*TERMINATED: 12/21/2020*

**Miscellaneous**
**Douglas H. Wigdor**                    represented by **Michael Steven Ross**
Law Offices of Michael S. Ross
60 East 42nd Street, Fl. 47
New York, NY 10165
(212)-505-4060
Fax: (212)-505-4054
Email: michaelross@rosslaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

SDNY CM/ECF NextGen Version 1.6

**Eugene Alexander Gormakh**
Law Offices of Michael S. Ross
60 East 42nd Street
New York, NY 10165
(212)-505-4135
Fax: (212)-505-4054
Email: eugenegormakh@rosslaw.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2017 | 1 | COMPLAINT against James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Filing Fee $ 400.00, Receipt Number 0208-14114283)Document filed by Charles Oakley.(Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 2 | CIVIL COVER SHEET filed. (Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to James Dolan, re: 1 Complaint,. Document filed by Charles Oakley. (Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to MSG Networks, Inc., re: 1 Complaint,. Document filed by Charles Oakley. (Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to The Madison Square Garden Company, re: 1 Complaint,. Document filed by Charles Oakley. (Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to MSG Sports & Entertainment, LLC, re: 1 Complaint,. Document filed by Charles Oakley. (Wigdor, Douglas) (Entered: 09/12/2017) |
| 09/12/2017 | 7 | NOTICE OF APPEARANCE by Renan F Varghese on behalf of Charles Oakley. (Varghese, Renan) (Entered: 09/12/2017) |
| 09/12/2017 | 8 | NOTICE OF APPEARANCE by Alex Jeffrey Hartzband on behalf of Charles Oakley. (Hartzband, Alex) (Entered: 09/12/2017) |
| 09/13/2017 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Richard J. Sullivan. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (kl) (Entered: 09/13/2017) |
| 09/13/2017 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (kl) (Entered: 09/13/2017) |
| 09/13/2017 | | Case Designated ECF. (kl) (Entered: 09/13/2017) |
| 09/13/2017 | 9 | ELECTRONIC SUMMONS ISSUED as to James Dolan(in his professional capacity), James Dolan(in his individual capacity). (kl) (Entered: 09/13/2017) |
| 09/13/2017 | 10 | ELECTRONIC SUMMONS ISSUED as to MSG Networks, Inc.. (kl) (Entered: 09/13/2017) |
| 09/13/2017 | 11 | ELECTRONIC SUMMONS ISSUED as to The Madison Square Garden Company. (kl) (Entered: 09/13/2017) |
| 09/13/2017 | 12 | ELECTRONIC SUMMONS ISSUED as to MSG Sports & Entertainment, LLC. (kl) (Entered: 09/13/2017) |
| 09/14/2017 | 13 | NOTICE OF APPEARANCE by Milton L. Williams, Jr on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Williams, Milton) (Entered: 09/14/2017) |
| 09/14/2017 | 14 | NOTICE OF APPEARANCE by James Walden on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Walden, James) (Entered: 09/14/2017) |
| 09/18/2017 | 15 | ORDER: IT IS HEREBY ORDERED THAT Plaintiff shall file affidavits of service forthwith. IT IS FURTHER ORDERED THAT the parties shall appear for an initial conference on Thursday, October 19, 2017 at 9:30 a.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. IT IS FURTHER ORDERED THAT, by October 12, 2017, the parties shall jointly submit a letter, not to exceed five (5) pages, providing the following information in separate paragraphs: A brief statement of the nature of the action and the principal defenses thereto...The estimated length of trial; and any other information that the parties believe may assist this Court in resolving this action. IT IS FURTHER ORDERED THAT, by October 12, 2017, the parties shall submit to the Court a proposed case management plan and scheduling order. A template for the order is available at: |

| | | http://www.nysd.uscourts.gov/judge/Sullivan, and as further set forth herein. (Initial Conference set for 10/19/2017 at 09:30 AM in Courtroom 905, 40 Centre Street, New York, NY 10007 before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan on 9/18/2017) (ras) (Entered: 09/18/2017) |
|---|---|---|
| 09/18/2017 | 16 | FIRST LETTER MOTION for Extension of Time to File Response/Reply *to Complaint* addressed to Judge Richard J. Sullivan from Jim Walden dated 9/18/2017. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Walden, James) (Entered: 09/18/2017) |
| 09/18/2017 | 17 | ORDER granting 16 Letter Motion for Extension of Time to File Response/Reply. The request is GRANTED. Defendants shall answer or otherwise respond to the complaint no later than November 13, 2017. As set forth in the Court's September 18, 2017 order (Doc. No. 15), the parties shall submit their joint letter and proposed case-management plan no later than November 21, 2017. The initial conference currently scheduled for October 19, 2017 is adjourned to November 28, 2017 at 1:00 p.m. (Signed by Judge Richard J. Sullivan on 9/18/2017) (mro) (Entered: 09/19/2017) |
| 09/18/2017 | | Set/Reset Deadlines: James Dolan(in his professional capacity) answer due 11/13/2017; James Dolan(in his individual capacity) answer due 11/13/2017; MSG Networks, Inc. answer due 11/13/2017; MSG Sports & Entertainment, LLC answer due 11/13/2017; The Madison Square Garden Company answer due 11/13/2017. (mro) (Entered: 09/19/2017) |
| 09/18/2017 | | Set/Reset Hearings: Initial Conference set for 11/28/2017 at 01:00 PM before Judge Richard J. Sullivan. (mro) (Entered: 09/19/2017) |
| 09/25/2017 | 18 | NOTICE OF APPEARANCE by Randy M. Mastro on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Mastro, Randy) (Entered: 09/25/2017) |
| 11/13/2017 | 19 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated November 13, 2017 re: Pre-Motion Letter. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 11/13/2017) |
| 11/14/2017 | 20 | NOTICE OF APPEARANCE by Sarah Kushner on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Kushner, Sarah) (Entered: 11/14/2017) |
| 11/14/2017 | 21 | LETTER addressed to Judge Richard J. Sullivan from Renan F. Varghese dated November 14, 2017 re: Request for Extension of Time to Respond to Defendants' Request for Pre-motion Conference. Document filed by Charles Oakley. (Varghese, Renan) (Entered: 11/14/2017) |
| 11/14/2017 | 23 | MEMO ENDORSEMENT on re: 21 Letter filed by Charles Oakley. ENDORSEMENT: Plaintiff shall respond to Defendants' premotion letter no later than December 1, 2017. As set forth in the Court's September 18, 2017 order, the parties shall submit their joint letter and proposed-case management plan no later than December 13, 2017. The initial conference currently scheduled for November 28, 2017 is adjourned to December 20, 2017 at 9:30 a.m. and shall also function as a premotion conference for Defendants' contemplated motion to dismiss. The Court finds that the presumption in favor of open records has been overcome by the privacy interests presented by the redacted material in this letter and grants Plaintiff's sealing request. (Initial Conference set for 12/20/2017 at 09:30 AM before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan on 11/14/2017) (ras) Modified on 12/18/2017 (ras). (Entered: 11/15/2017) |
| 11/15/2017 | 22 | NOTICE OF APPEARANCE by Kenneth Daniel Walsh on behalf of Charles Oakley. (Walsh, Kenneth) (Entered: 11/15/2017) |
| 12/01/2017 | 24 | LETTER addressed to Judge Richard J. Sullivan from Renan F. Varghese dated December 1, 2017 re: Opposition to Defendants' November 13, 2017 Pre-Motion Conference Letter. Document filed by Charles Oakley.(Varghese, Renan) (Entered: 12/01/2017) |
| 12/13/2017 | 25 | JOINT LETTER addressed to Judge Richard J. Sullivan from Plaintiff & Defendants dated December 13, 2017 re: Joint Letter + Proposed CMP. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Text of Proposed Order Joint Proposed CMP)(Mastro, Randy) (Entered: 12/13/2017) |
| 12/16/2017 | 26 | FIRST LETTER MOTION to Adjourn Conference addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 15, 2017. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 12/16/2017) |
| 12/18/2017 | 27 | ORDER granting 26 Letter Motion to Adjourn Conference. The premotion conference is adjourned to January 12, 2018 at 2:30 p.m. The deadline for initial disclosures is adjourned to January 19, 2018. (Pre-Motion Conference set for 1/12/2018 at 02:30 PM before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan on 12/18/2017) (ras) (Entered: 12/18/2017) |
| 01/12/2018 | | Minute Entry for proceedings held before Judge Richard J. Sullivan: Premotion Conference held on 1/12/2018. Renan |

|  |  | Varghese and Douglas Wigdor present for Plaintiff. Randy Mastro and Sarah Kushner present for Defendants. Court reporter present. The Court held a pretrial conference on Defendants' contemplated motion to dismiss. The parties shall submit a joint letter to the Court by January 19, 2018, updating the Court as to: (1) whether plaintiff wishes to amend his complaint, (2) the type of motion Defendants wish to make, (3) a proposed briefing schedule, and (4) whether the Court should stay discovery. (Nessim, Daniel) Modified on 1/12/2018 (Skolnik, Brandon). (Entered: 01/12/2018) |
|---|---|---|
| 01/16/2018 | 28 | MOTION for Alex J. Hartzband to Withdraw as Attorney . Document filed by Charles Oakley.(Varghese, Renan) (Entered: 01/16/2018) |
| 01/19/2018 | 29 | JOINT LETTER addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated January 19, 2018 re: Status Update Pursuant to the Court's January 12, 2018 Order. Document filed by Charles Oakley.(Wigdor, Douglas) (Entered: 01/19/2018) |
| 01/19/2018 | 30 | MEMO ENDORSEMENT on re: 29 Letter filed by Charles Oakley. ENDORSEMENT: SO ORDERED. ( Amended Pleadings due by 2/9/2018.) (Signed by Judge Richard J. Sullivan on 1/19/2018) (mro) (Main Document 30 replaced on 1/22/2018) (mro). (Entered: 01/22/2018) |
| 01/19/2018 | 31 | MEMO ENDORSEMENT granting 28 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Attorney Alex Jeffrey Hartzband terminated. (Signed by Judge Richard J. Sullivan on 1/19/2018) (mro) (Entered: 01/22/2018) |
| 02/02/2018 | 32 | NOTICE OF CHANGE OF ADDRESS by Kenneth Daniel Walsh on behalf of Charles Oakley. New Address: Wigdor LLP, 85 Fifth Avenue, Fifth Floor, New York, NY, United States 10003, 212-257-6800. (Walsh, Kenneth) (Entered: 02/02/2018) |
| 02/07/2018 |  | ***DELETED DOCUMENT. Deleted document number 33 Transcript. The document was incorrectly filed in this case. (ras) (Entered: 03/05/2018) |
| 02/07/2018 |  | ***DELETED DOCUMENT. Deleted document number 34 Notice. The document was incorrectly filed in this case. (ras) (Entered: 03/05/2018) |
| 02/09/2018 | 35 | LETTER addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated February 9, 2018 re: Plaintiff's Amended Complaint. Document filed by Charles Oakley.(Wigdor, Douglas) (Entered: 02/09/2018) |
| 02/09/2018 | 36 | AMENDED COMPLAINT amending 1 Complaint, against James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company with JURY DEMAND.Document filed by Charles Oakley. Related document: 1 Complaint,. (Wigdor, Douglas) (Entered: 02/09/2018) |
| 02/28/2018 | 37 | JOINT LETTER addressed to Judge Richard J. Sullivan from Randy Mastro & Douglas Wigdor dated February 28, 2018 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 02/28/2018) |
| 03/05/2018 | 38 | ORDER: The Court has reviewed the parties' joint letter proposing a briefing schedule and explaining the parties' respective positions on whether discovery should be stayed pending the disposition of Defendants' contemplated motion to dismiss. (Doc. No. 37.) Accordingly, IT IS HEREBY ORDERED THAT Defendants' opening brief is due by Friday, March 30, 2018, Plaintiff's opposition brief is due by Thursday, May 24, 2018, and Defendants' reply brief is due by Monday, June 11, 2018. IT IS FURTHER ORDERED THAT discovery will be stayed pending the disposition of Defendants' motion to dismiss the amended complaint. The Court is confident that neither party will be prejudiced by such a stay and that discovery will proceed more efficiently when there is greater clarity as to the viable causes of action in the amended complaint. ( Motions due by 3/30/2018., Responses due by 5/24/2018, Replies due by 6/11/2018.) (Signed by Judge Richard J. Sullivan on 3/5/2018) (mro) (Entered: 03/06/2018) |
| 03/21/2018 | 39 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated March 21, 2018 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 03/21/2018) |
| 03/21/2018 | 40 | MEMO ENDORSEMENT on re: 39 Letter, filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan. ENDORSEMENT: Although the Court is not at all persuaded that 40-page briefs are warranted, the parties seem determined to litigate this case extravagantly, and apparently have the time and resources to do so. Accordingly, the parties' request for a 15-page extension is granted. Nevertheless, because the Court remains concerned that the parties' over-sized briefs will be tailored more to the court of public opinion than to the United States District Court for the Southern District of New York, the Court reminds the parties that their submissions shall be limited to argument and authorities relevant to the pending motion. (Signed by Judge Richard J. Sullivan on 3/21/2018) (ras) (Entered: 03/22/2018) |
| 03/30/2018 | 41 | MOTION to Dismiss Plaintiff's Amended Complaint. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 03/30/2018) |

| | | |
|---|---|---|
| 03/30/2018 | 42 | MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*. . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Mastro, Randy) (Entered: 03/30/2018) |
| 03/30/2018 | 43 | DECLARATION of Sarah L. Kushner in Support re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*.. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Exhibit 1- ESPN Broadcast, # 2 Exhibit 2- MSG Footage, # 3 Exhibit 3- NYT's Video, # 4 Exhibit 4- YouTube Video, # 5 Exhibit 5- Security Footage, # 6 Exhibit 6- ESPN Interview, # 7 Exhibit 7- Criminal Complaint, # 8 Exhibit 8- Trespass Notice, # 9 Exhibit 9- Nev. D. Ct. Pleading Excerpts, # 10 Exhibit 10- Nev. D. Ct. Complaint, # 11 Exhibit 11- Oakley Website Information, # 12 Exhibit 12- Rebound Institute Website Information, # 13 Exhibit 13- Rebound Institute Twitter Information, # 14 Exhibit 14- Ticket Language, # 15 Exhibit 15- Email Chain)(Mastro, Randy) (Entered: 03/30/2018) |
| 03/30/2018 | 44 | DECLARATION of Jim Walden in Support re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*.. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Mastro, Randy) (Entered: 03/30/2018) |
| 04/03/2018 | 45 | NOTICE OF CHANGE OF ADDRESS by James Walden on behalf of All Defendants. New Address: Walden Macht & Haran LLP, One Battery Park Plaza, 34th Floor, New York, New York, United States of America 10004, (212) 335-2031. (Walden, James) (Entered: 04/03/2018) |
| 05/10/2018 | 46 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated May 10, 2018 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Attachment A, # 2 Attachment B)(Mastro, Randy) (Entered: 05/10/2018) |
| 05/17/2018 | 47 | LETTER addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated May 17, 2018 re: Request for Additional Pages. Document filed by Charles Oakley. (Attachments: # 1 Exhibit A (May 17, 2018 Email))(Wigdor, Douglas) (Entered: 05/17/2018) |
| 05/17/2018 | 49 | MEMO ENDORSEMENT on re: 47 Letter filed by Charles Oakley. ENDORSEMENT: Plaintiff's request for an additional five pages is denied; however, Plaintiff may use the same font sizes, margins, and spacing as Defendants used in their opening brief. (Signed by Judge Richard J. Sullivan on 5/17/2018) (ras) (Entered: 05/18/2018) |
| 05/18/2018 | 48 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated May 17, 2018 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 05/18/2018) |
| 05/24/2018 | 50 | MEMORANDUM OF LAW in Opposition re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*. . Document filed by Charles Oakley. (Varghese, Renan) (Entered: 05/24/2018) |
| 05/24/2018 | 51 | DECLARATION of Renan F. Varghese in Opposition re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*.. Document filed by Charles Oakley. (Attachments: # 1 Exhibit 1 (January 12, 2018 Court Transcript))(Varghese, Renan) (Entered: 05/24/2018) |
| 05/29/2018 | 52 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated May 29, 2018 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 05/29/2018) |
| 05/30/2018 | 53 | MEMO ENDORSEMENT on re: 52 Letter, filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan. ENDORSEMENT: IT IS HEREBY ORDERED THAT Defendants may have an additional five pages, for a total of fifteen pages, for their reply brief. SO ORDERED. (Signed by Judge Richard J. Sullivan on 5/30/2018) (rro) (Entered: 05/31/2018) |
| 06/11/2018 | 54 | REPLY MEMORANDUM OF LAW in Support re: 41 MOTION to Dismiss *Plaint₁j f's Amended Complaint*. . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Mastro, Randy) (Entered: 06/11/2018) |
| 06/11/2018 | 55 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 06/11/2018) |
| 03/13/2019 | 56 | LETTER addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated March 13, 2019 re: Oakley v. Dolan. Document filed by Charles Oakley. (Attachments: # 1 Exhibit A - Fan Video, # 2 Exhibit B - New York Post Article) (Wigdor, Douglas) (Entered: 03/13/2019) |
| 03/13/2019 | 57 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated March 13, 2019 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual |

SDNY CM/ECF NextGen Version 1.6

|  |  |  |
|---|---|---|
|  |  | capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 03/13/2019) |
| 07/29/2019 | 58 | LETTER addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated July 29, 2019 re: Oakley v. Dolan. Document filed by Charles Oakley.(Wigdor, Douglas) (Entered: 07/29/2019) |
| 07/30/2019 | 59 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated July 30, 2019 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 07/30/2019) |
| 09/04/2019 | 60 | NOTICE OF APPEARANCE by Nelson Andrew Boxer on behalf of Charles Oakley. (Boxer, Nelson) (Entered: 09/04/2019) |
| 09/04/2019 | 61 | LETTER MOTION for Discovery addressed to Judge Richard J. Sullivan from Douglas H. Wigdor dated September 4, 2019. Document filed by Charles Oakley.(Wigdor, Douglas) (Entered: 09/04/2019) |
| 09/05/2019 | 62 | ORDER denying 61 Letter Motion for Discovery. Because the Court will rule on Defendants' motion to dismiss imminently, IT IS HEREBY ORDERED THAT Plaintiff's motion to vacate the stay of discovery is DENIED. So Ordered. (Signed by Judge Richard J. Sullivan on 9/5/19) (yv) (Entered: 09/05/2019) |
| 11/15/2019 | 63 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated November 15, 2019 re: Oakley v. Dolan, et al., 17 Civ. 6903 (RJS). Document filed by Charles Oakley.(Boxer, Nelson) (Entered: 11/15/2019) |
| 11/18/2019 | 64 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated November 18, 2019 re: Oakley v. Dolan, et al., 17-cv-6903 (RJS). Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company.(Mastro, Randy) (Entered: 11/18/2019) |
| 01/29/2020 | 65 | LETTER MOTION for Discovery addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated January 29, 2020. Document filed by Charles Oakley.(Boxer, Nelson) (Entered: 01/29/2020) |
| 01/29/2020 | 66 | LETTER RESPONSE in Opposition to Motion addressed to Judge Richard J. Sullivan from Randy M. Mastro dated January 29, 2020 re: 65 LETTER MOTION for Discovery addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated January 29, 2020. . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Mastro, Randy) (Entered: 01/29/2020) |
| 02/19/2020 | 67 | ORDER denying 65 Letter Motion for Discovery. On September 5, 2019, the Court denied Plaintiff's September 4, 2019 motion to vacate the stay of discovery in this matter. (Doc. No. 62.) Plaintiff now moves the Court to reconsider that denial. Plaintiff's motion for reconsideration is untimely and is therefore DENIED. (See S.D. N. Y. Local Civil Rule 6.3.) To the extent that Plaintiff's letter can be construed as a new motion to vacate the stay order, that request is also DENIED as moot in light of the Court's opinion and order granting Defendants' motion to dismiss issued tandem with this order. The Clerk of Court is respectfully directed at document number 65. So Ordered. (Signed by Judge Richard J. Sullivan on 2/19/20) (yv) (Entered: 02/19/2020) |
| 02/19/2020 | 68 | OPINION AND ORDER re: 41 MOTION to Dismiss *Plaint¡;f's Amended Complaint.* filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan. IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED. IT IS FURTHER ORDERED THAT Oakley's request for leave to file another amended complaint is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at document number 41 and to close this case. SO ORDERED. (Signed by Judge Richard J. Sullivan, Sitting by Designation on 2/19/20) (yv) Transmission to Orders and Judgments Clerk for processing. (Entered: 02/19/2020) |
| 02/20/2020 | 69 | CLERK'S JUDGMENT re: 68 Memorandum & Opinion in favor of MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company, James Dolan against Charles Oakley. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated February 19, 2020, Defendants' motion to dismiss is GRANTED. Oakleys request for leave to file another amended complaint is DENIED; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 2/20/2020) (Attachments: # 1 Right to Appeal) (km) (Entered: 02/20/2020) |
| 02/20/2020 | 70 | NOTICE OF APPEAL from 68 Memorandum & Opinion,, 69 Clerk's Judgment,,. Document filed by Charles Oakley. Filing fee $ 505.00, receipt number ANYSDC-18863736. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Wigdor, Douglas) (Entered: 02/20/2020) |
| 02/20/2020 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 70 Notice of Appeal. (tp) (Entered: 02/20/2020) |
| 02/20/2020 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 70 Notice of Appeal, filed by Charles Oakley were transmitted to the U.S. Court of Appeals. (tp) (Entered: 02/20/2020) |
| 11/16/2020 | 71 | USCA OPINION (Certified) as to 70 Notice of Appeal, filed by Charles Oakley USCA Case Number 20-642. Appeal from a judgment of the District Court for the Southern District of New York (Richard J. Sullivan, Judge), dismissing an amended complaint brought by Charles Oakley against MSG Networks, Inc., The Madison Square Garden |

| | | |
|---|---|---|
| | | Company, and MSG Sports & Entertainment, LLC and James Dolan. Reversed and remanded as to causes of action for assault and battery; affirmed as to all other causes of action in a summary order filed this date.. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 11/16/2020. (Attachments: # 1 Summary Order).(nd) (Entered: 11/16/2020) |
| 11/16/2020 | | Transmission of USCA Opinion to the District Judge re: 71 USCA Opinion,,..(nd) (Entered: 11/16/2020) |
| 11/25/2020 | 72 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated November 25, 2020 re: request for a pre-motion conference. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 11/25/2020) |
| 11/30/2020 | 73 | ORDER. Defendants' request for a pre-motion conference and stay of discovery is DENIED without prejudice to renewal following issuance of the Second Circuit's mandate. So Ordered. (Signed by Judge Richard J. Sullivan, Sitting by Designation on 11/25/20) (yv) (Entered: 11/30/2020) |
| 12/07/2020 | 74 | MANDATE of USCA (Certified Copy) as to 70 Notice of Appeal, filed by Charles Oakley USCA Case Number 20-0642. IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment is REVERSED as to the causes of action for assault and battery and AFFIRMED as to other causes of action discussed in the accompanying summary order, and the case is REMANDED for further proceedings consistent with this Court's opinion. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 12/7/2020. (Attachments: # 1 OPINION, # 2 Summary Order). (tp) (Entered: 12/07/2020) |
| 12/07/2020 | | Transmission of USCA Mandate/Order to the District Judge re: 74 USCA Mandate. (tp) (Entered: 12/07/2020) |
| 12/07/2020 | 75 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 7, 2020 re: request for a pre-motion conference. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 12/07/2020) |
| 12/08/2020 | 76 | ORDER, IT IS HEREBY ORDERED THAT Plaintiff shall file a responsive letter by Friday, December 11, 2020. IT IS FURTHER ORDERED THAT the parties shall appear for a video conference on Friday, December 18, 2020 at 11:00 a.m. The Court will issue a separate order containing instructions for the parties to access the video conference and for members of the public to monitor the proceedings. SO ORDERED.( Telephone Conference set for 12/18/2020 at 11:00 AM before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/8/20) (yv) (Entered: 12/08/2020) |
| 12/08/2020 | 77 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated 12/08/2020 re: Oakley v. Dolan, et al., 17-cv-06903 (RJS). Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 12/08/2020) |
| 12/08/2020 | 78 | MEMO ENDORSEMENT on re: 77 Letter informing the Court that, unless there is objection from the Court, Allen, will be working with him on (and will file a Notice of Appearance in) this matter filed by Charles Oakley. ENDORSEMENT: As Mr. Allen was a student extern in the Court's chambers before the commencement of this case, and because Defendants do not object to his involvement, IT IS HEREBY ORDERED, that Mr. Allen may represent Plaintiff in this matter. So Ordered. (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/8/20) (yv) (Entered: 12/09/2020) |
| 12/09/2020 | 79 | ORDER. As indicated in the Court's previous order (Doc. No. 76), a conference in this matter is scheduled for Friday, December 18, 2020 at 11:00 a.m. In light of the ongoing COVID-19 pandemic and Chief Judge McMahon's most recent order regarding the curtailment of proceedings at the Courthouse (Standing Order at 1, Nov. 30, 2020), the conference shall take place via Skype for Business videoconference. No later than 5:00 p.m. on Wednesday, December 16, 2020, the parties shall jointly email to the Court a list of the names and email addresses of persons who anticipate speaking during the videoconference, as well as the phone numbers of those who will be participating via telephone conference. Chambers will email the parties directly in due course with further instructions for accessing the videoconference. Members of the public may monitor the conference via the Court's free audio line by dialing 1-888-363-4749 and using access code 3290725#. SO ORDERED. (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/9/20) (yv) (Entered: 12/09/2020) |
| 12/09/2020 | 80 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 9, 2020 re: rescheduling of the video conference date. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 12/09/2020) |
| 12/10/2020 | 81 | MEMO ENDORSEMENT on re: 80 Letter rescheduling of the video conference date, filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan. ENDORSEMENT: IT IS HEREBY ORDERED THAT the pre-motion conference in this matter will instead take place on Tuesday, December 22, 2020 at 10:00 a.m. via the Skype for Business videoconference system. No later than 5:00 p.m. on Friday, December 18, 2020, the parties shall jointly email to the Court a list of the names and email addresses of persons who anticipate speaking during the videoconference, as well as the phone numbers of those who will be participating via telephone conference. Chambers will email the parties directly in due course with further instructions for accessing the videoconference. Members of the public may monitor the conference via the Court's free audio line by dialing 1-888-363-4749 and using access code 3290725#. SO ORDERED., ( Telephone Conference set for 12/22/2020 at 10:00 |

| | | |
|---|---|---|
| | | AM before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/10/20) (yv) (Entered: 12/10/2020) |
| 12/11/2020 | 82 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated 12/11/2020 re: Opposition to Request to Move for Summary Judgment and Discovery Stay. Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 12/11/2020) |
| 12/11/2020 | 83 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated 12/11/2020 re: Request to Move to File an Amended Complaint. Document filed by Charles Oakley. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Boxer, Nelson) (Entered: 12/11/2020) |
| 12/14/2020 | 84 | MEMO ENDORSEMENT on re: 83 Letter filed by Charles Oakley. ENDORSEMENT: In accordance with Rule 2.A. of the Court's Individual Rules and Practices, IT IS HEREBY ORDERED THAT Defendants shall file a response to this letter by Thursday, December 17, 2020. Plaintiff's anticipated motion to amend his complaint will be discussed along with Defendants' anticipated motion for summary judgment at the pre-motion conference on December 22, 2020 at 10:00 a.m. SO ORDERED. (Signed by Judge Richard J. Sullivan on 12/14/2020) (ks) (Entered: 12/14/2020) |
| 12/15/2020 | 85 | NOTICE OF APPEARANCE by Nelson Andrew Boxer on behalf of Charles Oakley..(Boxer, Nelson) (Entered: 12/15/2020) |
| 12/17/2020 | 86 | NOTICE OF APPEARANCE by Declan Thomas Conroy on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Conroy, Declan) (Entered: 12/17/2020) |
| 12/17/2020 | 87 | MOTION for SARAH L. KUSHNER to Withdraw as Attorney . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Declaration of Randy M. Mastro, # 2 Text of Proposed Order). (Mastro, Randy) (Entered: 12/17/2020) |
| 12/17/2020 | 88 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 17, 2020 re: response to Plaintiff's request for leave to file a Second Amended Complaint. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 12/17/2020) |
| 12/21/2020 | 89 | ORDER granting 87 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED THAT Defendants' motion is granted, and the appearance of Ms. Kushner is withdrawn as of the date of this Order. SO ORDERED. ( Attorney Sarah L. Kushner terminated.) (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/21/20) (yv) Modified on 1/21/2021 (yv). (Entered: 12/22/2020) |
| 12/22/2020 | | Minute Entry for proceedings held before Judge Richard J. Sullivan: Pre-Motion Conference held on 12/22/2020. Pre-motion conference held via Skype for Business. Attorneys Douglas Wigdor and Nelson Boxer present on behalf of Plaintiff (by video). Attorneys Randy Mastro and Declan Conroy present on behalf of Defendants (by video). Court reporter present (by telephone). The parties addressed Plaintiffs anticipated motion to amend his complaint and Defendants anticipated motion for summary judgment. The Court will issue a separate order setting forth the briefing schedule discussed during the conference and addressing Defendants request for a stay of discovery pending resolution of their motion for summary judgment.(Miller, Arielle) (Entered: 12/22/2020) |
| 12/22/2020 | 90 | ORDER, IT IS HEREBY ORDERED THAT the parties shall comply with the following briefing schedule on their contemplated motions: (1) by Friday, January 22, 2021, Plaintiff shall file his motion to amend his complaint and supporting brief, and Defendants shall file their motion for summary judgment and supporting brief and Rule 56.1 statement; (2) by Friday, February 19, 2021, each party shall file its opposition to the relevant motions; and (3) by Tuesday, March 2, 2021, each party shall file its reply brief. In the event that any party wishes to submit video evidence in connection with the motion for summary judgment, such videos shall be submitted in one of the following readily accessible file formats: MP4, MOV, WMV, FLV, or AVI. IT IS FURTHER ORDERED THAT discovery will be stayed pending the disposition of Defendants' motion for summary judgment. The Court finds that neither party will be prejudiced by such a stay, as Plaintiff may oppose summary judgment on the grounds that additional discovery is necessary, pursuant to Federal Rule of Civil Procedure 56(d). See, e.g., Papazian v. Sony Music Ent., No. 16-cv-07911 (RJS), 2017 WL 4339662, at *2 (S.D.N.Y. Sept. 28, 2017) ("Under Rule 56(d), the Court may order a continuance if a party opposing summary judgment shows by affidavit that it cannot present facts essential to justify its opposition to the motion" (internal quotation marks and alteration omitted)). SO ORDERED. ( Motions due by 1/22/2021., Responses due by 2/19/2021, Replies due by 3/2/2021.) (Signed by Judge Richard J. Sullivan, Sitting by Designation on 12/22/20) (yv) Modified on 1/21/2021 (yv). (Entered: 12/23/2020) |
| 12/24/2020 | 91 | LETTER MOTION to Stay *Defendants' time to serve their answer to Plaintiff's Amended Complaint* addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 24, 2020. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 12/24/2020) |
| 12/28/2020 | 92 | ORDER terminating 91 Letter Motion to Stay. IT IS HEREBY ORDERED THAT Defendants shall serve their answer to Plaintiff's Amended Complaint by Monday, January 11, 2021. The Court will consider any further extension once Defendants' counsel has learned of Plaintiff's position regarding any such extension. SO ORDERED. (Signed by Judge Richard J. Sullivan on 12/28/2020) (mml) (Entered: 12/28/2020) |

| | | |
|---|---|---|
| 12/29/2020 | 93 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/22/2020 before Judge Richard J. Sullivan. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/19/2021. Redacted Transcript Deadline set for 1/29/2021. Release of Transcript Restriction set for 3/29/2021..(McGuirk, Kelly) (Entered: 12/29/2020) |
| 12/29/2020 | 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/22/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 12/29/2020) |
| 01/05/2021 | 95 | LETTER MOTION to Stay re: 36 Amended Complaint, - *Defendants' time to serve their answer to Plaintiff's Amended Complaint* addressed to Judge Richard J. Sullivan from Randy M. Mastro dated January 5, 2021. Document filed by James Dolan (in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/05/2021) |
| 01/05/2021 | 96 | MEMO ENDORSEMENT on re: 95 LETTER MOTION to Stay re: 36 Amended Complaint, - *Defendants' time to serve their answer to Plaintiff's Amended Complaint* addressed to Judge Richard J. Sullivan from Randy M. Mastro dated January 5, 2021. filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan. ENDORSEMENT: IT IS HEREBY ORDERED THAT Plaintiff shall submit a response to this letter by Friday, January 8, 2021, setting forth his reasons for opposing Defendants' request to extend their time to answer Plaintiff's Amended Complaint until two weeks after disposition of Defendants' motion for summary judgment. So Ordered., ( Responses due by 1/8/2021) (Signed by Judge Richard J. Sullivan, Sitting by Designation on 1/5/21) (yv) (Entered: 01/06/2021) |
| 01/06/2021 | 97 | NOTICE OF APPEARANCE by Akiva Shapiro on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Shapiro, Akiva) (Entered: 01/06/2021) |
| 01/06/2021 | 98 | NOTICE OF APPEARANCE by Grace Elizabeth Hart on behalf of James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Hart, Grace) (Entered: 01/06/2021) |
| 01/08/2021 | 99 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated January 8, 2021 re: Plaintiff Opposition. Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 01/08/2021) |
| 01/11/2021 | 100 | ORDER granting 95 Letter Motion to Stay. Defendants' request to stay their obligation to file an answer until after the Court resolves their motion for summary judgment is GRANTED. SO ORDERED. (Signed by Judge Richard J. Sullivan, Sitting by Designation on 1/11/21) (yv) (Entered: 01/11/2021) |
| 01/22/2021 | 101 | SUPPLEMENTAL RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent The Madison Square Garden Company, Corporate Parent Madison Square Garden Entertainment Corp. for MSG Sports & Entertainment, LLC. Document filed by MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/22/2021) |
| 01/22/2021 | 102 | MOTION for Summary Judgment . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/22/2021) |
| 01/22/2021 | 103 | MEMORANDUM OF LAW in Support re: 102 MOTION for Summary Judgment . . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/22/2021) |
| 01/22/2021 | 104 | DECLARATION of Randy M. Mastro in Support re: 102 MOTION for Summary Judgment .. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Exhibit 1- ESPN Broadcast, # 2 Exhibit 2- MSG Footage, # 3 Exhibit 3- NYT's Video, # 4 Exhibit 4- YouTube Video, # 5 Exhibit 5- MSG Security Footage, # 6 Exhibit 6- Ticket Language).(Mastro, Randy) (Entered: 01/22/2021) |
| 01/22/2021 | 105 | RULE 56.1 STATEMENT. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/22/2021) |
| 01/22/2021 | 106 | MOTION for Leave to File Second Amended Complaint . Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 01/22/2021) |
| 01/22/2021 | 107 | MEMORANDUM OF LAW in Support re: 106 MOTION for Leave to File Second Amended Complaint . . Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 01/22/2021) |
| 01/22/2021 | 108 | DECLARATION of Renan F. Varghese in Support re: 106 MOTION for Leave to File Second Amended Complaint .. Document filed by Charles Oakley. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Varghese, Renan) (Entered: 01/22/2021) |

A-13

| | | |
|---|---|---|
| 02/19/2021 | 109 | MEMORANDUM OF LAW in Opposition re: 106 MOTION for Leave to File Second Amended Complaint . . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 02/19/2021) |
| 02/19/2021 | 110 | MEMORANDUM OF LAW in Opposition re: 102 MOTION for Summary Judgment . . Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 02/19/2021) |
| 02/19/2021 | 111 | RULE 56.1 STATEMENT. Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 02/19/2021) |
| 02/19/2021 | 112 | DECLARATION of Douglas H. Wigdor in Opposition re: 102 MOTION for Summary Judgment .. Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 02/19/2021) |
| 02/19/2021 | 113 | DECLARATION of Renan F. Varghese in Opposition re: 102 MOTION for Summary Judgment .. Document filed by Charles Oakley. (Attachments: # 1 Exhibit A).(Varghese, Renan) (Entered: 02/19/2021) |
| 02/19/2021 | 114 | DECLARATION of Charles Oakley in Opposition re: 102 MOTION for Summary Judgment .. Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 02/19/2021) |
| 02/22/2021 | 115 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Richard J. Sullivan from Renan F. Varghese dated February 22, 2021. Document filed by Charles Oakley..(Varghese, Renan) (Entered: 02/22/2021) |
| 02/23/2021 | 116 | ORDER granting 115 Letter Motion for Extension of Time to File Response/Reply re 115 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Richard J. Sullivan from Renan F. Varghese dated February 22, 2021., 102 MOTION for Summary Judgment ., 106 MOTION for Leave to File Second Amended Complaint . IT IS HEREBY ORDERED THAT Plaintiff's request for an extension is GRANTED. Both parties' respective reply briefs shall be submitted by March 9, 2021. SO ORDERED. ( Replies due by 3/9/2021.) (Signed by Judge Richard J. Sullivan on 2/23/21) (yv) (Entered: 02/23/2021) |
| 03/09/2021 | 117 | REPLY MEMORANDUM OF LAW in Support re: 106 MOTION for Leave to File Second Amended Complaint . . Document filed by Charles Oakley..(Wigdor, Douglas) (Entered: 03/09/2021) |
| 03/09/2021 | 118 | REPLY MEMORANDUM OF LAW in Support re: 102 MOTION for Summary Judgment . . Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 03/09/2021) |
| 03/09/2021 | 119 | DECLARATION of DECLAN T. CONROY in Support re: 102 MOTION for Summary Judgment .. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company. (Attachments: # 1 Exhibit 1 - Video Clip (to be filed and served in hard copy)).(Conroy, Declan) (Entered: 03/09/2021) |
| 03/09/2021 | 120 | COUNTER STATEMENT TO 111 Rule 56.1 Statement. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 03/09/2021) |
| 11/08/2021 | 121 | OPINION AND ORDER re: 102 MOTION for Summary Judgment . filed by The Madison Square Garden Company, MSG Sports & Entertainment, LLC, MSG Networks, Inc., James Dolan, 106 MOTION for Leave to File Second Amended Complaint . filed by Charles Oakley. For the past three years, much ink has been spilled describing and characterizing what transpired between Charles Oakley and the security guards tasked with escorting him from Madison Square Garden during a Knicks game in February 2017. These descriptions and characterizations have had their place in the pleadings, in the Defendants' motions to dismiss, and on appeal. But at this stage of the proceedings, the case is no longer about words. It's about evidence. And the undisputed video evidence conclusively demonstrates that the Garden's security guards did not use excessive force as they escorted Oakley from the arena. To the contrary, the video clearly shows that: (1) the guards asked Oakley to leave; (2) they gave him a chance to leave; and (3) when he refused to leave, and in fact escalated the confrontation, they removed him from the Garden by using a degree of force that was indisputably reasonable and appropriate under the circumstances. No rational jury could conclude otherwise, and Oakley's previously offered versions of the events are so blatantly contradicted by the [video] record... that no reasonable jury could believe [them]. Scott, 550 U.S. at 380. Therefore, for the reasons stated above, IT IS HEREBY ORDERED THAT Defendants' motion for summary judgment is GRANTED. IT IS FURTHER ORDERED THAT Oakley's request for leave to file another amended complaint is DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 102 and 106 and to close this case. SO ORDERED. Sitting by Designation. (Signed by Judge Richard J. Sullivan on 11/8/2021) (ate) (Entered: 11/08/2021) |
| 11/08/2021 | | Terminate Transcript Deadlines (ate) (Entered: 11/08/2021) |
| 11/08/2021 | | Transmission to Orders and Judgments Clerk. Transmitted re: 121 Memorandum & Opinion, to the Orders and Judgments Clerk. (ate) (Entered: 11/22/2021) |
| 11/22/2021 | 122 | CLERK'S JUDGMENT re: 121 Memorandum & Opinion, in favor of MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company, James Dolan against Charles Oakley. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated November 8, 2021, Defendants' motion for summary judgment is GRANTED. IT IS FURTHER ORDERED THAT |

|  |  |  |
|---|---|---|
|  |  | Oakley's request for leave to file an amended complaint is DENIED; accordingly, this case is closed. (Signed by Clerk of Court Ruby Krajick on 11/22/2021) (Attachments: # 1 Notice of Right to Appeal) (dt) (Entered: 11/22/2021) |
| 11/24/2021 | 123 | NOTICE OF APPEAL from 122 Clerk's Judgment,, 121 Memorandum & Opinion,,,,,,,. Document filed by Charles Oakley. Filing fee $ 505.00, receipt number ANYSDC-25381687. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Wigdor, Douglas) Modified on 11/24/2021 (nd). (Entered: 11/24/2021) |
| 11/24/2021 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 123 Notice of Appeal,..(nd) (Entered: 11/24/2021) |
| 11/24/2021 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 123 Notice of Appeal, filed by Charles Oakley were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/24/2021) |
| 11/29/2021 | 124 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated November 29, 2021 re: pre-motion conference on sanctions. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 11/29/2021) |
| 12/02/2021 | 125 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated 12/2/2021 re: Plaintiff's Response to Defendants' Letter seeking a Pre-Motion Conference for their anticipated Motion for Sanctions. Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 12/02/2021) |
| 12/03/2021 | 126 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated December 3, 2021 re: pre-motion conference on sanctions. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 12/03/2021) |
| 12/03/2021 | 127 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated 12/3/2021 re: Opposition to Document 126. Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 12/03/2021) |
| 12/20/2021 | 128 | ORDER: The Court is in receipt of Defendants' letter, dated November 29, 2021, requesting a conference to discuss a potential motion for sanctions (Doc. No. 124), as well as Plaintiff's response, dated December 2, 2021 (Doc. No. 125), and additional letters by both parties dated December 3, 2021 (Doc Nos. 126, 127). IT IS HEREBY ORDERED that the parties shall appear before the Court on Monday, January 3, 2022, at 11:00 a.m., for a pre-motion conference. The conference shall take place in Courtroom 21C at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007. Members of the public may monitor the proceeding either in-person in Courtroom 21C or via the Court's free audio line by dialing 1-888-363-4749 and using access code 3290725#. SO ORDERED., ( Pre-Motion Conference set for 1/3/2022 at 11:00 AM in Courtroom 21C, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan on 12/20/2021) (ama) (Entered: 12/20/2021) |
| 12/22/2021 | 129 | NOTICE OF APPEARANCE by Michael Steven Ross on behalf of Douglas H. Wigdor..(Ross, Michael) (Entered: 12/22/2021) |
| 01/01/2022 | 130 | NOTICE OF APPEARANCE by Eugene Alexander Gormakh on behalf of Douglas H. Wigdor..(Gormakh, Eugene) (Entered: 01/01/2022) |
| 01/01/2022 | 131 | ORDER: As previously ordered (Doc. No. 128), the Court will conduct a pre-motion conference on Monday, January 3, 2022 at 11:00 a.m. in connection with Defendants' contemplated motion for sanctions. In light of the recent surge in COVID-19 cases, IT IS HEREBY ORDERED THAT the conference will take place via ZoomGov videoconference. The Court will email the parties directly with instructions for accessing the conference in due course. No later than 9:00 a.m. on January 3, 2022, the parties shall email to the Court a list of the names and email addresses of persons who anticipate speaking during the videoconference, as well as the phone numbers of those who will be participating via telephone conference. Members of the public may monitor the conference via the Court's free audio line by dialing 1-888-363-4749 and using access code 3290725#. Sitting by Designation. (Signed by Judge Richard J. Sullivan on 12/30/2021) (ate) (Entered: 01/03/2022) |
| 01/03/2022 | 132 | Minute Entry for proceedings held before Judge Richard J. Sullivan: Pre-Motion Conference held on 1/3/2022. Pre-motion conference held via ZoomGov videoconference. Attorneys Nelson Boxer, Michael Ross, Eugene Gormakh, Renan Varghese, and John Allen present on behalf of Plaintiff (by video). Attorneys Randy Mastro, Akiva Shapiro, and Declan T. Conroy present on behalf of Defendants (by video). Court reporter present (by telephone). The parties addressed Defendants' contemplated motion for sanctions. The Court directed the parties to submit a joint letter within seven days of the 2nd Circuit's resolution of Plaintiff's pending appeal.(Court Reporter Steven Greenblum)(Submitted by RJS Chambers) (Entered: 01/03/2022) |
| 01/04/2022 | 133 | LETTER addressed to Judge Richard J. Sullivan from Randy M. Mastro dated January 4, 2022 re: delay of formal filing of sanctions motion. Document filed by James Dolan(in his professional capacity), James Dolan(in his individual capacity), MSG Networks, Inc., MSG Sports & Entertainment, LLC, The Madison Square Garden Company..(Mastro, Randy) (Entered: 01/04/2022) |
| 01/05/2022 | 134 | LETTER addressed to Judge Richard J. Sullivan from Nelson A. Boxer dated January 5, 2022 re: Timing of Defendant's Rule 11 motion. Document filed by Charles Oakley..(Boxer, Nelson) (Entered: 01/05/2022) |
| 01/11/2022 | 135 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/3/2022 before Judge Richard J. Sullivan. Court |

A-15

| | | |
|---|---|---|
| | | Reporter/Transcriber: Steven Greenblum, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/1/2022. Redacted Transcript Deadline set for 2/11/2022. Release of Transcript Restriction set for 4/11/2022..(Moya, Goretti) (Entered: 01/11/2022) |
| 01/11/2022 | 136 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/3/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 01/11/2022) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 02/08/2022 10:54:37 | | |
| PACER Login: | dhwigdor1 | Client Code: | 24029 |
| Description: | Docket Report | Search Criteria: | 1:17-cv-06903-RJS |
| Billable Pages: | 20 | Cost: | 2.00 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
CHARLES OAKLEY,                                  :
                                                 :
                          Plaintiff,             :     Civil Case No.:
                                                 :
          v.                                     :
                                                 :     **COMPLAINT**
JAMES DOLAN, in his individual and professional  :
capacities, MSG NETWORKS, INC., THE MADISON      :
SQUARE GARDEN COMPANY and MSG SPORTS &           :     **Jury Trial Demanded**
ENTERTAINMENT, LLC,                              :
                                                 :
                          Defendants.            :
-----------------------------------------------------------------------X

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

## PRELIMINARY STATEMENT

1.        Charles Oakley, or "Oak," as he is often referred to by adoring fans of the New

York Knicks (the "Knicks"), was the heart and soul of one of the most successful periods in the

history of the franchise, one which saw the Knicks assume their place among the most successful

teams in the NBA.

2.        While he never specialized in the type of flashy plays of some of his more famous

contemporaries, countless Knicks fans who experienced the gritty and successful teams of the

1990s undoubtedly have memories of Mr. Oakley going toe to toe with some of the legends of

the sport, single name icons such as "Michael," "Reggie" and "Magic."  What became the

hallmark of Mr. Oakley's career was that, no matter how famous the opponent, he never backed

down and defended the lane at Madison Square Garden (the "Garden") as if he were protecting

his own home.  This passion, commitment and toughness made Mr. Oakley a legend in New

York, and especially among Knicks fans.

3.      However, one person who could not abide by Mr. Oakley's refusal to meekly submit to people in positions of power was Defendant James Dolan, who inherited control of the Knicks from his father a year after Mr. Oakley's career with the team came to an end.  Whether it was because of resentment for Mr. Oakley's passionate following among Knicks fans, anger that Mr. Oakley would not "kiss the ring" of the heir to the Madison Square Garden empire, or petty insecurities driven by his own personal demons, Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his hand during meetings, denying him the type of fan appreciation nights given to much less popular and successful members of the Knicks, and even making him purchase his own tickets to attend games at the arena he called home for a decade.

4.      Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley returned to the Garden to watch a Knicks game.  Within minutes of unobtrusively taking his seat, Defendant Dolan directed that security forcibly remove Mr. Oakley from the Garden and publicly embarrass him on live television.  Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely.  Despite his immense contributions to the franchise, Mr. Oakley was treated like a common criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "MSG").

5.      As if their public mistreatment of Mr. Oakley was not embarrassing and shameful enough, over the ensuing days Defendants Dolan and MSG launched a coordinated and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating these blatant lies about Mr. Oakley, Defendants Dolan and MSG have caused irreparable harm to his

name and career and discriminated against him based on the false perception that he is an alcoholic, all in a transparent attempt to denigrate his standing among Knicks fans. However, as he did throughout his playing career, Mr. Oakley has refused to walk to the bench in shame. Instead, holding his head up high, Mr. Oakley files this Complaint to set the record straight and to hold Defendants responsible for their reprehensible conduct.

6.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.* ("ADA"), the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL") and the New York City Human Rights Law, New York City Administrative Code §§ 8-101, *et seq.* ("NYCHRL"), as well as various state tort laws.

## PARTIES

7.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the NBA, and a resident of the State of Ohio.

8.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

9.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121. At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza,

3

New York, New York 10121.  At all relevant times, The Madison Square Garden Company owned and operated Madison Square Garden and the New York Knicks.

11.      Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned and operated Madison Square Garden and the New York Knicks.

## JURISDICTION AND VENUE

12.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

13.      The Court further has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a ).

14.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

## I.      MR. OAKLEY'S LEGENDARY CAREER FOR THE NEW YORK KNICKS

15.      Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on June 27, 1988.

16.      Over the next ten years, Mr. Oakley was instrumental in ushering in one of the most successful eras in Knicks history.

4

17.      At the time of the trade, the Knicks, once one of the NBA's premier franchises in its largest market, had fallen into disarray, having advanced as far as the second round of the playoffs only twice in the previous ten years.

18.      Though the kind of highlight reel dunks and no look passes that made stars of other players in the league were not part of Mr. Oakley's game, his talents – defense, an indomitable will to win and hardnosed play – made him a fan favorite and the engine driving the Knicks' resurgence.

19.      Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed their most sustained run of excellence and reassumed their place among the league's elite teams, making the second round of the playoffs every single year except for one while Mr. Oakley was on the team, in large part due directly to his contributions.

20.      By way of example, in 1994 – a season during which Mr. Oakley was instrumental in leading the Knicks to within one win of a NBA championship – he was both named to the All-Defensive First Team and appeared in the NBA All-Star Game.

21.      Additionally, Mr. Oakley was named to the All-Defensive First Team in 1998, his final year with the franchise.

22.      Even now, nearly two decades after he stopped playing for the Knicks, Mr. Oakley ranks among the top three players in franchise history in offensive rebounds, defensive rebounds, minutes played and steals, making him inarguably the greatest power forward in Knicks history.

23.      Put simply, Mr. Oakley is an iconic figure in Knicks history, whose name is synonymous with the widely celebrated 1990s-era Knicks.

**II.     DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES**

24.     In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

25.     Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premiere teams, winning only a single lone playoff series since the turn of the century.

26.     Indeed, the Knicks have unfortunately become a laughingstock in the NBA, decried for their incompetence both on and off the court.

27.     The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained of having been sexually harassed by the then-coach of the Knicks.

28.     In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from him for his unlawful conduct.

29.     This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

**III.    DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY**

30.     Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

31.     Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

32.     Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

33.     To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley – a true Knicks legend – has repeatedly been forced to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

## IV.     THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN

34.     On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

35.     Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

36.     Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant Dolan would even be attending this particular game, let alone where he would be seated if he did so).

37.     Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

38.     Incredibly, within a few minutes of reaching his seats, Mr. Oakley was approached by three large men identifying themselves as being members of Madison Square Garden's security team who ordered him, without explanation, to leave the arena.

A-23

39.     Understandably confused, Mr. Oakley asked them why he was being forced to leave when he had done nothing more than sit among friends in publicly available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to Mr. Dolan?"

40.     At that point, it became clear to Mr. Oakley that the security guards had been sent to carry out Defendant Dolan's orders.

41.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate him in front of the same fans who spent a decade cheering for him, Mr. Oakley responded that he had done nothing wrong and had every right to attend the game.

42.     Mr. Oakley then proceeded to turn around and return to his seat.

43.     As he did so, two of the security guards grabbed him and pushed him to the ground.

44.     When he got back to his feet, the security guards loudly reiterated their demand that Mr. Oakley leave the Garden immediately, despite the fact that he had done nothing wrong.

45.     When Ms. Oakley continued to protest this outrageous behavior, the security guards started to physically grab at Mr. Oakley to forcibly compel him to leave.

46.     Fearing for his safety surrounded by several large security guards, Mr. Oakley pushed their hands away in self-defense.

47.     Within seconds, Mr. Oakley was turned around so his back faced security, grabbed by six officials and thrown onto the ground.

48.     He was then put into restraints and the security guards roughly threw him out of the Garden, again dragging him to the ground in the process.

49.     Mr. Oakley was ultimately taken outside of the arena, arrested and charged with assault.

50.     The incident caused an enormous spectacle during the game and was incredibly embarrassing for Mr. Oakley.

51.     Mr. Oakley was also completely bewildered by the incident because, according to the security guard who first approached him, all he had done was sit too closely to Defendant Dolan.

52.     Following the incident, it was announced that Mr. Oakley was banned indefinitely from Knicks games and the Garden generally.

## V.     **DEFAMATORY STATEMENTS BY DEFENDANTS**

53.     Not content with humiliating Mr. Oakley on national television, Defendants proceeded to launch a coordinated smear campaign in a further attempt to ruin his reputation.

54.     Indeed, over the next approximately 48 hours, Defendants made a series of outrageous and patently false statements to the national media with the sole intent of defaming Mr. Oakley.

### A.     **Statements by MSG**

55.     On February 8, 2017, shortly after the incident, the Knicks public relations Twitter account (@NY_KnicksPR) tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly inappropriate and completely abusive manner***.   He has been ejected and is currently being arrested by the New York City Police Department.   He was a great Knick and ***we hope he gets some help soon***.

(emphasis added).

56.     This statement is completely false and Defendants knew it was false at the time it was made.  Mr. Oakley at no time acted inappropriately or abusively.  To the extent that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by Defendants' personnel, in a clear act of self-defense.  But at no point did Mr. Oakley initiate contact or attempt to physically engage in an altercation with any of Defendants' employees.

57.     The statement by the Knicks that the organization hoped Mr. Oakley would "get[] some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a substance abuse problem of some kind.

58.     It would later become apparent that this statement by the Knicks was part of a coordinated media strategy by Defendants designed to propagate the lie that Mr. Oakley is an alcoholic.

59.     The next day, on February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and issued a blanket denial of Mr. Oakley's statements to the media that he had done nothing to warrant the physical abuse from the security guards.  Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed *Oakley's abusive behavior*. It started when he entered the building and continued until he was arrested and left the building.  *Every single statement we have received is consistent in describing his actions*.  *Everything he said since the incident is pure fiction*.

(emphasis added).

60.     Upon information and belief, Defendants misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

B.    **Statements by Defendant Dolan**

61.    On February 10, 2017, Defendant Dolan appeared on the ESPN Radio's, "The Michael Kay Show" and spoke about the dispute with Mr. Oakley.

62.    Defendant Dolan arrived at the show with a binder labeled, "Preparation."

63.    Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned from the Garden indefinitely, and unleashed a litany of defamatory statements.

64.    On banning Mr. Oakley from the Garden, Defendant Dolan said: "I think the most important thing with that is we need to keep the Garden safe for anybody who goes there . . . So *anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned*."

65.    Defendant Dolan went on to accuse Mr. Oakley several more times of being an alcoholic and/or having been overly impaired during the game:

> *To me, Charles has got a problem. We've said it before; he's his own worst problem. People have to understand that. He has a problem with anger. He's both physically and verbally abusive. He may have a problem with alcohol.*
>
> . . .
>
> *We know he said on TV that he was drinking beforehand. We heard statements from police that he appeared to be impaired. Our staff clearly could see that.*
>
> . . .
>
> *When you have issues like this, the first step for anybody is to ask for help.*

66.    Defendant Dolan's statements were and are entirely without basis in fact, as Defendant Dolan was well aware.  Mr. Oakley has never had a problem with excessive anger nor has he ever abused alcohol or any other drug.

67.     During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of

putting the safety of Knicks fans at risk, and somehow having abused them:  "***The No. 1 concern***

***has to be the safety and comfort of the fans***."

68.     Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at

risk and treated them abusively, when in reality he had done nothing but attempt to attend the

game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.
> But I would like for those people to look around and look at the
> people working at Madison Square Garden and ***realize that the guy***
> ***they're chanting for might have been a great Knick player, but he***
> ***was terribly abusive to them.***
>
>                                     . . .
>
> ***There were security people there who were abused. There were***
> ***service people who were abused. The same people who help fans***
> ***get to their seats, they were abused. With racial overtones, sexual***
> ***overtones.*** How do you bring your kids to a game if you think
> that's going to happen?

69.     Perhaps feeling he needed to justify his decision to have him removed and banned

indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating that Mr.

Oakley had come to the game with an "agenda" to take some unspecified action against him:

> ***It's very clear to us that Charles Oakley came into the Garden***
> ***with an agenda. From the moment he stepped into the Garden, he***
> ***began with this behavior. Abusive behavior, stuff you wouldn't***
> ***want to say on the radio*** . . . ***It just accelerated and accelerated***
> ***and accelerated*** . . . I'm not inside of Charles Oakley's mind. ***He***
> ***did say a bunch of things along the way that looked like he was***
> ***headed in my direction. I didn't hear them myself but we heard***
> ***from our employees that he was using my name a lot.*** But this isn't
> because I'm nervous. This is because you can't do what he did and
> stay. We clearly did not — we weren't perfect here, and I think
> Charles never should have made it to his seats. And that's on us,
> and we're doing things to remedy that and make sure that never
> happens again. … I can't say for sure.

70.     As with virtually all of Defendant Dolan's statements during this show, he was fully aware that these too were complete fabrications.  Mr. Oakley had made no effort to confront Defendant Dolan and did nothing to otherwise incite Defendants to forcibly remove him from the Garden.

71.     At no point was Mr. Oakley abusive towards any of Defendants' employees or staff, as evinced by the fact that he was allowed to proceed to his seat without interruption, despite being in full view of the public.

72.     It was only when Defendant Dolan first caught sight of Mr. Oakley that issues arose.

**C.      Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

73.     Tellingly, this was not the first time that Defendant Dolan has attempted to malign individuals who upset him with unsupported accusations that they were alcoholics.

74.     In February 2015, Defendant Dolan accused a fan of being an alcoholic merely based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing but ill bet your life is a mess and you are a hateful mess. What have you done that anyone would consider positive or nice. I am betting nothing. In fact ill bet you are negative force in everyone who comes in contact with you. You most likely have made your family miserable. **Alcoholic maybe. I just celebrated my 21 year anniversary of sobriety. You should try it.**

(emphasis added).

75.      In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

76.     Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from

A-29

alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

## FIRST CAUSE OF ACTION
### (Defamation *Per Se*)
### *Against All Defendants*

77.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

78.     Defendants defamed Plaintiff by publicly accusing him of having committed the serious crime of assault.

79.     Defendants further defamed Plaintiff by accusing him of suffering from the loathsome disease of alcoholism.

80.     Defendants made defamatory statements that caused serious injury to Plaintiff's professional and personal reputation.

81.     None of these assertions by Defendants had any factual basis.

82.     In making these statements, Defendants were acting with actual malice as they were at all times aware that none of the statements were true.

83.     As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

## SECOND CAUSE OF ACTION
### (Libel)
### *Against Defendants MSG Networks, Inc.,*
### *The Madison Square Garden Company*
### *and MSG Sports & Entertainment, LLC*

84.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

14

85.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC defamed Plaintiff by, *inter alia*, publicly accusing him on Twitter of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

86.     None of these assertions by Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC have any factual basis.

87.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC were aware at all times that the statements were false and made the statements in reckless disregard of their falsity.

88.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's libelous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### THIRD CAUSE OF ACTION
**(Slander)**
*Against All Defendants*

89.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

90.     Defendants defamed Plaintiff by, *inter alia*, publicly accusing him of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

91.     None of these assertions by Defendants had any factual basis.

92.     Defendants made the statements despite being fully aware that they were not true and for the sole purpose of attacking Mr. Oakley's reputation.

93.     As a direct and proximate result of Defendants' slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### FOURTH CAUSE OF ACTION
#### (Assault)
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

94.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

95.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

96.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### FIFTH CAUSE OF ACTION
#### (Battery)
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

97.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

98.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff

without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

99.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(False Imprisonment)**
***Against Defendants MSG Networks, Inc.,***
***The Madison Square Garden Company***
***and MSG Sports & Entertainment, LLC***

</div>

100.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

101.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally confined Plaintiff, with Plaintiff's knowledge and awareness and without his consent, when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

102.     Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's confinement of Plaintiff was not privileged in any way.

103.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### SEVENTH CAUSE OF ACTION
**(Abuse of Process)**
*Against All Defendants*

104.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

105.    Defendants caused process to be issued to Plaintiff in the form of a criminal charge.

106.    Defendants caused Plaintiff to be charged with an intent to do harm and without excuse or justification.

107.    Defendants caused Plaintiff to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing Plaintiff and destroying his reputation.

108.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### EIGHTH CAUSE OF ACTION
**(Denial of a Public Accommodation in Violation of the ADA)**
*Against All Defendants*

109.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

110.    Defendants own and operate the Garden, a place of public accommodation.

111.    Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

112.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an injunction prohibiting Defendants from further discriminating against him.

### NINTH CAUSE OF ACTION
**(Denial of a Public Accommodation in Violation of the NYSHRL)**
***Against All Defendants***

113.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

114.    Defendants own and operate the Garden, a place of public accommodation.

115.    Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

116.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### TENTH CAUSE OF ACTION
**(Denial of a Public Accommodation in Violation of the NYCHRL)**
***Against All Defendants***

117.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

118.    Defendants own and operate the Garden, a place of public accommodation.

119.    Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

120.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

E.      An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.      An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

G.      An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

A-36

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 12, 2017
   New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      Douglas H. Wigdor
      Renan F. Varghese
      Alex H. Hartzband

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com
ahartzband@wigdorlaw.com

*Attorneys for Plaintiff*

1

I1C5oakC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHARLES OAKLEY,

4                 Plaintiff,              New York, N.Y.

5         v.                             17 Civ. 6903 (RJS)

6   JAMES DOLAN,
    MSG NETWORKS, INC.,
7   THE MADISON SQUARE GARDEN
    COMPANY,
8

9                 Defendants.
10  ------------------------------x

11                                       January 12, 2018
12                                       2:30 p.m.

13  Before:

14                HON. RICHARD J. SULLIVAN,

15                                       District Judge

16

17                        APPEARANCES
18

19  WIGDOR LLP
         Attorneys for Plaintiff
20  BY:  RENAN F. VARGHESE
         DOUGLAS H. WIGDOR
21
    GIBSON, DUNN & CRUTCHER, LLP
22       Attorneys for Defendants
    BY:  SARAH KUSHNER
23       RANDY M. MASTRO

24

25

I1C5oakC

```
 1              (Case called)

 2              THE COURT:  Good afternoon.  Let me take appearances.

 3              For the plaintiff?

 4              MR. WIGDOR:  Douglas Wigdor and Renan Varghese for

 5    Wigdor, LLP, for the plaintiff.  Good afternoon.

 6              THE COURT:  Mr. Wigdor and Mr. Varghese.  Good

 7    afternoon.  Before I get to the defendants, Mr. Hartzband is on

 8    this case?

 9              MR. WIGDOR:  He is not any longer.

10              THE COURT:  He is not.  His name is still on the

11    docket sheet.  And Mr. Walsh?  Is he still on this?

12              MR. WIGDOR:  For the plaintiff?

13              THE COURT:  Yes.  Kenneth Daniel Walsh?

14              MR. WIGDOR:  Yes, he is.  Yes.

15              THE COURT:  I notice the docket sheet has him at a

16    different firm.  It has his e-mail address at Wigdor, it has

17    his mailing address as Ford, Marrin, Esposito, Witmeyer &

18    Gleser.

19              MR. WIGDOR:  I have no idea.

20              THE COURT:  It probably needs to be updated, so just

21    if you could update that?

22              MR. WIGDOR:  We will take care of that, your Honor.

23              THE COURT:  And Mr. Hartzband has an e-mail address of

24    faruqilaw.com.

25              MR. WIGDOR:  He is at that firm now.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

| 1 | THE COURT: He has left your firm? |
|---|---|

1        THE COURT:  He has left your firm?

2        MR. WIGDOR:  Correct.

3        THE COURT:  So he should then withdraw.

4        MR. WIGDOR:  Correct.

5        THE COURT:  Or you can send a letter saying he is no

6   longer with the firm and he is withdrawing.

7        MR. WIGDOR:  We will do that.

8        THE COURT:  Great.

9        And for the defendant?

10        MR. MASTRO:  Yes, your Honor.  Randy Mastro and Sarah

11   Kushner from Gibson, Dunn & Crutcher for the defendants.

12        THE COURT:  Mr. Mastro, Ms. Kushner.

13        And then Mr. Walden is still on this case?  Or not.

14        MR. MASTRO:  Still on the case, your Honor, but we

15   will be handling today.

16        THE COURT:  You should tell him -- I mean I am sure

17   that he only benefits by the association but the mailing

18   address for him is Gibson, Dunn and he is at a different place

19   now.  Right?

20        MR. MASTRO:  We enjoyed his time with us but now he

21   has his own firm, your Honor.

22        THE COURT:  So, he needs to correct that as well so

23   just let him know.

24        MR. MASTRO:  Will do.

25        THE COURT:  I should note for the record Ms. Kushner

I1C5oakC

1   was my law clerk several years ago so don't think I'm going to

2   go easy on you just because you are here.  But, you should know

3   that, Mr. Wigdor.  I don't think I need to recuse.

4           MR. WIGDOR:  I am sure it was a coincidence, your

5   Honor, I am sure.  The Judge that I clerked for would go a

6   little extra hard on her.

7           THE COURT:  I usually do, right.

8           So, we are here for pre-motion conference on

9   defendant's contemplated motions to dismiss the complaint and

10  its various causes of action.  Let me just tell you the ground

11  rules on these.  So, some judges do these, some judges don't.

12  I do them because I think they're valuable and they allow me to

13  get my head into the game before you folks have sent me 50 or

14  60 pages of briefing between you.  And so, it's a preview, it

15  is an opportunity for me to kick the tires and to have a little

16  bit of colloquy with you.  I'm not coming in here cold, I have

17  looked at the pleadings, I have looked at the letters, I have

18  looked at the authorities cited, I have done my research,

19  thought about it.  So, it's not a full blown oral argument the

20  way it would be after a fully briefed motion but it's not just

21  shooting the breeze either.

22          Now, I never tell a party they can't make the motion,

23  that's not the point here, it is not to discourage people from

24  making motions.  It is simply to give me an to opportunity

25  share with you my initial thoughts and sometimes I will be

I1C5oakC

1  candid and say I don't think one is going any place or I will

2  be candid and say, plaintiff, you better amend because this

3  looks to me like it's not going to get past the 10-yard line.

4  I guess that's a mixed metaphor for this case, probably.  But,

5  anyway, I never tell a party you can't file so if you disagree,

6  that's fine.  The benefit still I think exists because it gives

7  you an opportunity to shape your pleading, your motions to

8  figure out, well, this judge is so befuddled we really need to

9  work very hard on this point because he showed his ignorance so

10  that can be valuable, too.

11          So that's my thinking.

12          Here we have 10 causes of action I think, right?

13          MR. MASTRO:  Yes, your Honor.

14          THE COURT:  And so, let's start with the defamation

15  causes of action.  Actually, me take a step back for a second.

16          It is an interesting case, I'm happy to have it, but I

17  thought the NBA Commissioner met with the parties in this case

18  and had squared it all away.  So, I was surprised to see

19  everything coming back.  Is there a prospect for settlement?

20  Should send you to Magistrate Judge?  Should I send you back to

21  the Commissioner?  Should I have you play a game of H-O-R-S-E

22  over this?  I was surprised.  I thought that there had been

23  some history here.

24          So, is there more to the story?

25          MR. WIGDOR:  We, I mean, I would be happy to have

I1C5oakC

1    Mr. Oakley and myself play Mr. Mastro and Mr. Dolan in a game

2    of H-O-R-S-E.  Mr. Walden and I had an initial conversation but

3    since then Mr. Maestro and I --

4            THE COURT:  Mastro.

5            MR. WIGDOR:  -- Mr. Mastro have hadn't conversations

6    resolving the matter.

7            THE COURT:  Is there any benefit to doing that?  Or

8    no.

9            MR. WIGDOR:  I am always open to talk.  I am sure

10   Mr. Mastro is but we haven't had any conversations.

11           THE COURT:  I don't generally view my role as to

12   strong arm people into settling things.  I like trials,

13   actually.  And, some cases should be decided on the merits,

14   that's the way it should go.  On the other hand, this could end

15   up costing a lot of money and taking a lot of time and if you

16   guys are going to ultimately resolve this thing then it might

17   make sense to consider that now before you spend a lot of time

18   and money and I spend a lot of time on a case that is

19   ultimately going to get resolved.  So, I will leave that to you

20   but it just, I thought it was worth mentioning.

21           So, let's then talk about the defamation claims.  So,

22   this is New York Law that we are applying here, right?

23           MR. MASTRO:  Yes, your Honor.

24           MR. WIGDOR:  Yes, your Honor.

25           THE COURT:  And so, among the elements are a

I1C5oakC

1    defamatory statement that's false, published to a third-party,

2    fault on the part of the defendant, actual malice, and

3    defamation *per se* or special damages.  So, I want to focus on

4    defamation *per se* or special damages.  It seems to me special

5    damages have not been pled.  Do you agree with that,

6    Mr. Wigdor?

7              MR. WIGDOR:  I do.

8              THE COURT:  You agree with that.

9              MR. WIGDOR:  Yes.

10             THE COURT:  And is this something that you are

11   thinking of amending to add special damages?  Or no.

12             MR. WIGDOR:  No, your Honor.  We are alleging

13   defamation *per se* which doesn't require special damages.

14             THE COURT:  All right, so let's then talk about

15   defamation *per se*.

16             Under New York Law that's usually pretty narrowly

17   decided.  I mean, that's a serious crime, it tends to injure

18   another in his trade, business, or profession, a loathsome --

19   that the plaintiff has a loathsome disease or imputing

20   unchastity to a woman which shows -- I think -- how dated this

21   concept and these elements are, perhaps.  But, in any event,

22   so, I don't think you're alleging that these statements have

23   injured Mr. Oakley in his trade, business or profession, or am

24   I wrong about that?  I didn't see anything about that in this

25   complaint.

I1C5oakC

1          MR. WIGDOR:  That's correct, your Honor.

2          THE COURT:  So, instead we are talking about then a

3    serious crime and a loathsome disease, right?

4          MR. WIGDOR:  That's right.

5          THE COURT:  So the serious crime is the assault here?

6          MR. WIGDOR:  That's correct, your Honor.

7          THE COURT:  That's not clear to me from the pleadings

8    here that you are even alleging an assault.  I think what is

9    alleged is he is verbally and physically abusive.  Is being

10   physically abusive, by definition, the same thing as a felony

11   assault?

12         MR. WIGDOR:  Well, it doesn't need to be a felony

13   assault, your Honor.

14         THE COURT:  Okay.

15         MR. WIGDOR:  And I think that the Sprewell case that

16   we cited in our letter as well as the Wilcox case that we cited

17   in our letter are directly on point here.

18         The Sprewell case specifically says that in that case

19   that while the articles that were at issue in that case by The

20   New York Post didn't expressly charge Mr. Sprewell with having

21   committed a crime, the defamatory language didn't need to

22   consist of technical words of a criminal indictment provided

23   that there was some connotation of criminality.  And Courts

24   have held that a serious misdemeanor may form the basis for a

25   claim of defamation *per se* where it involves a crime that puts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

1  another in fear of physical harm.

2         The Wilcox case went even further and said that

3  statements that the plaintiff should take a leave of absence

4  for the safety of the students is subject to a defamatory

5  interpretation that the plaintiff presents a risk of harm to

6  the students in her care.  And that's exactly what we have

7  here, your Honor.

8         THE COURT:  I don't think Mr. Oakley has any students

9  though, right?

10         MR. WIGDOR:  No, your Honor, but Mr. Dolan, one of the

11  comments that -- well, Mr. Dolan made a series of comments

12  which your Honor, in acting as the gate keeper in the

13  defamation claim and determining whether the defamation claims

14  are reasonably susceptible to a defamatory meaning taking them

15  as a whole, what he did say is that you need to keep the Garden

16  safe when he was referring to Charles Oakley.  So, it is

17  directly analogous to keeping students safe to keeping the

18  Garden safe and that's what Mr. Dolan said in the context of

19  his remarks about Mr. Oakley, which also included, and I will

20  focus on the remarks since we are talking now about the crime

21  aspect of defamation *per se* and not the loathsome disease which

22  was him referring to Mr. Oakley -- or referring to Mr. Oakley

23  as an alcoholic which I will get to when your Honor raises

24  that.  But, on the issue of the assault, he said that he needs

25  to keep the Garden safe, he said that he had a problem with

I1C5oakC

1    anger, that he is both physically and --

2             THE COURT:  Verbally abusive, yes.

3             MR. WIGDOR:  Verbally abusive.

4             THE COURT:  He may have a problem with alcohol.

5             MR. WIGDOR:  I am going to get to the alcohol.  If you

6    want me to address it now, I can.

7             THE COURT:  That's the quote.

8             MR. WIGDOR:  Yes.  And then he went on to say that the

9    number one concern has to be the safety -- again, the safety

10   element of the fans.  He then went on to say that there were

11   security people who were abused, service people who were

12   abused.

13            So, reading those as a whole and taking into account

14   the Sprewell case and the Wilcox case and looking at those

15   comments as a whole, I believe that we have adequately pled a

16   defamation claim just on that prong, putting aside the

17   alcoholic comments.  And while the defendants seem to suggest

18   that the case, I guess that they're primarily relying upon is

19   the Rotondi case against Madison Square Garden, but that case

20   was very different, your Honor, because in that case your Honor

21   will recall, since you have reviewed these cases, that in that

22   case the person who -- the plaintiff was with his employer at

23   Madison Square Garden and the claim for defamation in that case

24   was that the next day somebody from Madison Square Garden

25   called the plaintiff's employer, the person who was at the game

A-47

11

I1C5oakC

1  with the plaintiff, and said that the plaintiff was abusive and

2  interfered with the game and refused to leave the game.  And

3  that's all there was in that case.  There wasn't the

4  broadcasting of the statements to the world both on Twitter and

5  on ESPN Radio and there certainly weren't comments regarding

6  physical issues that I have already -- the quote about him

7  being physically abusive.  And in that case there also weren't

8  any things that were said about safety.  And so, that case, I

9  believe, is a horse of a different color and the cases that

10  really are more analogous are the two cases that I have already

11  identified.

12        In terms of the comments made about Mr. Oakley and

13  alcohol, alcoholism --

14        THE COURT:  Right.

15        MR. WIGDOR:  The case that is most directly on point

16  here, your Honor, I think is actually dispositive, is the Hayes

17  v. Sweeney case out of the Western District.  In that case the

18  Court said that New York Courts have determined that an

19  imputation of alcohol consumption is defamatory when a

20  accompanied by some aggravating factor such as the suggestion

21  that the conduct is habitual or that the person is a drunk.

22  And that is exactly what Mr. Dolan took to the air waves to do,

23  to say.  He said that anybody drinking too much alcohol looking

24  for a fight -- I forgot to mention that part, actually looking

25  for a fight goes to the first part that I have already

I1C5oakC

```
 1   discussed -- they're going to get banned and ejected.  And then

 2   he goes on to say, to me, Charles has got a problem.  So he is

 3   referring to him being a habitual drunk.  He has said it

 4   before, he referred to his prior conduct -- alleged prior

 5   conduct, he is his worst problem.  And he goes on to say, he

 6   may have a problem with alcohol.  And then he goes on to say,

 7   when you have issues like this, the first step for anybody is

 8   to ask for help.  Again, that is the part of the Hayes case

 9   which talks about the suggestion that the conduct is habitual.

10   Mr. Dolan's comment that --

11             THE COURT:  Mr. Dolan's comment is that he's abusive

12   and he has a problem with alcohol.  So you think that's the

13   same as saying it is a person who is a habitual drunk?

14             MR. WIGDOR:  Well, I think it is when you are saying

15   repeatedly and in essence that he needs to get help, yes.  And

16   you have to look at it in the context of who Mr. Dolan is

17   because Mr. Dolan has been on the record as an alleged reformed

18   alcoholic and this isn't the first person that he has told

19   needs help with alcohol consumption, which we set forth in our

20   complaint.  And so, when you look at it in the context of what

21   he said there is no question that, again, the issue for your

22   Honor to ultimately decide is whether -- not whether what the

23   jury will ultimately do but whether it is reasonably

24   susceptible to a defamatory meaning.  And I think there is no

25   question that Mr. Dolan's remarks regarding Mr. Oakley's
```

I1C5oakC

1   physical and abusive behavior towards others, coupled with,

2   that he was drinking and that he needs help make out the

3   requisite reasonable, and it is reasonably susceptible to a

4   defamatory meaning in that any notion to dismiss the defamation

5   claims should be denied.

6          THE COURT:  Well, I mean, what you are saying is that

7   you think the case law supports alcoholism being found as a

8   loathsome disease.

9          MR. WIGDOR:  It most certainly does, your Honor.

10         THE COURT:  And you are citing for that Hayes v.

11  Sweeney.  Is that the case?

12         MR. WIGDOR:  That's one of the cases but there are

13  others, your Honor.

14         THE COURT:  I think there are -- I think those cases

15  and I think you should look at them, involve defamation and

16  their defamatory statements when they're coupled with damages.

17  I don't think that these cases stand for the proposition that

18  this is defamation, *per se*, and so I think that's really why I

19  start out by asking you if you wanted to replead to sort of

20  allege damages but you are doubling down on this, right?  You

21  are saying alcoholism is defamatory *per se*.

22         MR. WIGDOR:  Yes, your Honor.

23         THE COURT:  Okay, Mr. Mastro, let's hear you on these

24  and we will come to the other causes of action.

25         MR. MASTRO:  Thank you, your Honor.

I1C5oakC

1      Your Honor, I like to go with what was actually said.

2           THE COURT:  Well, what the complaint alleges is that

3      he behaved inappropriately and a completely abusive manner.

4           MR. MASTRO:  Correct, your Honor.

5           THE COURT:  That he is both physically and verbally

6      abusive, that security people were abused.

7           MR. MASTRO:  Correct, your Honor.

8           THE COURT:  So, that was my question.  Does abusive

9      and abused mean the same as assault?

10          MR. MASTRO:  I think the clear answer to that, your

11     Honor, is no.  There was not a single statement made about

12     Mr. Oakley assaulting anyone although, your Honor, whether your

13     Honor has the opportunity to view the public video of the game

14     that they refer to --

15          THE COURT:  Why don't we start there because it seems

16     to me this is a motion to dismiss on the pleadings and you are

17     saying that I should skip all of that and go to the video, like

18     Warner Wolf.

19          MR. MASTRO:  I do believe your Honor should go to the

20     video because they make reference to this happening on national

21     television in front of millions of people and in a public

22     setting, they've incorporated that by reference, a nationally

23     televised game, that's in their pleading, and your Honor has

24     every right, and Judge after Judge in this district has looked

25     at the best evidence, the video of the event, surveillance

15

I1C5oakC

1  video or public video available of the event in the context of

2  a motion to dismiss.  Judge Preska, Judge Engelmayer, Judge

3  Furman, they have all permitted video to be considered, and

4  Judge Buchwald most recently have all considered video evidence

5  on a motion to dismiss when there was reference to it.

6         But, your Honor, we don't have to go there but I

7  believe your Honor has every right to do that and should

8  because, your Honor, there is a reason why this case was

9  brought in federal court instead of as a verified pleading as

10 it would have had to be in state court because many of the

11 allegations themselves in the complaint are demonstrably false.

12 When you look at the public video, the public video of the game

13 and the publicly available video that was posted in the New

14 York Times and on YouTube, and in these other cases Judges of

15 this district have consistently considered such video evidence

16 on a motion to dismiss including video posted on YouTube and

17 surveillance video which the Garden has which prove point after

18 point after point the allegations in this complaint are

19 demonstrably false.

20         THE COURT:  All right, but --

21         MR. MASTRO:  Let me come more specifically though,

22 your Honor --

23         THE COURT:  I think you are overstating Engelmayer's

24 case.  I think that's a case in which it was specifically

25 referenced in the complaint and the plaintiff stated that he

I1C5oakC

1  was incorporating it by reference.  That's not this case.  Now

2  maybe you want to make a motion for summary judgment and say

3  that all I need is the videotape and we will go from there, but

4  it doesn't seem to me that this is a case in which I should be

5  broadening the pleadings to include the video.  There might be

6  any number of videos on this.

7          MR. MASTRO:  Certainly, your Honor.  Certainly, your

8  Honor, there are specific references to this having occurred on

9  national television in a nationally televised game for millions

10 to see.  This is part of the humiliation that they reference.

11 How is that video not incorporated by reference, your Honor,

12 under those circumstances?

13          But let me just say this, your Honor.  We will brief

14 the issue, your Honor can consider the video evidence or not,

15 we win anyway.  So let me explain why we win anyway.

16          MR. WIGDOR:  Can I address the video issue, your

17 Honor?

18          THE COURT:  Well --

19          MR. MASTRO:  May I --

20          THE COURT:  I think I know your position.  You are

21 saying it doesn't come in.  If you want me to look at it I am

22 happy to look at it.

23          MR. WIGDOR:  I want to respond to Mr. Mastro's

24 comment.

25          I have looked at the video as well, it is not part of

I1C5oakC

1    the complaint, but it doesn't show what Mr. Mastro depicts it

2    as showing, and at the end of the day I don't see what it has

3    to do with the issue of defamation, *per se*.  It might be

4    somewhat relevant at summary judgment on the a assault and

5    battery claim but, ultimately, the jury is going to look at

6    that video and, like your Honor just said, there are many

7    different camera angles, some of which we have, some of which

8    we don't have, and a jury will determine who was pushed down

9    first.

10            THE COURT:  It might go to whether the statement is

11   false.  I think that's what you are saying, right?

12            MR. MASTRO:  It goes to whether certain allegations

13   are false and it definitely goes, your Honor, to the other tort

14   claims alleged in this case.

15            THE COURT:  Well --

16            MR. MASTRO:  But, your Honor --

17            THE COURT:  Let's stay focused on the defamation and

18   libel claims for now.

19            MR. MASTRO:  Certainly, your Honor, but for the record

20   the complaint at paragraph 4 says that this was done to

21   publicly embarrass him on live television, end quote, and in

22   complaint paragraph 53 it says that Mr. Oakley was humiliated

23   on national television.

24            So, that game on national television is incorporated

25   by reference in this complaint that this was captured --

I1C5oakC

1        THE COURT:  The defamation are the statements made by

2   Mr. Dolan.

3        MR. MASTRO:  Understood, so let me focus on that, your

4   Honor.

5        THE COURT:  Okay.

6        MR. MASTRO:  The statements by Mr. Dolan and by

7   Knicks --

8        THE COURT:  But not what was on the national video.

9   The defamation is not the video of an altercation at the

10  Garden, right?

11       MR. MASTRO:  The video shows the altercation, your

12  Honor, and captures some of the audio of what was said by

13  Mr. Oakley and what was said to him.

14       THE COURT:  But not by what was said by Mr. Dolan or

15  anybody else who is being changed or accused of defamation,

16  right.

17       MR. MASTRO:  No.  I'm not suggesting to your Honor

18  that the video goes to showing the statements that were made by

19  Mr. Dolan or Knicks PR.  I am saying to your Honor that the

20  video supports the truth of those statements as they relate to

21  a characterization of his behavior.

22       THE COURT:  Maybe.  But I want to focus on the

23  defamation claim for whether or not there is defamation *per se*

24  by -- alleged in this complaint with respect to an assault

25  committed by Mr. Oakley and with respect to alcoholism being a

I1C5oakC

1    loathsome disease.

2          MR. MASTRO:  Correct, your Honor.  Let's start with

3    alcoholism.

4          As your Honor has already pointed out, the Hayes case

5    from the Western District of New York back in the 1990s was

6    narrowly based on whether there could be -- it could be

7    construed as a defamatory statement that someone was an

8    alcoholic when there was some aggravating, additional statement

9    that affected the allegation and the assumption in that case,

10   wrongly, was that New York Law supported that interpretation.

11   In fact, every case that has been decided since -- and we are

12   prepared -- we cited some but are prepared to cite others to

13   your Honor -- in New York Law has concluded that allegations

14   relating to alcoholism do not in fact constitute a loathsome

15   disease, meaning a venereal disease or other communicable

16   disease.  Alcoholism doesn't fit.  There is Southern District

17   cases subsequent to this including Judge Briccetti here in 2012

18   in the Marino case, that's 2012 Westlaw 1871623 at page 11,

19   SDNY 2012 case.  There is Walker v. Urban Compress, 2017

20   Westlaw 608308, that's New York County Supreme Court, February

21   15th, 2017, finding that abusing alcohol, even when that

22   allegation is made in the context of someone showing up drunk

23   for work as an allegation, does not constitute defamation,

24   *per se*.  And, your Honor, it is also the case that -- and both

25   of those are motions to dismiss, your Honor, and there is also

I1C5oakC

1    the Ruderman case holding that statements that a plaintiff was

2    an alcoholic do not constitute slander, *per se*.  Ruderman v.

3    Stern, 2004 Westlaw 3153217 at page 16, also New York County

4    Supreme Court.

5          So, your Honor, I think it is very clear what is meant

6    by a loathsome disease, that's the TC v. Valley Central School

7    District case, 777 F.Supp.2d 577, 603, Southern District case,

8    2011, Judge Eginton, it is a venereal disease or other

9    loathsome and communicable disease.  That's the definition.

10   Alcohol doesn't fit.

11         So, not only is Hayes an outdated outlier that

12   misapplied New York Law, it also doesn't apply for the reasons

13   that your Honor already stated.

14         THE COURT:  Okay.

15         MR. MASTRO:  Now, having said that, let's talk

16   about --

17         THE COURT:  The assault.

18         MR. MASTRO:  -- the assault and whether that

19   constitutes a serious crime.

20         THE COURT:  I guess there is two points.  Does assault

21   constitute a serious crime and does the complaint make an

22   allegation that there was an accusation of assault?

23         MR. MASTRO:  Completely correct, your Honor.

24         There isn't a single thing in this complaint that says

25   Mr. Oakley committed an assault, it doesn't use the word

I1C5oakC

1    "assault."

2         THE COURT:  It certainly doesn't use the word assault.

3    It says he was looking for a fight, he was physically and

4    verbally abusive.

5         MR. MASTRO:  Correct, your Honor.  And the context in

6    which that arises, your Honor, the full quote and I am quoting

7    from the complaint and then I will tell you when the complaint

8    cuts off because the answer continued by Mr. Dolan, he says, *to

9    me, Charles has got a problem.  He is his own worst problem.

10   He has a problem with anger.  He is both physically and

11   verbally abusive.  He may have a problem with alcohol.*

12        THE COURT:  Right.  No, I think the only one there

13   that I think gets close is both physically and verbally abusive

14   coupled with there were security people that were abused.

15        MR. MASTRO:  Your Honor, that's not even accusing him

16   of a crime let alone saying that it is a serious crime, and of

17   course the standard for defamation *per se* is that it has to be

18   a serious crime.  And there are many cases, your Honor, many

19   cases, that have held under New York Law that misdemeanors are

20   not serious crimes and what is left out of this complaint but a

21   matter of public record is that the only things that Mr. Oakley

22   was eventually charged with were a series of misdemeanors.

23        THE COURT:  Well, that is true but I don't know that

24   that's dispositive.  It seems to me if you make statements that

25   support a conclusion or an inference that a person committed a

I1C5oakC

1   serious crime, the fact that they weren't charged with that

2   crime is not a defense for a defamation claim.

3           MR. MASTRO:  That's correct, your Honor.  I simply

4   point out that no one accused him of a serious crime, he wasn't

5   charged with a serious crime which you can take judicial notice

6   of and none of the words we have cited here, other than

7   Mr. Dolan's opinion that, to me, Charles may have a problem,

8   that, to me, he is physically and verbally abusive.

9           THE COURT:  He didn't say to me he is physically and

10  verbally abusive.  He said he is both physically and verbally

11  abusive and later says there were security people that were

12  abused.

13          MR. MASTRO:  Correct, your Honor.

14          THE COURT:  So, is that enough to rise to the level of

15  an assault?

16          MR. MASTRO:  How could that possibly rise to the level

17  of assault?

18          THE COURT:  I am asking the questions.  You are

19  answering the questions.

20          MR. MASTRO:  Your Honor, we are both former federal

21  prosecutors.  Nobody would charge that as a criminal assault,

22  to say that somebody was abusive.  That is not going to rise to

23  the level of a serious felony crime which is what New York Law

24  requires.  And just so we are clear on this, just so we are

25  clear on this, to say that somebody was abusive or abused

I1C5oakC

1    someone, to us is a statement of opinion but, regardless, it

2    certainly doesn't amount to accusing someone of having

3    committed a serious crime and under New York Law it's very

4    clear that the serious crime has to be at the level of a

5    felony, meaning a big deal crime.  And the cases that were

6    cited by my worthy adversary are clearly distinguishable.  The

7    Hayes v. the New York post, the Sprewell case --

8            THE COURT:  Sprewell, Sprewell.

9            MR. MASTRO:  -- the Post kept blasting away that he

10   had thrown someone against the wall, broken a bone -- a finger

11   I believe.  Accused him of doing very serious violent things

12   when there was actual bodily injury and a broken bone.  That's

13   what The Post kept reporting over and over again in that

14   context, completely different than here to say somebody behaved

15   abusively which, to us, is a statement of opinion that doesn't

16   get out of the box because it is not a statement of fact but

17   even if it did, it certainly isn't allegation of a serious

18   crime.

19           Your Honor, just so the record is clear, the Lieberman

20   case, New York Court of Appeals, 80 N.Y.2d 429, page 435, 1992,

21   the New York Court of Appeals held that misdemeanor harassment

22   was not a serious crime.  Okay?  You also have the Burdick v.

23   Verizon case, 785 N.Y.2d 877, also 2003, that hitting or taking

24   a swipe at another is not actionable as libel, *per se*.  And

25   finally Fusco v. Fusco, 2008 Westlaw, 307456 at page 4, New

I1C5oakC

1    York County Supreme Court in 2008, "misdemeanors" are not

2    "serious crimes"  For purposes of defamation, *per se*.

3          So, I think New York Law is very clear on this point

4    and it is creative to try and argue there is any ambiguity to

5    this but there isn't.  What Sprewell was accused of was felony

6    assault, having broken a bone, having shoved someone up against

7    the wall and cause them bodily injury.  And the other case,

8    Wilcox cited, has both the element of whether someone in a

9    school system posed a threat of harm to students and that

10   obviously related, your Honor, to their professionalism, to

11   their profession, trade or business.  So, that's a completely

12   different context that's conceded here.

13         So, your Honor, for all of those reasons, the

14   defamation claim should be dismissed on this basis alone.

15         THE COURT:  Was there anything else you wanted to say

16   on defamation?

17         MR. MASTRO:  I mean, your Honor, there is other

18   reasons why the defamation claim should be -- we have a *Twombly*

19   *Iqbal* standard, your Honor, and the actual malice isn't

20   properly pled, we have concession on special damages, we don't

21   have to talk about that but, your Honor, I think when you break

22   out the statements that are actually alleged to be defamatory

23   or slanderous or libelous here, they either fall in the bucket

24   of statements of opinion, not fact, or they fall in the bucket

25   that's been a little confused in my adversary's presentation,

I1C5oakC

1    of generalized statements not of and concerning the plaintiff

2    specifically.  They're made in the context of this incident but

3    they're generalized statements about protecting the safety and

4    comfort, that word was left out.  Mr. Dolan said our number one

5    priority is protecting the safety and comfort of those who

6    attend the Garden.  How is that defamatory?  Yet it was cited

7    here earlier in oral argument as a reference to safety alone as

8    to Mr. Oakley.  It was a generalized statement.

9            So, I think when you parse each of these statements

10   individually they're either not actionable opinions or not of

11   and concerning the plaintiff that generalized statements which

12   your Honor has written extensively about in prior opinions in

13   dismissing other cases.

14           THE COURT:  In any event, we have some other points I

15   want to get to.

16           MR. WIGDOR:  Can I add one other point, your Honor?

17           I think it is important because he makes the point,

18   frankly, which is that your Honor's obligation is not to parse

19   each statement separately, it is to view the statements in

20   their totality.

21           THE COURT:  I think I have done that about four times

22   and all I have seen is physically and verbally abusive,

23   security people that were abused.  I don't see anything else in

24   here.  No one is accusing him of an assault.  Nobody is saying

25   that he beat the heck out of somebody which is saying --

I1C5oakC

1          MR. WIGDOR:  You don't need that, your Honor, and

2     again, the Sprewell case is directly on point on this issue,

3     your Honor.  The Sprewell case specifically said that Courts

4     have held that a serious misdemeanor may form the basis for a

5     claim of defamation *per se* --

6          THE COURT:  That's not what I am saying.  The acts

7     alleged in Sprewell were a lot more explicit than this.  They

8     were not, oh, he was physically abusive and people were abused.

9     I think that's all you have here.

10         MR. WIGDOR:  My adversary's recitation of the facts in

11    Sprewell are wrong.  The only fact in Sprewell that the Court

12    was considering with respect to whether it constituted

13    defamation *per se* was that Mr. Sprewell took a swing and miss

14    and hit a wall with his own hand.  Okay?  And that was -- there

15    was none of this other stuff that Mr. Mastro was making

16    allusion to.  And the Court went on to say that alone involved

17    a crime that put another in fear of physical harm.  And it went

18    on and to add that the imputations of violence and criminality

19    in connection with the incident may be interpreted by the

20    average reader in light of the widespread publicity as to the

21    plaintiff's prior acts of alleged violence, and importantly it

22    says that the crime is sufficiently serious in the context of

23    the prior publicity to be actionable as libel *per se* and he

24    doesn't need to prove special damages.

25              Here, your Honor, when you look at the totality of the

I1C5oakC

1  circumstances you have Mr. Dolan saying (A) he is currently

2  being arrested, okay, so that would lead the listener or viewer

3  since it was a Tweet to know that it was a crime or an alleged

4  crime, he was looking for a fight, a fight which is an assault,

5  he was, as your Honor pointed out, physically and verbally

6  abusive, that Mr. Dolan was concerned about the safety of the

7  fans.  And again, your Honor, it is only to determine whether

8  all of those comments, not parsing them out but in their

9  totality of the circumstances here, whether they are reasonably

10 susceptible to a defamatory meaning.

11         THE COURT:  I get all of that.  Let's move on.  I have

12 to say I think this is an uphill climb.  I am surprised that

13 you don't want to replead but you clearly don't and you don't

14 have to but --

15         MR. WIGDOR:  On the repleading, your Honor, on that

16 point we don't.  There may be other things we -- I am not

17 saying we are not going to replead at all.

18         THE COURT:  Okay, but you are certainly not alleging

19 damages let alone special damages.

20         MR. WIGDOR:  That's correct, your Honor.

21         THE COURT:  Okay.  So, I think that's going to be an

22 uphill climb, candidly, based on what's in the complaint.

23 There is just not a lot of skin on those bones and the language

24 is fairly generic.  So, all right, let's then move to the

25 assault and battery and this is one where it does seem to me

I1C5oakC

1   that here I think, Mr. Mastro, you really are relying on the

2   video and I'm not sure that I am prepared to do that.  I think

3   the cases you cited to me are distinguishable and I think based

4   on what is alleged in the complaint it looks to me like there

5   is an allegation of an assault and battery against security,

6   right.

7           MR. MASTRO:  Your Honor, if I may, I do think there

8   are many cases, as I said, I think I have cited five of them

9   here, we didn't have a chance to cite all of these cases to you

10  in the three-letter submission.  I think you would find others

11  have been more analogous and I find it interesting, your Honor,

12  that when there is a complaint that says he was humiliated on

13  national television in a nationally televised game, that anyone

14  would object to seeing the best evidence of the supposed

15  assault and battery.

16          THE COURT:  So what is the best evidence?  Tell me

17  what it is.  What is this video?  What network?  What cameras?

18  Is there stuff in the control room that made it onto national

19  TV?

20          MR. MASTRO:  Absolutely.  It was actually --

21          THE COURT:  That's my point, is that --

22          MR. MASTRO:  Your Honor, you have the following pieces

23  of video evidence and I will go in the order in which I think

24  you most readily should consider them.

25          Number one, the game itself.  The cameras switched to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

1    the incident as --

2         THE COURT:  And stayed with it continuously the entire

3    time.

4         MR. MASTRO:  It doesn't cover the entire time.

5         THE COURT:  It doesn't.  I just think this is not a

6    winner.

7         MR. MASTRO:  Your Honor, you have the opportunity to

8    see, from the nationally televised game, you will see, I think

9    you will be shocked by what you see given what was pled in this

10   complaint.  I found it shocking when I saw the video on

11   national television.  It shows Mr. Oakley actually physically

12   assaulting security guards with NYPD there at all times trying

13   to get him to leave the venue.  They treated him literally with

14   great respect and he got physical with them, you would see that

15   just on that nationally televised video.  You see a shocking

16   shoving by him, multiple shoves, and this is not a -- and you

17   don't see, your Honor, I think, anything done wrong by an NYPD

18   officer or security guards.

19        THE COURT:  And the fact that I don't see that means

20   that nothing else could have happened?

21        MR. MASTRO:  I am going to go --

22        MR. WIGDOR:  Your Honor, I --

23        THE COURT:  Whoa, whoa, whoa.  I didn't ask you to

24   stand up so you have a seat.

25        MR. MASTRO:  Your Honor, the nationally televised game

I1C5oakC

1    captures the incident in progress and sees it through to a

2    certain point where he is starting to be moved from the seat.

3         What we also have are a New York Times video, publicly

4    posted with the New York Times article on the incident which

5    covers --

6         THE COURT:  And why am I considering that one?  Was

7    that relied on in the pleadings, the New York Times video?

8         MR. MASTRO:  It was not, your Honor, but the case

9    law -- the case law, and I think your Honor will see it --

10        THE COURT:  I have read these cases.  I think that you

11   are overstating them.  You can keep telling me again and again

12   and I am wrong and maybe you will persuade me in the briefing

13   but I don't think it is the best use of your time now.  So, why

14   don't you tell me anything else about the battery claim other

15   than the fact that I should look at the video.

16        MR. MASTRO:  Your Honor, if I can, and I will not take

17   much more of your Honor's time, I just want to tell you the

18   other videos that are out there that I think your Honor --

19        THE COURT:  If you want to make a motion for summary

20   judgment and then we can collect all the videos and I can look

21   at them all, then that would be fine, I suppose, and then I

22   guess we will hear from Mr. Wigdor whether he thinks some

23   additional discovery is necessary including testimonial

24   discovery.  But, this is a motion to dismiss.

25        MR. MASTRO:  I understand.  And I just wanted to say,

I1C5oakC

1    your Honor, that on a motion to dismiss it is incorporated by

2    reference in the complaint or is integral to the dispute, and

3    to us the video displaying the incident is integral to the

4    dispute.

5            THE COURT:  The New York Times video is integral to

6    this dispute?

7            MR. MASTRO:  Because it shows the New York Times video

8    and a posted YouTube video, both show the incident really

9    almost from start to finish.

10           THE COURT:  And that makes it integral to dispute?

11           MR. MASTRO:  To determining whether there was an a

12   assault and battery, your Honor.

13           THE COURT:  I think witness testimony might be

14   integral to dispute and I should consider that as well on a

15   motion to dismiss.

16           MR. MASTRO:  Well, as your Honor knows, witnesses do

17   not always, in their subjective views, have accurate memories

18   and we suggest to you that --

19           THE COURT:  But the lack of accurate memory is what

20   makes something not integral to a dispute?  I am just trying to

21   figure this out.

22           MR. MASTRO:  No, your Honor.

23           THE COURT:  Yes.

24           MR. MASTRO:  Video doesn't lie.  Video depicts what

25   happened at the time.  There is also internal arena security

I1C5oakC

1    footage and internal arena footage that really shows every

2    moment from when Charles Oakley came into the arena to take his

3    seat to when Charles Oakley was escorted out of the arena and

4    then showing him being escorted to a police van to take him

5    away.

6            At every one of those moments, your Honor, just to be

7    clear, at every one of those moments the NYPD, at least one

8    officer is participating in observing Mr. Oakley, approaching

9    Mr. Oakley to have him leave, asking him to leave and then

10   arresting him.

11           THE COURT:  Are these arguments for my best or

12   somebody else's benefit back there?

13           MR. MASTRO:  They are, your Honor.

14           THE COURT:  Because it is not helping me much.  This

15   is a motion to dismiss and all you are telling me is that there

16   is a lot of video that proves what you are claiming in your

17   defense and I just think that's not what a motion to dismiss is

18   about.

19           MR. MASTRO:  Okay.

20           THE COURT:  So, are you saying that the pleadings are

21   deficient?  Are you telling me the pleadings are false and

22   contradicted by evidence that's not yet before me?  Because if

23   it is the latter, that's not a motion to dismiss.

24           MR. MASTRO:  I am simply suggesting to your Honor that

25   there are videos --

I1C5oakC

1          THE COURT:  I know there are videos.

2          MR. MASTRO:  And that they show exactly what happened

3     here.

4          THE COURT:  Okay.

5          MR. MASTRO:  And that in other circumstances some

6     other Courts in this district have considered that video

7     evidence.

8          THE COURT:  Are you saying there is something wrong

9     with the pleadings other than that it's contradicted by the

10    videos?  Is there anything else you have got to say with

11    respect to the pleadings on a assault and battery?

12         MR. MASTRO:  I have much more to say about assault,

13    your Honor.

14         THE COURT:  Okay.  So, let's do that.

15         MR. MASTRO:  And I am definitely saying they're

16    contradicted by the videos.

17         THE COURT:  What else are you saying?

18         MR. MASTRO:  Let me tell you what else I am saying

19    about assault, your Honor, because there are independent

20    reasons why the assault and battery claim there should be

21    dismissed.

22         On assault, your Honor, the legal standard for assault

23    under New York Law is an intentional placing of another in fear

24    of imminent harmful contact.  Imminent harmful contact.  The

25    only allegation in the complaint, your Honor, and that's the

I1C5oakC

1    U.S. v. National Insurance case, 994 F.2d 105.

2          THE COURT:  That case is in the complaint?

3          MR. MASTRO:  No, no.

4          THE COURT:  What's the only allegation in the

5    complaint?

6          MR. MASTRO:  The only allegation -- I am just giving

7    you the case, your Honor, that cites the standard.  The

8    complaint in paragraph 38, the only thing the complaint says is

9    that Mr. Oakley was approached by three large men and asked to

10   leave.  Now, your Honor, Charles Oakley is 6'10" and he talks

11   about being the best power forward in Knicks history, and I

12   don't think under *Twombly* and *Iqbal* that an allegation that he

13   was approached by three large men and told to leave and that he

14   didn't think there was any reason to leave and that they made

15   him leave, that that was fear of imminent harmful contact in

16   allegations sufficient to state such a claim.

17         THE COURT:  Well, paragraph 43 and 45 are the ones

18   that seem to me to be alleging assault.

19         MR. WIGDOR:  And 46, your Honor.

20         THE COURT:  Okay.  Well, that's when Mr. Oakley pushed

21   away their hands in self-defense.

22         MR. WIGDOR:  He was fearing for his safety, your

23   Honor.  That's what assault is.

24         THE COURT:  Well, that goes to state of mind.  I am

25   talking about what the security guards did and it is alleged

I1C5oakC

1    that two security guards grabbed him, pushed him to the ground.

2    When he continued to protest this outrageous behavior they

3    started to physically grab him to forcefully compel him to

4    leave.  I guess 46 goes to the state of mind that he feared for

5    his safety.  But I don't even know if that's necessarily to be

6    alleged because if you draw the inference from the grabbing,

7    pushing and -- physical grabbing, and then put in restraints,

8    roughly threw him out of the Garden, dragging him to the ground

9    in the process.

10            MR. MASTRO:  So, your Honor, even if you considered

11   those allegations sufficient under other circumstances to state

12   such a claim, here you have the circumstance that under New

13   York Law you have -- the private property owner has the right

14   to use reasonable force to eject a trespasser from the premises

15   and can be forcibly compelled to leave when the property owner

16   withdraws their license to be on the property.  Here, your

17   Honor, you have, in the context of an assault claim, you have

18   the Garden, the private owner of the venue, having withdrawn

19   its consent to Mr. Oakley being there, him having refused, they

20   have the right --

21            THE COURT:  Is it doesn't say he refused.  It says he

22   asked questions and protesting he didn't do anything wrong, he

23   then returned to his seat and then they pushed him to the

24   ground.  You are saying that if you don't hop to it and get out

25   right away they have a right to grab you and throw you to the

I1C5oakC

1    ground?

2         MR. MASTRO:  Your Honor, I am saying when the

3    revocable license -- and such a ticket to an entertainment

4    venue is a revocable license is withdrawn, and that's solely

5    within the discretion -- this is what New York Law says, your

6    Honor, solely within their discretion -- that once the license

7    is revoked the person has to leave or he is a trespasser.  And

8    when he is a trespasser, there can be physical contact to

9    remove him.

10        Now, your Honor, this is what the Mitchell v. NYU case

11   squarely held.  214 Westlaw 123255, New York Supreme Court,

12   January 2014, Justice Madden in New York County here, and this

13   involved security guards at NYU who revoked the license of

14   someone to be on NYU's property.  The person refused to leave

15   and they were allowed to remove the person including a physical

16   touching to remove him.  And, you know, that case seems to us

17   to be on all fours with this situation.

18        THE COURT:  Look.  But the pleadings were different.

19   That's the whole point.  It all turns on the pleadings.  It all

20   turns on what is alleged here and so I think what you are

21   saying is that based on what is alleged here, which is that

22   three men identifying themselves as security team, ordered him

23   to leave the arena -- I have another matter so we will have to

24   wrap this one up soon -- but he then responds he didn't do

25   anything wrong and I guess your point is that in the next

I1C5oakC

1   paragraph 42, he proceeded to turn around and return to his

2   seat meant they could physically grab him and force him out of

3   the place, right?  That's what you are saying.

4        MR. MASTRO:  At that point he was a trespasser, your

5   Honor.

6        THE COURT:  Okay.  So, let's leave it there.  I don't

7   want to go to the video, I want to leave it to the pleadings.

8        So, Mr. Wigdor, on that point there, he is asked to

9   leave, he refuses to leave, and your view is that they have to

10  just let him stay for the rest of the game?

11       MR. WIGDOR:  I don't --

12       THE COURT:  They're not allowed to touch him.

13       MR. WIGDOR:  I will reread the letter they sent, your

14  Honor.  I don't know that this exact argument was made.

15       THE COURT:  I don't care about the letter, I am asking

16  about the pleadings and what you are saying with respect to a

17  trespasser.

18       MR. WIGDOR:  Yes.  Our pleadings allege, your Honor,

19  that Mr. Mastro, when he was talking about the video, neglected

20  to inform the Court this but when the videos that I have seen

21  is that when they approach Mr. Oakley, the first thing that

22  happens before all the things Mr. Mastro went on to tell your

23  Honor is that he gets thrown to the ground.  And so --

24       THE COURT:  That's not what the complaint says.

25       MR. MASTRO:  That's not what the complaint says.

I1C5oakC

1          MR. WIGDOR:  It says that --

2          THE COURT:  He doesn't get you thrown to the ground

3     until paragraph 43.  What's that?

4          MR. WIGDOR:  I'm sorry.  Go on.

5          THE COURT:  Grabbed him and pushed him to the ground,

6     paragraph 43.  That's after he turned around and returned to

7     his seat defying their request to leave the arena.

8          MR. WIGDOR:  Sorry for the confusion, your Honor.  I

9     was addressing who was pushing who first in responding to

10    Mr. Mastro's comment that Mr. Oakley was pushing them.

11         THE COURT:  Mr. Mastro's comment is that once they've

12    asked him to leave he has to go.  If he doesn't go, then

13    they're allowed to touch him.  It is not an assault at this

14    point, they're justified in doing it.

15         MR. WIGDOR:  I would need to research that exact

16    point, your Honor.  I have not looked at that point and I would

17    actually need to speak to my client again to determine whether

18    he was specifically asked to leave at that point.

19         THE COURT:  This is your pleading.

20         MR. WIGDOR:  Before he was touched -- you're right, it

21    is but, your Honor, I mean if the law were such that a security

22    guard could come to you and say you need to leave and you start

23    to return to your seat and you can get thrown down, which is

24    what eventually happened here, Knicks fans I think should be

25    pretty worried about going to the next Knicks game because it

I1C5oakC

1   wouldn't make any sense, your Honor.

2          THE COURT:  There would be a lot of reasons not to go

3   to the next Knicks game -- they lost three in a row at home and

4   they can't win on the road.  So, I don't know.

5          I think the point is your pleading says he was asked

6   to leave by people who identified themselves as Madison Square

7   Garden security, he didn't do it, he turned around and returned

8   to his seat.  I think your point is that that may allow them to

9   escort him out, maybe not push him to the ground.

10          Is that what you are saying?

11          MR. WIGDOR:  Your Honor --

12          THE COURT:  It is an excessive force claim, more than

13   what was reasonable?

14          MR. WIGDOR:  Your Honor, I think, and I think not

15   having seen cases on the specific subject, I think it would

16   need to be reasonable, your Honor, when somebody returns to

17   their seat you don't then get hostile.

18          THE COURT:  Mr. Mastro, you are not saying that they

19   asked him to leave, they wouldn't go, so they have the right

20   now to beat the hell out of the guy.  You are not saying that,

21   right?

22          MR. MASTRO:  I am absolutely not saying that, your

23   Honor.

24          THE COURT:  Okay.

25          MR. MASTRO:  I am saying that I think the proper

I1C5oakC

1    construction of the pleading --

2              THE COURT:  That they didn't say that.

3              MR. MASTRO:  That they didn't do that.

4              THE COURT:  It is not pled that they did that.

5              MR. MASTRO:  Right.  That he was asked to leave --

6              THE COURT:  Okay.

7              MR. MASTRO:  -- there is some form of resistance, he

8    falls to the ground, and he doesn't leave and they are allowed

9    to use reasonable physical force to remove a trespasser.

10              And, your Honor, I have to point one other thing out

11   because Mr. Oakley also says in the pleading that he purchased

12   tickets, the same tickets that you and I purchase to go to the

13   games and on the back of that ticket, your Honor, you can take

14   as evidence on a motion to dismiss, the back of the ticket that

15   we all purchase and he says in his complaint he purchased,

16   says, on every one of those tickets, "this ticket is a personal

17   license revocable in MSG's sole discretion."

18              THE COURT:  I am not hung up on that.  It seems to me

19   what is alleged in the complaint arises to the level of assault

20   because it is excessive or more than necessary to get him to

21   leave.  I so I think that's a closer call.  I think that's one

22   where we will get some briefing on that.

23              False imprisonment.  It seems to me that you guys are

24   talking past each other on this one.  The false imprisonment

25   claim is I think that the Madison Square Garden security folks

I1C5oakC

1    restrained him and wouldn't let him leave and then removed him

2    from the Garden.  Defendants are saying that PD are the ones

3    who detained him and restrained him.  So, I think we only

4    talking about the security guards, right?

5              MR. WIGDOR:  That's correct.

6              MR. MASTRO:  And, your Honor, in I think the case law

7    it will show you that when he was told to leave and then

8    escorted out it is with NYPD involved.  It is admitted in the

9    stipulated facts that we gave to your Honor in the joint letter

10   on potentially setting a schedule that it is security guards

11   and NYPD.

12             THE COURT:  I am focused on the pleadings.  That

13   letter is not an amended complaint.

14             MR. MASTRO:  Your Honor, he is basically in an arrest

15   situation.  There is NYPD with him the whole time and he is

16   arrested, he is in fact cuffed.  He talks about being

17   restrained in handcuffs.  That's no MSG security guards, that's

18   NYPD.  So he is an arrest situation, they not charging false

19   arrest.  So, I don't see how there could possibly be a false

20   imprisonment claim.

21             THE COURT:  They're charging abuse of process.  But,

22   look, I want to get briefing on these too.

23             The one thing I want to talk about is denial of public

24   accommodation under the ADA, New York State and New York City

25   Human Rights Laws.

I1C5oakC

1           BOTTOM LEFT:  Certainly, your Honor.

2           THE COURT:  Let me jump to sort of where I am.

3           MR. MASTRO:  Sure.

4           THE COURT:  As you have noticed already I have a view

5    and then whoever has the burden of persuading me, not the legal

6    burden but where I think I'm going, then I give them first

7    crack.

8           MR. MASTRO:  Understood, your Honor.

9           THE COURT:  So, here it seems to me that the problem

10   with these causes of action is that you're alleging that he was

11   barred from the Garden based on the perception that he suffers

12   from alcoholism.  But, that pretty much contradicts your theory

13   that they are falsely accusing him of alcoholism.  They know he

14   is not an alcoholic, they know this is not an alcohol problem.

15   That is a pretext.  It is a false, defamatory statement that

16   they're uttering maliciously so he is not being barred from the

17   Garden because of the perception he suffers from alcoholism, it

18   is for some other reason altogether and they are defaming him.

19   I don't see how you can have it both ways.

20           Mr. Wigdor?

21           MR. WIGDOR:  We certainly could plead in the

22   alternative, your Honor.

23           THE COURT:  Is that what you are doing?

24           MR. WIGDOR:  Well, no.  No, your Honor.  But I think

25   the point on the perceived as disabled claim, which would be

I1C5oakC

1      under the three statutes, actually the City law we do agree

2      should be dismissed, but if the defendants perceived him as

3      being an alcoholic I don't see why that would necessarily

4      undermine the defamation claim.

5              THE COURT:  I thought you said it was a false claim.

6              MR. WIGDOR:  It is a false claim.

7              THE COURT:  So it is a false claim.  It is known to be

8      false which is one of the elements, right?

9              MR. WIGDOR:  Correct.

10             THE COURT:  And it is maliciously uttered and yet they

11     are denying him access to the Garden because of the perception

12     that he suffers from alcoholism.

13             MR. WIGDOR:  But the perception doesn't need to be

14     true, your Honor.

15             THE COURT:  Well, it is the perception to whom?

16             MR. WIGDOR:  The perception to Mr. Dolan.

17             THE COURT:  But Mr. Dolan --

18             MR. WIGDOR:  But it could be a false perception.

19             THE COURT:  -- doesn't perceive that he suffers from

20     alcoholism.

21             MR. WIGDOR:  It is a false perception but that is what

22     he stated.

23             THE COURT:  I don't think that's an ADA problem.

24             MR. WIGDOR:  Let's take a situation where, out of this

25     example here, but if somebody owns a business and doesn't want

I1C5oakC

1    to let somebody in and knowing that they're not an alcoholic

2    but says I'm not letting you in here because you're an

3    alcoholic and making it up, I don't see why you wouldn't have

4    both a defamation claim and a perceived as disabled claim.  I

5    don't see them being inconsistent.  It could be a false

6    perception.

7            THE COURT:  But it's not a perception at all is what

8    you are saying.  Dolan doesn't perceive him as being an

9    alcoholic.  Dolan is lying, he has some other reason to make

10   these statements is what you are saying, right?

11           MR. WIGDOR:  What I am saying is he falsely perceives

12   him as being disabled.

13           THE COURT:  No.

14           MR. WIGDOR:  He knows he is not an alcoholic.

15           THE COURT:  So he doesn't perceive him to be an

16   alcoholic then.  The fact that you lie about something -- you

17   can't perceive it to be the case but be lying about it at the

18   same time.  I perceive you to be an alcoholic but I know you're

19   not an alcoholic.  That doesn't work.

20           MR. WIGDOR:  Respectfully, I think you can falsely

21   perceive something.

22           THE COURT:  But then it's not malicious and it is not

23   an intentional falsehood, right?

24           MR. WIGDOR:  No, it would be.

25           THE COURT:  Then it is a mistake.

I1C5oakC

1           MR. WIGDOR:  No, because --

2           THE COURT:  Okay.

3           MR. WIGDOR:  -- I'm not suggesting that Mr. Dolan

4    actually believed that Mr. Oakley was an alcoholic.  I believe

5    that he defamed him, as we have already stated, when he said

6    that he needed help, and made those other comments.  What I am

7    also saying is that when he kicks him out of Madison Square

8    Garden and not letting him return, that was based on a false

9    perception that Mr. Oakley was disabled.  Now, I believe that

10   was a knowingly false perception but I believe that it would

11   still --

12          THE COURT:  What is the difference between a knowingly

13   false perception and a knowingly false statement?  Maybe we

14   need to go to the dictionary and look up the word "perception"

15   because I think you are using the terms interchangeably and

16   they're not the same, I don't think.

17          MR. WIGDOR:  Well, it wouldn't make any sense, your

18   Honor, in my view of the disabled accommodation laws, for

19   someone who knows that somebody is not an alcoholic but then

20   kicks them out of a place of business based on that lie that

21   somebody is an alcoholic.  It wouldn't further what the statute

22   is all about which is not allowing somebody to enter a public

23   accommodation because of some sort of disease or illness that

24   falls within the various different statutes.  And so, here

25   Mr. Dolan is saying he is an alcoholic, he knows he is not an

I1C5oakC

1   alcoholic but he is not allowing him into the Garden because he

2   is an alcoholic.

3          I do also believe that it should be pled in the

4   alternative as well to the extent that your Honor is not going

5   to --

6          THE COURT:  I don't think -- you have incorporated

7   every paragraph from the defamation claim, right?

8          MR. WIGDOR:  Well, we do have a right to replead, your

9   Honor, obviously.

10          THE COURT:  I guess, but you assured me you didn't

11   want to do that.

12          MR. WIGDOR:  What I said was I didn't want to do it on

13   the special damages.

14          THE COURT:  So what do you want do it for?

15          MR. WIGDOR:  Well, your Honor, what I would like to do

16   is see -- he has already put in new arguments that weren't in

17   the letter so what I would like to see is the motion that he

18   intends on filing and then looking at that to see what they're

19   going to move to dismiss on before amending which we have a

20   right to do under Rule 15.  That's the whole purpose of it.

21          THE COURT:  So, what you are saying is you don't think

22   you have a good enough idea now as to what his is basis is for

23   dismissing the ADA and the New York -- you aren't dismissing

24   New York City, you are withdrawing that one you said.

25          MR. WIGDOR:  Correct.

47

I1C5oakC

1          THE COURT:  So, New York State human rights law.

2          MR. WIGDOR:  Correct.

3          THE COURT:  So, I am giving you the opportunity now to

4    amend because we have spent an hour and change on this and we

5    have kicked the tires pretty well and you are saying you want

6    to wait until they have spent a lot of time and money briefing

7    it, then decide that you want to amend.

8          MR. WIGDOR:  Given that I have heard new arguments

9    today there is no assurance that I won't hear new arguments in

10   a new motion to dismiss so, your Honor, that would be my

11   preference and that's what the rule states and that's what I --

12         THE COURT:  That's what the rule states but, look,

13   Mr. Mastro, then, you can move for damages or just the cost of

14   briefing something twice I guess, right?  And we will see.  I'm

15   not anticipating granting or denying that motion but that is

16   the relief you get from having to do something multiple times,

17   right?

18         MR. WIGDOR:  If Mr. Mastro wants to represent to me

19   that he is not going to make any other arguments beyond what he

20   has made here today in the letter then I can amend before he

21   makes that motion but I have a feeling he is not going do that.

22         THE COURT:  I don't know.

23         MR. MASTRO:  Your Honor, just to be clear, I have

24   cited cases to the Court because three pages limited the number

25   of cases.

I1C5oakC

1           THE COURT:  I agree.

2           MR. MASTRO:  I think these arguments are ones that

3    were described to the court already but the fact of the matter

4    is we haven't done the -- look.  There are parts of this

5    complaint that never should have been brought in the first

6    place.  He has already withdrawn one claim under the City Human

7    Rights Law.  I didn't say, oh, its sanctionable what you did,

8    don't do that, but he is now proposing that I have to spend my

9    client's money to move to dismiss.  I think it is a meritorious

10   motion to dismiss the complaint in its entirety and then he

11   gets a chance to replead?  Many of these arguments, your Honor,

12   are ones where I don't think he will be able to replead but

13   that I should have to go through that twice, yes, I will be

14   asking the Court for it.

15          MR. WIGDOR:  Your Honor --

16          THE COURT:  Whoa, whoa, whoa.  We can't all talk at

17   the same time.

18          MR. WIGDOR:  Your Honor, the New York City law --

19          THE COURT:  Whoa, whoa, whoa.  If I talk, everybody

20   stops.  I'm like the ref.  Okay?

21          So, we will cross that bridge when we get to it.

22          MR. MASTRO:  Understood.

23          THE COURT:  I don't need to resolve that now.

24          MR. MASTRO:  Understood.

25          THE COURT:  Okay?  So, let's talk about the motion and

I1C5oakC

1    let's talk about discovery.

2            So, one question I had for Mr. Mastro and I have asked

3    it a couple of times is do you want to move for summary

4    judgment quickly relying just on the tapes?  It sounds like you

5    don't.

6            MR. MASTRO:  Your Honor, I need to say this.  I need

7    to consult with my client about it.  This is a very important

8    case to Madison Square Garden.  This has been a painful moment.

9    We are here out of sorrow but we have been dragged into court

10   by Mr. Oakley so I want to talk to them about what they want to

11   do but I would say this, your Honor.  I would say that we

12   believe we are entitled to dismissal.  We think the videos are

13   actually going to be shocking to your Honor.

14           THE COURT:  You think I don't watch ESPN?

15           MR. MASTRO:  Your Honor, I have surveillance videos

16   that take you all the way through the incident.

17           THE COURT:  Okay, but my point is that's not the

18   national TV stuff that's even referenced in the complaint so

19   you are going well beyond the pleadings for that stuff.

20           MR. MASTRO:  Oh, but I am saying, your Honor, even

21   your Honor seeing that which was captured on ESPN would shock

22   you based on the allegations that were made in this complaint.

23           THE COURT:  Well, anyway --

24           MR. WIGDOR:  I think they would shock you in

25   Mr. Oakley's favor.

I1C5oakC

1          MR. MASTRO:  I am just saying, your Honor, that I want

2     to talk to my client about that.  We want to brief why you

3     should consider the evidence on a motion to dismiss and I will

4     ask my client if they would like your Honor to convert it into

5     summary judgment, if your Honor feels that's the only

6     appropriate vehicle for considering that evidence.

7          Your Honor, I don't say this lightly, I have great

8     respect for your Honor and my adversary, but there are things

9     in that complaint that are demonstrably false over and over and

10    over again and the video puts the lie to the allegations there.

11    It is not a verified pleading for a reason.

12          So, I do want you to see those videos but I don't

13    think you have to see them to dismiss this case.

14          THE COURT:  Well, that may be.  In any event.  There

15    are other avenues.  If it turns out that you are right about

16    demonstrably false pleadings then you can make a sanctions

17    motions at some point.

18          MR. MASTRO:  Your Honor, just so we don't have any

19    doubt about it, we didn't discuss abuse of process but there

20    has to be a collateral objective, there is no such allegation

21    and no conceivable allegation of a collateral objective for

22    abuse of process.

23          THE COURT:  I get that.  I am running out of time.

24          Look.  You guys are going to get to brief this, I want

25    you to brief this, and I have to cut this short.  I am sorry.

I1C5oakC

1          MR. WIGDOR:  I haven't gotten a chance to respond.

2          THE COURT:  You will.  You will respond to everything

3    that he said.

4          MR. WIGDOR:  I think the most important point, your

5    Honor, if I just might say, not on the substance of what he

6    said but just on the principle because I am just reading your

7    Honor on this whole does Wigdor get a chance to amend after

8    filing of a motion to dismiss or should he do it now.  I hear

9    what your Honor is saying and I would be happy to save the

10   resources of Mr. Mastro and his client and the way I think that

11   would be only fair to do that is to limit the arguments that he

12   has made either in the letter or in court today, or if he has

13   another argument that he thinks of this evening or next week

14   before he contemplated making the motion to run that by me, so

15   that way I'm not put at a disadvantage to what I would

16   otherwise be entitled to do under Rule 15.

17          I'm not asking very much, your Honor.

18          THE COURT:  I don't think -- you are not necessarily

19   at a disadvantage.  I'm not ruling now.  I am just putting you

20   on notice that that's a possibility, making somebody brief

21   something twice does open the door to perhaps having to cover

22   the cost of that but I'm not ruling on that, you might have

23   good arguments that, well, these are all different arguments

24   that were raised in the pre-motion letter or discussed in

25   court, made for the first time in the motion to dismiss.  There

A-88

I1C5oakC

1   might be lots of good arguments.  You will get to make these

2   arguments if and when there is ever a motion to have you cover

3   his costs for a second briefing.  I am saying be mindful of

4   that.

5        My goal in having these conferences is to just be

6   efficient and to hopefully avoid the need to replead multiple

7   times and so usually we talk about it, I ask the party if they

8   want to replead and they see the hand writing on the wall or

9   they have a better sense by then as to what the defendant's

10  arguments might be, what the Court's thinking is, and they say

11  sure, I'll take it.

12       MR. WIGDOR:  That's precisely why I am willing to sit

13  down with Mr. Mastro to discuss that because what I wouldn't

14  want to do, your Honor, is amend the complaint, then he makes a

15  motion to dismiss on an argument that he hasn't raised with the

16  Court or me and he goes *ah-ha!* Wigdor has now made his one

17  amendment as matter of right.

18       THE COURT:  Look.  You get the one as a matter of

19  right and then you get, with leave of the Court, to do more

20  and, generally speaking, you get to amend if there is a good

21  reason to unless it is futile or done for purposes of delay.

22  We will get to that, maybe.  Maybe not.

23       So, why don't I suggest this.  You guys talk to your

24  clients, talk to each other then about going forward on this

25  motion, talk to each other about a schedule for this motion,

I1C5oakC

1    and then send me a joint letter in a week telling me what you

2    propose.  If you don't agree, then tell me your respective

3    positions on this.  I am inclined to stay discovery pending

4    resolution of this motion but if it is going to be a motion for

5    summary judgment then I guess I would be curious to hear

6    whether the tapes are the whole story or we need some

7    additional limited discovery if it were converted to a summary

8    judgment motion.  So, think about that.

9         MR. MASTRO:  Understood, your Honor.  Appreciate the

10   guidance, appreciate all the time your Honor has given today,

11   and we will talk to Mr. Wigdor and I will talk to my client and

12   we will work out an appropriate schedule.

13        THE COURT:  Great.

14        MR. MASTRO:  And I really appreciate all the time,

15   your Honor.

16        THE COURT:  Don't be silly.  It is always a pleasure

17   to have good lawyers and you are certainly two good lawyers.  I

18   want to thank you.  I want to thank the other lawyers that I

19   know prepared you and helped you get ready for this.  The

20   pre-motion letters were helpful.  It is good to have lawyers

21   who are responsive and smart and I certainly got my money's

22   worth there.

23        MR. WIGDOR:  Thank you.

24        MR. MASTRO:  Thank you.

25        THE COURT:  Have a nice day.

54

I1C5oakC

1          So, I will see you.  I will hear from you in a week.

2     Thank you very much.  Thank you to the court reporter.  If

3     anyone needs a copy of the transcript you can take that up with

4     her but do that through the website because we are 45 minutes

5     late on a different matter.

6               MR. WIGDOR:  Thank you.

7               MR. MASTRO:  Thank you.

8               THE COURT:  Thanks.  You bet.  Take it easy.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
CHARLES OAKLEY,                                    :
                                                   :
                              Plaintiff,           :   Civil Case No.: 17-cv-6903 (RJS)
                                                   :
                  v.                               :
                                                   :
JAMES DOLAN, in his individual and professional    :   **AMENDED COMPLAINT**
capacities, MSG NETWORKS, INC., THE MADISON        :
SQUARE GARDEN COMPANY and MSG SPORTS &             :
ENTERTAINMENT, LLC,                                :   **Jury Trial Demanded**
                                                   :
                              Defendants.          :
------------------------------------------------------------------------X

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      In 1998, Charles Oakley was traded to the New York Knicks and, during the

ensuing decade on which he played for the team, he established himself as a premier player

known for his hard-nosed play, defense and rebounding.

2.      However, one person who did not appreciate Mr. Oakley's contributions to the

Knicks franchise was Defendant James Dolan, who inherited control of the Knicks from his

father a year after Mr. Oakley's career with the team came to an end.  Without any justification,

Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his

hand during meetings, making him purchase his own tickets to attend games at the arena he

called home for a decade, and even having security harass him when he did attend games prior to

the incident in question.

3.      Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley

appeared at Madison Square Garden (the "Garden") to watch a Knicks game.  Within minutes of

unobtrusively taking his seat, Defendant Dolan directed security to forcibly remove Mr. Oakley

from the Garden and humiliate him in front of the Knicks fans that had attended the game.

Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely.

Despite his immense contributions to the franchise, Mr. Oakley was treated like a common

criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden

Company and MSG Sports & Entertainment, LLC (together, "MSG").

4.      As if their mistreatment of Mr. Oakley at the Garden was not embarrassing and

shameful enough, over the ensuing days, Defendants Dolan and MSG launched a coordinated

and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of

abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating

what they knew to be blatant lies, Defendants Dolan and MSG have caused irreparable harm to

Mr. Oakley's name and career, and discriminated against him based on the false perception that

he is an alcoholic.  However, as he did throughout his playing career, Mr. Oakley has refused to

walk to the bench in shame.  Instead, holding his head up high, Mr. Oakley files this Amended

Complaint to set the record straight and to hold Defendants responsible for their reprehensible

conduct.

5.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct in

violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.* ("ADA") and the

New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL"), as

well as various state tort laws.

**PARTIES**

6.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the NBA, and a resident of the State of Ohio.

7.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

8.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

9.      Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, The Madison Square Garden Company owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned and operated Madison Square Garden and the New York Knicks.

**JURISDICTION AND VENUE**

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

3

12.     The Court further has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331

and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights

under the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising

under state law pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to this action, including the unlawful

practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

### I.    MR. OAKLEY'S CAREER WITH THE NEW YORK KNICKS

14.     Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on

June 27, 1988.

15.     Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed

their most sustained run of excellence and reassumed their place among the league's elite teams,

making the second round of the playoffs every single year, except for one, while Mr. Oakley was

on the team, in large part due directly to his contributions.

16.     By way of example, in 1994 – a season during which Mr. Oakley was

instrumental in leading the Knicks to within one win of a NBA championship – he was both

named to the All-Defensive First Team and appeared in the NBA All-Star Game.

17.     Even now, nearly two decades after he stopped playing for the Knicks, Mr.

Oakley ranks among the top three players in franchise history in offensive rebounds, defensive

rebounds, minutes played and steals, making him inarguably the greatest power forward in

Knicks history.

4

## II.   DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES

18.     In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

19.     Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premier teams, winning only a single playoff series since the turn of the century.

20.     The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained about having been sexually harassed by the then-coach of the Knicks.

21.     In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from Defendant Dolan for his unlawful conduct.

22.     This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

## III.   DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY

23.     Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

24.     Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

25.     Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

26.     To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley has repeatedly been forced to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

27.     Even when attending such games, Defendant Dolan went out of his way to harass Mr. Oakley without justification.

28.     By way of example only, during a Knicks game that Mr. Oakley attended during the 2015-2016 season, he noticed that a team of security personnel made a point of following him everywhere he went at the Garden.  One security guard admitted to Mr. Oakley that they were only treating him in such a manner because Defendant Dolan had ordered them to do so, despite the fact that Plaintiff had done nothing to deserve to be treated like a criminal.

29.     Despite the abhorrent treatment that he has received at the hands of Defendant Dolan, Mr. Oakley was committed to, and continues to be committed to, returning to MSG.

IV.     **THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN**

30.     On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

31.     Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

32.     Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant

Dolan would even be attending this particular game, let alone where he would be seated if he did so).

33.     Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

34.     Incredibly, within a few minutes of reaching his seats, Mr. Oakley was approached by three large men identifying themselves as being members of Madison Square Garden's security team who ordered him to leave the arena without explanation.

35.     Understandably confused, Mr. Oakley asked these purported security guards why he was being forced to leave the area when he had done nothing more than sit in publicly available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to Mr. Dolan?"

36.     At that point, it became clear to Mr. Oakley that the sole reason that the security guards were seeking to oust him from the Garden was Defendant Dolan's orders.

37.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate him in front of the same fans who spent a decade cheering for him, Mr. Oakley attempted to defuse the situation by patiently explaining to the security personnel that he had done nothing wrong and simply wanted to watch the game in peace.

38.     Mr. Oakley raised his arms during this encounter, in a defensive posture that clearly conveyed that he had no intention of engaging in any violent behavior.

39.     If security had simply asked Mr. Oakley to take his seat and watch the game, what followed would never have happened.

40.    Mr. Oakley attempted to demonstrate that he was capable of watching the game without creating an incident, by turning around and peaceably returning to his seat.

41.    Mr. Oakley did not, however, refuse to leave the Garden at the time and merely sought an explanation for why he was being treated differently than every other fan who had attended the Knicks game that night.

42.    As he did so, two of the security guards grabbed Mr. Oakley and pushed him to the ground.

43.    In forcibly shoving Mr. Oakley to the ground within seconds of first approaching him, and without any physical threat or provocation from Mr. Oakley, the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct.

44.    When Mr. Oakley got back to his feet, the security guards loudly reiterated their demand that he leave the Garden immediately, despite the fact that they had no legitimate basis for ejecting him.

45.    When Mr. Oakley continued to request an explanation for this outrageous behavior, the security guards further escalated the confrontation by physically grabbing Mr. Oakley to forcibly compel him to leave.

46.    Fearing for his safety as he was surrounded by several large security guards, and having already been roughly shoved to the ground once, Mr. Oakley pushed their hands away in self-defense.

47.    Within seconds, Mr. Oakley was forcibly turned around so his back faced security, grabbed by six officials and thrown onto the ground.

48.    The security guards further refused Mr. Oakley's repeated requests that he be allowed to stand up, instead crowding around him and impeding his ability to get to his feet.

49.    Mr. Oakley was then put into restraints and the security guards roughly threw him out of the Garden.

50.    In grabbing Mr. Oakley, restraining him, dragging him to the ground and refusing his repeated requests that he be allowed to stand up, Defendants greatly exceeded the amount of force that was necessary in the situation, especially since Mr. Oakley had explained repeatedly that he had not done anything wrong and not instigated the violent conduct.

51.    Mr. Oakley was ultimately taken outside of the arena, arrested and charged with assault.

52.    The incident caused an enormous spectacle during the game and was incredibly embarrassing for Mr. Oakley.

53.    Mr. Oakley was also completely bewildered by the incident because, according to the security guard who first approached him, all he had done was sit too closely to Defendant Dolan.

54.    As a Knicks legend who had repeatedly attended games in the past, Mr. Oakley had every intention of returning to the site of his playing days, even after having been treated in such a blatantly violent and inappropriate manner.

55.    However, the Knicks sought to take away this source of joy and pride from Mr. Oakley as well, as they immediately announced that Mr. Oakley was banned indefinitely from Knicks games and the Garden, generally.

## V.    DEFAMATORY STATEMENTS BY DEFENDANTS

56.    Recognizing that there was no legitimate basis for their horrendous treatment of Mr. Oakley, Defendants were left scrambling for an explanation to provide to Knicks fans as to why they would violently throw out a Knicks legend from the Garden.

57.    It became apparent over the next approximately 48 hours that Defendants had attempted to solve the problem that they had created by making a series of outrageous and patently false statements to the national media with the sole intent of defaming Mr. Oakley, implying both that he was an alcoholic and that he had committed a violent crime against Knicks fans while at the Garden that night.

### A.    Statements by MSG

58.    On February 8, 2017, shortly after the incident, the Knicks public relations Twitter account (@NY_KnicksPR), which is owned and operated by Defendants, tweeted:

> Charles Oakley came to the game tonight and *behaved in a highly inappropriate and completely abusive manner*. He has been ejected and is currently being arrested by the New York City Police Department. He was a great Knick and *we hope he gets some help soon*.

(emphasis added).

59.    This statement is completely false and Defendants knew it was false at the time it was made and/or recklessly disregarded their truth at the time they were made. At no point while being attacked at the Garden had Mr. Oakley acted inappropriately or abusively. To the extent that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by Defendants' personnel, in a clear act of self-defense. However, Mr. Oakley neither initiated contact nor attempted to physically engage in an altercation with any of Defendants' employees.

60.     The statement by the Knicks that the organization hoped Mr. Oakley would "get[] some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a substance abuse problem of some kind.

61.     It would later become apparent that this statement by the Knicks was part of a coordinated media strategy by Defendants, designed to propagate the lie that Mr. Oakley is an alcoholic.

62.     The next day, on February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and sought to reinforce their claim that Mr. Oakley had somehow deserved the physical abuse he had received from their security guards.  Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed *Oakley's abusive behavior*. It started when he entered the building and continued until he was arrested and left the building.  *Every single statement we have received is consistent in describing his actions.  Everything he said since the incident is pure fiction.*

(emphasis added).

63.     Upon information and belief, Defendants intentionally misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

64.     These references to alleged statements made by security guards and other witnesses were designed to provide the impression that Defendants' prior and subsequent statements had factual underpinnings and were not mere statements of opinion.

**B.    Statements by Defendant Dolan**

65.     On February 10, 2017, Defendant Dolan appeared on ESPN Radio's, "The Michael Kay Show" and spoke about the dispute with Mr. Oakley.

11

66.    Defendant Dolan arrived at the show with a binder labeled, "Preparation."

67.    Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned from the Garden indefinitely, and unleashed a litany of defamatory statements.

68.    In attempting to explain his decision, Defendant Dolan said:  "I think the most important thing with that is we need to keep the Garden safe for anybody who goes there . . .  So *anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned*."

69.    Defendant Dolan went on to accuse Mr. Oakley several more times of being an alcoholic and/or having been overly impaired during the game:

> *To me, Charles has got a problem. We've said it before; he's his own worst problem. People have to understand that. He has a problem with anger. He's both physically and verbally abusive. He may have a problem with alcohol.*
>
> . . .
>
> *We know he said on TV that he was drinking beforehand. We heard statements from police that he appeared to be impaired. Our staff clearly could see that.*
>
> . . .
>
> *When you have issues like this, the first step for anybody is to ask for help.*

70.    In making these statements, Defendant Dolan was acting with actual malice towards Ms. Oakley, as he was fully aware that his comments were and are entirely without basis in fact and/or made the comments with a reckless disregard for their truth.  Defendant Dolan further attempted to provide a basis for his false statements by referencing statements made by others purporting to support his allegations about Mr. Oakley.  However, Mr. Oakley has never had a problem with excessive anger nor has he ever abused alcohol or any other drug.

12

71.    During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of

putting the safety of Knicks fans at risk, and somehow having abused them:  "***The No. 1 concern***

***has to be the safety and comfort of the fans***."

72.    Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at

risk and treated them abusively, when in reality he had done nothing but attempt to attend the

game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.
> But I would like for those people to look around and look at the
> people working at Madison Square Garden and ***realize that the guy***
> ***they're chanting for might have been a great Knick player, but he***
> ***was terribly abusive to them.***
>
> . . .
>
> ***There were security people there who were abused. There were***
> ***service people who were abused. The same people who help fans***
> ***get to their seats, they were abused. With racial overtones, sexual***
> ***overtones.*** How do you bring your kids to a game if you think
> that's going to happen?

73.    Perhaps feeling he needed to justify his decision to have Mr. Oakley removed and

banned indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating

that Mr. Oakley had come to the game with an "agenda" to take some unspecified action against

him:

> ***It's very clear to us that Charles Oakley came into the Garden***
> ***with an agenda. From the moment he stepped into the Garden, he***
> ***began with this behavior. Abusive behavior, stuff you wouldn't***
> ***want to say on the radio . . . It just accelerated and accelerated***
> ***and accelerated*** . . . I'm not inside of Charles Oakley's mind. ***He***
> ***did say a bunch of things along the way that looked like he was***
> ***headed in my direction. I didn't hear them myself but we heard***
> ***from our employees that he was using my name a lot.*** But this isn't
> because I'm nervous. This is because you can't do what he did and
> stay. We clearly did not — we weren't perfect here, and I think
> Charles never should have made it to his seats. And that's on us,

and we're doing things to remedy that and make sure that never
happens again. … I can't say for sure.

74.     As with virtually all of Defendant Dolan's statements about Mr. Oakley during

this show, he was fully aware that these too were complete fabrications and acted with actual

malice in making them.  Mr. Oakley had made no effort to confront Defendant Dolan and did

nothing to otherwise incite Defendants to forcibly remove him from the Garden.

75.     Defendants were aware that at no point was Mr. Oakley abusive towards any of

Defendants' employees or staff, nor was he abusive to any Knicks fans, as evinced by the fact

that he was allowed to proceed to his seat without interruption, despite being in full view of the

public.

76.     Thus Defendants were also aware that their statements accusing Mr. Oakley of

instigating the confrontation or otherwise provoking the security personnel at the Garden were

false at the time they made these statements, and/or Defendants were recklessly indifferent to

this fact.

77.     It was only when Defendant Dolan first caught sight of Mr. Oakley that issues

arose.

**C.    Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

78.     Tellingly, this was not the first time that Defendant Dolan has attempted to malign

individuals who upset him with unsupported accusations that they were alcoholics.

79.     In February 2015, Defendant Dolan accused a fan of being an alcoholic merely

based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing
> but ill bet your life is a mess and you are a hateful mess. What
> have you done that anyone would consider positive or nice. I am
> betting nothing. In fact ill bet you are negative force in everyone
> who comes in contact with you. You most likely have made your

14

family miserable. **Alcoholic maybe. I just celebrated my 21 year anniversary of sobriety. You should try it**.

(emphasis added).

80.     In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

81.     Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

D.      **The Effect of Defendants' Statements on Mr. Oakley**

82.     When read together, it is clear that Defendants engaged in a coordinated and intentional effort to malign Mr. Oakley's reputation in two separate ways.

83.     First, Defendants repeatedly claimed that Mr. Oakley was "*abusive*," and "*looking for a fight*."

84.     Defendant Dolan expounded on these spurious claims when he knowingly and falsely claimed that Mr. Oakley was "terribly abusive to [the fans]" and that Mr. Oakley's behavior purportedly threatened "*the safety and comfort of the fans*."

85.     The only implication that could have been drawn from these statements, in conjunction with Defendants' references to the fact that Mr. Oakley was "arrested" for his conduct, notably without explaining the nature of the charges brought against Mr. Oakley, and by their references to selected statements allegedly made by witnesses, was that that Mr. Oakley had committed such a serious act of violence towards Knicks fans that it had warranted his

15

arrest, a claim that Defendants propagated despite knowing full well that nothing of the sort had occurred.

86.     Thus, Defendants claimed, without basis, that Mr. Oakley, a former power forward for the Knicks, was arrested as a result of his behavior in "looking for a fight" that jeopardized "the safety" of the team's fans.

87.     These statements were clearly designed to create the belief that Mr. Oakley had committed a serious crime, which Defendants knew not to be the case.

88.     Second, Defendants repeatedly referred to the fact that Mr. Oakley was purportedly "drinking too much alcohol" on February 8, 2017, and that he was "clearly" "impaired" as a result of his drinking, neither of which were true, as Defendants were fully aware.

89.     However, Defendants were not satisfied with falsely claiming that Mr. Oakley was intoxicated while at the Garden.  Instead, they compounded their malicious statements by further stating, without any support, that Mr. Oakley had a possible "problem" with alcohol, requiring him to "ask for help," and leading Defendants to "*hope he gets some help soon*."

90.     Such statements, coupled with the references to statements from unidentified individuals purportedly supporting the false claim that Mr. Oakley was impaired, were inarguably spreading the false rumor that Mr. Oakley was an alcoholic who had a habitual problem that required "help."

91.     Defendants' statements concerning Mr. Oakley not only caused him to suffer reputational harm, but also directly caused him to lose significant business opportunities.

A-107

92.     Specifically, prior to February 8, 2017, Mr. Oakley made guest appearances at a drug and alcohol rehabilitation clinics to speak with patients and provide other services, including cooking them meals.

93.     However, as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, one such rehabilitation clinic, the Rebound Institute, came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients.

94.     Prior to Defendants' statements, Mr. Oakley was scheduled to earn appearance fees totaling precisely $40,000 from the Rebound Institute.

95.     However, once Defendants falsely claimed that he was an alcoholic who needed to get "help," Mr. Oakley was not able to receive the $40,000 he would have otherwise been paid for his appearance at the Rebound Institute.

### FIRST CAUSE OF ACTION
**(Defamation *Per Quod*)**

96.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

97.     Defendants defamed Plaintiff by falsely accusing him of being an alcoholic who required treatment.

98.     The statements made by Defendants were false.

99.     Defendants were at all times aware that these statements were false, or were recklessly indifferent to the falsity of these statements, and made them with the specific intention of damaging Oakley's reputation and maligning him to the general public.

100.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

17

101.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**SECOND CAUSE OF ACTION**
**(Defamation *Per Se*)**
***Against All Defendants***

102.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.    Defendants defamed Plaintiff by publicly accusing him of having committed the serious crime of assault against members of the public, warranting his arrest.

104.    Defendants further defamed Plaintiff by accusing him of suffering from the loathsome disease of alcoholism.

105.    Defendants' accusation that Plaintiff is an alcoholic further defamed Plaintiff in his trade, business or profession, as it is a matter of common knowledge that Plaintiff works with individuals who suffer from substance abuse issues, and substance abuse treatment centers cannot associate with alleged alcoholics.

106.    Defendants made defamatory statements that caused serious injury to Plaintiff's professional and personal reputation.

107.    None of these assertions by Defendants had any factual basis.

108.    In making these statements, Defendants were acting with actual malice, as they were at all times aware that none of the statements were true, or were acting with reckless indifference to the falsity of these statements.

109.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Libel)**
***Against Defendants MSG Networks, Inc.,***
***The Madison Square Garden Company***
***and MSG Sports & Entertainment, LLC***

</div>

110.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

111.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC defamed Plaintiff by, *inter alia*, publicly accusing him on Twitter of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

112.    None of these assertions by Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC have any factual basis.

113.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC were aware at all times that the statements were false and made the statements in reckless disregard of their falsity.

114.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

115.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's libelous conduct,

Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### FOURTH CAUSE OF ACTION
#### (Slander)
*Against All Defendants*

116.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

117.   Defendants defamed Plaintiff by, *inter alia*, publicly accusing him of having committed assault, having subjected other individuals, including members of the public, to abusive conduct and being an alcoholic.

118.   None of these assertions by Defendants had any factual basis.

119.   Defendants made the statements despite being fully aware that they were not true and for the sole purpose of attacking Mr. Oakley's reputation.

120.   As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

121.   As a direct and proximate result of Defendants' slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### FIFTH CAUSE OF ACTION
#### (Assault)
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

122.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

20

123.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

124.    Defendants had no reasonable basis for their conduct and their conduct was unwarranted given that Plaintiff had refused to engage in aggressive and/or offensive conduct until provoked, and then only in self-defense.

125.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### SIXTH CAUSE OF ACTION
**(Battery)**
***Against Defendants MSG Networks, Inc.,***
***The Madison Square Garden Company***
***and MSG Sports & Entertainment, LLC***

126.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

127.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

128.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct,

Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

## SEVENTH CAUSE OF ACTION
### (False Imprisonment)
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

129.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

130.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally confined Plaintiff, with Plaintiff's knowledge and awareness and without his consent, when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

131.    Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's confinement of Plaintiff was not privileged in any way.

132.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

## EIGHTH CAUSE OF ACTION
### (Abuse of Process)
*Against All Defendants*

133.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

134.    Defendants caused process to be issued to Plaintiff in the form of a criminal charge.

135.    Defendants caused Plaintiff to be charged with an intent to do harm and without excuse or justification.

136.    Defendants caused Plaintiff to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing Plaintiff and destroying his reputation.

137.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

138.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**NINTH CAUSE OF ACTION**
**(As an Alternative Claim to Claims One through Four in the Event that Defendants Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the Truth of Such a Belief)**
**(Denial of a Public Accommodation in Violation of the ADA)**
*Against All Defendants*

139.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

140.    Defendants own and operate the Garden, a place of public accommodation.

141.    Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

142.    As a former Knicks great, Plaintiff intended to return to the Garden had Defendants not denied him access, and intends to return to the Garden if he is permitted access.

143.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an

injunction prohibiting Defendants from further discriminating against him.

## TENTH CAUSE OF ACTION
**(As an Alternative Claim to Claims One through Four in the Event that Defendants
Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the
Truth of Such a Belief)
(Denial of a Public Accommodation in Violation of the NYSHRL)
*Against All Defendants***

144.    Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

145.    Defendants own and operate the Garden, a place of public accommodation.

146.    Defendants discriminated against Plaintiff by denying him access to the Garden

based on their perception that he suffers from alcoholism, a disability.

147.    As a former Knicks great, Plaintiff intended to return to the Garden had

Defendants not denied him access, and intends to return to the Garden if he is permitted access.

148.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award

of damages to the greatest extent permitted under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against

Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants

complained of herein violate the laws of the United States, and the State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any

such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

E.      An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.      An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

G.      An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 9, 2018                    Respectfully submitted,
       New York, New York

                                           **WIGDOR LLP**

                                           By: _____
                                               Douglas H. Wigdor
                                               Renan F. Varghese
                                               Kenneth Walsh

                                           85 Fifth Avenue
                                           New York, NY 10003
                                           Telephone: (212) 257-6800
                                           Facsimile: (212) 257-6845
                                           dwigdor@wigdorlaw.com
                                           rvarghese@wigdorlaw.com
                                           kwalsh@wigdorlaw.com

                                           *Attorneys for Plaintiff*

A-116

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                          :

CHARLES OAKLEY,                    :

               Plaintiff,         :

     v.                          :

JAMES DOLAN, in his individual and    :   Case No. 17-cv-6903 (RJS)
professional capacities, MSG NETWORKS,    :
INC., THE MADISON SQUARE GARDEN    :
COMPANY and MSG SPORTS &        :
ENTERTAINMENT, LLC,            :

              Defendants.     :
-------------------------------------------------------x

## DECLARATION OF SARAH L. KUSHNER

    I, SARAH L. KUSHNER, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

    1.   I am a member of the bar of this Court and an associate at the law firm of Gibson,

Dunn & Crutcher LLP, counsel to Defendants in this action.  I submit this declaration in support

of Defendants' Rule 12(b)(6) motion to dismiss Plaintiff Charles Oakley's Amended Complaint,

and accompanying Memorandum Of Law.

    2.   Defendants respectfully submit for the reasons explained in their Memorandum Of

Law In Support Of Defendants' Motion To Dismiss Plaintiff's Amended Complaint at pages 12–

16 that all of the documents now submitted here may be considered by the Court on Defendants'

motion to dismiss:

    **Video Footage Of The February 8, 2017 Incident**

    3.   Attached hereto as Exhibit 1 is a true and correct copy of the portion of the ESPN

national public broadcast of the February 8, 2017 New York Knicks game that captured the

A-117

February 8, 2017 incident.  Specifically, this national broadcast captured the incident inside the arena from when Oakley physically strikes a third guard in plain view of the NYPD officer who was present throughout the incident, until Oakley is physically escorted to the nearest exit by that police officer, MSG security personnel, and a second NYPD police officer.

    4.   Attached hereto as Exhibit 2 is internal MSG Arena Camera footage capturing the entire February 8, 2017 Knicks game, the proprietary software program needed to play that footage, and a "close up" video of this same footage zoomed into the area in the arena where the February 8, 2017 incident unfolded.  Specifically:

        a.   Attached hereto as Exhibit 2.a is a true and correct copy of the internal MSG Arena Camera footage of the entire February 8, 2017 Knicks game and the special program software needed to play this footage on a computer.  (To access this footage, first open up the program software file, a window will open, and then drag the actual video file into that window.  Using your mouse, you can explore the footage from all angles, including zooming in on the area where the entire incident unfolded.  For the Court's convenience, however, we have also now submitted the video of this same footage in "close up."

        b.   Attached hereto as Exhibit 2.b is a true and correct copy of the "close up" video of the internal MSG Arena Camera footage that is zoomed in on the relevant area in the arena where the incident occurred.  No special software is needed for this video.

    5.   Attached hereto as Exhibit 3 is a true and correct copy of a publicly available video of part of the February 8, 2017 incident, published on *The New York Times*'s website that same day as part of an article, *Former Knick Charles Oakley Is Arrested After Altercation at Madison*

2

A-118

*Square Garden*, N.Y. Times (Feb. 8, 2017)—the article with the video are publicly available at the following link: https://www.nytimes.com/2017/02/08/sports/basketball/charles-oakley-new-york-knicks.html?mtrref=www.google.com.

6.   Attached hereto as Exhibit 4 is a true and correct copy of a publicly available video of the February 8 incident, published on YouTube.  The video is publicly available at the following link: https://www.youtube.com/watch?v=LWpELvHeYd8.

7.   Attached hereto as Exhibit 5 is a true and correct copy of internal MSG post-incident security footage capturing Oakley after he is escorted out of the arena in handcuffs until he gets in an NYPD van that drives him away from MSG.  The footage is contained on four separate videos, each marked as follows:  5.a, 5.b, 5.c, and 5.d.

**Video Of February 10, 2017 Dolan Interview on ESPN Radio's *The Michael Kay Show***

8.   Attached hereto as Exhibit 6 is a true and correct copy of the entire video of Jim Dolan's February 10, 2017 interview on ESPN Radio's *The Michael Kay Show*.  The interview is publicly available at the following link:  https://www.youtube.com/watch?v=OyRH7TAMvLA.

**Documents From Oakley's Related Criminal Case**

9.   Attached hereto as Exhibit 7 is a true and correct copy of the criminal complaint, dated March 31, 2017, filed in the related criminal action against Oakley.

10. Attached hereto as Exhibit 8 is a true and correct copy of the Trespass Notice, dated August 4, 2017, that Oakley signed as part of a plea disposition in the criminal action, pursuant to which he agreed not to enter Madison Square Garden for one year.

**Prior Civil Cases Filed By Oakley Against Security Guards And Police Officers**

11. Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the parties' respective pleadings filed in a prior lawsuit Oakley brought against a Las Vegas resort & casino and members of its security personnel, *Oakley v. Aria Resort & Casino*, No. A-11-641182-C

(Nev. D. Ct.). Specifically, excerpts from Oakley's complaint, filed May 12, 2011, and defendants' first amended answer and counter-claim, filed July 13, 2011.

12. Attached hereto as Exhibit 10 is a true and correct copy of Oakley's complaint filed on July 13, 2011, in a prior civil action that Oakley initiated against police officers and the City of Henderson in Nevada. *Oakley v. City of Henderson*, No. A-11-644871-C (Nev. D. Ct.).

### Information Published On Public Websites

13. Attached hereto as Exhibit 11 is a true and correct copy of public information posted on Oakley's official personal website, http://oakleyinthekitchen.com/. This information is posted under Oakley's bio, news, and appearance sections on his website.

14. Attached hereto as Exhibit 12 is a true and correct copy of public information posted on the "About Us" page of the Rebound Institute's official website, https://www.reboundinstitute.com/.

15. Attached hereto as Exhibit 13 is a true and correct copy of public information posted on the Rebound Institute's Twitter account between March 17, 2017 and May 7, 2017, available at https://twitter.com/reboundinst?lang=en.

### New York Knicks Ticket Language

16. Attached hereto as Exhibit 14 is a true and correct copy of the standard language that appears on the back of all tickets purchased for Knicks games at Madison Square Garden. This language plainly states that the ticket is a "license revocable in MSG's sole discretion." In his Amended Complaint, Oakley explicitly references tickets he "purchased" to Knicks games he attended at the Garden, including the February 8, 2017 game; those tickets, as all purchased Knicks tickets do, necessarily contained this same language on the back of the ticket. Am. Compl. ¶ 2 (Oakley "purchase[d] his own tickets to attend games at the arena"); *id.* ¶¶ 26, 28

4

(stating that Oakley has "purchase[d] tickets to Knicks games out of his own pocket," including "a Knicks game . . . during the 2015-2016 season").

**Correspondence Between Counsel of Record**

17. Attached hereto as Exhibit 15 is a true and correct copy of an email chain between the parties' counsel containing two emails from Plaintiff's counsel, Mr. Wigdor, dated February 23, 2018, and February 26, 2018, acknowledging that, before filing this lawsuit, he had "the public video" and "believed" he also had possession of the "non-public video," which he described as "whatever" internal footage MSG "gave to the District Attorney" in the related criminal action, which included the internal MSG Arena Camera footage and the post-incident security footage.

Dated: New York, New York
       March 30, 2018

Sarah L. Kushner

A-121

# EXHIBIT 2.a-2.b

**(Video Filed And Served In Hard Copy)**

A-122

# EXHIBIT 6

**(Video Filed And Served In Hard Copy)**

A-123

# EXHIBIT 7

A-124

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK                    MISDEMEANOR

-against-

Charles Oakley (M 54),

                                        Defendant.

Police Officer William Dottavio, Shield 994 of the Midtown South Precinct, states as follows:

*The defendant is charged with:*

| | | |
|---|---|---|
| 1 | PL 120.00(1) | Assault in the Third Degree (defendant #1: 1 count) |
| 2 | PL 240.30(4) | Aggravated Harassment in the Second Degree (defendant #1: 1 count) |
| 3 | PL 110/120.00(1) | Attempted Assault in the Third Degree (defendant #1: 1 count) |
| 4 | PL 140.10(a) | Criminal Trespass in the Third Degree (defendant #1: 1 count) |
| 5 | PL 240.26(1) | Harassment in the Second Degree (defendant #1: 2 counts) |

On or about February 8, 2017 at about 8:25 P.M., at 10 Pennsylvania Plaza in the County and State of New York, the defendant, with intent to cause physical injury to another person, caused such injury to another person; the defendant, with the intent to harass, annoy, threaten and alarm another person, struck, shoved, kicked and otherwise subjected another person to physical contact thereby causing physical injury to such person and to a family and household member of such person as defined in section 530.11 of the criminal procedure law; the defendant, with intent to cause physical injury to another person, attempted to cause such injury to another person; the defendant knowingly entered and remained unlawfully in a building and upon real property which was fenced and otherwise enclosed in a manner designed to exclude intruders; the defendant, with intent to harass, annoy and alarm another, subjected that person to physical contact and attempted and threatened to do the same.

*The factual basis for these charges are as follows:*

I am informed by Thomas Redmond, of an address known to the District Attorney's Office, that he is an event manager at Madison Square Garden. I am further informed that, after the defendant was observed shouting and cursing, he asked the

1

A-125

Received:
912122399371     Case 1:17-cv-06903-RJS     Document 43-7     Filed 03/30/18     Page 3 of 3
Mar 31 2017 05:10pm
04:59:48 p.m.     03-31-2017     2 /2

Page 2 of 2

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK          MISDEMEANOR

-against-

Charles Oakley (M 54),

Defendant.

defendant to leave Madison Square Garden more than three times and that the defendant refused to leave. I am further informed by Mr. Redmond that, as a custodian of Madison Square Garden, he knows that Madison Square Garden is a fully-enclosed building with security checkpoints and that only people with valid tickets are allowed to enter or remain. I am further informed that, after being asked to leave, the defendant did not have permission or authority to remain in Madison Square Garden.

I am further informed by Mr. Redmond that after he asked the defendant to leave, he observed the defendant shove him and strike him about the face with his hand.

I am informed by Jayson Jacknow, of an address known to the District Attorney's Office, that he observed the defendant shove him and strike him about the arm with the side of his hand, causing redness and bruising that lasted for several days, a laceration to his hand, and substantial pain.

False statements made in this written instrument are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law, and as other crimes.

_____
Police Officer William Dottavio

03/31/17     1703
Date          Time

2

# EXHIBIT 8

A-127

# Official Trespass Notice

> *(Please print the name, address and date of birth of the person receiving this notice.)*
>
> Name: Charles Oakley                Date of Birth 12 / 18 / 1962
>
> Address _____ Apt. #_____
>
> City _____ State_____ Zip Code_____

## I, **CHARLES OAKLEY**, understand as follows:

(a)  I was arrested on February 8, 2017, based on accusations that (i) I refused a lawful request to leave the Madison Square Garden Arena, located at 4 Penn Plaza, New York, New York ("MSG"), and (ii) I caused physical contact with security officers;

(b)  As a condition to the District Attorney's offer of a 6-month adjournment in contemplation of dismissal ("ACD"), I understand and agree that I am prohibited from entering MSG for the one-year period from the date of this Official Trespass Notice;

(c)  If I re-enter MSG during that one-year period, I am subject to arrest for the crime of Trespass, pursuant to Section 140.10 of the New York State Penal Law, and any other appropriate criminal charge; and

(d)   If I re-enter MSG during the 6-month period of the ACD, I will violate the terms of the ACD and am subject to reinstatement of the currently pending charges.

Dated: August 4, 2017

| PERSON RECEIVING NOTICE (DEFENDANT) | ASSISTANT DISTRICT ATTORNEY | VENUE REPRESENTATIVE |
|---|---|---|
| Charles Oakley | Ryan Lipes | Lawrence Burian |

1

A-128

# EXHIBIT 9

Electronically Filed
05/12/2011 10:53:46 AM

1   **COMP**
    JAMES E. SMYTH II
2   Nevada Bar No. 6506
    LISA J. ZASTROW
3   Nevada Bar No. 9727
    KAEMPFER CROWELL RENSHAW
4   GRONAUER & FIORENTINO
    8345 West Sunset Road, Suite 250
5   Las Vegas, Nevada 89113
    Telephone:  (702) 792-7000
6   Fax:        (702) 796-7181
    jsmyth@kcnvlaw.com
    lzastrow@kcnvlaw.com

**CLERK OF THE COURT**

7   Attorneys for Plaintiff

8

9                              DISTRICT COURT

10                        CLARK COUNTY, NEVADA

11  CHARLES OAKLEY,                    | Case No. A-11-641182-C
                                       | Dept. No.    XXIV
12          Plaintiff,

13  vs.

14  ARIA RESORT & CASINO, LLC, a Nevada        **COMPLAINT**
    limited liability company; CITYCENTER
15  REALTY CORPORATION, a Nevada       **(Arbitration Exemption Claimed:**
    corporation; MGM RESORT            **Damages in Excess of $50,000)**
16  INTERNATIONAL, a foreign corporation;
    ELIJAH GERMANY, an individual; JOSEPH
17  KENNY, an individual; ROBERT MCCAIN,
    an individual; AVION REED, an individual;
18  RYAN SALAS, an individual; SECURITY
    OFFICERS DOES 1 through 10, employees of
19  the Aria Resort & Casino; DOES 1 through 10,
    inclusive; and ROE CORPORATIONS 1
20  through 10, inclusive,

21          Defendants.

22

23          Plaintiff CHARLES OAKLEY ("Plaintiff" or "OAKLEY"), by and through his attorneys

24  of record, James E. Smyth II and Lisa J. Zastrow of the law firm of Kaempfer Crowell Renshaw

    Gronauer & Fiorentino, complains against Defendants as follows:

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

996404_2 DOC  16151 1

36.     That as a direct and proximate result of the intentional, unreasonable and negligent actions of Defendants, OAKLEY has suffered a loss of earning capacity, lost wages, physical impairment, mental anguish and loss of enjoyment of life, in a presently unascertainable amount.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE - AS TO DEFENDANTS ARIA, CITYCENTER AND MGM**

37.     Plaintiff incorporates paragraphs 1 through 36 of the Complaint as though said paragraphs were fully set forth herein.

38.     Defendants ARIA, CITYCENTER and MGM had a duty of care to protect OAKLEY from the unreasonable harm caused by Defendants SECURITY OFFICERS while OAKLEY was a guest of ARIA and under its care, custody and control during and following the assault perpetuated upon OAKLEY.

39.     Defendants ARIA, CITYCENTER and MGM owed OAKLEY, and others as guests or invitees coming upon Defendant ARIA's premises, a duty of care in the selection, hiring, training and supervision of its agents and employees, including the Defendant SECURITY OFFICERS.

40.     Defendants ARIA, CITYCENTER and MGM breached this duty of care to OAKLEY as evidenced by the acts and omissions alleged herein. Said acts and omissions were done negligently and Defendants knew, or should have known, that such acts or omissions would have injured OAKLEY.

41.     Defendants ARIA, CITYCENTER and MGM are responsible for the supervision and employment of its agents to insure said agents perform their duties and respond in a reasonable and appropriate manner.

/ / / /

KAEMPFER CROWELL, RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

996404_2.DOC  16151.1

Page 6 of 14

1      42.   Defendants ARIA, CITYCENTER and MGM negligently failed to supervise

2   and/or train Defendant SECURITY OFFICERS which caused harm to OAKLEY.

3      43.   As a direct and proximate result of Defendants ARIA, CITYCENTER and

4   MGM's negligent conduct and supervision, OAKLEY suffered harm and damages in an amount

5   in excess of $10,000.00. Furthermore, to the extent that said acts were done maliciously,

6   intentionally and recklessly, OAKLEY seeks an award of punitive damages in an amount to be

7   proved at trial.

8      44.   As a direct and proximate result of Defendants ARIA, CITYCENTER and

9   MGM's negligent conduct and supervision, OAKLEY has been required to retain the law firm

10   of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action and therefore is

11   entitled to all reasonable attorney fees and costs.

12                           **SECOND CAUSE OF ACTION**
                 **ASSAULT – DEFENDANTS ARIA, CITYCENTER AND MGM**
13

14      45.   Plaintiff incorporates paragraphs 1 through 44 of the Complaint as though said

15   paragraphs were fully set forth herein.

16      46.   Defendants ARIA, CITYCENTER and MGM threatened to use force on

17   OAKLEY causing him to have a reasonable fear of an imminent harmful contact and ARIA,

18   CITYCENTER and MGM's conduct as alleged in this Complaint were outrageous, intentional,

19   unreasonable and unnecessary given the circumstances surrounding the altercation, and the

20   duties owed to OAKLEY.

21      47.   As a direct and proximate result of Defendants ARIA, CITYCENTER and

22   MGM's employees' intentional actions, OAKLEY, who was a well and able-bodied individual,

23   has suffered a loss of earning capacity, lost wages, physical impairment, mental anguish and

24   loss of enjoyment of life in an amount in excess of $10,000.00.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

996404_2.DOC  16151.1                                                    Page 7 of 14

48.     As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's employees' intentional actions, OAKLEY has incurred, and will continue to incur in the future, expenses for medical care and treatment incidental thereto, the present amount of which is unknown.

49.     The aforementioned intentional and reckless actions of Defendants ARIA, CITYCENTER and MGM's employees were willful and malicious and were intended to oppress and cause injury to OAKLEY.

50.     As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's intentional actions, OAKLEY has been required to retain the law firm of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action and therefore is entitled to all reasonable attorney fees and costs.

## THIRD CAUSE OF ACTION
## BATTERY - DEFENDANTS ARIA, CITYCENTER AND MGM

51.     Plaintiff incorporates paragraphs 1 through 50 of the Complaint as though said paragraphs were fully set forth herein.

52.     Defendants ARIA, CITYCENTER and MGM's employees committed unwarranted, unlawful, wrongful and offensive contact against OAKLEY by striking, hitting, battering, and attacking OAKLEY with the intent to cause physical harm.

53.     As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's employees' actions, OAKLEY suffered harm and damages in excess of $10,000.00.

54.     As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's employees' actions, OAKLEY has incurred, and will continue to incur in the future, expenses for medical care and treatment incidental thereto, the present amount of which is unknown.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

996404_2 DOC  16151 1

Page 8 of 14

4

55.    The aforementioned intentional and reckless actions of Defendants ARIA, CITYCENTER and MGM's employees were willful and malicious and were intended to oppress and cause injury to OAKLEY.

56.    As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's intentional actions, OAKLEY has been required to retain the law firm of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action and therefore is entitled to all reasonable attorney fees and costs.

**FOURTH CAUSE OF ACTION**
**FALSE IMPRISONMENT - DEFENDANTS ARIA, CITYCENTER AND MGM**

57.    Plaintiff incorporates paragraphs 1 through 56 of the Complaint as though said paragraphs were fully set forth herein.

58.    The actions and conduct of Defendants ARIA, CITYCENTER and MGM's employees, as alleged herein, establish they intended to confine OAKLEY within boundaries they fixed and Defendants ARIA, CITYCENTER and MGM's conduct resulted in the confinement, detention and violation of the personal liberty of OAKLEY, without legal excuse or reasonable justification.

59.    As a direct and proximate result of the confinement, detention and violation of the personal liberty, OAKLEY was conscious of the confinement and he suffered physical pain and distress that ultimately amplified the injuries sustained.

60.    As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's conduct, OAKLEY suffered harm and damages in excess of $10,000.00.

61.    As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's actions, OAKLEY has incurred, and will continue to incur in the future, expenses for medical care and treatment incidental thereto, the present amount of which is unknown.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road
Suite 250
Las Vegas, Nevada 89113

996404_2 DOC  161511

62.    As a direct and proximate result of Defendants ARIA, CITYCENTER and MGM's intentional actions, OAKLEY has been required to retain the law firm of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action and therefore is entitled to all reasonable attorney fees and costs.

## FIFTH CAUSE OF ACTION
## DEFAMATION PER SE

63.    Plaintiff incorporates paragraphs 1 through 62 of the Complaint as though said paragraphs were fully set forth herein.

64.    Many of the actions and conduct of the Defendants, including but not limited to handcuffing OAKLEY without cause, were engaged in and committed in front of, and in the presence of, third person invitees and guests of Defendant ARIA. Said third persons were, and would have been led to falsely believe and assume that OAKLEY had committed and been guilty of some crime or wrongdoing.

65.    Defendants were not privileged to take such actions leading to the false belief and assumption that OAKLEY had been guilty of some crime or wrongdoing and Defendants were at fault and acted intentionally or at least negligently.

66.    As a direct and proximate result of Defendants' intentional and wrongful actions, OAKLEY was per se defamed and suffered damages thereby in excess of $10,000.00.

67.    As a direct and proximate result of the Defendants' intentional and wrongful actions, OAKLEY has been required to retain the law firm of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action and therefore is entitled to all reasonable attorney fees and costs.

/././

/././

Electronically Filed
07/13/2011 04:08:50 PM

**CLERK OF THE COURT**

1  AACS
   MARTIN J. KRAVITZ, ESQ.
2  Nevada Bar No. 83
   M. BRADLEY JOHNSON, ESQ.
3  Nevada Bar No. 4646
   JENNIFER N. TAYLOR, ESQ.
4  Nevada Bar No. 6141
   KRAVITZ, SCHNITZER, SLOANE
5  & JOHNSON, CHTD.
   8985 S. Eastern Avenue, Suite 200
6  Las Vegas, Nevada 89123
   Telephone:    (702) 362-6666
7  Facsimile:    (702) 362-2203
   Attorneys for Defendants

8
                    **DISTRICT COURT**
9                **CLARK COUNTY, NEVADA**

10  CHARLES OAKLEY,                          Case No. A-11-641182-C

11                      Plaintiff,           Dept. No. XXIV

12  vs.

13  ARIA RESORT & CASINO, LLC, a Nevada      **DEFENDANTS, ARIA RESORT &**
    limited liability company; CITYCENTER    **CASINO, LLC, CITYCENTER REALTY**
14  REALTY CORPORATION, a Nevada             **CORPORATION, MGM RESORTS**
    corporation; M G M R E S O R T           **INTERNATIONAL ELIJAH GERMANY,**
15  INTERNATIONAL, a foreign corporation;    **JOSEPH KENNY, ROBERT MCCAIN,**
    ELIJAH GERMANY, an individual; JOSEPH    **AVION REED, AND RYAN SALAS'**
16  KENNY, an individual; ROBERT MCCAIN,     **FIRST AMENDED ANSWER TO**
    an individual; AVION REED, an individual; **COMPLAINT AND FIRST AMENDED**
17  RYAN SALAS, an individual; SECURITY      **COUNTER-CLAIM**
    OFFICERS DOES 1 through 10, employees
18  of the Aria Resort & Casino; DOES 1 through
    10, inclusive; and ROE CORPORATIONS 1
19  through 10, inclusive,

20                      Defendants.

21
22  ARIA RESORT & CASINO, LLC, a
    Nevada limited liability company; ELIJAH
23  GERMANY, an Individual; ROBERT
    MCCAIN, an Individual; AVION REED, an
24  Individual; and JOSEPH KENNY, an
    Individual,

25                      Counterclaimants,
26  vs.

27  CHARLES OAKLEY,

28                      Counterdefendant.

LAW OFFICES
KRAVITZ, SCHNITZER, SLOANE &
JOHNSON, CHTD.

7

10.    Counter-claimants are also informed and believe that OAKLEY has been involved in a number of altercations, fights, and/or arrests upon individuals outside of his basketball career.

11.    As a claimed celebrity/retired player, OAKLEY has used his celebrity to obtain "VIP" benefits from various hotels and casinos, including ARIA.

12.    As will be shown in this pleading, OAKLEY has attacked and injured not only employees of ARIA, but his behavior began when OAKLEY assaulted and battered employees of The Light Group, Inc. at the Liquid pool located inside the Aria Resort & Casino.

13.    At the Liquid pool, OAKLEY not only pushed, punched, and assaulted security officers of The Light Group, Inc., but also chose to assault and batter an innocent bystander who happened to be working on the audio equipment at the Liquid pool.

14.    OAKLEY has also had a history of battering other innocent bystanders.  For instance, on April 9, 2006, OAKLEY sent a Bellagio employee to the hospital with a one-half inch laceration above his right eye.  OAKLEY had been playing craps, and threw a hand full of dice at a Bellagio employee.

15.    As a result of the incident, the employee did in fact filed a police report with Metro before going to the hospital.

16.    However, because of OAKLEY's status as a high roller, the employee did not press charges against OAKLEY.

17.    This was not the first incident wherein OAKLEY engaged in misconduct at Bellagio. On July 17, 2005, OAKLEY punched Security Supervisor Shawn Duran in the face. Duran wanted to press charges, but was persuaded to not press charges because of OAKLEY's celebrity status.

**THE INCIDENT IN QUESTION - OAKLEY'S ATTACK UPON THE LIGHT GROUP EMPLOYEES AT THE LIQUID POOL**

18.    On May 28, 2010, OAKLEY and other friends, including Jermaine O'Neil, were guests at the Liquid pool.  During that time, OAKLEY consumed several large drinks containing liquor. The Liquid pool is operated by The Light Group, Inc., which is separate and apart from any of the named parties to this suit.

///

Page 14 of 22

19.   Around closing time in the late afternoon, OAKLEY got into a scuffle with Liquid employees. More particularly, OAKLEY was upset that he and his friends were not allowed to invite additional females into the pool after closing.

20.   As a consequence, OAKLEY pushed and battered The Light Group Security Officer Richard Subach.

21.   Subach then called for assistance from a number of Liquid employees and security officers, including Keoni Cargill, Benito Armenta, Eric Turner and Erik Jacobson.

22.   OAKLEY then started a pushing and shoving match with the aforementioned Liquid security officers in front of the bar area of the pool.

23.   Eventually, OAKLEY pushed and battered The Light Group employee Benito Armenta so as to cause him to be thrown to the ground and smash the back of his head into a patio table.

24.   Additionally, OAKLEY's actions caused ARIA executive, William Cramsey, to be thrown to the ground.

25.   As a result of these actions, Richard Subach radioed for assistance from ARIA security staff. In particular, Subach asked that ARIA's security officers respond to assist with a citizen's arrest of OAKLEY for assault and battery.

26.   Before the ARIA's security could arrive, OAKLEY noticed that an ARIA employee, Jeff Marshall, happened to have a camera around his neck.

27.   Marshall worked for ARIA as a audio/visual technician and was in the Liquid pool area maintaining and repairing various speakers.

28.   Once OAKLEY noticed the camera, he screamed: "Are you _____ taking pictures of me?"; and proceeded to move forward shouting obscenities at Jeff Marshall, and demanding that Marshall surrender his camera.

29.   OAKLEY backed Mr. Marshall into a DJ booth/closet wherein OAKLEY assaulted and battered Marshall by ripping the camera from his neck and throwing the Twenty-Five Hundred Dollar ($2,500) camera into the swimming pool.

///

Page 15 of 22

30.    Immediately thereafter, OAKLEY was escorted to the exit of the Liquid pool by The Light Group employees.

31.    As OAKLEY was walking back to the hotel, the first responding ARIA security officer, RYAN SALAS, encountered OAKLEY in the pool walkway back to the hotel.

32.    SALAS repeatedly asked OAKLEY to stop so that he could talk to him and question him about the assaults and batteries on the Liquid staff and Mr. Marshall.  OAKLEY refused to stop his walk, and continued to move through the pool area and into the hallways of the hotel when he arrived at the secured entrance to the VIP Sky Suites.

33.    Upon arrival at the Sky Suites door, additional security officers of ARIA arrived. In particular, OAKLEY refused to obey repeated commands to stop so that the officers could discuss the matter with him.

34.    Instead, he pushed officer JOSEPH KENNEY repeatedly out of the way, and threatened to do bodily harm to a number of the officers as they continued to respond to the scene.

35.    Ultimately, security officer ROBERT McCAIN arrived and asked OAKLEY by name to step to the side so they could discuss the matter.  Officer McCAIN recognized OAKLEY, although the other officers did not know his identity up until that moment.

36.    OAKLEY refused to obey repeated commands by all the officers to calm down and to discuss the previous attacks on others with them.  Instead, OAKLEY pushed officers out of the way, punched some officers, kicked other officers, and actually bit two of the officers on their hands.

37.    Pursuant to their training, the ARIA officers immediately began the process to restrain and take OAKLEY into detention not only because of the original reports of battery on the Liquid employees, and Mr. Marshall but also because of the crimes committed in their presence, i.e., assault and batteries upon them.

38.    During the course of the attempt by ARIA security to restrain OAKLEY, OAKLEY engaged in the following actions:

a.    He bit two of the officers;

LAW OFFICES
KRAVITZ, SCHNITZER, SLOANE &
JOHNSON, CHTD.

Page 16 of 22

b.   He elbowed two of the officers in their face;

c.   He used obscenities and threatened to "knock people out";

d.   He kicked officers;

e.   He spit on one of the officers; and

f.   He punched several of the officers with his fist.

39.   Each of the actions taken by OAKLEY, starting with his actions at the Liquid pool upon the Liquid employees, and his unprovoked action upon Jeff Marshall, would have justified an arrest in and of itself. However, OAKLEY exacerbated the problems by then assaulting and battering the investigating and responding ARIA officers.

40.   Therefore, at the point and time OAKLEY was put in restraints, he had engaged in tortious misconduct upon multiple individuals.

41.   OAKLEY had also violated Nevada statutes which permitted his exclusion and arrest.

42.   After being handcuffed, OAKLEY was escorted through the back of the house to detention.

43.   OAKLEY, as in past encounters, was not arrested because of his celebrity status.

44.   Consequently, OAKLEY once again escaped culpability for his violent, intentional, and unlawful acts.

45.   Three of the ARIA officers were injured and received medical treatment that day.

46.   ARIA also replaced Jeff Marshall's personal camera which OAKLEY had destroyed at a cost of more than Two Thousand Five Hundred Dollars ($2,500).

47.   OAKLEY then brought the instant action and released false and misleading information to the media to portray himself as a victim, when in reality, he was the vicious aggressor who provoked the incidents at issue.

**FIRST CLAIM FOR RELIEF**
**(ASSAULT)**

48.   Defendants/Counter-Claimants repeat and reallege each and every allegation contained in Paragraphs 1 through 47 above and incorporates herein by reference as though fully set forth herein.

Page 17 of 22

11

49. Based upon the acts described upon, Plaintiff/Counter-Defendant threatened to use force and caused Defendants/Counter-Claimants to have a reasonable apprehension and fear of imminent harmful or offensive contact and Plaintiff/Counter-Defendant's conduct as alleged herein was outrageous, intentional, unreasonable and unnecessary.

50. As a direct and proximate result of the assault committed by Plaintiff/Counter-Defendant, and his intentional actions, Defendants/Counter-Claimants suffered emotional and/or mental distress, and injury to their persons, severe pain and suffering, all or some of which conditions may be permanent or disabling in nature all in excess of $10,000.

51. Defendants/Counter-Claimants are also entitled to punitive damages in excess of $10,000 to punish OAKLEY for his wrongful misconduct and to deter such action in the future.

52. That it has been necessary for the Defendants/Counter-Claimants to retain the services of counsel to pursue this Counter-claim and, therefore, Defendants/Counter-Claimants should be reimbursed by Plaintiff/Counter-Defendant for all attorneys' fees and costs incurred as a result of this action.

**SECOND CLAIM FOR RELIEF**
**(BATTERY)**

53. Defendants/Counter-Claimants repeat and reallege each and every allegation contained in Paragraphs 1 through 52 above and incorporates herein by reference as though fully set forth herein.

54. Based upon the acts described upon, Plaintiff/Counter-Defendant committed unwarranted, unlawful, wrongful and offensive contact against Defendants/Counter-Claimants by striking, hitting, spitting, pushing, battering, and attacking Defendants/Counter-Claimants with the intent to inflict serious bodily harm.

55. As a direct and proximate result of the battery committed by Plaintiff/Counter-Defendant, and his intentional actions, Defendants/Counter-Claimants suffered emotional and/or mental distress and injury to their persons, severe pain and suffering, all or some of which conditions may be permanent or disabling in nature all in excess of $10,000.

56. Defendants/Counter-Claimants are also entitled to punitive damages in excess of $10,000 to punish OAKLEY for his wrongful misconduct and to deter such action in the future.

LAW OFFICES
KRAVITZ, SCHNITZER, SLOANE &
JOHNSON, CHTD.

57.  That it has been necessary for the Defendants/Counter-Claimants to retain the services of counsel to pursue this Counter-claim and, therefore, Defendants/Counter-Claimants should be reimbursed by Plaintiff/Counter-Defendant for all attorneys' fees and costs incurred as a result of this action.

**THIRD CLAIM FOR RELIEF**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

58.  Defendants/Counter-Claimants repeat and reallege each and every allegation contained in Paragraphs 1 through 57 above and incorporates herein by reference as though fully set forth herein.

59.  Plaintiff/Counter-Defendant's conduct was extreme or outrageous with either the intention of, or reckless disregard for, causing emotional distress to Defendants/Counter-Claimants.

60.  Defendants/Counter-Claimants suffered severe and extreme emotional distress as the actual or proximate result of Plaintiff/Counter-Defendant's conduct.

60.  As a direct and proximate result of Plaintiff/Counter-Defendant's conduct, Defendants/Counter-Claimants suffered injury to her body and severe pain and suffering, all or some of which conditions may be permanent or disabling in nature all in excess of $10,000.

62.  Defendants/Counter-Claimants are also entitled to punitive damages in excess of $10,000 to punish OAKLEY for his wrongful misconduct and to deter such action in the future.

63.  That it has been necessary for the Defendants/Counter-Claimants to retain the services of counsel to pursue this Counter-claim and, therefore, Defendants/Counter-Claimants should be reimbursed by Plaintiff/Counter-Defendant for all attorneys' fees and costs incurred as a result of this action.

**FOURTH CLAIM FOR RELIEF**

**(REIMBURSEMENT ON BEHALF OF ARIA RESORT & CASINO)**

64  Defendants/Counter-Claimants repeat and reallege each and every allegation contained in Paragraphs 1 through 63 above and incorporates herein by reference as though fully set forth herein.

///

Page 19 of  22

LAW OFFICES
KRAVITZ, SCHNITZER, SLOANE &
JOHNSON, CHTD.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

65.    On May 28, 2010, Defendant/Counter-Claimant, Joseph Kenny was employed by ARIA as a security officer.

66.    On May 28, 2010, Jeff Marshall was employed by ARIA as an audio/visual technician.

67.    On that same date, Mr. Marshall was present at the Liquid Pool where OAKLEY was involved in an incident with employees of the Light Group, owner and operated of Liquid Pool. While present at the time in question, Mr. Marshall had a camera forcibly taken from him by OAKLEY and destroyed by throwing it into Liquid Pool located on ARIA's premises.

68.    Said camera that OAKLEY forcibly took from Mr. Marshall was his own personal property he was using while on duty at Defendant's/Counter-Claimant's premises on May 28, 2010.

69.    On that same date, Mr. Kenny responded to a call for assistance involving Plaintiff/Counter-Defendant OAKLEY who was in the process of arguing with other security personnel employed by Defendant/Counter-Claimant ARIA.

70.    In the process of responding to the call, Mr. Kenny sustained an injury to his person which included being bitten on his right hand and spit upon in his face by OAKLEY which required medical care.

71.    That the Plaintiff/Counter-Defendant's intentional and careless actions were a direct and proximate cause of the injuries sustained by Mr. Kenny.

72.    That the Plaintiff/Counter-Defendant's intentional and careless actions were a direct and proximate cause of the damages to the property of Mr. Marshall.

73.    ARIA paid in excess of $2,500 for medical services received by Mr. Kenny.

74.    ARIA paid in excess of $2,500 for the replacement of the camera destroyed by OAKLEY that belonged to Mr. Marshall.

75.    ARIA, as the employer of Mr. Kenny, having paid the reasonable and necessary expenses of medical care received by Mr. Kenny, is subrogated to the rights of Mr. Kenny to recover those expenses it has paid.

76.    ARIA has a right of action for reimbursement against OAKLEY in excess of $2,500 for the replacement camera purchased by ARIA.

Page 20 of 22

77.    That it has been necessary for the Defendant/Counter-Claimant to retain the services of counsel to pursue this Counterclaim and, therefore, Defendant/Counter-Claimant should be reimbursed by Counter-Defendant for all attorneys' fees and costs incurred as a result of this action.

WHEREFORE, Defendants/Counter-Claimants prays for judgment against Plaintiff/Counter-Defendant, as follows:

1.    For money damages in an amount in excess of $10,000.00, including interest;

2.    For punitive damages in excess of $10,000.00, including interest;

3.    For reimbursement against any all amounts paid by Defendant/Counter-Claimant ARIA for medical and other services related to the injury sustained by its employee, Joseph Kenny arising out of the incident which  is the subject of Plaintiff/Counter-Defendant's Complaint.

4.    For reimbursement against any all amounts paid by Defendant/Counter-Claimant ARIA for property damages related to the conduct of OAKLEY arising out of the incident which is the subject of Plaintiff/Counter-Defendant's Complaint.

5.    For attorney's fees and costs of suit incurred herein; and

6.    For such other relief as just and proper.

DATED this 13th day of July, 2011.

KRAVITZ, SCHNITZER, SLOANE
& JOHNSON, CHTD.

MARTIN J. KRAVITZ, ESQ.
Nevada Bar No. 83
M. BRADLEY JOHNSON, ESQ.
Nevada Bar No. 4646
JENNIFER N. TAYLOR, ESQ.
Nevada Bar No. 6141
8985 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
Attorneys for Defendants/Counter-Claimants

A-144

# EXHIBIT 10

A-145

Electronically Filed
07/13/2011 09:57:50 AM

CLERK OF THE COURT

1  LAW OFFICES OF DANIEL MARKS
   DANIEL MARKS, ESQ.
2  Nevada State Bar No. 002003
   530 South Las Vegas Blvd., Suite 300
3  Las Vegas, Nevada 89101
   (702) 386-0536; Fax: (702) 386-6812
4  Attorney for Plaintiff

5                    DISTRICT COURT

6                CLARK COUNTY, NEVADA

7
8  CHARLES OAKLEY,                          Case No. :
                                            Dept. No.:
9       Plaintiff,

10 vs.                                      A- 11- 6 4 4 8 7 1- C
                                           XXI X
11 THE CITY OF HENDERSON, and
   JOHN DOES and JANE DOES I
12 THROUGH X, inclusive,

13      Defendants.
                                    /
14

15                        COMPLAINT

16     COMES NOW the Plaintiff Charles Oakley, by and through his undersigned counsel, Adam Levine,

17 Esq., and for his cause of actions against the Defendants herein alleges as follows:

18     1.    At all times material hereto Plaintiff, Charles Oakley (hereafter "Plaintiff"), was a resident

19           of Las Vegas, Nevada.

20     2.    That at all times material hereto Defendant City of Henderson was a political subdivision of

21           the State of Nevada.

22     3.    At all times material hereto, Defendants John Does and Jane Does I through X were police

23           officers employed by the City of Henderson and were performing duties within the course

24           and scope of their employment.  Plaintiff will seek leave of the Court to file an Amended

25           Complaint when the identities of John Does and Jane Does I through X are ascertained.

26     4.    The Defendants' actions caused events to occur within the State of Nevada out of which the

27           Plaintiff's claims herein arise.

28     5.    The Defendant City of Henderson is vicarious liable for the actions of its police officers

                                        1

1   undertaken in the course and scope of their employment.

2   6.   The jurisdictional amount for filing this claim is satisfied and exceeds Ten Thousand Dollars

3   ($10,000.00).

### FIRST CAUSE OF ACTION
#### (Negligence)

5   7.   Plaintiff restates the allegations contained in Paragraphs 1-6 and incorporates them herein

6   by reference.

7   8.   On or about 2:30 a.m. on March 12, 2011, two of the Defendant City of Henderson's police

8   officers, temporarily seized and/or detained the Plaintiff and two of his friends. The police

9   officers controlled the actions of the Plaintiff and his friends during the temporary seizure

10   and/or detention in a reckless, careless and negligent manner which caused serious personal

11   injuries to the Plaintiff. The Defendants ordered the Plaintiff and his friends to "get on the

12   police car and stay on the police car," which caused severe burns just above the Plaintiff's

13   knees. The Plaintiff will also have permanent scarring just above both of his knees.

14   9.   That as a direct and proximate result of the recklessness, carelessness and negligence of the

15   Defendants, the Plaintiff has suffered, incurred, and will continue to suffer and/or incur:

16   a.   Severe and possibly permanent physical injuries, the full nature and extent of which

17   are currently unknown;

18   b.   Pain, anxiety, distress and disfigurement; and

19   c.   Medical, hospital, therapy and related expenses.

20   10.   Plaintiff is entitled to compensatory damages in an amount that will be determined at trial,

21   in addition to other damages.

22   11.   The Plaintiff was forced to retain counsel to bring this action and should be awarded his

23   reasonable attorney's fees and litigation costs incurred.

24   ////

25   ////

26   ////

27   ////

28   ////

2

### SECOND CAUSE OF ACTION
### (Battery)

12. Plaintiff incorporates paragraphs 1-12 herein.

13. Defendants intentionally caused a harmful or offensive contact with the Plaintiff when the police officers directed the Plaintiff in a hostile tone to "get on the police car and stay on the police car," which caused burns to the Plaintiff's legs.

14. The actions of the Defendants as set forth above constitute a battery upon the person of the Plaintiff.

15. Plaintiff is entitled to compensatory damages in an amount that will be determined at trial, in addition to other damages.

16. The Plaintiff was forced to retain counsel to bring this action and should be awarded his reasonable attorney's fees and litigation costs incurred.

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1. For general damages in an amount in excess of Ten Thousand Dollars ($10,000.00);

2. For compensatory damages in an amount in excess of Ten Thousand Dollars ($10,000.00) to be determined at trial;

3. For attorney's fees and litigation costs incurred; and

4. For such other relief as the Court deems just and proper.

DATED this ⁄⁄ day of July, 2011

LAW OFFICE OF DANIEL MARKS

DANIEL MARKS, ESQ.
Nevada Bar No. 002003
ADAM LEVINE, ESQ.
Nevada Bar No. 004673
530 South Las Vegas Blvd., Ste. 300
Las Vegas, Nevada 89101
Attorney for Plaintiff

3

A-148

# EXHIBIT 11

A-149

CHARLES OAKLEY

HOME    BIO    NEWS    APPEARANCES    MEDIA ROOM    SHOP    CONTACT



## NEWS



### Oakley Raising Money For Summer Hoops Camps

PUBLISHED ON AUGUST 3, 2017

To many people, Charles Oakley is living the American dream, the good life, and, in...

DETAILS



### Oakley Helps Jayson Williams Rebound From Addiction

PUBLISHED ON DECEMBER 12, 2016

He places his hand firmly on the big man's lower back, Charles Oakley does, dismissing...

DETAILS



### Oakley In Exile From Knicks But At Home In Cleveland

PUBLISHED ON NOVEMBER 3, 2016

Charles Oakley pushed his hands into his pockets and peered at the small photo of...

DETAILS

## OAK'S BIO



| 18 | 12,417 | 12,205 | 1,282 |
|----|--------|--------|-------|
| NBA Seasons | NBA Points | NBA Rebounds | NBA Games |

## MEDIA ROOM

  

1

Case 21-2939, Document 26, 03/08/2022, 3273884, Page156 of 202

Case 1:17-cv-06903-RJS    Document 43-11    Filed 03/30/18    Page 3 of 10





**Basketball Career**

Oakley was born in Cleveland, Ohio, and attended Virginia Union University.

NBA Career

**Chicago Bulls (1985-1988)**

Oakley was drafted with the 9th overall pick in the 1985 NBA Draft by the Cleveland Cavaliers, but his draft rights were traded to the Chicago Bulls. Oakley provided another scoring option and steady offensive and defensive performances to an up-and-coming Bulls squad led by Michael Jordan. Oakley earned All-Rookie Team honors in 1986.

**New York Knicks (1988-1998)**

With the drafting and development of Horace Grant, the Bulls traded Oakley to the New York Knicks for 7'1" center Bill Cartwright. Oakley eventually became a part of the core which the Knicks built around, which also featured Patrick Ewing, John Starks, and point guard Mark Jackson. During the Knicks' 1994 season, which included a record 25 playoff games, Oakley started every regular season and playoff game for a record 107 starts in a single season. During his tenure with the Knicks, Oakley was primarily known as a defensive specialist and top NBA rebounder.

**Toronto Raptors (1998-2001)**

In 1998, Oakley was traded by New York to the Toronto Raptors for blossoming star Marcus Camby. For the Raptors, he provided a veteran presence to a young team that included Vince Carter and Tracy McGrady.

**Return to Chicago (2001-2002)**

In 2001, Oakley was traded by the Toronto Raptors with a 2002 2nd-round pick to the Chicago Bulls for Brian Skinner. This was his second tenure with the Bulls. Starting 36 of his 57 played games, he averaged 3.8 points per game, 6 rebounds per game, and 2 assists per game.

**Washington Wizards (2002-2003)**

In 2002, Oakley signed as a free agent with the Washington Wizards. He was reunited with former teammate Michael Jordan. Oakley played 42 games during the 2002-03 season.

**Houston Rockets (2004)**

The 2003-04 season was Oakley's last. On March 18, 2004, Oakley signed the first of two 10-day contracts with the Houston Rockets. Oakley only played 7 games and at the end of the season, Oakley retired from the NBA.

**Career Highlights**

• He placed in the Top 10 in rebounds per game average five times between 1987 and 1994. In all but one of these seasons he played the full complement of 82 games.

• He placed in the Top 10 in total rebounds 6 times and led the league in total rebounds twice (1987 and 1988).

• In 1994, he became an NBA All-Star and was chosen to the league's All-Defense 1st team.

3





## Oak In The Kitchen

Since retiring from basketball, Charles has turned his passion toward the kitchen. In 2008, he hosted his own unique cooking show, Cafe Oakley. His specialty: healthy options with savory and delicious flavors, notably: turkey burgers. He went on to open Red, The Steakhouse in Cleveland and another location in South Beach, Miami, FL. Oakley has displayed his culinary skills on several cooking competition shows, including Chopped Tournament of Stars on the Food Network, in 2014.

Charles is active today cooking for various private and public parties and can be hired to cook for any event. Please contact Charles with more information about your event and how he can add the "flavor" you are looking for to make your event a huge success. It's not often you find a talented chef with a 19 year NBA career. Charles offers both the celebrity awareness and cooking prowess for a unique blend and twist for your event.

Look for Charles' cookbook coming soon...due out in 2016. Make sure to watch the video below of Charles cooking.



4



**Life After Basketball**

CHARLES OAKLEY

On December 26, 2010, Oakley was hired as an assistant coach for the Charlotte Bobcats under then-head coach Paul Silas. He left that position on December 1, 2011 after experiencing health issues with back pain during the 2010-11 season.

Oakley turned his passion toward the kitchen. In 2008, he hosted his own unique cooking show, Cafe Oakley. His specialty: healthy options with savory and delicious flavors, notably: turkey burgers. He went on to open Red, The Steakhouse in Cleveland and another location in South Beach, Miami, FL. Oakley has displayed his culinary skills on several cooking competition shows, including Chopped Tournament of Stars on the Food Network, in 2014.

In 2013, Oakley and famed game developer Robert Alexander co-founded a free sweepstakes app, Kizzang® Sweepstakes, available on Web, Facebook, iTunes, and Google Play. The app offers free cash and other prizes through its daily slot tournaments, scratch cards, sports contests, and sweepstakes. The Oak in the Kitchen slot game and scratch card both feature Oakley as a chef building and serving burgers. Kizzang Sweepstakes garnered media attention in March 2013 with its $7.7 Million College Basketball Bracket Challenge™, and again in 2016 when Kizzang partnered with Sports Illustrated® to present the $25,000,000 College Basketball Bracket Challenge™.

Charles was inducted into the Virginia Sports Hall of Fame in honor of his 18-year professional basketball career. The induction ceremony was held on April 30, 2016.

NEWS



## Oakley Raising Money For Summer Hoops Camps

PUBLISHED ON AUGUST 3, 2017

To many people, Charles Oakley is living the American dream, the good life, and, in...

DETAILS




## Oakley Helps Jayson Williams Rebound From Addiction

PUBLISHED ON DECEMBER 12, 2016

He places his hand firmly on the big man's lower back, Charles Oakley does, dismissing...

DETAILS

type and hit enter

## Recent Comments

Charles Oakley to host strip club party steps from MSG - California Scoop on Oak In The Kitchen

Viral Site 9 » Charles Oakley to host strip club party steps from MSG on Oak In The Kitchen

Viral Site 7 » Charles Oakley to host strip club party steps from MSG on Oak In The Kitchen

Charles Oakley to host strip club party steps from MSG - The USA Times |US News,World News, Politics, Economics, Entertainment,Sport,Business & Finance | The USA Times | US News,World News, Politics, Economics, Entertainment,Sport,Business & Finance on Oak In The Kitchen

Charles Oakley to host strip club party steps from

Archives

August 2017

December 2016

November 2016

September 2016

June 2016

May 2016

January 2016

March 2015

Categories

Appearances

Awards

Basketball

Cleveland

Cooking/Food

Events

Family

News

Recognition



## Cleveland Names Street After Charles Oakley

PUBLISHED ON SEPTEMBER 30, 2016

Former NBA All-Star Charles Oakley and former U.S. Representative Louis Stokes will forever be linked together...

DETAILS



## Oakley: Charles Barkley's Not A Tough Guy

PUBLISHED ON MAY 6, 2016

Following the Cleveland Cavaliers 123-98 blowout victory over the Atlanta Hawks in Game 2, TNT...

DETAILS



## Oakley In Exile From Knicks But At Home In Cleveland

PUBLISHED ON NOVEMBER 8, 2016

Charles Oakley pushed his hands into his pockets and peered at the small photo of...

DETAILS

## Charles Oakley Makes Camp Christ Appearance

PUBLISHED ON JUNE 18, 2016

Charles Oakley made an appearance this week at Camp Christ, a premier Catholic Sports Camp...

DETAILS

7



## Oakley: Member of Virginia Sports Hall of Fame

PUBLISHED ON JANUARY 20, 2016

One of the roughest NBA players of all time briefly peeled back the rugged exterior...

DETAILS

## Toronto Honors Oakley: Talks Basketball and Life

PUBLISHED ON MARCH 14, 2016

Last night, as part of the Raptors ongoing 20th Anniversary Nights series, the team honoured...

DETAILS

### SITE MAP

HOME

BIO

NEWSROOM

APPEARANCES

MEDIA ROOM

CONTACT

LINKS OF INTEREST

### RECENT NEWS

Oakley Choosing Money For Customer People Events

Oakley Helps Boston Williams Witness Event Addiction

Oakley in State Enter Kansas Bad At Honor In Cleveland

Cleveland Names Street After Charles Oakley

Charles Oakley Atlanta Camp Clinic Appearance

### CONTACT

To contact Charles Oakley for personal appearances, speaking engagements, endorsements or to find Charles Oakley booking agent for inquiries please email any questions or opportunities to www@therealcharlesoakley.com. You will receive an immediate response.

Thank you for visiting my official website!

### LATEST TWEETS

Charles Oakley
@CharlesOakley34

into to 1994 All Star Weekend. @pippenppen ask Will if he still has that jacket. @JulianneVan instagram.com/p/mock.gu.bc

© Copyright 2015 Charles Oakley | Powered & Designed by BrandBox.io

8

A-157



Appearances



**Speaking**

Charles is active with various speaking engagements of all sizes including but not limited to corporate and christian motivational speaking engagements. Please inquire about Charles Oakley's motivational speaker fee and his availability via the form below.



**Appearances**

Charles makes all types of personal appearances including corporate events, meet and greets, and trade shows. Please contact Charles via the form below to inquire about his appearance fees and availability.



**Cooking**

Charles has cooked for parties of all sizes including corporate events, private parties and fundraisers. To secure Charles as the celebrity chef for your event or group please fill out the contact form below.

CHARLES HAS BEEN FORTUNATE TO WORK WITH SOME GREAT CLIENTS

## Clients







SECURE CHARLES AS THE CELEBRITY CHEF FOR YOUR EVENT

9

A-158

# EXHIBIT 12



# About Us

Case 1:17-cv-06903-RJS    Document 43-12    Filed 03/30/18    Page 3 of 8



# Healing For All

Every teammate at Rebound has the chance to design their own program. That's because you know what your inner difficulties are, and we're here to help you take charge of your own recovery journey. We offer evidence-based therapeutic methods as well as holistic care, massage, dual diagnosis care, fellowship groups, physical exercise programs, dietician and nutritionist services, and adventure therapy to help individuals reconnect with nature and their own physical selves. Because we're a family, we experience life together at Rebound, from skydiving and snorkeling trips to gathering in the kitchen together to prepare meals and strengthen our community bonds.

Whether it's caused by addiction or simply a slump, a career change or an issue with one's spouse, everyone goes through a period in their lives where they need to focus on themselves and their own health and well-being. Rebound Institue offers a place to do just that. With a staff that's available 24/7, an individual

program of care for every teammate, and a supportive, lifelong community, individuals at Rebound Institute have a chance to regain their self-esteem and respect.

Once they leave our program, teammates bring a newfound sense of self to their relationships and daily routines that elevate their standard of living. This allows them to be the best possible version of themselves. If you want a life that is fulfilling and whole, we invite you to join our community at Rebound. What you will find here is an experience that is life-changing, long-lasting, and that helps you to return to the person you were always meant to be.

## About the Rebound Institute

The Rebound Institute was founded because there is a need for something different in the Rebound Instituteworld of treatment. We're not an addiction rehabilitation center- we're a Wellness Institute created for the purpose of helping people to live their best possible lives.

Many individuals, no matter their background, struggle with substance use issues. We do offer services to help these clients, but we go way beyond the world of detox and rehab. Because the truth is, many people also struggle with having structure, with mental health, with their family relationships, physical ailments, and ultimately, finding their purpose and their community.

Case 1:17-cv-06903-RJS    Document 43-12    Filed 03/30/18    Page 5 of 8

That's why we're here- to provide a place where people can come to retreat, recharge, and rebound back into life happier and healthier. At Rebound, we're not "patients" and "staff", we are teammates working together to create a sense of family and community and to heal through holistic care and structure.

In addition to detox and rehab, we help teammates who struggle with gambling, mental health issues, family and romantic relationship struggles, and people who simply need a break to reassess and rediscover their purpose in life.

# Rebound Institute, LLC

**Mission:**

We provide private, confidential, and effective recovery and wellness programs for individuals that are committed to their recovery and their loved ones who have been affected by addictions of all types.

**Vision:**

We are the first choice for learning and teaching positive behavior change, wellness and recovery through collaboration, empathy, structure and teamwork.

**Goals:**

• To help individuals and their loved ones find effective personal solutions to recover from alcohol, drug, gambling and other addictions.

• To measurably improve the lives of families and their communities where addictions threaten their health, relationships and overall well-functioning.

• To meaningfully contribute knowledge, innovation and inspiration toward improving addiction science, treatment services and prevention efforts.

**Our Values:**

Honesty, Integrity,
Empathy, Teamwork
Structure, Commitment to Helping Others
Positive Change, Accountability
Family Values

A-164

## Overview of Our Program

The Rebound Institute, LLC is a private treatment program that provides customized recovery and wellness programs for individuals that are committed to their recovery. We provide individual assessments, planning, goal setting and treatment approaches that are based upon each client's personal needs. Each person that enters our program is viewed as an individual who has unique strengths, needs and life experiences. Our approach is holistic and focuses on mind, body and spirit. Our treatment strategies are based upon the latest and best research on addictions, sports medicine, emotions and stress management, and the mind/body connection. Clients have programs for physical fitness and rehabilitation, brain health, nutrition, marriage and family strengthening, trauma resolution therapies, as needed, plus effective use of 12 step programs for long-term, sustainable recovery from addictions of all types. Treatments methods and modalities may include Cognitive Behavior Therapy, Mindfulness, Solution-Focused Therapy, Individual Psychotherapy, Group Counseling, Couples and Family Therapy, and Recreation and Adventure Therapy. All of our components are tailored to meet the needs of each person and their loved ones and toward developing a personal recovery pathway and support systems. We emphasize personal responsibility, accountability and teamwork in recovery. Individualized family programs, aftercare services with follow-up and alumni activities are very important elements of our program and allow our clients to take back control of their lives.

## Jayson's approach to building the right team for Rebound Institute:

"When we decided to launch the Rebound Institute, one of our main focuses was making sure that we were diligent about recruiting top-level qualified professionals to join our team. We have recruited some of the most experienced administrators, doctors, clinicians and consultants from across the county to be a part of our effort to make a sincere difference in the lives of individuals suffering from addiction, as well as their families. The team we have built will allow Rebound Institute to provide the highest-quality individualized medical and clinical care focused on healing our patients and mending their familial relationships."

# Rebound Institute in the Press

Sun Sentinel: Once rivals, former NBA stars Charles Oakley and Jayson Williams unite to fight addictionNew York Post Article

New York Post: Oakley: Does Dolan think I'm an alcoholic because I help alcoholics?

Fox News: Charles Oakley responds to James Dolan, denies he's an alcoholic

Hoops Hype: Jayson Williams Rumors

# EXHIBIT 13

A-167

Home

Have an account? Log in ∨

**Rebound Institute**
@ReboundInst

| Tweets | Following | Followers | Likes |
|--------|-----------|-----------|-------|
| **240** | **74** | **101** | **143** |

Follow

Rebound Institute Retweeted

**City of RivieraBeach** @Rivierabch · 17 Mar 2017
NBA All-Star's Jayson Williams & Charles Oakley Basketball Camp this weekend in on March 18, 2017 at the Dan Calloway-Tate Recreation Center

Rebound Institute and
Riviera Beach Maritime Academy
Presents:

**The Jayson Williams & Charles Oakley**

# BASKETBALL CAMP

**Completed Essay Required for Entry**

**WHERE?**
Dan Calloway-Tate Recreation Center
1420 W 10th Street, Riviera Beach, FL 33404

**WHEN?**
SATURDAY, MARCH 18TH, 2017
9:00am - 3:00pm

8:00 am - Registration Begins
(uniforms to be handed out at registration)

12:00 pm - 12:30 pm - Delray Beach Police
Department vs Riviera Beach Police
Department Game

**EVENT HIGHLIGHTS**

- BBQ Rib Cook-Off Featuring
  Charles Oakley Against Local
  Chefs with Community and
  Audience Judges!

- Riviera Beach Police Department
  and Riviera Beach Parks and
  Recreation in Attendance

- Special Guest - World's Best
  Dunker - Guy Dupuy

- 100 Total Kids (Boys & Girls)
  Age Groups 9-11 years old, 12-14
  years old and 15-17 years old

001

○ 1     ⇄ 5     ♡ 5

1

Case 1:17-cv-06903-RJS   Document 43-13   Filed 03/30/18   Page 3 of 15





Twitter, Inc. [US] | https://twitter.com/Reboundinst

Home    Moments        Search Twitter        Have an account? Log in ▾

**Rebound Institute**
@Reboundinst

| Tweets | Following | Followers | Likes |
|--------|-----------|-----------|-------|
| **240** | **74** | **101** | **143** |

Follow

Rebound Institute Retweeted

**Rebound Institute** @ReboundInst · 19 Mar 2017
#AllStarTeam! Thank u @CharlesOakley34 @GuyDupuy1 #pastorbillythompson #jaysonwilliams @ReboundInst #basketballcamp 🔥 #healthandwellness



○    ↻ 3    ♡ 6

**Rebound Institute** @Reboundinst

| Tweets | Following | Followers | Likes |
|---|---|---|---|
| 240 | 74 | 101 | 143 |

Have an account? Log in — Follow

**Rebound Institute** @Reboundinst · 23 May 2017
For more information please contact Bill Tuccillo or Alyson Rowe:
btuccillo@positivempact.net - arowe@positivempact.net - 609.395.1992

**Rebound Institute** @Reboundinst · 23 Mar 2017
Join Jayson Williams, @ChrisKirkpatrick @MettaWorldPeace @CynthiaBailey10
and many more for a celebrity golf and dinner outing!

Anthony Avent • Former NBA Star
Kenny Anderson • Former NBA All-Star
OJ Anderson • Two-Time Super Bowl Champ
Cynthia Bailey • Reality TV Star
Bill Bellamy • Actor and Comedian
Cedric Ceballos • Former NBA All-Star
Rex Chapman • Former NBA Star
Derrick Coleman • Former NBA All-Star
Lamar Green • Former NBA Star
Rodney Hampton • Former NFL Star
Chris Kirkpatrick • NSYNC Member
Bob McAdoo • Former NBA All-Star
Jim McKenzie • Former NBA Star
Chris Mullin • Former NBA All-Star
Charles Oakley • Former NBA All-Star
Jeff Ruland • Former NBA All-Star
Rod Strickland • Former NBA Star
Irving Thomas • Former NBA Star
Billy Thompson • Former NBA Star
Travis Tomko • Former Pro Wrestler
Rex Walters • Former NBA Star

---

**Rebound Institute** @Reboundinst

| Tweets | Following | Followers | Likes |
|---|---|---|---|
| 240 | 74 | 101 | 143 |

Have an account? Log in — Follow

**Rebound Institute** @Reboundinst · 23 Mar 2017
Please join us and all of our incredible celebrity guests who are dedicated to
helping raise money for those who cannot afford detox



Celebrities Scheduled to Appear

THE INAUGURAL REBOUND CELEBRITY

GOLF

OUTING & DINNER

4 MAY 17

Bey Grove Golf & Tennis Club

5

Home   ⏴ Moments                                      Search Twitter          Have an account? **Log in▾**

| Rebound Institute | Tweets | Following | Followers | Likes | **Follow** |
| @ReboundInst | **240** | **74** | **101** | **143** | |

⇄ Rebound Institute Retweeted

**Edward A Alvarez DDS** @NYCLaserDentist · 11 Apr 2017

Such an honor to have the #Legend #CharlesOakley visit me in the office today #Class act #Gentleman #NY#Knicks #nyc #NewYorkCity #DolanSucks – at Dentist-Dr Alvarez



Charles Oakley, Edward A Alvarez DDS, MJ Pedone and IndraPublicRelations

♡ 4      ⇄ 13      ♡ 32

6

A-173



← → C | 🔒 Twitter, Inc. [US]

🔍 Search Twitter | Have an account? **Log in ▾**

🐦 Home  |  🏠 Moments

**Rebound Institute**
@Reboundinst

**Follow**

| Tweets | Following | Followers | Likes |
|--------|-----------|-----------|-------|
| **240** | 74 | 101 | 143 |

will host the Rebound Celebrity Golf & dinner outing

♡   ♡ 3   ♡ 2

**Rebound Institute** @Reboundinst · 27 Apr 2017
#TBT to the good old days! The ultimate duo. Rebound founder
@JayOnTheRebound & @CharlesOakley34 @NBA @nyknicks @BrooklynNets



♡   ♡ 4   ♡ 6

**Rebound Institute** @Reboundinst · 26 Apr 2017

8





Twitter, Inc. [U...]

Home    Moments                    Search Twitter    🔍    Have an account? Log in ▾

**Rebound Institute**
@ReboundInst                                                    Follow

Tweets     Following     Followers     Likes
240        74            101           143

**Rebound Institute** @ReboundInst · 28 Apr 2017
Just 5 days from our incredible charity event! Jayson Williams & Charles Oakley
will host the Rebound Celebrity Golf & dinner outing
♡        ⟲        ♡ 2                                              ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
For more information on Rebound, please call 1-877-2REBOUND or visit out
website at reboundinstitute.com
♡        ⟲        ♡                                               ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
The Rebound Institute is dedicated to providing a safe foundation to those
looking to take the first steps in the recovery process.
♡        ⟲        ♡                                               ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
All proceeds will provide scholarships to those unable to afford the cost of detox
and recovery.
♡        ⟲        ♡                                               ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
The event will take place on 5/4/17. All proceeds will provide scholarships to
those unable to afford the cost of detox and recovery
♡        ⟲        ♡                                               ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
Just 6 days from our incredible charity event! Jayson Williams & Charles Oakley
will host the Rebound Celebrity Golf & dinner outing
♡        ⟲ 3      ♡ 2                                             ⌄

**Rebound Institute** @ReboundInst · 27 Apr 2017
#TBT to the good old days! The ultimate duo. Rebound founder
@JayOnTheRebound & @CharlesOakley34 @NBA #nyknicks @BrooklynNets    ⌄

10



Twitter. Inc. [US]

Home  Moments  Search Twitter  Have an account? Log in ▾

**Rebound Institute**
@Reboundinst                                                    Follow

Tweets   Following   Followers   Likes
240      74          101         143

Rebound Institute Retweeted

**Ottis OJ Anderson** @OJAnderson24 · 4 May 2017
The only time I feel short. Oakley & Williams @Reboundinst

♡ 1    ↻ 4    ♡ 13

Rebound Institute Retweeted

**Akhtar Farzaie** @akhtarfarzaie1 · 6 May 2017
@IamCKirkpatrick appreciate you supporting @Reboundinst celebrity golf outing for charity! Great times for great cause! Thank you!

11



A-179





Twitter, Inc. [US]

Home  Moments  Search Twitter  Have an account? Log in

Rebound Institute
@ReboundInst

Follow

Tweets **240**  Following **74**  Followers **101**  Likes **143**

**Rebound Institute** @ReboundInst · 7 May 2017
To the celebrities and amazing folks who attended, thank you for your unconditional support.

**Rebound Institute** @ReboundInst · 7 May 2017
Thank you to everyone who came out to the amazing Rebound Institute Celebrity Golf Invitational. We did a lot of great work

14

A-181

# EXHIBIT 14

A-182



THIS TICKET IS A PERSONAL LICENSE REVOCABLE IN
MSG'S SOLE DISCRETION, AND IS ISSUED PURSUANT TO
AND IS SUBJECT TO THE TERMS AND CONDITIONS OF
THE APPLICABLE MADISON SQUARE GARDEN SEASON
SUBSCRIPTION AGREEMENT.

Madison Square Garden ("MSG") reserves the right, without
refund of the purchase price, to refuse admission to or eject
any person whose conduct MSG deems disorderly, who uses
vulgar or abusive language or who fails to comply with these
terms. You, on behalf of yourself and any minor accompanying
you, by using this ticket and entering the venue agree to all
terms hereof. WARNING! OBJECTS OFTEN LEAVE THE
PLAYING SURFACE AND MAY CAUSE INJURY. You assume
the risk of dangers incidental to the event ("Event") to which
this ticket admits you. MSG is not responsible for lost, stolen
or damaged property. No smoking, alcohol, drugs, weapons,
laser pens, food, bottles or cans allowed. By using this ticket,
you consent to a reasonable search for prohibited items. You
agree not to transmit, distribute or sell (or aid in such actions),
in any medium, any description, account, picture, video, audio
or other reproduction of the Event or surrounding activities. You
grant permission, on your behalf and any minor accompanying
you, to MSG and/or a League, and their broadcast partners
and licensees, to utilize your image, likeness and statements
in audio, video, and/or photographic displays or other
transmissions, exploitations, publications or reproductions
made of the Event in any medium for any purpose, including
commercial or promotional, without authorization or
compensation. This ticket may not be used for any commercial
purpose (e.g. advertising, promotion, sweepstakes) without
MSG's express written consent, and, pursuant to New York law,
may not be resold within 1,500 feet of the venue under penalty
of law. Unlawful resale is punishable by fine and imprisonment.
"Added Value" is only redeemable for food, beverages and
merchandise at the Event.  No cash value, not redeemable for
cash; expires at end of Event.

YOU ACKNOWLEDGE THAT YOU ARE NOT ENTITIELD TO ANY
REFUND IN THE EVENT OF A CANCELLATION OR RESCHEDULING
OF THE APPLICABLE EVENT.

A-183

# EXHIBIT 15

| From: | Douglas Wigdor |
|-------|---------------|
| To: | Mastro, Randy M. |
| Cc: | Renan F. Varghese; Kushner, Sarah L. |
| Subject: | Re: Oakley v. Dolan et al., 17-cv-6903 -- Sent On Behalf Of Randy Mastro |
| Date: | Monday, February 26, 2018 3:56:22 PM |
| Attachments: | image012.png |
| | image005.png |
| | image007.png |
| | image013.png |
| | image004.png |

Dear Randy,

Obviously we had the public video- anyone could have obtained that from the internet as your citations demonstrate from your correspondence.  As for the other videos, I say that I believe we have the non public video as I don't know whether there is additional video beyond which was given to us.  There very well could be and certainly discovery will show what we have and don't have.  We most certainly don't agree with your conclusions about what the videos show, but I am looking forward to litigating that issue with you and it ultimately being resolved by the fact finder.  As for the emails, I don't believe that they would be irrelevant to your contemplated motion to dismiss- but will wait to see your arguments before explaining further and/or seeking appropriate relief.

Renan will get back to you regarding the proposed briefing schedule tomorrow.

Have a good week.

Regards,

Douglas H. Wigdor
Partner
WIGDOR LLP
85 Fifth Avenue
New York, NY 10003
212-257-6800 (P)
212-257-6845 (F )
dwigdor@wigdorlaw.com
www.wigdorlaw.com

Sent from my iPhone

This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.

A-185

On Feb 26, 2018, at 3:26 PM, Mastro, Randy M. <RMastro@gibsondunn.com> wrote:

Doug -

You now say below that you "have had" the public videos we recently sent you all along and that you "believe" you "have whatever" we "gave the District Attorney," which included the security footage showing the entire time Charles Oakley was in the arena that night. Given that you have now confirmed you have already seen all of the videos we wished to send you, the issue is moot. We believe the videos flat out contradict the key factual allegations in both of your client's pleadings and do not see any other way to look at them. Separately, the emails that you request going back three years are irrelevant to the disposition of our motion to dismiss. In any event, I agree that we've exhausted for now the benefit of any further email exchange on this subject.

Thanks,

Randy

**From:** dwigdor@wigdorlaw.com
**Sent:** February 23, 2018 10:14 AM
**To:** RMastro@gibsondunn.com
**Cc:** RVarghese@wigdorlaw.com; SKushner@gibsondunn.com
**Subject:** RE: Oakley v. Dolan et al., 17-cv-6903 -- Sent On Behalf Of Randy Mastro

Dear Randy,

This is the sort of back and forth that could have been better handled by a phone call – but if you insist on the further emails and mischaracterizations to make a record for yet another Friday afternoon submission to the Court, I must respond. The public videos we obviously have (and have had) – and they don't show what you say they show – and we believe a jury will see them for what they are. The complaint accurately depicts what happened with regard to the assault, battery, false imprisonment and abuse of process. With regard to the other video you make reference to, I believe we have whatever you gave to the District Attorney and again, that doesn't show anything that alters our view of what transpired that evening. I think you know this already, but emails by your clients (Mr. Dolan and security) referring to Mr. Oakley would likely be highly relevant as to the true reasons Mr. Oakley was being surveilled in the first place (as he was on other occasions he was at MSG) and would likely be relevant to why Mr. Oakley was surrounded by security while your client gleefully looked on a few rows away – both of which would be relevant to our assault, battery, false imprisonment and abuse of process claims. In addition, this information would undoubtedly be relevant

to your clients' animus toward our client and provide further evidence of his actual malice and therefore also be relevant with regard to his defamation and disability claims.  Are you unwilling to share with us the requested documents set forth in the below e-mail and give us the opportunity to amend the complaint should we find further corroboration of our client's claims in those documents?

**Douglas H. Wigdor**
*Partner*

**WIGDOR LLP**
85 Fifth Avenue, New York, NY 10003
T: (212) 257-6800  |  F: (212) 257-6845

dwigdor@wigdorlaw.com
www.wigdorlaw.com

<image001.jpg>

<image004.png><image005.png><image006.jpg><image007.png>
<image012.png><image013.png>

This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.

**From:** Mastro, Randy M. [mailto:RMastro@gibsondunn.com]
**Sent:** Friday, February 23, 2018 9:54 AM
**To:** Douglas Wigdor
**Cc:** Renan F. Varghese; Kushner, Sarah L.
**Subject:** Re: Oakley v. Dolan et al., 17-cv-6903 -- Sent On Behalf Of Randy Mastro

Doug --

You seem intentionally to miss the point.  Your client's case is about what happened that night and its aftermath, not what may or may not have happened three years ago. There is video evidence of exactly what happened that night, some on which is publicly-available that we have already provided you, other of which is internal security footage depicting the entire time your client was in the arena that we are prepared to make available to you now, subject to the protections of a protective order. So if you wanted

to actually know what happened that night, you'd surely want that video now, instead of making allegations in pleadings you know or should know to be false from videos of what actually happened that night. The truth is out there. The question is whether you'll continue to avert your eyes or open them to see it.

Thanks,

Randy

**From:** dwigdor@wigdorlaw.com
**Sent:** February 23, 2018 7:09 AM
**To:** RMastro@gibsondunn.com
**Cc:** RVarghese@wigdorlaw.com; SKushner@gibsondunn.com
**Subject:** Re: Oakley v. Dolan et al., 17-cv-6903 -- Sent On Behalf Of Randy Mastro

Dear Randy,

I don't see how you "gave us" publicly available video.  In any event, if we want to get to the truth here, are you willing to provide all communications (texts, emails, etc) from/to Dolan regarding or concerning Charles Oakley over the last three years (February 2015-date) and all communications concerning Charles Oakley from/to MSG security over the same period under the condition that should we find evidence supporting our claims you would permit us to amend the complaint again as of right.  I would think you would agree that this is the best evidence that would demonstrate your clients' intent.  If you are agreeable to providing this, please let me know exactly what it is you seek regarding our defamation claims.

Regards,

Douglas H. Wigdor
Partner
WIGDOR LLP
85 Fifth Avenue
New York, NY 10003
212-257-6800 (P)
212-257-6845 (F )
dwigdor@wigdorlaw.com
www.wigdorlaw.com

Sent from my iPhone

This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.

On Feb 22, 2018, at 11:11 PM, Mastro, Randy M. <RMastro@gibsondunn.com>
wrote:

> Doug --
>
> What I don't get is why you wouldn't want to start
> exchanging at least some information now on a
> voluntary basis in order to get to the truth of the
> matter. For example,  I would like to give you
> internal security footage showing the entire time
> Charles Oakley was in the arena that night, subject
> to a protective order. Do you want to see it or not?
> It is the best evidence of what actually happened
> that night (in addition to the publicly-available
> videos we already gave you before you filed your
> amended pleading). What say you?  I await your
> response.
>
> Thanks,
>
> Randy

**From:** dwigdor@wigdorlaw.com
**Sent:** February 22, 2018 7:39 PM
**To:** RMastro@gibsondunn.com
**Cc:** RVarghese@wigdorlaw.com; SKushner@gibsondunn.com
**Subject:** Re: Oakley v. Dolan et al., 17-cv-6903 -- Sent On Behalf Of Randy
Mastro

Dear Randy,

Unlike you we don't pretend to know what the Judge will do should
you make your request, other than of course follow the Federal Rules
of Civil Procedure.  To that end, as we set forth in our letter to you,
we are unaware of any Rule that would permit you to unilaterally
seek this discovery prior to your responsive pleading.  What rule are
you relying on?  Why do you think it would be fair for us to share
documents (to the extent they exist) with you and you not share
documents with us that would likely support our claims?  Honestly, I
don't get it.  I am not trying to be difficult, but I do think you are
trying to take advantage of the situation.  Maybe there is reciprocal
discovery that we could both engage in-- assuming of course, you
would permit us to amend the complaint again based on any new
evidence we discover in that mutual exchange prior to you filing a
responsive pleading.  Is that something you are willing to engage in

5

or is it just you who gets to seek discovery now?

Finally, I am not sure why we keep getting letters and emails from your team rather than picking up the phone. I have found that speaking is a much more effective way for counsel to communicate with each other. To that end, I would happily speak with you or Sarah.


Regards,

Douglas H. Wigdor
Partner
WIGDOR LLP
85 Fifth Avenue
New York, NY 10003
212-257-6800 (P)
212-257-6845 (F )
dwigdor@wigdorlaw.com
www.wigdorlaw.com

Sent from my iPhone


This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.



On Feb 22, 2018, at 7:17 PM, Mastro, Randy M.
<RMastro@gibsondunn.com> wrote:

> Renan and Doug -
>
> Really? We'll see what Judge Sullivan thinks of your
> position that you'd rather not have any voluntary
> exchange of information at this point under the
> protections of a protective order -- and refuse to
> respond to even basic questions about your client's
> newfound allegations -- simply because we have
> requested, and may request again, a stay of invasive,

expansive formal discovery while any dispositive motion
practice is pending. Perhaps you should reconsider.

Thanks,

Randy

---

**From:** RVarghese@wigdorlaw.com
**Sent:** February 22, 2018 10:43 AM
**To:** SKushner@gibsondunn.com; dwigdor@wigdorlaw.com;
kwalsh@wigdorlaw.com
**Cc:** RMastro@gibsondunn.com
**Subject:** RE: Oakley v. Dolan et al., 17-cv-6903 -- Sent On
Behalf Of Randy Mastro

Randy and Sarah-

We appreciate you putting this together but we are not
clear on the purpose of entering into a Protective Order
at this stage in the proceedings.  Defendants had
previously taken the position that they would be seeking
a stay of discovery pending the Court's decision on their
potential motion to dismiss and Judge Sullivan had
indicated during the pre-motion conference that he was
inclined to grant that request.  Are Defendants no longer
intending on seeking a stay of discovery?  If so, we will
edit the Protective Order and return it back to you.

However, if Defendants are intending to seek such a
stay, we see no reason for the parties to enter into a
Protective Order until the Court rules on whether such a
stay is appropriate.  Of course, if the Court denies the
stay, we will be happy to move quickly to enter into an
appropriate Protective Order and proceed with discovery.

Sincerely,


**Renan F. Varghese**
*Senior Associate*

**WIGDOR LLP**
85 Fifth Avenue, New York, NY 10003
T: (212) 257-6800  F: (212) 257-6845

rvarghese@wigdorlaw.com
www.wigdorlaw.com

<image004.png>  <image002.png>

This communication may contain Confidential or Attorney-Client
Privileged Information and/or Attorney Work Product. If you are

A-191

not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.

...

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

A-192

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                             :

CHARLES OAKLEY,                 :

           Plaintiff,        :

                             :

         v.                   :    Case No. 17-cv-6903 (RJS)

                             :

JAMES DOLAN, in his individual and     :
professional capacities, MSG NETWORKS,
INC., THE MADISON SQUARE GARDEN   :
COMPANY and MSG SPORTS &
ENTERTAINMENT, LLC,            :

                             :

           Defendants.     :
-------------------------------------------------------x

## DECLARATION OF JIM WALDEN

     I, JIM WALDEN, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1. I am a member of the bar of this Court and a partner at the law firm Walden Macht & Haran

    LLP ("WMH"). We are co-counsel to Defendants in this action, and also represented The

    Madison Square Garden Company in the related criminal action against Charles Oakley (the

    "Criminal Action") in connection with his conduct at the arena at Madison Square Garden

    ("MSG") on February 8, 2017 (the "February 8 Incident").

2. On or about March 22, 2017, and on or about July 18, 2017, in connection with the Criminal

    Action, WMH produced to the Manhattan District Attorney's Office (the "DA") videos of the

    February 8 Incident, including those described in further detail below.

3. On or about March 22, 2017, WMH produced to the DA four videos containing internal

    MSG security footage of Oakley on February 8, 2017, immediately following the incident in

    the arena (the "Post-Incident Videos"), beginning when Oakley has just exited the arena and

A-193

is placed in handcuffs by New York Police Department ("NYPD") officers, up through the time when the officers walk Oakley to an NYPD van, and Oakley gets in and is driven away. Each Post-Incident Video contains footage from a different camera, with each camera stationed at a different location outside the arena, beginning at the "Zamboni Gate" exit (the location where Oakley was escorted out of the arena), following Oakley's path through a marshalling area and on a ramp just outside the arena, to the site at the bottom of the ramp where he got into an NYPD van and was driven away.

4. The videos contained the file names:

    a. "Security Video 1, Zamboni Gate;"

    b. "Security Video 2, Marshalling Area;"

    c. "Security Video 3, Ramp;" and

    d. "Security Video 4, Bottom of Ramp."

5. In addition to producing these videos to the DA, WMH provided copies of these four videos to Oakley's counsel in the Criminal Action on or about June 14, 2017.

6. I have reviewed the videos that Defendants in the instant action have marked and submitted to this Court as Exhibit 5, and they are the same Post-Incident Videos that WMH produced to the DA on or about March 22, 2017, and provided to Oakley's counsel on or about June 14, 2017.

7. On or about July 18, 2017, WMH made another production to the DA. This production contained internal MSG surveillance footage of the entire February 8, 2017 Knicks game at MSG from a camera inside the arena (the "Arena Cam"). This footage captures the entire February 8 Incident, beginning when Oakley entered the arena in Section 7 through gates 111-112, and ending once he was escorted out of the arena through the Zamboni Gate exit.

8.  The Arena Cam incorporates advanced technology and produces video that cannot be converted into a format that will play with a standard media player.  Accordingly, when WMH produced this footage to the DA, we also provided the special proprietary software that could play the video.

9.  The footage from the Arena Cam was provided to the DA with the file name containing its Bates number, "WMH-OAKLEY-000039.ave."  The proprietary software was provided to the DA with the file name "AvigilonControlCenterPlayerStandAlone-5.6.0.24."

10. I reviewed the "Internal MSG Arena Cam" video and accompanying software that Defendants in the instant action have marked and submitted to this Court as Exhibit 2 in support of their motion to dismiss, and it is the same footage and software as the "WMH-OAKLEY-000039.ave" and "AvigilonControlCenterPlayerStandAlone-5.6.0.24." files we produced to the DA on or about July 18, 2017.

11. I understand that the District Attorney's Office subsequently produced the videos described above to Oakley's counsel in the Criminal Action pursuant to New York's Criminal Procedure Law § 240.20.

Executed in New York, NY, on March 30, 2018

_____
JIM WALDEN

3

A-195

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
CHARLES OAKLEY,                  :
                                        :

                      Plaintiff,       :    Civil Case No.: 17-cv-6903 (RJS)
                                          :

      v.                              :
                                          :

JAMES DOLAN, in his individual and professional  :
capacities, MSG NETWORKS, INC., THE MADISON  :
SQUARE GARDEN COMPANY and MSG SPORTS &amp;  :
ENTERTAINMENT, LLC,                  :
                                          :

                    Defendants.     :
-----------------------------------------------------------------------X

**<u>DECLARATION OF RENAN F. VARGHESE IN OPPOSITION TO DEFENDANTS'</u>**
**<u>MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>**

      I, Renan F. Varghese, pursuant to 28 U.S.C. § 1746, declare and state as follows:

    1.     I am a member of the bar of this Court and a Senior Associate at the law firm

Wigdor LLP, attorneys for Plaintiff Charles Oakley ("Mr. Oakley" or "Plaintiff") in the above-

captioned matter against Defendants James Dolan, MSG Networks, Inc., The Madison Square

Garden Company and MSG Sports & Entertainment, LLC (together, "MSG").

    2.     I have full knowledge of the facts set forth herein and submit this declaration

with the exhibits thereto in support of Plaintiff's Memorandum of Law in Opposition to

Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

    3.     Attached hereto as **Exhibit 1** is a true and accurate copy of the transcript of the

proceedings before the Court dated January 12, 2018.

    4.     Plaintiff had never received a copy of the videos attached as Exhibit 2a or 2b to

the Declaration of Sarah Kushner prior to the filing of the instant lawsuit.  In fact, Plaintiff had

not even seen these videos until Defendants' motion to dismiss was filed on March 30, 2018.

5.      I declare under the penalty of perjury that the foregoing is true and correct.

Dated: May 24, 2018
        New York, New York

                                                    _____
                                                        Renan F. Varghese, Esq.