# 21-2939-cv

## United States Court of Appeals

*for the*

## Second Circuit

CHARLES OAKLEY,

*Plaintiff-Appellant,*

– v. –

JAMES DOLAN, in his individual capacity, in his professional capacity,
MSG NETWORKS, INC., MADISON SQUARE GARDEN COMPANY,
MSG SPORTS & ENTERTAINMENT, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 3 (Pages A-197 to A-370)

DECLAN T. CONROY
RANDY M. MASTRO
AKIVA SHAPIRO
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Defendants-Appellees*

JAMES A. WALDEN
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
(212) 335-2031

*Attorneys for Defendants-Appellees*

NELSON A. BOXER
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
(212) 370-0330

– and –

DOUGLAS H. WIGDOR
RENAN F. VARGHESE
WIGDOR LLP
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

*Attorneys for Plaintiff-Appellant*

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed September 12, 2017 ........................ A-16

Transcript of Proceedings held before the
    Honorable Richard J. Sullivan, dated
    January 12, 2018 ................................................... A-37

Amended Complaint, filed February 9, 2018 ............ A-91

Declaration of Sarah L. Kushner, for Defendants, in
    Support of Motion to Dismiss Amended
    Complaint, filed March 30, 2018......................... A-116

Exhibit 2.a to Kushner Declaration -
    Video (CD-ROM Hardcopy) ................................ A-121

Exhibit 6 to Kushner Declaration -
    Video (CD-ROM Hardcopy) ................................ A-122

Exhibit 7 to Kushner Declaration -
    Misdemeanor, dated March 31, 2017, in *The
    People of the State of New York v. Charles
    Oakley*, New York County Indictment No.
    17-cv-06903 ........................................................ A-123

Exhibit 8 to Kushner Declaration -
    Official Trespass Notice, dated August 4, 2017..... A-126

Exhibit 9 to Kushner Declaration -
    Excerpts of Pleadings, in *Oakley v. Aria Resort &
    Casino, LLC et al.*, Nevada, Clark County, Case
    No. A-11-641182-C ............................................. A-128

ii

**Page**

Exhibit 10 to Kushner Declaration -
Complaint, dated July 12, 2011, in *Oakley v. The
City of Henderson et al.*, Nevad,a Clark County,
Case No. A-11-644871-C...................................... A-144

Exhibit 11 to Kushner Declaration -
Charles Oakley Website Information.................... A-148

Exhibit 12 to Kushner Declaration -
Rebound Institute  "About Us" ............................ A-158

Exhibit 13 to Kushner Declaration -
Rebound Institute Twitter Account....................... A-166

Exhibit 14 to Kushner Declaration -
Madison Square Garden Ticket Standard
Language................................................................ A-181

Exhibit 15 to Kushner Declaration -
E-mails between Doug Wigdor and Randy M.
Mastro .................................................................. A-183

Declaration of Jim Walden, for Defendants, in
Support of Motion to Dismiss Amended
Complaint, filed March 30, 2018.......................... A-192

Declaration of Renan F. Varghese, for Plaintiff, in
Opposition to Motion to Dismiss Amended
Complaint, filed May 24, 2018.............................. A-195

Exhibit 1 to Varghese Declaration -
Transcript of Proceedings held before the
Honorable Richard J. Sullivan, dated
January 12, 2018.................................................. A-197

Letter from Gibson, Dunn & Crutcher LLP to the
Honorable Richard J. Sullivan, filed
December 7, 2020................................................. A-252

iii

**Page**

Letter from Petrillo Klein & Boxer LLP to the
  Honorable Richard J. Sullivan, filed
    December 11, 2020 ................................................. A-255

Letter from Petrillo Klein & Boxer LLP to the
  Honorable Richard J. Sullivan, filed
    December 11, 2020 ................................................. A-258

  Exhibit A to Letter -
  Redlined Second Amended Complaint .................. A-261

  Exhibit B to Letter -
  Second Amended Complaint, dated
    December 11, 2020 ................................................. A-290

Letter from Gibson, Dunn & Crutcher LLP to the
  Honorable Richard J. Sullivan, filed
    December 17, 2020 ................................................. A-313

Transcript of Proceedings held before the
  Honorable Richard J. Sullivan, dated
    December 22, 2020 ................................................. A-316

Declaration of Randy M. Mastro, for Defendants, in
  Support of Motion to Dismiss the Amended
    Complaint, filed January 22, 2021 ........................ A-361

  Exhibit 1 to Mastro Declaration -
  Video (CD-ROM Hardcopy) ................................. A-365

  Exhibit 2.a to Mastro Declaration -
  Video (CD-ROM Hardcopy) ................................. A-366

  Exhibit 2.b to Mastro Declaration -
  Video (CD-ROM Hardcopy) ................................. A-367

  Exhibit 3 to Mastro Declaration -
  Video (CD-ROM Hardcopy) ................................. A-368

iv

|  | **Page** |
|---|---|
| Exhibit 4 to Mastro Declaration - Video (CD-ROM Hardcopy) | A-369 |
| Exhibit 5.a to Mastro Declaration - Video (CD-ROM Hardcopy) | A-370 |
| Exhibit 5.b to Mastro Declaration - Video (CD-ROM Hardcopy) | A-371 |
| Exhibit 5.c to Mastro Declaration - Video (CD-ROM Hardcopy) | A-372 |
| Exhibit 5.d to Mastro Declaration - Video (CD-ROM Hardcopy) | A-373 |
| Exhibit 6 to Mastro Declaration - Madison Square Garden Ticket Standard Language | A-374 |
| Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, filed January 22, 2021 | A-376 |
| Declaration of Renan F. Varghese, for Plaintiff, in Support of Motion to File a Second Amended Complaint, filed January 22, 2021 | A-390 |
| Exhibit A to Varghese Declaration - Redlined Second Amended Complaint, | A-391 |
| Exhibit B to Varghese Declaration - Second Amended Complaint, dated December 11, 2020 | A-419 |
| Plaintiff's Response to Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, filed February 19, 2021 | A-441 |

v

**Page**

Declaration of Douglas H. Wigdor, for Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021............................................ A-485

Declaration of Renan F. Varghese, for Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021............................................ A-491

    Exhibit A to Varghese Declaration -
    New York Knicks Twitter ...................................... A-492

Declaration of Charles Oakley, Plaintiff, in
    Opposition to Motion for Summary Judgment,
    filed February 19, 2021............................................ A-495

Declaration of Declan T. Conroy, for Defendants, in
    Support of Motion for Summary Judgment, filed
    February 19, 2021 .................................................... A-499

    Exhibit 1 to Conroy Declaration -
    Video (CD-ROM Hardcopy) .................................. A-501

Defendants' Response to Plaintiff's Additional
    Material and Disputed Issues of Fact, filed
    March 9, 2021 ......................................................... A-502

Notice of Appeal, filed November 24, 2021 .............. A-541

A-197

# Exhibit 1

I1C5oakC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHARLES OAKLEY,

4                   Plaintiff,              New York, N.Y.

5          v.                               17 Civ. 6903 (RJS)

6    JAMES DOLAN,
     MSG NETWORKS, INC.,
7    THE MADISON SQUARE GARDEN
     COMPANY,
8

9                   Defendants.

10   ------------------------------x

11                                          January 12, 2018
12                                          2:30 p.m.

13   Before:

14                   HON. RICHARD J. SULLIVAN,

15                                          District Judge

16

17                         APPEARANCES

18

19   WIGDOR LLP
          Attorneys for Plaintiff
20   BY:  RENAN F. VARGHESE
          DOUGLAS H. WIGDOR
21

22   GIBSON, DUNN & CRUTCHER, LLP
          Attorneys for Defendants
22   BY:  SARAH KUSHNER
23        RANDY M. MASTRO

24

25
```

I1C5oakC

1              (Case called)

2              THE COURT:  Good afternoon.  Let me take appearances.

3              For the plaintiff?

4              MR. WIGDOR:  Douglas Wigdor and Renan Varghese for

5      Wigdor, LLP, for the plaintiff.  Good afternoon.

6              THE COURT:  Mr. Wigdor and Mr. Varghese.  Good

7      afternoon.  Before I get to the defendants, Mr. Hartzband is on

8      this case?

9              MR. WIGDOR:  He is not any longer.

10             THE COURT:  He is not.  His name is still on the

11     docket sheet.  And Mr. Walsh?  Is he still on this?

12             MR. WIGDOR:  For the plaintiff?

13             THE COURT:  Yes.  Kenneth Daniel Walsh?

14             MR. WIGDOR:  Yes, he is.  Yes.

15             THE COURT:  I notice the docket sheet has him at a

16     different firm.  It has his e-mail address at Wigdor, it has

17     his mailing address as Ford, Marrin, Esposito, Witmeyer &

18     Gleser.

19             MR. WIGDOR:  I have no idea.

20             THE COURT:  It probably needs to be updated, so just

21     if you could update that?

22             MR. WIGDOR:  We will take care of that, your Honor.

23             THE COURT:  And Mr. Hartzband has an e-mail address of

24     faruqilaw.com.

25             MR. WIGDOR:  He is at that firm now.

I1C5oakC

1              THE COURT:  He has left your firm?

2              MR. WIGDOR:  Correct.

3              THE COURT:  So he should then withdraw.

4              MR. WIGDOR:  Correct.

5              THE COURT:  Or you can send a letter saying he is no

6      longer with the firm and he is withdrawing.

7              MR. WIGDOR:  We will do that.

8              THE COURT:  Great.

9              And for the defendant?

10             MR. MASTRO:  Yes, your Honor.  Randy Mastro and Sarah

11     Kushner from Gibson, Dunn & Crutcher for the defendants.

12             THE COURT:  Mr. Mastro, Ms. Kushner.

13             And then Mr. Walden is still on this case?  Or not.

14             MR. MASTRO:  Still on the case, your Honor, but we

15     will be handling today.

16             THE COURT:  You should tell him -- I mean I am sure

17     that he only benefits by the association but the mailing

18     address for him is Gibson, Dunn and he is at a different place

19     now.  Right?

20             MR. MASTRO:  We enjoyed his time with us but now he

21     has his own firm, your Honor.

22             THE COURT:  So, he needs to correct that as well so

23     just let him know.

24             MR. MASTRO:  Will do.

25             THE COURT:  I should note for the record Ms. Kushner

I1C5oakC

1   was my law clerk several years ago so don't think I'm going to

2   go easy on you just because you are here.  But, you should know

3   that, Mr. Wigdor.  I don't think I need to recuse.

4         MR. WIGDOR:  I am sure it was a coincidence, your

5   Honor, I am sure.  The Judge that I clerked for would go a

6   little extra hard on her.

7         THE COURT:  I usually do, right.

8         So, we are here for pre-motion conference on

9   defendant's contemplated motions to dismiss the complaint and

10  its various causes of action.  Let me just tell you the ground

11  rules on these.  So, some judges do these, some judges don't.

12  I do them because I think they're valuable and they allow me to

13  get my head into the game before you folks have sent me 50 or

14  60 pages of briefing between you.  And so, it's a preview, it

15  is an opportunity for me to kick the tires and to have a little

16  bit of colloquy with you.  I'm not coming in here cold, I have

17  looked at the pleadings, I have looked at the letters, I have

18  looked at the authorities cited, I have done my research,

19  thought about it.  So, it's not a full blown oral argument the

20  way it would be after a fully briefed motion but it's not just

21  shooting the breeze either.

22        Now, I never tell a party they can't make the motion,

23  that's not the point here, it is not to discourage people from

24  making motions.  It is simply to give me an to opportunity

25  share with you my initial thoughts and sometimes I will be

I1C5oakC

1    candid and say I don't think one is going any place or I will

2    be candid and say, plaintiff, you better amend because this

3    looks to me like it's not going to get past the 10-yard line.

4    I guess that's a mixed metaphor for this case, probably.  But,

5    anyway, I never tell a party you can't file so if you disagree,

6    that's fine.  The benefit still I think exists because it gives

7    you an opportunity to shape your pleading, your motions to

8    figure out, well, this judge is so befuddled we really need to

9    work very hard on this point because he showed his ignorance so

10   that can be valuable, too.

11           So that's my thinking.

12           Here we have 10 causes of action I think, right?

13           MR. MASTRO:  Yes, your Honor.

14           THE COURT:  And so, let's start with the defamation

15   causes of action.  Actually, me take a step back for a second.

16           It is an interesting case, I'm happy to have it, but I

17   thought the NBA Commissioner met with the parties in this case

18   and had squared it all away.  So, I was surprised to see

19   everything coming back.  Is there a prospect for settlement?

20   Should send you to Magistrate Judge?  Should I send you back to

21   the Commissioner?  Should I have you play a game of H-O-R-S-E

22   over this?  I was surprised.  I thought that there had been

23   some history here.

24           So, is there more to the story?

25           MR. WIGDOR:  We, I mean, I would be happy to have

I1C5oakC

```
 1    Mr. Oakley and myself play Mr. Mastro and Mr. Dolan in a game
 2    of H-O-R-S-E.  Mr. Walden and I had an initial conversation but
 3    since then Mr. Maestro and I --
 4              THE COURT:  Mastro.
 5              MR. WIGDOR:  -- Mr. Mastro have hadn't conversations
 6    resolving the matter.
 7              THE COURT:  Is there any benefit to doing that?  Or
 8    no.
 9              MR. WIGDOR:  I am always open to talk.  I am sure
10    Mr. Mastro is but we haven't had any conversations.
11              THE COURT:  I don't generally view my role as to
12    strong arm people into settling things.  I like trials,
13    actually.  And, some cases should be decided on the merits,
14    that's the way it should go.  On the other hand, this could end
15    up costing a lot of money and taking a lot of time and if you
16    guys are going to ultimately resolve this thing then it might
17    make sense to consider that now before you spend a lot of time
18    and money and I spend a lot of time on a case that is
19    ultimately going to get resolved.  So, I will leave that to you
20    but it just, I thought it was worth mentioning.
21              So, let's then talk about the defamation claims.  So,
22    this is New York Law that we are applying here, right?
23              MR. MASTRO:  Yes, your Honor.
24              MR. WIGDOR:  Yes, your Honor.
25              THE COURT:  And so, among the elements are a
```

I1C5oakC

```
 1   defamatory statement that's false, published to a third-party,

 2   fault on the part of the defendant, actual malice, and

 3   defamation per se or special damages.  So, I want to focus on

 4   defamation per se or special damages.  It seems to me special

 5   damages have not been pled.  Do you agree with that,

 6   Mr. Wigdor?

 7             MR. WIGDOR:  I do.

 8             THE COURT:  You agree with that.

 9             MR. WIGDOR:  Yes.

10             THE COURT:  And is this something that you are

11   thinking of amending to add special damages?  Or no.

12             MR. WIGDOR:  No, your Honor.  We are alleging

13   defamation per se which doesn't require special damages.

14             THE COURT:  All right, so let's then talk about

15   defamation per se.

16             Under New York Law that's usually pretty narrowly

17   decided.  I mean, that's a serious crime, it tends to injure

18   another in his trade, business, or profession, a loathsome --

19   that the plaintiff has a loathsome disease or imputing

20   unchastity to a woman which shows -- I think -- how dated this

21   concept and these elements are, perhaps.  But, in any event,

22   so, I don't think you're alleging that these statements have

23   injured Mr. Oakley in his trade, business or profession, or am

24   I wrong about that?  I didn't see anything about that in this

25   complaint.
```

I1C5oakC

1          MR. WIGDOR:  That's correct, your Honor.

2          THE COURT:  So, instead we are talking about then a

3   serious crime and a loathsome disease, right?

4          MR. WIGDOR:  That's right.

5          THE COURT:  So the serious crime is the assault here?

6          MR. WIGDOR:  That's correct, your Honor.

7          THE COURT:  That's not clear to me from the pleadings

8   here that you are even alleging an assault.  I think what is

9   alleged is he is verbally and physically abusive.  Is being

10  physically abusive, by definition, the same thing as a felony

11  assault?

12         MR. WIGDOR:  Well, it doesn't need to be a felony

13  assault, your Honor.

14         THE COURT:  Okay.

15         MR. WIGDOR:  And I think that the Sprewell case that

16  we cited in our letter as well as the Wilcox case that we cited

17  in our letter are directly on point here.

18         The Sprewell case specifically says that in that case

19  that while the articles that were at issue in that case by The

20  New York Post didn't expressly charge Mr. Sprewell with having

21  committed a crime, the defamatory language didn't need to

22  consist of technical words of a criminal indictment provided

23  that there was some connotation of criminality.  And Courts

24  have held that a serious misdemeanor may form the basis for a

25  claim of defamation *per se* where it involves a crime that puts

I1C5oakC

1    another in fear of physical harm.

2           The Wilcox case went even further and said that

3    statements that the plaintiff should take a leave of absence

4    for the safety of the students is subject to a defamatory

5    interpretation that the plaintiff presents a risk of harm to

6    the students in her care.  And that's exactly what we have

7    here, your Honor.

8           THE COURT:  I don't think Mr. Oakley has any students

9    though, right?

10          MR. WIGDOR:  No, your Honor, but Mr. Dolan, one of the

11   comments that -- well, Mr. Dolan made a series of comments

12   which your Honor, in acting as the gate keeper in the

13   defamation claim and determining whether the defamation claims

14   are reasonably susceptible to a defamatory meaning taking them

15   as a whole, what he did say is that you need to keep the Garden

16   safe when he was referring to Charles Oakley.  So, it is

17   directly analogous to keeping students safe to keeping the

18   Garden safe and that's what Mr. Dolan said in the context of

19   his remarks about Mr. Oakley, which also included, and I will

20   focus on the remarks since we are talking now about the crime

21   aspect of defamation *per se* and not the loathsome disease which

22   was him referring to Mr. Oakley -- or referring to Mr. Oakley

23   as an alcoholic which I will get to when your Honor raises

24   that.  But, on the issue of the assault, he said that he needs

25   to keep the Garden safe, he said that he had a problem with

I1C5oakC

1   anger, that he is both physically and --

2            THE COURT:  Verbally abusive, yes.

3            MR. WIGDOR:  Verbally abusive.

4            THE COURT:  He may have a problem with alcohol.

5            MR. WIGDOR:  I am going to get to the alcohol.  If you

6    want me to address it now, I can.

7            THE COURT:  That's the quote.

8            MR. WIGDOR:  Yes.  And then he went on to say that the

9    number one concern has to be the safety -- again, the safety

10   element of the fans.  He then went on to say that there were

11   security people who were abused, service people who were

12   abused.

13           So, reading those as a whole and taking into account

14   the Sprewell case and the Wilcox case and looking at those

15   comments as a whole, I believe that we have adequately pled a

16   defamation claim just on that prong, putting aside the

17   alcoholic comments.  And while the defendants seem to suggest

18   that the case, I guess that they're primarily relying upon is

19   the Rotondi case against Madison Square Garden, but that case

20   was very different, your Honor, because in that case your Honor

21   will recall, since you have reviewed these cases, that in that

22   case the person who -- the plaintiff was with his employer at

23   Madison Square Garden and the claim for defamation in that case

24   was that the next day somebody from Madison Square Garden

25   called the plaintiff's employer, the person who was at the game

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

1    with the plaintiff, and said that the plaintiff was abusive and

2    interfered with the game and refused to leave the game.  And

3    that's all there was in that case.  There wasn't the

4    broadcasting of the statements to the world both on Twitter and

5    on ESPN Radio and there certainly weren't comments regarding

6    physical issues that I have already -- the quote about him

7    being physically abusive.  And in that case there also weren't

8    any things that were said about safety.  And so, that case, I

9    believe, is a horse of a different color and the cases that

10   really are more analogous are the two cases that I have already

11   identified.

12           In terms of the comments made about Mr. Oakley and

13   alcohol, alcoholism --

14           THE COURT:  Right.

15           MR. WIGDOR:  The case that is most directly on point

16   here, your Honor, I think is actually dispositive, is the Hayes

17   v. Sweeney case out of the Western District.  In that case the

18   Court said that New York Courts have determined that an

19   imputation of alcohol consumption is defamatory when a

20   accompanied by some aggravating factor such as the suggestion

21   that the conduct is habitual or that the person is a drunk.

22   And that is exactly what Mr. Dolan took to the air waves to do,

23   to say.  He said that anybody drinking too much alcohol looking

24   for a fight -- I forgot to mention that part, actually looking

25   for a fight goes to the first part that I have already

I1C5oakC

 1    discussed -- they're going to get banned and ejected.  And then

 2    he goes on to say, *to me, Charles has got a problem*.  So he is

 3    referring to him being a habitual drunk.  He has said it

 4    before, he referred to his prior conduct -- alleged prior

 5    conduct, *he is his worst problem*.  And he goes on to say, *he*

 6    *may have a problem with alcohol*.  And then he goes on to say,

 7    *when you have issues like this, the first step for anybody is*

 8    *to ask for help*.  Again, that is the part of the Hayes case

 9    which talks about the suggestion that the conduct is habitual.

10    Mr. Dolan's comment that --

11         THE COURT:  Mr. Dolan's comment is that he's abusive

12    and he has a problem with alcohol.  So you think that's the

13    same as saying it is a person who is a habitual drunk?

14         MR. WIGDOR:  Well, I think it is when you are saying

15    repeatedly and in essence that he needs to get help, yes.  And

16    you have to look at it in the context of who Mr. Dolan is

17    because Mr. Dolan has been on the record as an alleged reformed

18    alcoholic and this isn't the first person that he has told

19    needs help with alcohol consumption, which we set forth in our

20    complaint.  And so, when you look at it in the context of what

21    he said there is no question that, again, the issue for your

22    Honor to ultimately decide is whether -- not whether what the

23    jury will ultimately do but whether it is reasonably

24    susceptible to a defamatory meaning.  And I think there is no

25    question that Mr. Dolan's remarks regarding Mr. Oakley's

I1C5oakC

```
 1   physical and abusive behavior towards others, coupled with,
 2   that he was drinking and that he needs help make out the
 3   requisite reasonable, and it is reasonably susceptible to a
 4   defamatory meaning in that any notion to dismiss the defamation
 5   claims should be denied.
 6            THE COURT:  Well, I mean, what you are saying is that
 7   you think the case law supports alcoholism being found as a
 8   loathsome disease.
 9            MR. WIGDOR:  It most certainly does, your Honor.
10            THE COURT:  And you are citing for that Hayes v.
11   Sweeney.  Is that the case?
12            MR. WIGDOR:  That's one of the cases but there are
13   others, your Honor.
14            THE COURT:  I think there are -- I think those cases
15   and I think you should look at them, involve defamation and
16   their defamatory statements when they're coupled with damages.
17   I don't think that these cases stand for the proposition that
18   this is defamation, *per se*, and so I think that's really why I
19   start out by asking you if you wanted to replead to sort of
20   allege damages but you are doubling down on this, right?  You
21   are saying alcoholism is defamatory *per se*.
22            MR. WIGDOR:  Yes, your Honor.
23            THE COURT:  Okay, Mr. Mastro, let's hear you on these
24   and we will come to the other causes of action.
25            MR. MASTRO:  Thank you, your Honor.
```

I1C5oakC

1          Your Honor, I like to go with what was actually said.

2          THE COURT:  Well, what the complaint alleges is that

3   he behaved inappropriately and a completely abusive manner.

4          MR. MASTRO:  Correct, your Honor.

5          THE COURT:  That he is both physically and verbally

6   abusive, that security people were abused.

7          MR. MASTRO:  Correct, your Honor.

8          THE COURT:  So, that was my question.  Does abusive

9   and abused mean the same as assault?

10          MR. MASTRO:  I think the clear answer to that, your

11   Honor, is no.  There was not a single statement made about

12   Mr. Oakley assaulting anyone although, your Honor, whether your

13   Honor has the opportunity to view the public video of the game

14   that they refer to --

15          THE COURT:  Why don't we start there because it seems

16   to me this is a motion to dismiss on the pleadings and you are

17   saying that I should skip all of that and go to the video, like

18   Warner Wolf.

19          MR. MASTRO:  I do believe your Honor should go to the

20   video because they make reference to this happening on national

21   television in front of millions of people and in a public

22   setting, they've incorporated that by reference, a nationally

23   televised game, that's in their pleading, and your Honor has

24   every right, and Judge after Judge in this district has looked

25   at the best evidence, the video of the event, surveillance

I1C5oakC

1   video or public video available of the event in the context of

2   a motion to dismiss.  Judge Preska, Judge Engelmayer, Judge

3   Furman, they have all permitted video to be considered, and

4   Judge Buchwald most recently have all considered video evidence

5   on a motion to dismiss when there was reference to it.

6           But, your Honor, we don't have to go there but I

7   believe your Honor has every right to do that and should

8   because, your Honor, there is a reason why this case was

9   brought in federal court instead of as a verified pleading as

10  it would have had to be in state court because many of the

11  allegations themselves in the complaint are demonstrably false.

12  When you look at the public video, the public video of the game

13  and the publicly available video that was posted in the New

14  York Times and on YouTube, and in these other cases Judges of

15  this district have consistently considered such video evidence

16  on a motion to dismiss including video posted on YouTube and

17  surveillance video which the Garden has which prove point after

18  point after point the allegations in this complaint are

19  demonstrably false.

20          THE COURT:  All right, but --

21          MR. MASTRO:  Let me come more specifically though,

22  your Honor --

23          THE COURT:  I think you are overstating Engelmayer's

24  case.  I think that's a case in which it was specifically

25  referenced in the complaint and the plaintiff stated that he

I1C5oakC

 1    was incorporating it by reference.  That's not this case.  Now

 2    maybe you want to make a motion for summary judgment and say

 3    that all I need is the videotape and we will go from there, but

 4    it doesn't seem to me that this is a case in which I should be

 5    broadening the pleadings to include the video.  There might be

 6    any number of videos on this.

 7            MR. MASTRO:  Certainly, your Honor.  Certainly, your

 8    Honor, there are specific references to this having occurred on

 9    national television in a nationally televised game for millions

10    to see.  This is part of the humiliation that they reference.

11    How is that video not incorporated by reference, your Honor,

12    under those circumstances?

13            But let me just say this, your Honor.  We will brief

14    the issue, your Honor can consider the video evidence or not,

15    we win anyway.  So let me explain why we win anyway.

16            MR. WIGDOR:  Can I address the video issue, your

17    Honor?

18            THE COURT:  Well --

19            MR. MASTRO:  May I --

20            THE COURT:  I think I know your position.  You are

21    saying it doesn't come in.  If you want me to look at it I am

22    happy to look at it.

23            MR. WIGDOR:  I want to respond to Mr. Mastro's

24    comment.

25            I have looked at the video as well, it is not part of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

1    the complaint, but it doesn't show what Mr. Mastro depicts it

2    as showing, and at the end of the day I don't see what it has

3    to do with the issue of defamation, *per se*.  It might be

4    somewhat relevant at summary judgment on the a assault and

5    battery claim but, ultimately, the jury is going to look at

6    that video and, like your Honor just said, there are many

7    different camera angles, some of which we have, some of which

8    we don't have, and a jury will determine who was pushed down

9    first.

10          THE COURT:  It might go to whether the statement is

11   false.  I think that's what you are saying, right?

12          MR. MASTRO:  It goes to whether certain allegations

13   are false and it definitely goes, your Honor, to the other tort

14   claims alleged in this case.

15          THE COURT:  Well --

16          MR. MASTRO:  But, your Honor --

17          THE COURT:  Let's stay focused on the defamation and

18   libel claims for now.

19          MR. MASTRO:  Certainly, your Honor, but for the record

20   the complaint at paragraph 4 says that this was done to

21   publicly embarrass him on live television, end quote, and in

22   complaint paragraph 53 it says that Mr. Oakley was humiliated

23   on national television.

24          So, that game on national television is incorporated

25   by reference in this complaint that this was captured --

Case 21-2939, Document 27, 03/08/2022, 3273886, Page25 of 180

**A-215**

I1C5oakC

1          THE COURT:  The defamation are the statements made by

2   Mr. Dolan.

3          MR. MASTRO:  Understood, so let me focus on that, your

4   Honor.

5          THE COURT:  Okay.

6          MR. MASTRO:  The statements by Mr. Dolan and by

7   Knicks --

8          THE COURT:  But not what was on the national video.

9   The defamation is not the video of an altercation at the

10  Garden, right?

11         MR. MASTRO:  The video shows the altercation, your

12  Honor, and captures some of the audio of what was said by

13  Mr. Oakley and what was said to him.

14         THE COURT:  But not by what was said by Mr. Dolan or

15  anybody else who is being changed or accused of defamation,

16  right.

17         MR. MASTRO:  No.  I'm not suggesting to your Honor

18  that the video goes to showing the statements that were made by

19  Mr. Dolan or Knicks PR.  I am saying to your Honor that the

20  video supports the truth of those statements as they relate to

21  a characterization of his behavior.

22         THE COURT:  Maybe.  But I want to focus on the

23  defamation claim for whether or not there is defamation *per se*

24  by -- alleged in this complaint with respect to an assault

25  committed by Mr. Oakley and with respect to alcoholism being a

I1C5oakC

1      loathsome disease.

2              MR. MASTRO:  Correct, your Honor.  Let's start with

3      alcoholism.

4              As your Honor has already pointed out, the Hayes case

5      from the Western District of New York back in the 1990s was

6      narrowly based on whether there could be -- it could be

7      construed as a defamatory statement that someone was an

8      alcoholic when there was some aggravating, additional statement

9      that affected the allegation and the assumption in that case,

10     wrongly, was that New York Law supported that interpretation.

11     In fact, every case that has been decided since -- and we are

12     prepared -- we cited some but are prepared to cite others to

13     your Honor -- in New York Law has concluded that allegations

14     relating to alcoholism do not in fact constitute a loathsome

15     disease, meaning a venereal disease or other communicable

16     disease.  Alcoholism doesn't fit.  There is Southern District

17     cases subsequent to this including Judge Briccetti here in 2012

18     in the Marino case, that's 2012 Westlaw 1871623 at page 11,

19     SDNY 2012 case.  There is Walker v. Urban Compress, 2017

20     Westlaw 608308, that's New York County Supreme Court, February

21     15th, 2017, finding that abusing alcohol, even when that

22     allegation is made in the context of someone showing up drunk

23     for work as an allegation, does not constitute defamation,

24     *per se*.  And, your Honor, it is also the case that -- and both

25     of those are motions to dismiss, your Honor, and there is also

I1C5oakC

1    the Ruderman case holding that statements that a plaintiff was

2    an alcoholic do not constitute slander, per se.  Ruderman v.

3    Stern, 2004 Westlaw 3153217 at page 16, also New York County

4    Supreme Court.

5            So, your Honor, I think it is very clear what is meant

6    by a loathsome disease, that's the TC v. Valley Central School

7    District case, 777 F.Supp.2d 577, 603, Southern District case,

8    2011, Judge Eginton, it is a venereal disease or other

9    loathsome and communicable disease.  That's the definition.

10   Alcohol doesn't fit.

11           So, not only is Hayes an outdated outlier that

12   misapplied New York Law, it also doesn't apply for the reasons

13   that your Honor already stated.

14           THE COURT:  Okay.

15           MR. MASTRO:  Now, having said that, let's talk

16   about --

17           THE COURT:  The assault.

18           MR. MASTRO:  -- the assault and whether that

19   constitutes a serious crime.

20           THE COURT:  I guess there is two points.  Does assault

21   constitute a serious crime and does the complaint make an

22   allegation that there was an accusation of assault?

23           MR. MASTRO:  Completely correct, your Honor.

24           There isn't a single thing in this complaint that says

25   Mr. Oakley committed an assault, it doesn't use the word

I1C5oakC

1    "assault."

2          THE COURT:  It certainly doesn't use the word assault.

3    It says he was looking for a fight, he was physically and

4    verbally abusive.

5          MR. MASTRO:  Correct, your Honor.  And the context in

6    which that arises, your Honor, the full quote and I am quoting

7    from the complaint and then I will tell you when the complaint

8    cuts off because the answer continued by Mr. Dolan, he says, *to*

9    *me, Charles has got a problem.  He is his own worst problem.*

10   *He has a problem with anger.  He is both physically and*

11   *verbally abusi*ve.  *He may have a problem with alcohol.*

12         THE COURT:  Right.  No, I think the only one there

13   that I think gets close is both physically and verbally abusive

14   coupled with there were security people that were abused.

15         MR. MASTRO:  Your Honor, that's not even accusing him

16   of a crime let alone saying that it is a serious crime, and of

17   course the standard for defamation *per se* is that it has to be

18   a serious crime.  And there are many cases, your Honor, many

19   cases, that have held under New York Law that misdemeanors are

20   not serious crimes and what is left out of this complaint but a

21   matter of public record is that the only things that Mr. Oakley

22   was eventually charged with were a series of misdemeanors.

23         THE COURT:  Well, that is true but I don't know that

24   that's dispositive.  It seems to me if you make statements that

25   support a conclusion or an inference that a person committed a

I1C5oakC

1    serious crime, the fact that they weren't charged with that

2    crime is not a defense for a defamation claim.

3         MR. MASTRO:  That's correct, your Honor.  I simply

4    point out that no one accused him of a serious crime, he wasn't

5    charged with a serious crime which you can take judicial notice

6    of and none of the words we have cited here, other than

7    Mr. Dolan's opinion that, to me, Charles may have a problem,

8    that, to me, he is physically and verbally abusive.

9         THE COURT:  He didn't say to me he is physically and

10   verbally abusive.  He said he is both physically and verbally

11   abusive and later says there were security people that were

12   abused.

13        MR. MASTRO:  Correct, your Honor.

14        THE COURT:  So, is that enough to rise to the level of

15   an assault?

16        MR. MASTRO:  How could that possibly rise to the level

17   of assault?

18        THE COURT:  I am asking the questions.  You are

19   answering the questions.

20        MR. MASTRO:  Your Honor, we are both former federal

21   prosecutors.  Nobody would charge that as a criminal assault,

22   to say that somebody was abusive.  That is not going to rise to

23   the level of a serious felony crime which is what New York Law

24   requires.  And just so we are clear on this, just so we are

25   clear on this, to say that somebody was abusive or abused

I1C5oakC

 1   someone, to us is a statement of opinion but, regardless, it

 2   certainly doesn't amount to accusing someone of having

 3   committed a serious crime and under New York Law it's very

 4   clear that the serious crime has to be at the level of a

 5   felony, meaning a big deal crime.  And the cases that were

 6   cited by my worthy adversary are clearly distinguishable.  The

 7   Hayes v. the New York post, the Sprewell case --

 8            THE COURT:  Sprewell, Sprewell.

 9            MR. MASTRO:  -- the Post kept blasting away that he

10   had thrown someone against the wall, broken a bone -- a finger

11   I believe.  Accused him of doing very serious violent things

12   when there was actual bodily injury and a broken bone.  That's

13   what The Post kept reporting over and over again in that

14   context, completely different than here to say somebody behaved

15   abusively which, to us, is a statement of opinion that doesn't

16   get out of the box because it is not a statement of fact but

17   even if it did, it certainly isn't allegation of a serious

18   crime.

19            Your Honor, just so the record is clear, the Lieberman

20   case, New York Court of Appeals, 80 N.Y.2d 429, page 435, 1992,

21   the New York Court of Appeals held that misdemeanor harassment

22   was not a serious crime.  Okay?  You also have the Burdick v.

23   Verizon case, 785 N.Y.2d 877, also 2003, that hitting or taking

24   a swipe at another is not actionable as libel, *per se*.  And

25   finally Fusco v. Fusco, 2008 Westlaw, 307456 at page 4, New

I1C5oakC

1    York County Supreme Court in 2008, "misdemeanors" are not

2    "serious crimes"  For purposes of defamation, *per se*.

3            So, I think New York Law is very clear on this point

4    and it is creative to try and argue there is any ambiguity to

5    this but there isn't.  What Sprewell was accused of was felony

6    assault, having broken a bone, having shoved someone up against

7    the wall and cause them bodily injury.  And the other case,

8    Wilcox cited, has both the element of whether someone in a

9    school system posed a threat of harm to students and that

10   obviously related, your Honor, to their professionalism, to

11   their profession, trade or business.  So, that's a completely

12   different context that's conceded here.

13           So, your Honor, for all of those reasons, the

14   defamation claim should be dismissed on this basis alone.

15           THE COURT:  Was there anything else you wanted to say

16   on defamation?

17           MR. MASTRO:  I mean, your Honor, there is other

18   reasons why the defamation claim should be -- we have a *Twombly*

19   *Iqbal* standard, your Honor, and the actual malice isn't

20   properly pled, we have concession on special damages, we don't

21   have to talk about that but, your Honor, I think when you break

22   out the statements that are actually alleged to be defamatory

23   or slanderous or libelous here, they either fall in the bucket

24   of statements of opinion, not fact, or they fall in the bucket

25   that's been a little confused in my adversary's presentation,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I1C5oakC

1   of generalized statements not of and concerning the plaintiff

2   specifically.  They're made in the context of this incident but

3   they're generalized statements about protecting the safety and

4   comfort, that word was left out.  Mr. Dolan said our number one

5   priority is protecting the safety and comfort of those who

6   attend the Garden.  How is that defamatory?  Yet it was cited

7   here earlier in oral argument as a reference to safety alone as

8   to Mr. Oakley.  It was a generalized statement.

9         So, I think when you parse each of these statements

10  individually they're either not actionable opinions or not of

11  and concerning the plaintiff that generalized statements which

12  your Honor has written extensively about in prior opinions in

13  dismissing other cases.

14        THE COURT:  In any event, we have some other points I

15  want to get to.

16        MR. WIGDOR:  Can I add one other point, your Honor?

17        I think it is important because he makes the point,

18  frankly, which is that your Honor's obligation is not to parse

19  each statement separately, it is to view the statements in

20  their totality.

21        THE COURT:  I think I have done that about four times

22  and all I have seen is physically and verbally abusive,

23  security people that were abused.  I don't see anything else in

24  here.  No one is accusing him of an assault.  Nobody is saying

25  that he beat the heck out of somebody which is saying --

I1C5oakC

1          MR. WIGDOR:  You don't need that, your Honor, and

2     again, the Sprewell case is directly on point on this issue,

3     your Honor.  The Sprewell case specifically said that Courts

4     have held that a serious misdemeanor may form the basis for a

5     claim of defamation *per se* --

6          THE COURT:  That's not what I am saying.  The acts

7     alleged in Sprewell were a lot more explicit than this.  They

8     were not, oh, he was physically abusive and people were abused.

9     I think that's all you have here.

10          MR. WIGDOR:  My adversary's recitation of the facts in

11     Sprewell are wrong.  The only fact in Sprewell that the Court

12     was considering with respect to whether it constituted

13     defamation *per se* was that Mr. Sprewell took a swing and miss

14     and hit a wall with his own hand.  Okay?  And that was -- there

15     was none of this other stuff that Mr. Mastro was making

16     allusion to.  And the Court went on to say that alone involved

17     a crime that put another in fear of physical harm.  And it went

18     on and to add that the imputations of violence and criminality

19     in connection with the incident may be interpreted by the

20     average reader in light of the widespread publicity as to the

21     plaintiff's prior acts of alleged violence, and importantly it

22     says that the crime is sufficiently serious in the context of

23     the prior publicity to be actionable as libel *per se* and he

24     doesn't need to prove special damages.

25          Here, your Honor, when you look at the totality of the

I1C5oakC

1      circumstances you have Mr. Dolan saying (A) he is currently

2      being arrested, okay, so that would lead the listener or viewer

3      since it was a Tweet to know that it was a crime or an alleged

4      crime, he was looking for a fight, a fight which is an assault,

5      he was, as your Honor pointed out, physically and verbally

6      abusive, that Mr. Dolan was concerned about the safety of the

7      fans.  And again, your Honor, it is only to determine whether

8      all of those comments, not parsing them out but in their

9      totality of the circumstances here, whether they are reasonably

10     susceptible to a defamatory meaning.

11              THE COURT:  I get all of that.  Let's move on.  I have

12     to say I think this is an uphill climb.  I am surprised that

13     you don't want to replead but you clearly don't and you don't

14     have to but --

15              MR. WIGDOR:  On the repleading, your Honor, on that

16     point we don't.  There may be other things we -- I am not

17     saying we are not going to replead at all.

18              THE COURT:  Okay, but you are certainly not alleging

19     damages let alone special damages.

20              MR. WIGDOR:  That's correct, your Honor.

21              THE COURT:  Okay.  So, I think that's going to be an

22     uphill climb, candidly, based on what's in the complaint.

23     There is just not a lot of skin on those bones and the language

24     is fairly generic.  So, all right, let's then move to the

25     assault and battery and this is one where it does seem to me

I1C5oakC

1   that here I think, Mr. Mastro, you really are relying on the

2   video and I'm not sure that I am prepared to do that.  I think

3   the cases you cited to me are distinguishable and I think based

4   on what is alleged in the complaint it looks to me like there

5   is an allegation of an assault and battery against security,

6   right.

7              MR. MASTRO:  Your Honor, if I may, I do think there

8   are many cases, as I said, I think I have cited five of them

9   here, we didn't have a chance to cite all of these cases to you

10  in the three-letter submission.  I think you would find others

11  have been more analogous and I find it interesting, your Honor,

12  that when there is a complaint that says he was humiliated on

13  national television in a nationally televised game, that anyone

14  would object to seeing the best evidence of the supposed

15  assault and battery.

16             THE COURT:  So what is the best evidence?  Tell me

17  what it is.  What is this video?  What network?  What cameras?

18  Is there stuff in the control room that made it onto national

19  TV?

20             MR. MASTRO:  Absolutely.  It was actually --

21             THE COURT:  That's my point, is that --

22             MR. MASTRO:  Your Honor, you have the following pieces

23  of video evidence and I will go in the order in which I think

24  you most readily should consider them.

25             Number one, the game itself.  The cameras switched to

I1C5oakC

1   the incident as --

2           THE COURT:  And stayed with it continuously the entire

3   time.

4           MR. MASTRO:  It doesn't cover the entire time.

5           THE COURT:  It doesn't.  I just think this is not a

6   winner.

7           MR. MASTRO:  Your Honor, you have the opportunity to

8   see, from the nationally televised game, you will see, I think

9   you will be shocked by what you see given what was pled in this

10  complaint.  I found it shocking when I saw the video on

11  national television.  It shows Mr. Oakley actually physically

12  assaulting security guards with NYPD there at all times trying

13  to get him to leave the venue.  They treated him literally with

14  great respect and he got physical with them, you would see that

15  just on that nationally televised video.  You see a shocking

16  shoving by him, multiple shoves, and this is not a -- and you

17  don't see, your Honor, I think, anything done wrong by an NYPD

18  officer or security guards.

19          THE COURT:  And the fact that I don't see that means

20  that nothing else could have happened?

21          MR. MASTRO:  I am going to go --

22          MR. WIGDOR:  Your Honor, I --

23          THE COURT:  Whoa, whoa, whoa.  I didn't ask you to

24  stand up so you have a seat.

25          MR. MASTRO:  Your Honor, the nationally televised game

I1C5oakC

1    captures the incident in progress and sees it through to a

2    certain point where he is starting to be moved from the seat.

3          What we also have are a New York Times video, publicly

4    posted with the New York Times article on the incident which

5    covers --

6          THE COURT:  And why am I considering that one?  Was

7    that relied on in the pleadings, the New York Times video?

8          MR. MASTRO:  It was not, your Honor, but the case

9    law -- the case law, and I think your Honor will see it --

10         THE COURT:  I have read these cases.  I think that you

11   are overstating them.  You can keep telling me again and again

12   and I am wrong and maybe you will persuade me in the briefing

13   but I don't think it is the best use of your time now.  So, why

14   don't you tell me anything else about the battery claim other

15   than the fact that I should look at the video.

16         MR. MASTRO:  Your Honor, if I can, and I will not take

17   much more of your Honor's time, I just want to tell you the

18   other videos that are out there that I think your Honor --

19         THE COURT:  If you want to make a motion for summary

20   judgment and then we can collect all the videos and I can look

21   at them all, then that would be fine, I suppose, and then I

22   guess we will hear from Mr. Wigdor whether he thinks some

23   additional discovery is necessary including testimonial

24   discovery.  But, this is a motion to dismiss.

25         MR. MASTRO:  I understand.  And I just wanted to say,

I1C5oakC

1    your Honor, that on a motion to dismiss it is incorporated by

2    reference in the complaint or is integral to the dispute, and

3    to us the video displaying the incident is integral to the

4    dispute.

5           THE COURT:  The New York Times video is integral to

6    this dispute?

7           MR. MASTRO:  Because it shows the New York Times video

8    and a posted YouTube video, both show the incident really

9    almost from start to finish.

10          THE COURT:  And that makes it integral to dispute?

11          MR. MASTRO:  To determining whether there was an a

12   assault and battery, your Honor.

13          THE COURT:  I think witness testimony might be

14   integral to dispute and I should consider that as well on a

15   motion to dismiss.

16          MR. MASTRO:  Well, as your Honor knows, witnesses do

17   not always, in their subjective views, have accurate memories

18   and we suggest to you that --

19          THE COURT:  But the lack of accurate memory is what

20   makes something not integral to a dispute?  I am just trying to

21   figure this out.

22          MR. MASTRO:  No, your Honor.

23          THE COURT:  Yes.

24          MR. MASTRO:  Video doesn't lie.  Video depicts what

25   happened at the time.  There is also internal arena security

I1C5oakC

```
1    footage and internal arena footage that really shows every

2    moment from when Charles Oakley came into the arena to take his

3    seat to when Charles Oakley was escorted out of the arena and

4    then showing him being escorted to a police van to take him

5    away.

6              At every one of those moments, your Honor, just to be

7    clear, at every one of those moments the NYPD, at least one

8    officer is participating in observing Mr. Oakley, approaching

9    Mr. Oakley to have him leave, asking him to leave and then

10   arresting him.

11             THE COURT:  Are these arguments for my best or

12   somebody else's benefit back there?

13             MR. MASTRO:  They are, your Honor.

14             THE COURT:  Because it is not helping me much.  This

15   is a motion to dismiss and all you are telling me is that there

16   is a lot of video that proves what you are claiming in your

17   defense and I just think that's not what a motion to dismiss is

18   about.

19             MR. MASTRO:  Okay.

20             THE COURT:  So, are you saying that the pleadings are

21   deficient?  Are you telling me the pleadings are false and

22   contradicted by evidence that's not yet before me?  Because if

23   it is the latter, that's not a motion to dismiss.

24             MR. MASTRO:  I am simply suggesting to your Honor that

25   there are videos --
```

I1C5oakC

 1            THE COURT:  I know there are videos.

 2            MR. MASTRO:  And that they show exactly what happened

 3     here.

 4            THE COURT:  Okay.

 5            MR. MASTRO:  And that in other circumstances some

 6     other Courts in this district have considered that video

 7     evidence.

 8            THE COURT:  Are you saying there is something wrong

 9     with the pleadings other than that it's contradicted by the

10     videos?  Is there anything else you have got to say with

11     respect to the pleadings on a assault and battery?

12            MR. MASTRO:  I have much more to say about assault,

13     your Honor.

14            THE COURT:  Okay.  So, let's do that.

15            MR. MASTRO:  And I am definitely saying they're

16     contradicted by the videos.

17            THE COURT:  What else are you saying?

18            MR. MASTRO:  Let me tell you what else I am saying

19     about assault, your Honor, because there are independent

20     reasons why the assault and battery claim there should be

21     dismissed.

22            On assault, your Honor, the legal standard for assault

23     under New York Law is an intentional placing of another in fear

24     of imminent harmful contact.  Imminent harmful contact.  The

25     only allegation in the complaint, your Honor, and that's the

I1C5oakC

```
 1   U.S. v. National Insurance case, 994 F.2d 105.
 2            THE COURT:  That case is in the complaint?
 3            MR. MASTRO:  No, no.
 4            THE COURT:  What's the only allegation in the
 5   complaint?
 6            MR. MASTRO:  The only allegation -- I am just giving
 7   you the case, your Honor, that cites the standard.  The
 8   complaint in paragraph 38, the only thing the complaint says is
 9   that Mr. Oakley was approached by three large men and asked to
10   leave.  Now, your Honor, Charles Oakley is 6'10" and he talks
11   about being the best power forward in Knicks history, and I
12   don't think under Twombly and Iqbal that an allegation that he
13   was approached by three large men and told to leave and that he
14   didn't think there was any reason to leave and that they made
15   him leave, that that was fear of imminent harmful contact in
16   allegations sufficient to state such a claim.
17            THE COURT:  Well, paragraph 43 and 45 are the ones
18   that seem to me to be alleging assault.
19            MR. WIGDOR:  And 46, your Honor.
20            THE COURT:  Okay.  Well, that's when Mr. Oakley pushed
21   away their hands in self-defense.
22            MR. WIGDOR:  He was fearing for his safety, your
23   Honor.  That's what assault is.
24            THE COURT:  Well, that goes to state of mind.  I am
25   talking about what the security guards did and it is alleged
```

I1C5oakC

1    that two security guards grabbed him, pushed him to the ground.

2    When he continued to protest this outrageous behavior they

3    started to physically grab him to forcefully compel him to

4    leave.  I guess 46 goes to the state of mind that he feared for

5    his safety.  But I don't even know if that's necessarily to be

6    alleged because if you draw the inference from the grabbing,

7    pushing and -- physical grabbing, and then put in restraints,

8    roughly threw him out of the Garden, dragging him to the ground

9    in the process.

10            MR. MASTRO:  So, your Honor, even if you considered

11   those allegations sufficient under other circumstances to state

12   such a claim, here you have the circumstance that under New

13   York Law you have -- the private property owner has the right

14   to use reasonable force to eject a trespasser from the premises

15   and can be forcibly compelled to leave when the property owner

16   withdraws their license to be on the property.  Here, your

17   Honor, you have, in the context of an assault claim, you have

18   the Garden, the private owner of the venue, having withdrawn

19   its consent to Mr. Oakley being there, him having refused, they

20   have the right --

21            THE COURT:  Is it doesn't say he refused.  It says he

22   asked questions and protesting he didn't do anything wrong, he

23   then returned to his seat and then they pushed him to the

24   ground.  You are saying that if you don't hop to it and get out

25   right away they have a right to grab you and throw you to the

I1C5oakC

1    ground?

2          MR. MASTRO:  Your Honor, I am saying when the

3    revocable license -- and such a ticket to an entertainment

4    venue is a revocable license is withdrawn, and that's solely

5    within the discretion -- this is what New York Law says, your

6    Honor, solely within their discretion -- that once the license

7    is revoked the person has to leave or he is a trespasser.  And

8    when he is a trespasser, there can be physical contact to

9    remove him.

10         Now, your Honor, this is what the Mitchell v. NYU case

11   squarely held.  214 Westlaw 123255, New York Supreme Court,

12   January 2014, Justice Madden in New York County here, and this

13   involved security guards at NYU who revoked the license of

14   someone to be on NYU's property.  The person refused to leave

15   and they were allowed to remove the person including a physical

16   touching to remove him.  And, you know, that case seems to us

17   to be on all fours with this situation.

18         THE COURT:  Look.  But the pleadings were different.

19   That's the whole point.  It all turns on the pleadings.  It all

20   turns on what is alleged here and so I think what you are

21   saying is that based on what is alleged here, which is that

22   three men identifying themselves as security team, ordered him

23   to leave the arena -- I have another matter so we will have to

24   wrap this one up soon -- but he then responds he didn't do

25   anything wrong and I guess your point is that in the next

I1C5oakC

1   paragraph 42, he proceeded to turn around and return to his

2   seat meant they could physically grab him and force him out of

3   the place, right?  That's what you are saying.

4           MR. MASTRO:  At that point he was a trespasser, your

5   Honor.

6           THE COURT:  Okay.  So, let's leave it there.  I don't

7   want to go to the video, I want to leave it to the pleadings.

8           So, Mr. Wigdor, on that point there, he is asked to

9   leave, he refuses to leave, and your view is that they have to

10  just let him stay for the rest of the game?

11          MR. WIGDOR:  I don't --

12          THE COURT:  They're not allowed to touch him.

13          MR. WIGDOR:  I will reread the letter they sent, your

14  Honor.  I don't know that this exact argument was made.

15          THE COURT:  I don't care about the letter, I am asking

16  about the pleadings and what you are saying with respect to a

17  trespasser.

18          MR. WIGDOR:  Yes.  Our pleadings allege, your Honor,

19  that Mr. Mastro, when he was talking about the video, neglected

20  to inform the Court this but when the videos that I have seen

21  is that when they approach Mr. Oakley, the first thing that

22  happens before all the things Mr. Mastro went on to tell your

23  Honor is that he gets thrown to the ground.  And so --

24          THE COURT:  That's not what the complaint says.

25          MR. MASTRO:  That's not what the complaint says.

I1C5oakC

1          MR. WIGDOR:  It says that --

2          THE COURT:  He doesn't get you thrown to the ground

3     until paragraph 43.  What's that?

4          MR. WIGDOR:  I'm sorry.  Go on.

5          THE COURT:  Grabbed him and pushed him to the ground,

6     paragraph 43.  That's after he turned around and returned to

7     his seat defying their request to leave the arena.

8          MR. WIGDOR:  Sorry for the confusion, your Honor.  I

9     was addressing who was pushing who first in responding to

10    Mr. Mastro's comment that Mr. Oakley was pushing them.

11         THE COURT:  Mr. Mastro's comment is that once they've

12    asked him to leave he has to go.  If he doesn't go, then

13    they're allowed to touch him.  It is not an assault at this

14    point, they're justified in doing it.

15         MR. WIGDOR:  I would need to research that exact

16    point, your Honor.  I have not looked at that point and I would

17    actually need to speak to my client again to determine whether

18    he was specifically asked to leave at that point.

19         THE COURT:  This is your pleading.

20         MR. WIGDOR:  Before he was touched -- you're right, it

21    is but, your Honor, I mean if the law were such that a security

22    guard could come to you and say you need to leave and you start

23    to return to your seat and you can get thrown down, which is

24    what eventually happened here, Knicks fans I think should be

25    pretty worried about going to the next Knicks game because it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 21-2939, Document 27, 03/08/2022, 3273886, Page46 of 180

**A-236**

I1C5oakC

1    wouldn't make any sense, your Honor.

2              THE COURT:  There would be a lot of reasons not to go

3    to the next Knicks game -- they lost three in a row at home and

4    they can't win on the road.  So, I don't know.

5              I think the point is your pleading says he was asked

6    to leave by people who identified themselves as Madison Square

7    Garden security, he didn't do it, he turned around and returned

8    to his seat.  I think your point is that that may allow them to

9    escort him out, maybe not push him to the ground.

10             Is that what you are saying?

11             MR. WIGDOR:  Your Honor --

12             THE COURT:  It is an excessive force claim, more than

13   what was reasonable?

14             MR. WIGDOR:  Your Honor, I think, and I think not

15   having seen cases on the specific subject, I think it would

16   need to be reasonable, your Honor, when somebody returns to

17   their seat you don't then get hostile.

18             THE COURT:  Mr. Mastro, you are not saying that they

19   asked him to leave, they wouldn't go, so they have the right

20   now to beat the hell out of the guy.  You are not saying that,

21   right?

22             MR. MASTRO:  I am absolutely not saying that, your

23   Honor.

24             THE COURT:  Okay.

25             MR. MASTRO:  I am saying that I think the proper

I1C5oakC

1    construction of the pleading --

2            THE COURT:  That they didn't say that.

3            MR. MASTRO:  That they didn't do that.

4            THE COURT:  It is not pled that they did that.

5            MR. MASTRO:  Right.  That he was asked to leave --

6            THE COURT:  Okay.

7            MR. MASTRO:  -- there is some form of resistance, he

8    falls to the ground, and he doesn't leave and they are allowed

9    to use reasonable physical force to remove a trespasser.

10           And, your Honor, I have to point one other thing out

11   because Mr. Oakley also says in the pleading that he purchased

12   tickets, the same tickets that you and I purchase to go to the

13   games and on the back of that ticket, your Honor, you can take

14   as evidence on a motion to dismiss, the back of the ticket that

15   we all purchase and he says in his complaint he purchased,

16   says, on every one of those tickets, "this ticket is a personal

17   license revocable in MSG's sole discretion."

18           THE COURT:  I am not hung up on that.  It seems to me

19   what is alleged in the complaint arises to the level of assault

20   because it is excessive or more than necessary to get him to

21   leave.  I so I think that's a closer call.  I think that's one

22   where we will get some briefing on that.

23           False imprisonment.  It seems to me that you guys are

24   talking past each other on this one.  The false imprisonment

25   claim is I think that the Madison Square Garden security folks

I1C5oakC

```
1    restrained him and wouldn't let him leave and then removed him

2    from the Garden.  Defendants are saying that PD are the ones

3    who detained him and restrained him.  So, I think we only

4    talking about the security guards, right?

5              MR. WIGDOR:  That's correct.

6              MR. MASTRO:  And, your Honor, in I think the case law

7    it will show you that when he was told to leave and then

8    escorted out it is with NYPD involved.  It is admitted in the

9    stipulated facts that we gave to your Honor in the joint letter

10   on potentially setting a schedule that it is security guards

11   and NYPD.

12             THE COURT:  I am focused on the pleadings.  That

13   letter is not an amended complaint.

14             MR. MASTRO:  Your Honor, he is basically in an arrest

15   situation.  There is NYPD with him the whole time and he is

16   arrested, he is in fact cuffed.  He talks about being

17   restrained in handcuffs.  That's no MSG security guards, that's

18   NYPD.  So he is an arrest situation, they not charging false

19   arrest.  So, I don't see how there could possibly be a false

20   imprisonment claim.

21             THE COURT:  They're charging abuse of process.  But,

22   look, I want to get briefing on these too.

23             The one thing I want to talk about is denial of public

24   accommodation under the ADA, New York State and New York City

25   Human Rights Laws.
```

I1C5oakC

1              BOTTOM LEFT:  Certainly, your Honor.

2              THE COURT:  Let me jump to sort of where I am.

3              MR. MASTRO:  Sure.

4              THE COURT:  As you have noticed already I have a view

5      and then whoever has the burden of persuading me, not the legal

6      burden but where I think I'm going, then I give them first

7      crack.

8              MR. MASTRO:  Understood, your Honor.

9              THE COURT:  So, here it seems to me that the problem

10     with these causes of action is that you're alleging that he was

11     barred from the Garden based on the perception that he suffers

12     from alcoholism.  But, that pretty much contradicts your theory

13     that they are falsely accusing him of alcoholism.  They know he

14     is not an alcoholic, they know this is not an alcohol problem.

15     That is a pretext.  It is a false, defamatory statement that

16     they're uttering maliciously so he is not being barred from the

17     Garden because of the perception he suffers from alcoholism, it

18     is for some other reason altogether and they are defaming him.

19     I don't see how you can have it both ways.

20              Mr. Wigdor?

21              MR. WIGDOR:  We certainly could plead in the

22     alternative, your Honor.

23              THE COURT:  Is that what you are doing?

24              MR. WIGDOR:  Well, no.  No, your Honor.  But I think

25     the point on the perceived as disabled claim, which would be

I1C5oakC

```
 1   under the three statutes, actually the City law we do agree

 2   should be dismissed, but if the defendants perceived him as

 3   being an alcoholic I don't see why that would necessarily

 4   undermine the defamation claim.

 5           THE COURT:  I thought you said it was a false claim.

 6           MR. WIGDOR:  It is a false claim.

 7           THE COURT:  So it is a false claim.  It is known to be

 8   false which is one of the elements, right?

 9           MR. WIGDOR:  Correct.

10           THE COURT:  And it is maliciously uttered and yet they

11   are denying him access to the Garden because of the perception

12   that he suffers from alcoholism.

13           MR. WIGDOR:  But the perception doesn't need to be

14   true, your Honor.

15           THE COURT:  Well, it is the perception to whom?

16           MR. WIGDOR:  The perception to Mr. Dolan.

17           THE COURT:  But Mr. Dolan --

18           MR. WIGDOR:  But it could be a false perception.

19           THE COURT:  -- doesn't perceive that he suffers from

20   alcoholism.

21           MR. WIGDOR:  It is a false perception but that is what

22   he stated.

23           THE COURT:  I don't think that's an ADA problem.

24           MR. WIGDOR:  Let's take a situation where, out of this

25   example here, but if somebody owns a business and doesn't want
```

I1C5oakC

1   to let somebody in and knowing that they're not an alcoholic

2   but says I'm not letting you in here because you're an

3   alcoholic and making it up, I don't see why you wouldn't have

4   both a defamation claim and a perceived as disabled claim.  I

5   don't see them being inconsistent.  It could be a false

6   perception.

7           THE COURT:  But it's not a perception at all is what

8   you are saying.  Dolan doesn't perceive him as being an

9   alcoholic.  Dolan is lying, he has some other reason to make

10  these statements is what you are saying, right?

11          MR. WIGDOR:  What I am saying is he falsely perceives

12  him as being disabled.

13          THE COURT:  No.

14          MR. WIGDOR:  He knows he is not an alcoholic.

15          THE COURT:  So he doesn't perceive him to be an

16  alcoholic then.  The fact that you lie about something -- you

17  can't perceive it to be the case but be lying about it at the

18  same time.  I perceive you to be an alcoholic but I know you're

19  not an alcoholic.  That doesn't work.

20          MR. WIGDOR:  Respectfully, I think you can falsely

21  perceive something.

22          THE COURT:  But then it's not malicious and it is not

23  an intentional falsehood, right?

24          MR. WIGDOR:  No, it would be.

25          THE COURT:  Then it is a mistake.

45

I1C5oakC

1          MR. WIGDOR:  No, because --

2          THE COURT:  Okay.

3          MR. WIGDOR:  -- I'm not suggesting that Mr. Dolan

4    actually believed that Mr. Oakley was an alcoholic.  I believe

5    that he defamed him, as we have already stated, when he said

6    that he needed help, and made those other comments.  What I am

7    also saying is that when he kicks him out of Madison Square

8    Garden and not letting him return, that was based on a false

9    perception that Mr. Oakley was disabled.  Now, I believe that

10   was a knowingly false perception but I believe that it would

11   still --

12         THE COURT:  What is the difference between a knowingly

13   false perception and a knowingly false statement?  Maybe we

14   need to go to the dictionary and look up the word "perception"

15   because I think you are using the terms interchangeably and

16   they're not the same, I don't think.

17         MR. WIGDOR:  Well, it wouldn't make any sense, your

18   Honor, in my view of the disabled accommodation laws, for

19   someone who knows that somebody is not an alcoholic but then

20   kicks them out of a place of business based on that lie that

21   somebody is an alcoholic.  It wouldn't further what the statute

22   is all about which is not allowing somebody to enter a public

23   accommodation because of some sort of disease or illness that

24   falls within the various different statutes.  And so, here

25   Mr. Dolan is saying he is an alcoholic, he knows he is not an

I1C5oakC

1  alcoholic but he is not allowing him into the Garden because he

2  is an alcoholic.

3           I do also believe that it should be pled in the

4  alternative as well to the extent that your Honor is not going

5  to --

6           THE COURT:  I don't think -- you have incorporated

7  every paragraph from the defamation claim, right?

8           MR. WIGDOR:  Well, we do have a right to replead, your

9  Honor, obviously.

10          THE COURT:  I guess, but you assured me you didn't

11  want to do that.

12          MR. WIGDOR:  What I said was I didn't want to do it on

13  the special damages.

14          THE COURT:  So what do you want do it for?

15          MR. WIGDOR:  Well, your Honor, what I would like to do

16  is see -- he has already put in new arguments that weren't in

17  the letter so what I would like to see is the motion that he

18  intends on filing and then looking at that to see what they're

19  going to move to dismiss on before amending which we have a

20  right to do under Rule 15.  That's the whole purpose of it.

21          THE COURT:  So, what you are saying is you don't think

22  you have a good enough idea now as to what his is basis is for

23  dismissing the ADA and the New York -- you aren't dismissing

24  New York City, you are withdrawing that one you said.

25          MR. WIGDOR:  Correct.

I1C5oakC

1           THE COURT:  So, New York State human rights law.

2           MR. WIGDOR:  Correct.

3           THE COURT:  So, I am giving you the opportunity now to

4    amend because we have spent an hour and change on this and we

5    have kicked the tires pretty well and you are saying you want

6    to wait until they have spent a lot of time and money briefing

7    it, then decide that you want to amend.

8           MR. WIGDOR:  Given that I have heard new arguments

9    today there is no assurance that I won't hear new arguments in

10   a new motion to dismiss so, your Honor, that would be my

11   preference and that's what the rule states and that's what I --

12          THE COURT:  That's what the rule states but, look,

13   Mr. Mastro, then, you can move for damages or just the cost of

14   briefing something twice I guess, right?  And we will see.  I'm

15   not anticipating granting or denying that motion but that is

16   the relief you get from having to do something multiple times,

17   right?

18          MR. WIGDOR:  If Mr. Mastro wants to represent to me

19   that he is not going to make any other arguments beyond what he

20   has made here today in the letter then I can amend before he

21   makes that motion but I have a feeling he is not going do that.

22          THE COURT:  I don't know.

23          MR. MASTRO:  Your Honor, just to be clear, I have

24   cited cases to the Court because three pages limited the number

25   of cases.

I1C5oakC

 1          THE COURT:  I agree.

 2          MR. MASTRO:  I think these arguments are ones that

 3     were described to the court already but the fact of the matter

 4     is we haven't done the -- look.  There are parts of this

 5     complaint that never should have been brought in the first

 6     place.  He has already withdrawn one claim under the City Human

 7     Rights Law.  I didn't say, oh, its sanctionable what you did,

 8     don't do that, but he is now proposing that I have to spend my

 9     client's money to move to dismiss.  I think it is a meritorious

10     motion to dismiss the complaint in its entirety and then he

11     gets a chance to replead?  Many of these arguments, your Honor,

12     are ones where I don't think he will be able to replead but

13     that I should have to go through that twice, yes, I will be

14     asking the Court for it.

15          MR. WIGDOR:  Your Honor --

16          THE COURT:  Whoa, whoa, whoa.  We can't all talk at

17     the same time.

18          MR. WIGDOR:  Your Honor, the New York City law --

19          THE COURT:  Whoa, whoa, whoa.  If I talk, everybody

20     stops.  I'm like the ref.  Okay?

21          So, we will cross that bridge when we get to it.

22          MR. MASTRO:  Understood.

23          THE COURT:  I don't need to resolve that now.

24          MR. MASTRO:  Understood.

25          THE COURT:  Okay?  So, let's talk about the motion and

I1C5oakC

1      let's talk about discovery.

2              So, one question I had for Mr. Mastro and I have asked

3      it a couple of times is do you want to move for summary

4      judgment quickly relying just on the tapes?  It sounds like you

5      don't.

6              MR. MASTRO:  Your Honor, I need to say this.  I need

7      to consult with my client about it.  This is a very important

8      case to Madison Square Garden.  This has been a painful moment.

9      We are here out of sorrow but we have been dragged into court

10     by Mr. Oakley so I want to talk to them about what they want to

11     do but I would say this, your Honor.  I would say that we

12     believe we are entitled to dismissal.  We think the videos are

13     actually going to be shocking to your Honor.

14             THE COURT:  You think I don't watch ESPN?

15             MR. MASTRO:  Your Honor, I have surveillance videos

16     that take you all the way through the incident.

17             THE COURT:  Okay, but my point is that's not the

18     national TV stuff that's even referenced in the complaint so

19     you are going well beyond the pleadings for that stuff.

20             MR. MASTRO:  Oh, but I am saying, your Honor, even

21     your Honor seeing that which was captured on ESPN would shock

22     you based on the allegations that were made in this complaint.

23             THE COURT:  Well, anyway --

24             MR. WIGDOR:  I think they would shock you in

25     Mr. Oakley's favor.

I1C5oakC

1          MR. MASTRO:  I am just saying, your Honor, that I want

2     to talk to my client about that.  We want to brief why you

3     should consider the evidence on a motion to dismiss and I will

4     ask my client if they would like your Honor to convert it into

5     summary judgment, if your Honor feels that's the only

6     appropriate vehicle for considering that evidence.

7          Your Honor, I don't say this lightly, I have great

8     respect for your Honor and my adversary, but there are things

9     in that complaint that are demonstrably false over and over and

10    over again and the video puts the lie to the allegations there.

11    It is not a verified pleading for a reason.

12         So, I do want you to see those videos but I don't

13    think you have to see them to dismiss this case.

14         THE COURT:  Well, that may be.  In any event.  There

15    are other avenues.  If it turns out that you are right about

16    demonstrably false pleadings then you can make a sanctions

17    motions at some point.

18         MR. MASTRO:  Your Honor, just so we don't have any

19    doubt about it, we didn't discuss abuse of process but there

20    has to be a collateral objective, there is no such allegation

21    and no conceivable allegation of a collateral objective for

22    abuse of process.

23         THE COURT:  I get that.  I am running out of time.

24         Look.  You guys are going to get to brief this, I want

25    you to brief this, and I have to cut this short.  I am sorry.

I1C5oakC

1          MR. WIGDOR:  I haven't gotten a chance to respond.

2          THE COURT:  You will.  You will respond to everything

3     that he said.

4          MR. WIGDOR:  I think the most important point, your

5     Honor, if I just might say, not on the substance of what he

6     said but just on the principle because I am just reading your

7     Honor on this whole does Wigdor get a chance to amend after

8     filing of a motion to dismiss or should he do it now.  I hear

9     what your Honor is saying and I would be happy to save the

10    resources of Mr. Mastro and his client and the way I think that

11    would be only fair to do that is to limit the arguments that he

12    has made either in the letter or in court today, or if he has

13    another argument that he thinks of this evening or next week

14    before he contemplated making the motion to run that by me, so

15    that way I'm not put at a disadvantage to what I would

16    otherwise be entitled to do under Rule 15.

17         I'm not asking very much, your Honor.

18         THE COURT:  I don't think -- you are not necessarily

19    at a disadvantage.  I'm not ruling now.  I am just putting you

20    on notice that that's a possibility, making somebody brief

21    something twice does open the door to perhaps having to cover

22    the cost of that but I'm not ruling on that, you might have

23    good arguments that, well, these are all different arguments

24    that were raised in the pre-motion letter or discussed in

25    court, made for the first time in the motion to dismiss.  There

I1C5oakC

1    might be lots of good arguments.  You will get to make these

2    arguments if and when there is ever a motion to have you cover

3    his costs for a second briefing.  I am saying be mindful of

4    that.

5         My goal in having these conferences is to just be

6    efficient and to hopefully avoid the need to replead multiple

7    times and so usually we talk about it, I ask the party if they

8    want to replead and they see the hand writing on the wall or

9    they have a better sense by then as to what the defendant's

10   arguments might be, what the Court's thinking is, and they say

11   sure, I'll take it.

12        MR. WIGDOR:  That's precisely why I am willing to sit

13   down with Mr. Mastro to discuss that because what I wouldn't

14   want to do, your Honor, is amend the complaint, then he makes a

15   motion to dismiss on an argument that he hasn't raised with the

16   Court or me and he goes *ah-ha!* Wigdor has now made his one

17   amendment as matter of right.

18        THE COURT:  Look.  You get the one as a matter of

19   right and then you get, with leave of the Court, to do more

20   and, generally speaking, you get to amend if there is a good

21   reason to unless it is futile or done for purposes of delay.

22   We will get to that, maybe.  Maybe not.

23        So, why don't I suggest this.  You guys talk to your

24   clients, talk to each other then about going forward on this

25   motion, talk to each other about a schedule for this motion,

I1C5oakC

```
 1    and then send me a joint letter in a week telling me what you
 2    propose.  If you don't agree, then tell me your respective
 3    positions on this.  I am inclined to stay discovery pending
 4    resolution of this motion but if it is going to be a motion for
 5    summary judgment then I guess I would be curious to hear
 6    whether the tapes are the whole story or we need some
 7    additional limited discovery if it were converted to a summary
 8    judgment motion.  So, think about that.
 9              MR. MASTRO:  Understood, your Honor.  Appreciate the
10    guidance, appreciate all the time your Honor has given today,
11    and we will talk to Mr. Wigdor and I will talk to my client and
12    we will work out an appropriate schedule.
13              THE COURT:  Great.
14              MR. MASTRO:  And I really appreciate all the time,
15    your Honor.
16              THE COURT:  Don't be silly.  It is always a pleasure
17    to have good lawyers and you are certainly two good lawyers.  I
18    want to thank you.  I want to thank the other lawyers that I
19    know prepared you and helped you get ready for this.  The
20    pre-motion letters were helpful.  It is good to have lawyers
21    who are responsive and smart and I certainly got my money's
22    worth there.
23              MR. WIGDOR:  Thank you.
24              MR. MASTRO:  Thank you.
25              THE COURT:  Have a nice day.
```

I1C5oakC

1          So, I will see you.  I will hear from you in a week.

2     Thank you very much.  Thank you to the court reporter.  If

3     anyone needs a copy of the transcript you can take that up with

4     her but do that through the website because we are 45 minutes

5     late on a different matter.

6               MR. WIGDOR:  Thank you.

7               MR. MASTRO:  Thank you.

8               THE COURT:  Thanks.  You bet.  Take it easy.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

December 7, 2020

VIA ECF AND E-MAIL (CA02_RJSChambers@ca2.uscourts.gov)

Hon. Richard J. Sullivan
United States Circuit Judge
500 Pearl St., Room 2530
New York, New York 10007

Re:   *Oakley v. MSG Networks, Inc.,* et al., 17-cv-6903 (RJS)[1]

Dear Judge Sullivan:

I write as Defendants' counsel, pursuant to Your Honor's Rule 2(A), to request a pre-motion con-
ference seeking permission to file a motion for summary judgment, pursuant to Federal Rule of
Civil Procedure 56(a), and for a stay of discovery pending that motion's disposition.  The Second
Circuit issued its mandate today.  *See* Dkt. No. 74.

On February 19, 2020, this Court granted Defendants' motion to dismiss, in full, Plaintiff Charles
Oakley's claims.  Dkt. No. 68.  On November 16, 2020, the Second Circuit affirmed the dismissal
of Oakley's four defamation and libel claims, false imprisonment claim, and two denial of public
accommodation claims.  *See Oakley v. Dolan,* 2020 WL 6703527, at *1 (2d Cir. 2020).  It re-
versed the dismissal of Oakley's assault and battery claims—which are really the same claim—
finding the allegations sufficient to allow the case to proceed past the motion to dismiss stage.  *Id.*

The Second Circuit's opinion made clear that this lone surviving claim is exceedingly narrow.
Critically, the Second Circuit expressly rejected Oakley's contention that "the *act* of [his] removal
[from Madison Square Garden] was unreasonable."  *Id.* at *3 (emphasis added).  As the Court em-
phasized, the *only* question that remains is whether "the security guards used excessive force in
*accomplishing* the removal" of Oakley.  *Id.* (emphasis added).  Questions concerning whether De-
fendants had the right to remove Oakley, or what precipitated his removal, are not relevant to that
determination.[2]  All that is left to this case is whether the physical act of force used to remove
Oakley was "objectively unreasonable," which it is Oakley's burden to prove.[3]

The uncontroverted video evidence already in this record shows that the Defendants, working in
conjunction with NYPD officers, did not act unreasonably in removing Oakley, and that Oakley's
allegations to the contrary—including that he was supposedly thrown to the ground twice—are
complete fabrications.  This Court should permit Defendants to move for summary judgment,
based on this case-determinative evidence.

---

[1]   Because all claims against James Dolan have been dismissed, Defendants respectfully request that the Court or-
der his name removed from the case caption.

[2]   Because the Second Circuit "affirm[ed] the denial of leave to amend," Oakley is now barred from seeking to ex-
pand the scope of his allegations.  *See Oakley v. Dolan,* 2020 WL 6707696, at *1 n.3 (2d Cir. Nov. 16, 2020).

[3]   *See, e.g., Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir. 1996); *cf.* Dkt. No. 68 at 15 (emphasizing
that "[t]he law is clear that 'a property owner has the right to use reasonable force to eject a trespasser from its
premises'" (quoting *Mitchell v. N.Y. Univ.,* No. 2014 WL 123225, at *1 (N.Y. Sup. Ct. Jan. 8, 2014))).

**GIBSON DUNN**

December 7, 2020
Page 2

**LEGAL STANDARDS**:  "Rule 56(b) permits motions for summary judgment 'at any time until 30 days after the close of all discovery,'" including "prior to discovery."  *Ali v. City of N.Y.*, 2012 WL 3958154, at *3 n.10 (S.D.N.Y. Sept. 5, 2012) (Kaplan, J.) (quoting Fed. R. Civ. P. 56(b)). The party opposing relief "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome [the] motion."  *Hicks v Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  A "bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

**CONSIDERATION OF VIDEO EVIDENCE**:  Defendants intend to rely on the following videos to support their summary judgment motion:  (i) footage from ESPN's national broadcast, Dkt. No. 43-1 ("ESPN Video"); (ii) internal audioless Arena Cam footage, Dkt. Nos. 43-2a ("Arena Cam"), 43-2b; (iii) a fan video published on the *New York Times*'s website, Dkt. No. 43-3 ("NYT Video"); (iv) a fan video made available on YouTube, Dkt. No. 43-4 ("YouTube Video"); and (v) post-incident audioless security footage, Dkt. No. 43-5.  To date, neither this Court nor the Second Circuit has examined these videos.  *See* Dkt. No. 68 at 6; *see also Oakley*, 2020 WL 6703257, at *2 n.3.  Notably, however, Oakley actively *encouraged* the circuit judges to consider the video in his appeal.  *See* Oral Argument at 7:28–32, *Oakley*, 2020 WL 6703257 (No. 20-642) ("I'm happy for you to look at the video."); *id.* at 8:52–56 ("You should look at the video.").  Because both parties have represented that the videos support their position, there is no reason that this Court should not now consider this objective and uncontroverted evidence on summary judgment.[4]

**CONTENT OF VIDEO EVIDENCE**:  As a preliminary matter, the video evidence disproves the two key allegations on which the Second Circuit based its decision:  that Oakley was "thrown to the ground by actions that greatly exceeded the amount of force that was necessary," and that his removal was effectuated exclusively by "security officers" who "were not trying to handcuff a person whom they had authority to arrest."  *Oakley*, 2020 WL 6703257, at *3.  Multiple videos document that Oakley was never thrown to the ground—he tripped, and later fell as he turned around while being led out (then grabbed a rail resisting removal).  *See* Arena Cam at 8:20:08–12 (Oakley trips); YouTube Video :09–15 (same); ESPN Video :20–25 (Oakley falls); NYT Video :49–56 (same); YouTube Video 2:30–55 (grabs rail).  And the videos are equally clear that NYPD officers were present with security guards throughout the confrontation.  Arena Cam 8:19:42.2 (Oakley looks at NYPD officer while still seated); NYT Video :05–20 (NYPD officer present).

The video evidence likewise confirms that other key allegations of Oakley's are fabrications, and that the force used to remove Oakley was not objectively unreasonable:

---

[4]  While Oakley complained on appeal that the video evidence "does not show what Defendants' security personnel told Oakley" or "demonstrate what . . . Oakley said prior to being confronted," Reply Brief at 4, *Oakley*, 2020 WL 6703257, these issues are now irrelevant given the Second Circuit's dismissal of Oakley's discrimination claim and its finding that Defendants had the right to remove Oakley.  Nor is audio necessary to assess whether the physical act of removing Oakley was unreasonable.  *See, e.g.*, *McKinney v. Dzurenda*, 555 F. App'x 110, 111 (2d Cir. 2014) (excessive force claims dismissed based on audioless video); *McCoy v. Ferguson*, 2019 WL 3806008, at *2–3 (S.D. W. Va. Aug. 13, 2019) (discovery "unnecessary" in light of audioless video).

# GIBSON DUNN

December 7, 2020
Page 3

- While Oakley suggests that he was overpowered by "three large men," Dkt. No. 36 ¶ 34, Oakley in fact towered over all of the security officers involved, *see generally* NYT Video;
- During the initial exchange with security, Oakley invaded a security guard's personal space, Arena Cam 8:19:40–47, and then violently extended his arm and lunged at that guard (who had backed away), *id.* at 8:19:47.7, thoroughly discrediting his claim that he was in "a defensive posture" and "had no intention of engaging in any violent behavior," Dkt. No. 36 ¶ 38;
- Oakley's allegation that he was "shov[ed] to the ground within seconds" of security arriving is false, as nearly a minute passed between the guards arriving and an agitated Oakley tripping and falling to the floor, *compare* Dkt. No. 36 ¶ 43, *with* Arena Cam 8:19:23–20:10;
- Upon returning to his feet after his fall, Oakley did not "request an explanation" for his ejection, *contra* Dkt. No. 36 ¶ 45, but instead yelled "that's some bullsh*t," NYT Video :04–14, and refused a security guard's request to "please walk," NYT Video :08–12;
- After refusing to walk out with security, Oakley shoved his finger in a security guard's face and shouted "get the f**k out of my face," *id.* :15–22;
- When the security guard responded "no problem," Oakley *escalated* the situation by shouting "I said it to your mother**king face, mother**ker," *id.* :18–26;
- At this point, Oakley struck the security guard in the face, propelling his head backwards and evoking audible gasps of "no!" from the crowd, *id.* :29– 31—an attack that can in no way be characterized as "self-defense," *contra* Dkt. No. 36 ¶ 46;
- When another security guard softly rested his open hand on Oakley's back, NYT Video :33–35, Oakley screamed "get off of me," chopped downward on the security guard's arm, and twice shoved the security guard into a row of seats, *id.* :35–40; ESPN Video :09–11.

It was *only after all this aggressive behavior on Oakley's part* that security guards—with the help of one or more uniformed NYPD officers—had to use force to remove Oakley, who continued to resist removal from the arena. *See, e.g.*, NYT Video at :40–50. Notably, the security guards and NYPD officers removed Oakley without inflicting any physical injuries.

The Supreme Court has instructed that where, as here, video evidence "blatantly contradicts" a party's allegations, courts should reject those allegations and grant summary judgment based on the video evidence. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).[5] Defendants' "reliable objective evidence . . . speak[s] for itself," and demands the immediate dismissal of Oakley's case. *See Marcavage v. City of N.Y.*, 689 F.3d 98, 110 (2d Cir. 2012). Accordingly, Defendants intend to seek summary judgment dismissing Oakley's sole remaining claim alleging assault and battery, as well as a stay of discovery pending the motion's disposition.

Respectfully,

*/s/ Randy M. Mastro*

---

[5] *See also, e.g., Kafus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880 (2d Cir. 2012) (affirming summary judgment where video evidence "belie[d] th[e] claim"); *Pizarro v. Bd. of Corr.*, 2018 WL 3462512, at *2–5 (S.D.N.Y. July 17, 2018) (Sullivan, J.) (relying on video evidence that contradicted plaintiff's claims); *Lin v. City of N.Y.*, 2016 WL 7439362, at *11–12 (S.D.N.Y. Dec. 21, 2016) (Engelmayer, J.) (same).

**A-255**

# PETRILLO KLEIN & BOXER LLP

655 Third Avenue
22nd Floor
New York, NY 10017
Telephone: (212) 370-0330
www.pkbllp.com

Nelson A. Boxer
Direct Dial: (212) 370-0338
Cell:       (917) 273-2693
nboxer@pkbllp.com

December 11, 2020

**By ECF**

The Hon. Richard J. Sullivan
United States Court of Appeals for the Second Circuit
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 2530
New York, New York 10007

>   Re:   *Oakley v. Dolan, et al., 17-cv-06903 (RJS)*

Dear Judge Sullivan:

We represent Plaintiff Charles Oakley in the above-referenced action and write in opposition to Defendants' December 7, 2020 (Dkt. 75) request for permission to file a motion for summary judgment and for a discovery stay. For the reasons set forth below, Defendants' requests should be denied.

First, Defendants' December 7 letter ascribes a finding to the Second Circuit that does not appear in that court's opinion – namely, that the court "made clear that this lone surviving claim is exceedingly narrow." The opinion makes no such conclusion; in fact, what remains as a result of the Second Circuit's opinion and Mandate are two claims, one for assault (the Fifth Cause of Action), and one for battery (the Sixth Cause of Action), neither of which is a "narrow" claim nor "exceedingly" so. As the Second Circuit opined, the determination of whether Defendants' force was reasonable is "generally best left for the jury to decide" "because of its intensely factual nature." *Oakley v. Dolan*, No. 20-642, 2020 WL 6703527, at *3 (2d Cir. Nov. 16, 2020) (internal citations omitted)

Second, summary judgment should not be granted where, as here, the parties have not had any opportunity to conduct discovery and develop a factual record. *See, e.g., Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) ("A party opposing a motion for summary judgment must have had the opportunity to discover information that is essential to his opposition to the motion"). Defendants would have this court, rather than a jury, render a decision on the merits without providing Plaintiff an opportunity to discover relevant and admissible evidence. The litany of factual conclusions contained on page three of Defendant's December 7 letter highlight the need for discovery and jury resolution of these and other contentions.

Third, Defendants' contention – that because "what precipitated [Plaintiff's] removal" from MSG are irrelevant to assess his assault and battery claims, Plaintiff is not entitled to

December 11, 2020
Page 2

discovery – is erroneous. Even in the criminal context, where the Second Circuit has held that a defendant is entitled to *more* deference than a private security guard, plaintiff's behavior, including what precipitated his behavior, is a necessary part of the analysis as to whether the force used was unreasonable. *See Oakley v. Dolan*, WL 6703527 at *3 (*quoting Graham v. Connor*, 490 U.S. 386, 396 (1989)) (noting that the "severity of the crime" is directly relevant to assessing whether the forced used was reasonable); *Noonan v. Luther*, 206 N.Y. 105, 108 (1912) (upon revoking a license, a property owner could only use reasonable force, "after having afforded her a reasonable opportunity to leave, or while she was behaving in a disorderly manner, she refused to go"). The central question remaining in this action is whether Defendants' use of force in removing Plaintiff was reasonable (*see* Amend. Compl., Dkt. 36 at ¶¶ 50, 123, 124, 127), and the answer to that question depends upon the facts and circumstances of Defendants' conduct, which requires discovery. For example, it may be reasonable to use a greater amount of force to eject an aggressive, belligerent, or intoxicated fan (Defendants' contention regarding Plaintiff) or to eject someone who posed a threat to others or had a weapon in her possession, whereas use of such force would be unreasonable to remove a fan watching a game unobtrusively. Irrespective of the right to revoke Plaintiff's license, if Defendants' perpetrated unreasonable violence on Plaintiff – that is, *without justification*, taking into account all of the facts and circumstances, including what precipitated Plaintiff's removal, as well as what occurred during his removal – they are liable for assault and battery. *See, e.g., J.L. v. E. Suffolk Boces*, No. 14 Civ. 4565, 2018 WL 1882847, at *13 (E.D.N.Y. Apr. 19, 2018) (even at the summary judgment phase, defendant's alleged perception of the plaintiff's behavior created a jury question as to whether the amount of force used was reasonable in assault claim).

Fourth, two videos offered to date by Defendants undermine their contention that their use of force was, as a matter of law, reasonable. One video shows Plaintiff calmly shaking hands with fans, laughing with people sitting next to him, and speaking with Defendants' service employees. *See* Dkt. No. 43-2a at 8:13-8:18. Then, after a stoppage in play and without provocation, James Dolan signals to security personnel (with a downward pointing gesture), *id.* at 8:19:12, who, seconds thereafter, converge upon Plaintiff, confront him, and, when Plaintiff stands up, grab, and pull Plaintiff backwards. *Id.* at 8:19:49. It was after Dolan's unprovoked signal – evidence of a plan or prior instruction – that Defendants' security personnel resorted to unreasonable force. Another video depicts Plaintiff's arms raised in a defensive posture, when a security guard grabs Plaintiff's arm and pushes him back, causing Plaintiff to fall. *See* Dkt. 43-4 at 0:11-0:19. This limited evidence – we do not even yet know, for example, what was said[1] to and by Plaintiff at the moments depicted in the two videos – demonstrates that factual questions

---

[1] The two cases Defendants cite to argue that audio is unnecessary are not on point. In each, plaintiff was incarcerated (which impacted the determination of reasonableness) and was indisputably the initial aggressor – "assumed a boxing stance and made clear his willingness to fight," in *McKinney v. Dzurenda*, 555 F. App'x 110, 111 (2d Cir. 2014) (summary order), and initiated the physical struggle, after which defendant correctional officers responded "to an alert for officer assistance," in *McCoy v. Ferguson*, 2019 WL 3806008, at *2–3 (S.D.W.Va. Aug. 13, 2019) (defendant "easily, reasonably, and should have concluded that immediate action was necessary because the physical altercation … posed an imminent threat to the safety" of a corrections officer and "to the security of the facility"). *See also Oakley* at *3 (*quoting Graham v. Connor*, 490 U.S. 386, 396 (1989)) ("'tense, uncertain, and rapidly evolving'" circumstances in the criminal context "is not necessarily reasonable in the civil context to remove a person whose license to remain on private property has been revoked").

December 11, 2020
Page 3

exist requiring discovery as to whether Defendants' use of force was reasonable.  As the Second Circuit found, "[w]hen a plaintiff alleges that he was 'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary' and 'clearly exceeded the bounds of reasonable behavior,' and that he 'has suffered and continues to suffer harm,' the reasonable inference to be drawn is that he has been subjected to an unreasonable amount of force." *Oakley v. Dolan*, WL 6703527 at *3.

Fifth, Defendants waived their ability to move for summary judgment prior to discovery. In connection with their motion to dismiss, Defendants asked the court to consider one of its videos, a request Your Honor rejected, explaining that before making any decision based upon the proffered video, Defendants would have to make a motion for summary judgment.  *See* Oral Argument (Jan. 12, 2018) at 30:19-24 ("If you want to make a motion for summary judgement … I can look at [the videos] … and then I guess we will hear from Mr. Wigdor whether he thinks some additional discovery is necessary including testimonial discovery").  Your Honor asked Defendants if they wanted to convert their motion to dismiss to one for summary judgment.  *Id.* at 49:2-5 ("So, one question I had for Mr. Mastro and I have asked it a couple of times is do you want to move for summary judgment quickly relying just on the tapes?  It sounds like you don't.").  Defendants rejected the court's offer, and instead made the tactical decision to proceed with a motion to dismiss.  *See* Dkt. No. 37.  Now, after having failed to dismiss Plaintiff's assault and battery claims on the pleadings, Defendants seek a do-over; by declining to convert their motion to dismiss to a motion for summary judgment in the first instance, Defendants waived their right to do so now.

And sixth, none of the cases cited by Defendants in ostensible support of their application – *Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 881 (2d Cir. 2012); *Pizarro v. Bd. of Correction*, No. 16 Civ. 2418 (RJS), 2018 WL 3462512, at *3 (S.D.N.Y. July 17, 2018); *Lin v. City of New York*, No. 14 Civ. 9994 (PAE), 2016 WL 7439362, at *7 (S.D.N.Y. Dec. 21, 2016); *Marcavage v. City of New York*, 689 F.3d 98, 101 (2d Cir. 2012); and *Scott v. Harris*, 550 U.S. 372 (2007) – were decided prior to discovery.

The Second Circuit held that Plaintiff should be permitted to prosecute his assault and battery claims.  Defendants' December 7 submission is an effort to prevent Plaintiff from doing so.  For the reasons describe above, the court should deny Defendants' request for permission to file a motion for summary judgment and should direct that discovery proceed forthwith.

Respectfully submitted

Nelson A. Boxer
John Allen
Petrillo Klein & Boxer LLP
       - and -
Douglas Wigdor
Renan F. Varghese
Wigdor LLP
*Counsel for Plaintiff Charles Oakley*

# PETRILLO KLEIN & BOXER LLP

655 Third Avenue
22nd Floor
New York, NY 10017
Telephone: (212) 370-0330
www.pkbllp.com

Nelson A. Boxer
Direct Dial: (212) 370-0338
Cell:       (917) 273-2693
nboxer@pkbllp.com

December 11, 2020

**By ECF**

The Hon. Richard J. Sullivan
United States Court of Appeals for the Second Circuit
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 2530
New York, New York 10007

     **Re:**    *Plaintiff v. Dolan, et al., 17-cv-06903 (RJS)*

Dear Judge Sullivan:

     We represent Plaintiff in the above-referenced action and, pursuant to Your Honor's Individual Rule of Practice 2A, we respectfully request permission to file a motion, pursuant to Fed. R. Civ. P. 15(a), to serve the attached proposed Second Amended Complaint to add James Dolan as a defendant in the Fifth (assault) and Sixth (battery) causes of action based upon evidence that was not in Plaintiff's possession at the time the Amended Complaint was filed.[1] *See* Ex. A (additions in redline); Ex. B (clean).

     Fed. R. Civ. P. 15(a) provides that the court "should freely give leave [to amend a pleading] when justice so requires." *See Capitol Records, LLC v. Vimeo, LLC*, 972 F Supp. 2d 537, 549 (S.D.N.Y. 2013) ("Courts must 'freely give leave' to amend a complaint 'when justice so requires'") (quoting Rule 15(a)(2)). The liberal tenor of FRCP 15(a) is reinforced by the underlying goal of the Federal Rules of Civil Procedure that cases are litigated on the merits where possible, *see Foman v. Davis*, 371 U.S. 178, 181 (1982), and leave should be freely granted where, as here, there is no indication of "futility, bad faith, undue delay, or undue prejudice," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

     Prior to filing the original and amended complaints, Plaintiff was unaware of Mr. Dolan's role in the assault and battery perpetrated against Mr. Oakley. After filing the Amended Complaint, Plaintiff came into possession of evidence that demonstrated that Mr. Dolan, too, engaged in sufficient conduct to be held liable for the assault and battery at issue in this case. Specifically, Plaintiff learned the following concerning the moments before and after the alleged assault and battery: during a stoppage in game play, while Plaintiff was not acting boisterously, Mr. Dolan, after looking at Plaintiff, called over and conferred with a security guard; that guard then walked away and joined a group of approximately ten other security guards that had

---

[1] Plaintiff also seeks to amend his complaint to remove the causes of action that were dismissed by the Court and affirmed by the Second Circuit Court of Appeals. *See* Ex. A.

December 11, 2020
Page 2

assembled on the side of the court.  Thereafter, Mr. Dolan signaled to his security personnel by
making a downward pointing gesture with his right hand, immediately after which the large
group of security personnel converged on Plaintiff.  After Plaintiff stood from his seat, he was
immediately grabbed by security personnel and roughly pulled backwards, all while Mr. Dolan
looked on.  Security personnel then violently removed Plaintiff from his seat and dragged him
out of Madison Square Garden, while Mr. Dolan again looked on; and, after Plaintiff was
forcibly removed from his seat, Mr. Dolan made a "thumbs up" gesture.

        Based upon the foregoing, a claim of assault and battery can be stated against Mr. Dolan
under two theories.  First, that he acted in concert with his security personnel's assault and
battery, because he communicated with and directed his employees to remove Plaintiff, he
witnessed from a close distance (and without making any effort to intervene) a large number of
security guards' approach and subsequent assault and battery of Plaintiff, and he ratified and
adopted the assault and battery of Plaintiff as evidenced by his thumbs up gesture after Plaintiff
was dragged out of his seat with unreasonable force.  *See, e.g.*, *Weldon v. Rivera*, 301 A.D.2d
934, 935 (3d Dep't 2003) (under concerted action theory, individuals can be liable for assault if
they "lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their
benefit" (internal quotation omitted)); *Scollo v. Nunez*, 60 A.D.3d 840 (2d Dep't 2009) (finding
that defendants were liable under a concerted action theory where they "acted tortiously pursuant
to a tacit agreement to assault or batter the plaintiffs").  Second, Mr.  Dolan aided and abetted his
employees' assault and battery, because he directed the large number of security personnel to
remove Plaintiff from his seat and the arena.  *See, e.g.*, *McKiernan v. Vaccaro*, 168 A.D.3d 827,
830 (2d Dep't 2019) ("To be liable for an assault under an aiding and abetting theory, a
defendant must have committed some overt act, either by words or conduct, in furtherance of the
assault").  The above-summarized evidence, including reasonable inferences to be drawn
therefrom, evidence a plan and instruction from Mr. Dolan that states a claim for assault and
battery, and will also likely have additional evidentiary support after discovery.

        Because discovery has not begun, neither Mr. Dolan, nor any of the other defendants,
could be prejudiced if Plaintiff is permitted to file the proposed Second Amended Complaint.
*See, e.g.*, *Presser v. Key Food Stores Co-op., Inc.*, 218 F.R.D. 53, 56 (E.D.N.Y. 2003) (finding
no prejudice where "although over twenty-one months has elapsed since Plaintiff filed this
lawsuit, discovery has not yet begun and no trial date is set").

        Finally, claims against Mr. Dolan for assault and battery would be timely, because they
relate back to the time Plaintiff filed his original claims.  A complaint can be amended to assert
new claims against a defendant that relate back to the initial claims if (1) the claims arose "out of
the conduct, transaction, or occurrence set out" in the original pleading; (2) the defendant
"received such notice of the action that it will not be prejudiced in defending on the merits"; and
(3) the newly named defendant "knew or should have known that the action would have brought
against it, but for a mistake concerning the proper party's identity."  *See Krupski v. Costa
Crociere S. p. A.*, 560 U.S. 538, 547 (2010); *see also Petruzzi v. Purow*, 180 A.D.3d 1083, 1084
(2d Dep't 2020) (same).  With regard to "mistake," prong (3) of the test, the Supreme Court has
held that the

A-260

December 11, 2020
Page 3

> reasonableness of the mistake is not itself at issue. As noted, a plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.

*Id*. at 549. Additionally, a "plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the 'conduct, transaction, or occurrence,'" but the "only question under Rule 15(c)(1)(C)(ii) . . . is whether party A knew or should have known that, absent some mistake, the action would have been brought against him." *Id*.

Mr. Dolan's alleged liability for assault and battery arises out of the same event that gave rise to the assault and battery claims against the other Defendants. Defendants' security personnel all work for Mr. Dolan and initiated the confrontation with Plaintiff, in furtherance of their job duties, after consultation with Mr. Dolan. *See Sims v Bergamo*, 3 N.Y.2d 531, 535 (1957) (employee's perpetration of assault in furtherance of "maintenance of peace and order" in owner's property "would have been pursuant to unexpressed rules and in the performance of duties enjoined upon him by his employment and in the furtherance of his employer's interests"). Thus, Mr. Dolan was both on notice of Plaintiff's assault and battery claims and knew or should have known that, but for Plaintiff not being aware of Mr. Dolan's role in the assault and battery against Mr. Oakley, he would have been named as a defendant.

Based upon the foregoing, Plaintiff respectfully requests permission to move, pursuant to Fed. R. Civ. P. 15(a), to file and serve the attached Second Amended Complaint, which is based upon information discovered after the filing of the Amended Complaint.

Respectfully submitted,

Nelson A. Boxer
John Allen
Petrillo Klein & Boxer LLP
                - and -
Douglas Wigdor
Renan F. Varghese
Wigdor LLP
*Counsel for Plaintiff Charles Oakley*

A-261

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
CHARLES OAKLEY,                      :

             Plaintiff,           :    Civil Case No.: 17-cv-6903 (RJS)

               v.                  :

JAMES DOLAN, in his individual and professional   :   <u>SECOND</u> **AMENDED**
capacities, MSG NETWORKS, INC., THE MADISON      **COMPLAINT**
SQUARE GARDEN COMPANY and MSG SPORTS &    :
ENTERTAINMENT, LLC,                 :   **Jury Trial Demanded**

            Defendants.        :
------------------------------------------------------------------X

      Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     In 1998, Charles Oakley was traded to the New York Knicks and, during the

ensuing decade on which he played for the team, he established himself as a premier player

known for his hard-nosed play, defense and rebounding.

      2.     However, one person who did not appreciate Mr. Oakley's contributions to the

Knicks franchise was Defendant James Dolan, who inherited control of the Knicks from his

father a year after Mr. Oakley's career with the team came to an end.  Without any justification,

Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his

hand during meetings, making him purchase his own tickets to attend games at the arena he

called home for a decade, and even having security harass him when he did attend games prior to

the incident in question.

3.      Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley appeared at Madison Square Garden (the "Garden") to watch a Knicks game.  Within minutes of unobtrusively taking his seat, Defendant Dolan directed security to forcibly remove Mr. Oakley from the Garden and humiliate him in front of the Knicks fans that had attended the game.  Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely.  Despite his immense contributions to the franchise, Mr. Oakley was treated like a common criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "MSG").

4.      As if their mistreatment of Mr. Oakley at the Garden was not embarrassing and shameful enough, over the ensuing days, Defendants Dolan and MSG launched a coordinated and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating what they knew to be blatant lies, Defendants Dolan and MSG have caused irreparable harm to Mr. Oakley's name and career, and discriminated against him based on the false perception that he is an alcoholic.  However, as he did throughout his playing career, Mr. Oakley has refused to walk to the bench in shame.  Instead, holding his head up high, Mr. Oakley files this Second Amended Complaint to set the record straight and to hold Defendants responsible for their reprehensible conduct.

5.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct ~~in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.* ("ADA") and the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL"), as well as various state tort laws~~in violation of New York's assault and battery laws.

**PARTIES**

2

A-264

6.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the National Basketball Association ("NBA"), and a resident of the State of Ohio.

7.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

8.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

9.      Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, The Madison Square Garden Company owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned and operated Madison Square Garden and the New York Knicks.

**JURISDICTION AND VENUE**

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

3

~~12.     The Court further has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).~~

~~13.~~     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

12.

**FACTUAL ALLEGATIONS**

**I.    MR. OAKLEY'S CAREER WITH THE NEW YORK KNICKS**

~~14.~~13.  Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on June 27, 1988.

~~15.~~14.  Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed their most sustained run of excellence and reassumed their place among the league's elite teams, making the second round of the playoffs every single year, except for one, while Mr. Oakley was on the team, in large part due directly to his contributions.

~~16.~~15.  By way of example, in 1994 – a season during which Mr. Oakley was instrumental in leading the Knicks to within one win of a NBA championship – he was both named to the All-Defensive First Team and appeared in the NBA All-Star Game.

~~17.~~16.  Even now, nearly two decades after he stopped playing for the Knicks, Mr. Oakley ranks among the top three players in franchise history in offensive rebounds, defensive rebounds, minutes played and steals, making him inarguably the greatest power forward in Knicks history.

4

## II. DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES

18.17.  In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

19.18.  Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premier teams, winning only a single playoff series since the turn of the century.

20.19.  The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained about having been sexually harassed by the then-coach of the Knicks.

21.20.  In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from Defendant Dolan for his unlawful conduct.

22.21.  This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

## III. DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY

23.22.  Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

24.23.  Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

25.24.  Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

A-267

26.25.  To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley has repeatedly been forced to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

27.26.  Even when attending such games, Defendant Dolan went out of his way to harass Mr. Oakley without justification.

28.27.  By way of example only, during a Knicks game that Mr. Oakley attended during the 2015-2016 season, he noticed that a team of security personnel made a point of following him everywhere he went at the Garden.  One security guard admitted to Mr. Oakley that they were only treating him in such a manner because Defendant Dolan had ordered them to do so, despite the fact that Plaintiff had done nothing to deserve to be treated like a criminal.

29.28.  Despite the abhorrent treatment that he has received at the hands of Defendant Dolan, Mr. Oakley was committed to, and continues to be committed to, returning to MSG.

IV.     **THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN**

30.29.  On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

31.30.  Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

32.31.  Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant

6

Dolan would even be attending this particular game, let alone where he would be seated if he did so).

32. Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

33. Mr. Oakley spoke with attendees nearby and acted calmly and without incident.

34. However, unbeknownst to Mr. Oakley, Defendant Dolan observed had seen him Mr. Oakley and called over a security guard that he employed and over to conversed with the security guard.

35. Immediately after the security guard spoke with Defendant Dolan, he then proceeded to say something to Mr. Oakley.

36. Shortly thereafter, Defendant Dolan signaled to the same security guard, who now was standing with several other security guards, pointing downwards with his right index finger.

33.37. In response to Defendant Dolan's gesture, the security guard radioed to other security personnel at MSG and a large group of security personnel they proceeded to converge on Mr. Oakley.  Given the large number of security personnel that confronted Mr. Oakley, notwithstanding his calm demeanor up to that point, it is obvious that they acted at all times with the intention of forcing Mr. Oakley to leave the Garden MSG with unreasonable force.

34.38. Incredibly, within a few minutes of reaching his seats, These Mr. Oakley was approached by three large men then identifying identified themselves as being members of Madison Square Garden's security team who and ordered him to leave the arena without explanation.

35.39. Understandably confused, Mr. Oakley asked these purported security guards why he was being forced to leave the area when he had done nothing more than sit in publicly

7

available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security

guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to

Mr. Dolan?"

36.40.  At that point, it became clear to Mr. Oakley that the sole reason that the security

guards were seeking to oust him from the Garden was Defendant Dolan's orders.

41.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate

him in front of the same fans who spent a decade cheering for him, Mr. Oakley attempted to

defuse the situation by patiently explaining to the security personnel that he had done nothing

wrong and simply wanted to watch the game in peace.

37.42.  As he rose from his seat, the security personnel grabbed Mr. Oakleyhim and

roughly pulled him backwards as Defendant Dolan watched and refused to take action to prevent

their conduct, thereby both enabling the violent conduct against Mr. Oakley and signaling his

tacit approval of such unlawful behavior.

38.43.  Mr. Oakley raised his arms during this encounter, in a defensive posture that

clearly conveyed that he had no intention of engaging in any violent behavior.

39.44.  If security had simply asked Mr. Oakley to take his seat and watch the game, what

followed would never have happened.

40.45.  Mr. Oakley attempted to demonstrate that he was capable of watching the game

without creating an incident, by turning around and peaceably returning to his seat.

41.46.  Mr. Oakley did not, however, refuse to leave the Garden at the time and merely

sought an explanation for why he was being treated differently than every other fan who had

attended the Knicks game that night.

8

42.47.  As he did so, two of the security guards grabbed Mr. Oakley and pushed him to the ground.

43.48.  In forcibly shoving Mr. Oakley to the ground within seconds of first approaching him, and without any physical threat or provocation from Mr. Oakley, the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct.

44.49.  When Mr. Oakley got back to his feet, the security guards loudly reiterated their demand that he leave the Garden immediately, despite the fact that they had no legitimate basis for ejecting him.

45.50.  When Mr. Oakley continued to request an explanation for this outrageous behavior, the security guards further escalated the confrontation by physically grabbing Mr. Oakley to forcibly compel him to leave.

46.51.  Fearing for his safety as he was surrounded by several large security guards, and having already been roughly shoved to the ground once, Mr. Oakley pushed their hands away in self-defense.

47.52.  Within seconds, Mr. Oakley was forcibly turned around so his back faced security, grabbed by six officials and thrown onto the ground.

48.53.  The security guards further refused Mr. Oakley's repeated requests that he be allowed to stand up, instead crowding around him and impeding his ability to get to his feet.

49.54.  Mr. Oakley was then put into restraints and the security guards roughly threw him out of the Garden.

55.  In grabbing Mr. Oakley, restraining him, dragging him to the ground and refusing his repeated requests that he be allowed to stand up, Defendants greatly exceeded the amount of

9

force that was necessary in the situation, especially since Mr. Oakley had explained repeatedly
that he had not done anything wrong and not instigated the violent conduct.

50.56.  After Mr. Oakley was violently removed from his seat, Defendant Dolan gave his
security guards a "thumbs up" gesture, making clear that he approved of his security personnel's
use of violent force and that they had complied with his instructions.

51.57.  Mr. Oakley was ultimately taken outside of the arena, arrested and charged with
assault.

52.58.  The incident caused an enormous spectacle during the game and was incredibly
embarrassing for Mr. Oakley.

53.59.  Mr. Oakley was also completely bewildered by the incident because, according to
the security guard who first approached him, all he had done was sit too closely to Defendant
Dolan.

54.60.  As a Knicks legend who had repeatedly attended games in the past, Mr. Oakley
had every intention of returning to the site of his playing days, even after having been treated in
such a blatantly violent and inappropriate manner.

55.61.  However, the Knicks sought to take away this source of joy and pride from Mr.
Oakley as well, as they immediately announced that Mr. Oakley was banned indefinitely from
Knicks games and the Garden, generally.

**V.       DEFAMATORY STATEMENTS BY DEFENDANTS**

56.62.  Recognizing that there was no legitimate basis for their horrendous treatment of
Mr. Oakley, Defendants were left scrambling for an explanation to provide to Knicks fans as to
why they would violently throw out a Knicks legend from the Garden.

10

A-272

57 63.  It became apparent over the next approximately 48 hours that Defendants had

attempted to solve the problem that they had created by making a series of outrageous and

patently false statements to the national media with the sole intent of defaming Mr. Oakley,

implying both that he was an alcoholic and that he had committed a violent crime against Knicks

fans while at the Garden that night.

A.   **Statements by MSG**

58 64.  On February 8, 2017, shortly after the incident, the Knicks public relations

Twitter account (@NY_KnicksPR), which is owned and operated by Defendants, tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly
> inappropriate and completely abusive manner***.  He has been
> ejected and is currently being arrested by the New York City Police
> Department.  He was a great Knick and ***we hope he gets some help
> soon***.

(emphasis added).

59 65.  This statement is completely false, and Defendants knew it was false at the time it

was made and/or recklessly disregarded their truth at the time they were made.  At no point while

being attacked at the Garden had Mr. Oakley acted inappropriately or abusively.  To the extent

that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by

Defendants' personnel, in a clear act of self-defense.  However, Mr. Oakley neither initiated

contact nor attempted to physically engage in an altercation with any of Defendants' employees.

60 66.  The statement by the Knicks that the organization hoped Mr. Oakley would "get[]

some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a

substance abuse problem of some kind.

11

61 67.  It would later become apparent that this statement by the Knicks was part of a coordinated media strategy by Defendants, designed to propagate the lie that Mr. Oakley is an alcoholic.

62 68.  The next day, on February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and sought to reinforce their claim that Mr. Oakley had somehow deserved the physical abuse he had received from their security guards.  Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed *Oakley's abusive behavior*.  It started when he entered the building and continued until he was arrested and left the building.  *Every single statement we have received is consistent in describing his actions*.  *Everything he said since the incident is pure fiction*.

(emphasis added).

63 69.  Upon information and belief, Defendants intentionally misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

64 70.  These references to alleged statements made by security guards and other witnesses were designed to provide the impression that Defendants' prior and subsequent statements had factual underpinnings and were not mere statements of opinion.

**B.    Statements by Defendant Dolan**

65 71.  On February 10, 2017, Defendant Dolan appeared on ESPN Radio's, "The Michael Kay Show" and spoke about the dispute with Mr. Oakley.

66 72.  Defendant Dolan arrived at the show with a binder labeled, "Preparation."

67 73.  Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned from the Garden indefinitely, and unleashed a litany of defamatory statements.

12

68 74.  In attempting to explain his decision, Defendant Dolan said:  "I think the most important thing with that is we need to keep the Garden safe for anybody who goes there . . .  So *anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned*."

69 75.  Defendant Dolan went on to accuse Mr. Oakley several more times of being an alcoholic and/or having been overly impaired during the game:

> *To me, Charles has got a problem. We've said it before; he's his own worst problem. People have to understand that. He has a problem with anger. He's both physically and verbally abusive. He may have a problem with alcohol.*
>
> . . .
>
> *We know he said on TV that he was drinking beforehand. We heard statements from police that he appeared to be impaired. Our staff clearly could see that.*
>
> . . .
>
> *When you have issues like this, the first step for anybody is to ask for help.*

70 76.  In making these statements, Defendant Dolan was acting with actual malice towards Ms. Oakley, as he was fully aware that his comments were and are entirely without basis in fact and/or made the comments with a reckless disregard for their truth.  Defendant Dolan further attempted to provide a basis for his false statements by referencing statements made by others purporting to support his allegations about Mr. Oakley.  However, Mr. Oakley has never had a problem with excessive anger nor has he ever abused alcohol or any other drug.

71 77.  During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of putting the safety of Knicks fans at risk, and somehow having abused them:  "*The No. 1 concern has to be the safety and comfort of the fans*."

13

72.78.  Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at

risk and treated them abusively, when in reality he had done nothing but attempt to attend the

game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.  But
> I would like for those people to look around and look at the people
> working at Madison Square Garden and *realize that the guy they're
> chanting for might have been a great Knick player, but he was
> terribly abusive to them*.
>
>                              . . .
>
> *There were security people there who were abused. There were
> service people who were abused. The same people who help fans
> get to their seats, they were abused. With racial overtones, sexual
> overtones.* How do you bring your kids to a game if you think that's
> going to happen?

73.79.  Perhaps feeling he needed to justify his decision to have Mr. Oakley removed and

banned indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating

that Mr. Oakley had come to the game with an "agenda" to take some unspecified action against

him:

> *It's very clear to us that Charles Oakley came into the Garden with
> an agenda. From the moment he stepped into the Garden, he began
> with this behavior. Abusive behavior, stuff you wouldn't want to
> say on the radio . . . It just accelerated and accelerated and
> accelerated* . . . I'm not inside of Charles Oakley's mind. *He did say
> a bunch of things along the way that looked like he was headed in
> my direction. I didn't hear them myself but we heard from
> our employees that he was using my name a lot.* But this isn't
> because I'm nervous. This is because you can't do what he did and
> stay. We clearly did not — we weren't perfect here, and I think
> Charles never should have made it to his seats. And that's on us, and
> we're doing things to remedy that and make sure that never happens
> again. … I can't say for sure.

74.80.  As with virtually all of Defendant Dolan's statements about Mr. Oakley during

this show, he was fully aware that these too were complete fabrications and acted with actual

14

malice in making them.  Mr. Oakley had made no effort to confront Defendant Dolan and did

nothing to otherwise incite Defendants to forcibly remove him from the Garden.

~~75.~~81.  Defendants were aware that at no point was Mr. Oakley abusive towards any of

Defendants' employees or staff, nor was he abusive to any Knicks fans, as evinced by the fact

that he was allowed to proceed to his seat without interruption, despite being in full view of the

public.

~~76.~~82.  Thus, Defendants were also aware that their statements accusing Mr. Oakley of

instigating the confrontation or otherwise provoking the security personnel at the Garden were

false at the time they made these statements, and/or Defendants were recklessly indifferent to

this fact.

83.     It was only when Defendant Dolan first caught sight of Mr. Oakley that issues

arose.

**Formatted:** List Paragraph, Indent: Left:  0", First line:
0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … +
Start at: 1 + Alignment: Left + Aligned at:  1.63" + Indent
at:  1.88", Don't keep with next

**C.   Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

~~77.~~84.  Tellingly, this was not the first time that Defendant Dolan has attempted to malign

individuals who upset him with unsupported accusations that they were alcoholics.

~~78.~~85.  In February 2015, Defendant Dolan accused a fan of being an alcoholic merely

based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing
> but ill bet your life is a mess and you are a hateful mess. What have
> you done that anyone would consider positive or nice. I am betting
> nothing. In fact ill bet you are negative in everyone who comes
> in contact with you. You most likely have made your family
> miserable. **Alcoholic maybe. I just celebrated my 21 year
> anniversary of sobriety. You should try it.**

(emphasis added).

15

79 86.  In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

80 87.  Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

**D.      The Effect of Defendants' Statements on Mr. Oakley**

81 88.  When read together, it is clear that Defendants engaged in a coordinated and intentional effort to malign Mr. Oakley's reputation in two separate ways.

82 89.  First, Defendants repeatedly claimed that Mr. Oakley was "*abusive*," and "*looking for a fight*."

83 90.  Defendant Dolan expounded on these spurious claims when he knowingly and falsely claimed that Mr. Oakley was "terribly abusive to [the fans]" and that Mr. Oakley's behavior purportedly threatened "*the safety and comfort of the fans*."

84 91.  The only implication that could have been drawn from these statements, in conjunction with Defendants' references to the fact that Mr. Oakley was "arrested" for his conduct, notably without explaining the nature of the charges brought against Mr. Oakley, and by their references to selected statements allegedly made by witnesses, was that that Mr. Oakley had committed such a serious act of violence towards Knicks fans that it had warranted his arrest, a claim that Defendants propagated despite knowing full well that nothing of the sort had occurred.

16

A-278

85 92. Thus, Defendants claimed, without basis, that Mr. Oakley, a former power forward for the Knicks, was arrested as a result of his behavior in "looking for a fight" that jeopardized "the safety" of the team's fans.

86 93. These statements were clearly designed to create the belief that Mr. Oakley had committed a serious crime, which Defendants knew not to be the case.

87 94. Second, Defendants repeatedly referred to the fact that Mr. Oakley was purportedly "drinking too much alcohol" on February 8, 2017, and that he was "clearly" "impaired" as a result of his drinking, neither of which were true, as Defendants were fully aware.

88 95. However, Defendants were not satisfied with falsely claiming that Mr. Oakley was intoxicated while at the Garden. Instead, they compounded their malicious statements by further stating, without any support, that Mr. Oakley had a possible "problem" with alcohol, requiring him to "ask for help," and leading Defendants to "*hope he gets some help soon*."

89 96. Such statements, coupled with the references to statements from unidentified individuals purportedly supporting the false claim that Mr. Oakley was impaired, were inarguably spreading the false rumor that Mr. Oakley was an alcoholic who had a habitual problem that required "help."

90 97. Defendants' statements concerning Mr. Oakley not only caused him to suffer reputational harm, but also directly caused him to lose significant business opportunities.

91 98. Specifically, prior to February 8, 2017, Mr. Oakley made guest appearances at a drug and alcohol rehabilitation clinics to speak with patients and provide other services, including cooking them meals.

17

92 99.  However, as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, one such rehabilitation clinic, the Rebound Institute, came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients.

93 100.      Prior to Defendants' statements, Mr. Oakley was scheduled to earn appearance fees totaling precisely $40,000 from the Rebound Institute.

94 101.      However, once Defendants falsely claimed that he was an alcoholic who needed to get "help," Mr. Oakley was not able to receive the $40,000 he would have otherwise been paid for his appearance at the Rebound Institute.

FIRST CAUSE OF ACTION
(Defamation Per Quod)

95.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Defendants defamed Plaintiff by falsely accusing him of being an alcoholic who required treatment.

96.    The statements made by Defendants were false.

96.    Defendants were at all times aware that these statements were false, or were recklessly indifferent to the falsity of these statements, and made them with the specific intention of damaging Oakley's reputation and maligning him to the general public.

96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

18

### SECOND CAUSE OF ACTION
#### (Defamation *Per Se*)
##### *Against All Defendants*

96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

96.    Defendants defamed Plaintiff by publicly accusing him of having committed the serious crime of assault against members of the public, warranting his arrest.

96.    Defendants further defamed Plaintiff by accusing him of suffering from the loathsome disease of alcoholism.

96.    Defendants' accusation that Plaintiff is an alcoholic further defamed Plaintiff in his trade, business or profession, as it is a matter of common knowledge that Plaintiff works with individuals who suffer from substance abuse issues, and substance abuse treatment centers cannot associate with alleged alcoholics.

96.    Defendants made defamatory statements that caused serious injury to Plaintiff's professional and personal reputation.

96.    None of these assertions by Defendants had any factual basis.

96.    In making these statements, Defendants were acting with actual malice, as they were at all times aware that none of the statements were true, or were acting with reckless indifference to the falsity of these statements.

96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### THIRD CAUSE OF ACTION
#### (Libel)
##### *Against Defendants MSG Networks, Inc.,*
##### *The Madison Square Garden Company*

19

*and MSG Sports & Entertainment, LLC*

96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

96.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC defamed Plaintiff by, *inter alia*, publicly accusing him on Twitter of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

96.    None of these assertions by Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC have any factual basis.

96.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC were aware at all times that the statements were false and made the statements in reckless disregard of their falsity.

96.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

96.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's libelous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**FOURTH CAUSE OF ACTION**
(Slander)
*Against All Defendants*

96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

20

97.     Defendants defamed Plaintiff by, *inter alia*, publicly accusing him of having committed assault, having subjected other individuals, including members of the public, to abusive conduct and being an alcoholic.

97.     None of these assertions by Defendants had any factual basis.

97.     Defendants made the statements despite being fully aware that they were not true and for the sole purpose of attacking Mr. Oakley's reputation.

97.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

97.     As a direct and proximate result of Defendants' slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### ~~FIFTH~~ FIRST **CAUSE OF ACTION**
**(Assault)**
***Against*** ~~*Defendants MSG Networks, Inc.,*~~
~~*The Madison Square Garden Company*~~
~~*and MSG Sports & Entertainment, LL*~~*All Defendants*~~*C*~~

~~98.~~102._____ Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.\_\_\_ Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

~~99.~~104._____ Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who

assaulted Plaintiff, worked in concert with and aided and abetted them to perpetrate the assault by conspiring with the security personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of unreasonable force, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the assault -and by subsequently approving, ratifying and adopting the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

~~100.~~105.    Defendants had no reasonable basis for their conduct and their conduct was unwarranted given that Plaintiff had refused to engage in aggressive and/or offensive conduct until provoked, and then only in self-defense.

~~101.~~106.    As a direct and proximate result of Defendants'~~, MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's~~ tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### ~~SIXTH~~ SECOND **CAUSE OF ACTION**
**(Battery)**
*Against ~~Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC~~All Defendants*

~~102.~~107.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

108.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

22

103.109.         Defendant Dolan, who owns MSG Networks, Inc., The Madison Square

Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who

intentionally and wrongfully physically contacted Plaintiff without his consent, worked in

concert with them to perpetrate the battery by conspiring with the security personnel to

physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the

unwanted physical contact, enabling the use of unreasonable force by failing to exercise his

control over the security personnel to prevent the battery, and by subsequently approving,

ratifying and adopting the battery, and each of these allegations will likely have further

evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

104.110.        As a direct and proximate result of Defendants' MSG Networks, Inc.'s,

The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious

conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award

of damages to the greatest extent permitted under the law.

### SEVENTH THIRD CAUSE OF ACTION
#### (False ImprisonmentAiding and Abetting Assault)
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLCDolan*

105.111.        Plaintiff hereby repeats and realleges each and every allegation in the

preceding paragraphs as if set forth fully herein.

112.    Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden

Company and MSG Sports & Entertainment, LLC and employs the security guards who

assaulted Plaintiff, aided and abetted the assault against Plaintiff by conspiring with the security

personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of

unreasonable force, enabling the use of unreasonable force by failing to exercise his control over

23

the security personnel to prevent the assault and by subsequently approving the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

113.    As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### FOURTH CAUSE OF ACTION
#### (Aiding and Abetting Battery)
##### *Against Defendant Dolan*

114.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

—————Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who intentionally and wrongfully physically contacted Plaintiff without his consent, aided and abetted the battery by conspiring with the security personnel to physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the unwanted physical contact, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the battery and by subsequently approving the battery, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

115.    .

As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law. Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally confined Plaintiff, with Plaintiff's knowledge and awareness and without his consent,

24

when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and

MSG Sports & Entertainment, LLC's confinement of Plaintiff was not privileged in any way.

As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**EIGHTH CAUSE OF ACTION**
**(Abuse of Process)**
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.
Defendants caused process to be issued to Plaintiff in the form of a criminal charge.
Defendants caused Plaintiff to be charged with an intent to do harm and without excuse or justification.
Defendants caused Plaintiff to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing Plaintiff and destroying his reputation.
As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.
As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**NINTH CAUSE OF ACTION**
**(As an Alternative Claim to Claims One through Four in the Event that Defendants Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the Truth of Such a Belief)**
**(Denial of a Public Accommodation in Violation of the ADA)**
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.
Defendants own and operate the Garden, a place of public accommodation.
Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.
As a former Knicks great, Plaintiff intended to return to the Garden had Defendants not denied him access, and intends to return to the Garden if he is permitted access.

Formatted: Indent: Left: 0", First line: 0.5", Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1.63" + Indent at: 1.88"

As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an injunction prohibiting Defendants from further discriminating against him.

TENTH CAUSE OF ACTION
(As an Alternative Claim to Claims One through Four in the Event that Defendants Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the Truth of Such a Belief)
(Denial of a Public Accommodation in Violation of the NYSHRL)
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Defendants own and operate the Garden, a place of public accommodation.

Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

As a former Knicks great, Plaintiff intended to return to the Garden had Defendants not denied him access, and intends to return to the Garden if he is permitted access.

116.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

> **Formatted:** Indent: Left: 0", First line: 0.5", Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1.63" + Indent at: 1.88"

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of ~~the United States, and~~ the State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

~~E.~~D.    An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

~~F.~~E.    An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein; and

~~G.    An award of Plaintiff's reasonable attorneys' fees and costs; and~~

F.    Such other and further relief as the Court may deem just and proper.

> **Formatted:** Font: Bold, Underline

**JURY DEMAND**

27

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: ~~February 9, 2018~~December 11, 2020                Respectfully submitted,
New York, New York

                                                           **WIGDOR LLP**

                                                           By: _____

                                                                 Douglas H. Wigdor
                                                                 Renan F. Varghese
                                                                 ~~Kenneth Walsh~~

                                                           85 Fifth Avenue
                                                           New York, NY 10003
                                                           Telephone: (212) 257-6800
                                                           Facsimile: (212) 257-6845
                                                           dwigdor@wigdorlaw.com
                                                           rvarghese@wigdorlaw.com
                                                           ~~kwalsh@wigdorlaw.com~~

                                                           **PETRILLO KLEIN & BOXER LLP**


                                                           By: _____/s/_____
                                                                 Nelson A. Boxer

                                                           655 Third Avenue
                                                           New York, NY 10017
                                                           Telephone:  (212) 370-0330
                                                           Facsimile:  (212) 370-0391
                                                           nboxer@pkbllp.com


                                                           *Attorneys for Plaintiff*

28

A-290

# EXHIBIT B

A-291

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
CHARLES OAKLEY,                                   :
                                                  :
                              Plaintiff,          :   Civil Case No.: 17-cv-6903 (RJS)
                                                  :
              v.                                  :
                                                  :
JAMES DOLAN, in his individual and professional   :   **SECOND AMENDED**
capacities, MSG NETWORKS, INC., THE MADISON       :   **COMPLAINT**
SQUARE GARDEN COMPANY and MSG SPORTS &            :
ENTERTAINMENT, LLC,                               :
                                                  :   **Jury Trial Demanded**
                              Defendants.          :
                                                  :
------------------------------------------------------------------------X

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      In 1998, Charles Oakley was traded to the New York Knicks and, during the

ensuing decade on which he played for the team, he established himself as a premier player

known for his hard-nosed play, defense and rebounding.

2.      However, one person who did not appreciate Mr. Oakley's contributions to the

Knicks franchise was Defendant James Dolan, who inherited control of the Knicks from his

father a year after Mr. Oakley's career with the team came to an end.  Without any justification,

Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his

hand during meetings, making him purchase his own tickets to attend games at the arena he

called home for a decade, and even having security harass him when he did attend games prior to

the incident in question.

3.      Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley

appeared at Madison Square Garden (the "Garden") to watch a Knicks game.  Within minutes of

unobtrusively taking his seat, Defendant Dolan directed security to forcibly remove Mr. Oakley

from the Garden and humiliate him in front of the Knicks fans that had attended the game.

Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely.

Despite his immense contributions to the franchise, Mr. Oakley was treated like a common

criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden

Company and MSG Sports & Entertainment, LLC (together, "MSG").

4.      As if their mistreatment of Mr. Oakley at the Garden was not embarrassing and

shameful enough, over the ensuing days, Defendants Dolan and MSG launched a coordinated

and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of

abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating

what they knew to be blatant lies, Defendants Dolan and MSG have caused irreparable harm to

Mr. Oakley's name and career, and discriminated against him based on the false perception that

he is an alcoholic.  However, as he did throughout his playing career, Mr. Oakley has refused to

walk to the bench in shame.  Instead, holding his head up high, Mr. Oakley files this Second

Amended Complaint to set the record straight and to hold Defendants responsible for their

reprehensible conduct.

5.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct in

violation of New York's assault and battery laws.

## PARTIES

6.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the National Basketball Association ("NBA"), and a resident of the State of Ohio.

7.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

8.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

9.      Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, The Madison Square Garden Company owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned and operated Madison Square Garden and the New York Knicks.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

3

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

### I.     MR. OAKLEY'S CAREER WITH THE NEW YORK KNICKS

13.     Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on June 27, 1988.

14.     Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed their most sustained run of excellence and reassumed their place among the league's elite teams, making the second round of the playoffs every single year, except for one, while Mr. Oakley was on the team, in large part due directly to his contributions.

15.     By way of example, in 1994 – a season during which Mr. Oakley was instrumental in leading the Knicks to within one win of a NBA championship – he was both named to the All-Defensive First Team and appeared in the NBA All-Star Game.

16.     Even now, nearly two decades after he stopped playing for the Knicks, Mr. Oakley ranks among the top three players in franchise history in offensive rebounds, defensive rebounds, minutes played and steals, making him inarguably the greatest power forward in Knicks history.

### II.     DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES

17.     In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

18.     Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premier teams, winning only a single playoff series since the turn of the century.

19.     The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained about having been sexually harassed by the then-coach of the Knicks.

20.     In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from Defendant Dolan for his unlawful conduct.

21.     This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

## III.    DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY

22.     Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

23.     Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

24.     Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

25.     To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley has repeatedly been forced

to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

26.     Even when attending such games, Defendant Dolan went out of his way to harass Mr. Oakley without justification.

27.     By way of example only, during a Knicks game that Mr. Oakley attended during the 2015-2016 season, he noticed that a team of security personnel made a point of following him everywhere he went at the Garden.  One security guard admitted to Mr. Oakley that they were only treating him in such a manner because Defendant Dolan had ordered them to do so, despite the fact that Plaintiff had done nothing to deserve to be treated like a criminal.

28.     Despite the abhorrent treatment that he has received at the hands of Defendant Dolan, Mr. Oakley was committed to, and continues to be committed to, returning to MSG.

IV.     **THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN**

29.     On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

30.     Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

31.     Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant Dolan would even be attending this particular game, let alone where he would be seated if he did so).

32.     Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

33.     Mr. Oakley spoke with attendees nearby and acted calmly and without incident.

34.     Defendant Dolan observed Mr. Oakley and called over a security guard that he employed and conversed with the security guard.

35.     Immediately after the security guard spoke with Defendant Dolan, he then proceeded to say something to Mr. Oakley.

36.     Shortly thereafter, Defendant Dolan signaled to the same security guard, who now was standing with several other security guards, pointing downwards with his right index finger.

37.     In response to Defendant Dolan's gesture, the security guard radioed to other security personnel at MSG and a large group of security personnel proceeded to converge on Mr. Oakley.  Given the large number of security personnel that confronted Mr. Oakley, notwithstanding his calm demeanor up to that point, it is obvious that they acted at all times with the intention of forcing Mr. Oakley to leave the Garden with unreasonable force.

38.     The three large men then identified themselves as being members of Madison Square Garden's security team and ordered him to leave the arena without explanation.

39.     Understandably confused, Mr. Oakley asked these purported security guards why he was being forced to leave the area when he had done nothing more than sit in publicly available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to Mr. Dolan?"

40.     At that point, it became clear to Mr. Oakley that the sole reason that the security guards were seeking to oust him from the Garden was Defendant Dolan's orders.

41.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate him in front of the same fans who spent a decade cheering for him, Mr. Oakley attempted to

defuse the situation by patiently explaining to the security personnel that he had done nothing wrong and simply wanted to watch the game in peace.

42.     As he rose from his seat, the security personnel grabbed Mr. Oakley and roughly pulled him backwards as Defendant Dolan watched and refused to take action to prevent their conduct, thereby both enabling the violent conduct against Mr. Oakley and signaling his tacit approval of such unlawful behavior.

43.     Mr. Oakley raised his arms during this encounter, in a defensive posture that clearly conveyed that he had no intention of engaging in any violent behavior.

44.     If security had simply asked Mr. Oakley to take his seat and watch the game, what followed would never have happened.

45.     Mr. Oakley attempted to demonstrate that he was capable of watching the game without creating an incident, by turning around and peaceably returning to his seat.

46.     Mr. Oakley did not, however, refuse to leave the Garden at the time and merely sought an explanation for why he was being treated differently than every other fan who had attended the Knicks game that night.

47.     As he did so, two of the security guards grabbed Mr. Oakley and pushed him to the ground.

48.     In forcibly shoving Mr. Oakley to the ground within seconds of first approaching him, and without any physical threat or provocation from Mr. Oakley, the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct.

49.     When Mr. Oakley got back to his feet, the security guards loudly reiterated their demand that he leave the Garden immediately, despite the fact that they had no legitimate basis for ejecting him.

50.     When Mr. Oakley continued to request an explanation for this outrageous behavior, the security guards further escalated the confrontation by physically grabbing Mr. Oakley to forcibly compel him to leave.

51.     Fearing for his safety as he was surrounded by several large security guards, and having already been roughly shoved to the ground once, Mr. Oakley pushed their hands away in self-defense.

52.     Within seconds, Mr. Oakley was forcibly turned around so his back faced security, grabbed by six officials and thrown onto the ground.

53.     The security guards further refused Mr. Oakley's repeated requests that he be allowed to stand up, instead crowding around him and impeding his ability to get to his feet.

54.     Mr. Oakley was then put into restraints and the security guards roughly threw him out of the Garden.

55.     In grabbing Mr. Oakley, restraining him, dragging him to the ground and refusing his repeated requests that he be allowed to stand up, Defendants greatly exceeded the amount of force that was necessary in the situation, especially since Mr. Oakley had explained repeatedly that he had not done anything wrong and not instigated the violent conduct.

56.     After Mr. Oakley was violently removed from his seat, Defendant Dolan gave his security guards a "thumbs up" gesture, making clear that he approved of his security personnel's use of violent force and that they had complied with his instructions.

57.     Mr. Oakley was ultimately taken outside of the arena, arrested and charged with assault.

58.     The incident caused an enormous spectacle during the game and was incredibly embarrassing for Mr. Oakley.

59.     Mr. Oakley was also completely bewildered by the incident because, according to the security guard who first approached him, all he had done was sit too closely to Defendant Dolan.

60.     As a Knicks legend who had repeatedly attended games in the past, Mr. Oakley had every intention of returning to the site of his playing days, even after having been treated in such a blatantly violent and inappropriate manner.

61.     However, the Knicks sought to take away this source of joy and pride from Mr. Oakley as well, as they immediately announced that Mr. Oakley was banned indefinitely from Knicks games and the Garden, generally.

**V.      STATEMENTS BY DEFENDANTS**

62.     Recognizing that there was no legitimate basis for their horrendous treatment of Mr. Oakley, Defendants were left scrambling for an explanation to provide to Knicks fans as to why they would violently throw out a Knicks legend from the Garden.

63.     It became apparent over the next approximately 48 hours that Defendants had attempted to solve the problem that they had created by making a series of outrageous and patently false statements to the national media with the sole intent of defaming Mr. Oakley, implying both that he was an alcoholic and that he had committed a violent crime against Knicks fans while at the Garden that night.

A.     **Statements by MSG**

64.     On February 8, 2017, shortly after the incident, the Knicks public relations

Twitter account (@NY_KnicksPR), which is owned and operated by Defendants, tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly inappropriate and completely abusive manner***.  He has been ejected and is currently being arrested by the New York City Police Department.  He was a great Knick and ***we hope he gets some help soon***.

(emphasis added).

65.     This statement is completely false, and Defendants knew it was false at the time it

was made and/or recklessly disregarded their truth at the time they were made.  At no point while

being attacked at the Garden had Mr. Oakley acted inappropriately or abusively.  To the extent

that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by

Defendants' personnel, in a clear act of self-defense.  However, Mr. Oakley neither initiated

contact nor attempted to physically engage in an altercation with any of Defendants' employees.

66.     The statement by the Knicks that the organization hoped Mr. Oakley would "get[]

some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a

substance abuse problem of some kind.

67.     It would later become apparent that this statement by the Knicks was part of a

coordinated media strategy by Defendants, designed to propagate the lie that Mr. Oakley is an

alcoholic.

68.     The next day, on February 9, 2017, the Knicks organization doubled down on its

defamatory statement that Mr. Oakley had somehow been "abusive" and sought to reinforce their

claim that Mr. Oakley had somehow deserved the physical abuse he had received from their

security guards.  Specifically, the @NY_KnicksPR tweet read:

11

A-302

> Updated statement (2/9): There are dozens of security staff, employees and NYPD that witnessed ***Oakley's abusive behavior***. It started when he entered the building and continued until he was arrested and left the building. ***Every single statement we have received is consistent in describing his actions. Everything he said since the incident is pure fiction***.

(emphasis added).

69.     Upon information and belief, Defendants intentionally misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

70.     These references to alleged statements made by security guards and other witnesses were designed to provide the impression that Defendants' prior and subsequent statements had factual underpinnings and were not mere statements of opinion.

**B.     Statements by Defendant Dolan**

71.     On February 10, 2017, Defendant Dolan appeared on ESPN Radio's, "The Michael Kay Show" and spoke about the dispute with Mr. Oakley.

72.     Defendant Dolan arrived at the show with a binder labeled, "Preparation."

73.     Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned from the Garden indefinitely, and unleashed a litany of defamatory statements.

74.     In attempting to explain his decision, Defendant Dolan said: "I think the most important thing with that is we need to keep the Garden safe for anybody who goes there . . . So ***anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned***."

75.     Defendant Dolan went on to accuse Mr. Oakley several more times of being an alcoholic and/or having been overly impaired during the game:

> *To me, Charles has got a problem. We've said it before; he's his own worst problem. People have to understand that. He has a problem with anger. He's both physically and verbally abusive. He may have a problem with alcohol.*
>
> . . .
>
> *We know he said on TV that he was drinking beforehand. We heard statements from police that he appeared to be impaired. Our staff clearly could see that.*
>
> . . .
>
> *When you have issues like this, the first step for anybody is to ask for help.*

76.     In making these statements, Defendant Dolan was acting with actual malice towards Ms. Oakley, as he was fully aware that his comments were and are entirely without basis in fact and/or made the comments with a reckless disregard for their truth.  Defendant Dolan further attempted to provide a basis for his false statements by referencing statements made by others purporting to support his allegations about Mr. Oakley.  However, Mr. Oakley has never had a problem with excessive anger nor has he ever abused alcohol or any other drug.

77.     During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of putting the safety of Knicks fans at risk, and somehow having abused them:  "***The No. 1 concern has to be the safety and comfort of the fans.***"

78.     Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at risk and treated them abusively, when in reality he had done nothing but attempt to attend the game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.  But I would like for those people to look around and look at the people working at Madison Square Garden and ***realize that the guy they're chanting for might have been a great Knick player, but he was terribly abusive to them.***

13

. . .

> *There were security people there who were abused. There were service people who were abused. The same people who help fans get to their seats, they were abused. With racial overtones, sexual overtones.* How do you bring your kids to a game if you think that's going to happen?

79.     Perhaps feeling he needed to justify his decision to have Mr. Oakley removed and banned indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating that Mr. Oakley had come to the game with an "agenda" to take some unspecified action against him:

> *It's very clear to us that Charles Oakley came into the Garden with an agenda. From the moment he stepped into the Garden, he began with this behavior. Abusive behavior, stuff you wouldn't want to say on the radio . . . It just accelerated and accelerated and accelerated* . . . I'm not inside of Charles Oakley's mind. *He did say a bunch of things along the way that looked like he was headed in my direction. I didn't hear them myself but we heard from our employees that he was using my name a lot.* But this isn't because I'm nervous. This is because you can't do what he did and stay. We clearly did not — we weren't perfect here, and I think Charles never should have made it to his seats. And that's on us, and we're doing things to remedy that and make sure that never happens again. … I can't say for sure.

80.     As with virtually all of Defendant Dolan's statements about Mr. Oakley during this show, he was fully aware that these too were complete fabrications and acted with actual malice in making them.  Mr. Oakley had made no effort to confront Defendant Dolan and did nothing to otherwise incite Defendants to forcibly remove him from the Garden.

81.     Defendants were aware that at no point was Mr. Oakley abusive towards any of Defendants' employees or staff, nor was he abusive to any Knicks fans, as evinced by the fact that he was allowed to proceed to his seat without interruption, despite being in full view of the public.

A-305

82.     Thus, Defendants were also aware that their statements accusing Mr. Oakley of instigating the confrontation or otherwise provoking the security personnel at the Garden were false at the time they made these statements, and/or Defendants were recklessly indifferent to this fact.

83.     It was only when Defendant Dolan first caught sight of Mr. Oakley that issues arose.

**C.      Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

84.     Tellingly, this was not the first time that Defendant Dolan has attempted to malign individuals who upset him with unsupported accusations that they were alcoholics.

85.     In February 2015, Defendant Dolan accused a fan of being an alcoholic merely based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing but ill bet your life is a mess and you are a hateful mess. What have you done that anyone would consider positive or nice. I am betting nothing. In fact ill bet you are negative force in everyone who comes in contact with you. You most likely have made your family miserable. **Alcoholic maybe. I just celebrated my 21 year anniversary of sobriety. You should try it**.

(emphasis added).

86.     In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

87.     Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

15

D.      **The Effect of Defendants' Statements on Mr. Oakley**

88.     When read together, it is clear that Defendants engaged in a coordinated and intentional effort to malign Mr. Oakley's reputation in two separate ways.

89.     First, Defendants repeatedly claimed that Mr. Oakley was "***abusive***," and "***looking for a fight***."

90.     Defendant Dolan expounded on these spurious claims when he knowingly and falsely claimed that Mr. Oakley was "terribly abusive to [the fans]" and that Mr. Oakley's behavior purportedly threatened "***the safety and comfort of the fans***."

91.     The only implication that could have been drawn from these statements, in conjunction with Defendants' references to the fact that Mr. Oakley was "arrested" for his conduct, notably without explaining the nature of the charges brought against Mr. Oakley, and by their references to selected statements allegedly made by witnesses, was that that Mr. Oakley had committed such a serious act of violence towards Knicks fans that it had warranted his arrest, a claim that Defendants propagated despite knowing full well that nothing of the sort had occurred.

92.     Thus, Defendants claimed, without basis, that Mr. Oakley, a former power forward for the Knicks, was arrested as a result of his behavior in "looking for a fight" that jeopardized "the safety" of the team's fans.

93.     These statements were clearly designed to create the belief that Mr. Oakley had committed a serious crime, which Defendants knew not to be the case.

94.     Second, Defendants repeatedly referred to the fact that Mr. Oakley was purportedly "drinking too much alcohol" on February 8, 2017, and that he was "clearly"

"impaired" as a result of his drinking, neither of which were true, as Defendants were fully aware.

95.     However, Defendants were not satisfied with falsely claiming that Mr. Oakley was intoxicated while at the Garden.  Instead, they compounded their malicious statements by further stating, without any support, that Mr. Oakley had a possible "problem" with alcohol, requiring him to "ask for help," and leading Defendants to "*hope he gets some help soon*."

96.     Such statements, coupled with the references to statements from unidentified individuals purportedly supporting the false claim that Mr. Oakley was impaired, were inarguably spreading the false rumor that Mr. Oakley was an alcoholic who had a habitual problem that required "help."

97.     Defendants' statements concerning Mr. Oakley not only caused him to suffer reputational harm, but also directly caused him to lose significant business opportunities.

98.     Specifically, prior to February 8, 2017, Mr. Oakley made guest appearances at a drug and alcohol rehabilitation clinics to speak with patients and provide other services, including cooking them meals.

99.     However, as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, one such rehabilitation clinic, the Rebound Institute, came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients.

100.     Prior to Defendants' statements, Mr. Oakley was scheduled to earn appearance fees totaling precisely $40,000 from the Rebound Institute.

101.     However, once Defendants falsely claimed that he was an alcoholic who needed to get "help," Mr. Oakley was not able to receive the $40,000 he would have otherwise been paid for his appearance at the Rebound Institute.

17

## FIRST CAUSE OF ACTION
### (Assault)
### *Against All Defendants*

102.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

104.    Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who assaulted Plaintiff, worked in concert with and aided and abetted them to perpetrate the assault by conspiring with the security personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of unreasonable force, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the assault and by subsequently approving, ratifying and adopting the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

105.    Defendants had no reasonable basis for their conduct and their conduct was unwarranted given that Plaintiff had refused to engage in aggressive and/or offensive conduct until provoked, and then only in self-defense.

106.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

## SECOND CAUSE OF ACTION
### (Battery)

*Against All Defendants*

107.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

108.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

109.    Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who intentionally and wrongfully physically contacted Plaintiff without his consent, worked in concert with them to perpetrate the battery by conspiring with the security personnel to physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the unwanted physical contact, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the battery, and by subsequently approving, ratifying and adopting the battery, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

110.    As a direct and proximate result of Defendants'' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**THIRD CAUSE OF ACTION**
**(Aiding and Abetting Assault)**
*Against Defendant Dolan*

19

111.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112.    Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who assaulted Plaintiff, aided and abetted the assault against Plaintiff by conspiring with the security personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of unreasonable force, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the assault and by subsequently approving the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

113.    As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Battery)**
*Against Defendant Dolan*

114.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

115.    Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who intentionally and wrongfully physically contacted Plaintiff without his consent, aided and abetted the battery by conspiring with the security personnel to physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the unwanted physical contact, enabling the use of unreasonable force by failing to exercise his control over the security personnel to

20

prevent the battery and by subsequently approving the battery, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

116.    As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.    An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

E.    An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein; and

F.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 11, 2020
   New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

   Douglas H. Wigdor
   Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com

**PETRILLO KLEIN & BOXER LLP**

By: _____ /s/ _____

   Nelson A. Boxer

655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
nboxer@pkbllp.com

*Attorneys for Plaintiff*

22

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

December 17, 2020

VIA ECF AND E-MAIL (CA02_RJSChambers@ca2.uscourts.gov)

Hon. Richard J. Sullivan
United States Circuit Judge
500 Pearl St., Room 2530
New York, New York 10007

Re:   *Oakley v. MSG Networks, Inc.,* et al., 17-cv-6903 (RJS)

Dear Judge Sullivan:

I write as Defendants' counsel in opposition to Plaintiff Charles Oakley's request for leave to file
a Second Amended Complaint. *See* Dkt. No. 83. Oakley's audacious attempt, post-appeal, to
once again amend his pleading—after this Court denied him leave to amend a second time (Dkt.
No. 68 at 20–21), and the Second Circuit just affirmed that ruling (*Oakley v. Dolan*, 2020 WL
6707696, at *1 n.3 (2d Cir. Nov. 16, 2020))—is unworthy of consideration. He is barred from do-
ing so as a matter of law of the case and *res judicata*. Moreover, the claims he seeks to add are
untimely and meritless, especially since he knew of and could have pursued all of them in his
prior pleadings but chose not to do so. In a desperate attempt to avoid summary judgment and
justify intrusive, irrelevant discovery, Oakley now seeks to allege further meritless claims against
James Dolan, who is no longer a defendant in this case. This further pursuit of a "public relations
campaign" against Dolan and MSG should be summarily rejected. Dkt. No. 68 at 21.

**Oakley's Request Is Barred by the Law of the Case and *Res Judicata*:** Oakley asks this Court
for leave to file a "Second Amended Complaint" that would "add James Dolan as a defendant."
Dkt. No. 83 at 1. However, this Court expressly "denie[d] Oakley's request for leave to amend"
when it dismissed Oakley's Amended Complaint. *See* Dkt. No. 68 at 20–21 (emphasizing that
Oakley had "the benefit of Defendants' pre-motion letter and an extensive colloquy with the
Court" before amending his complaint). And the Second Circuit, on appeal, explicitly "affirm[ed]
the denial of leave to amend." *See Oakley*, 2020 WL 6707696, at *1 n.3. Thus, Oakley's latest
request for leave to amend is contrary to the law of the case doctrine, which "*requires the district
court on remand to comply with the dictates of the appellate court's remand order and forecloses
relitigation of issues expressly or implicitly decided by the appellate court.*" *Pearlstein v. Black-
Berry Ltd.*, 2019 WL 6831554, at *9 (S.D.N.Y. Aug. 2, 2019) (Parker, M.J.) (emphasis added).[1]

Oakley's request is likewise barred by the doctrine of *res judicata*, which "prevents a plaintiff
from relitigating claims that were or could have been raised in a prior action against the same de-
fendant where that action has reached a final judgment on the merits." *L-Tec Elecs. Corp. v. Cou-
gar Elec. Org., Inc.*, 198 F.3d 85, 87 (2d Cir. 1999). That doctrine applies with equal force to
"bar subsequent claims in the same continuing action after a judgement on the merits has been
granted on some claims." *Pearlstein*, 2019 WL 6831554, at *9. Indeed, in a similar case, the
Second Circuit held that plaintiffs were prohibited as a matter of law from "assert[ing] new

---

[1]   *Accord 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 314 F. Supp. 3d 497, 515 (S.D.N.Y. 2018) (Gardephe,
J.) (request for leave to amend "barred by the law of the case doctrine"); *Semple v. Eyeblaster, Inc.*, 2009 WL
1748062, at *2 (S.D.N.Y. June 19, 2009) (Baer, J.) (same).

# GIBSON DUNN

December 17, 2020
Page 2

claims" against individual defendants who had been dismissed from the litigation because those new claims—even if "based upon different legal theories"—"ar[o]se from the same transaction or occurrence" that was the subject of the initial complaint. *L-Tec Elecs. Corp.*, 198 F.3d at 86–88.

Oakley's argument that his amendment is premised on new evidence is false, and does not alter this analysis. The Second Circuit has ruled that a district court may not "change the law of the case as established by [an appellate court] on the basis of new evidence . . . unless, of course, authorized to do so by the terms of the remand." *United States v. Fernandez*, 506 F.2d 1200, 1202 (2d Cir. 1974). Likewise, "*[r]es judicata* applies even where new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence"—neither of which applies here. *L-Tec Elecs.*, 198 F.3d at 88.

**<u>Oakley's Latest Theory of Liability Against Dolan Is Not Based on Any "New Evidence"</u>**: Oakley falsely claims that this belated request—coming nearly three years after he amended his complaint, and more than three years after he filed this litigation—is supposedly justified because, "[p]rior to filing the original and amended complaints, [he] was unaware of Mr. Dolan's role in the assault and battery." Dkt. No. 83 at 1. In reality, Oakley already effectively made these allegations in his original complaint, and repeated these same allegations in his amended complaint—namely, that "Dolan *directed* that security forcibly remove Mr. Oakley from the Garden and publicly embarrass him on live television," that "the security guards had been sent to *carry out Defendant Dolan's orders*," and that "Defendant Dolan was clearly attempting to publicly humiliate [Oakley]" in forcing his removal. Dkt. Nos. 1 ¶¶ 4, 40, 41 (emphases added); 36 ¶¶ 3, 36, 37.

Moreover, Oakley's counsel confirmed that, prior to filing the Amended Complaint, he had *both* the "public videos" and "whatever you gave to the District Attorney"—which included all of the internal "Arena Cam" footage. Dkt. Nos. 43-15 at 2; 44 ¶¶ 7–11. Indeed, Oakley's counsel explicitly claimed in February 2018 that the videos in his possession allegedly showed Dolan "gleefully" endorsing the ejection, "which *would be relevant to our assault [ana] battery . . . claims*." Dkt. No. 43-15 at 2 (emphasis added). Thus, Oakley clearly *chose* not to include the allegations he now seeks to add when he previously amended his complaint—though he notably *did* make *all* of the same allegations in his Opposition to Defendants' Motion To Dismiss.[2] But a litigant cannot strategically choose to refrain from pleading available factual allegations, sit on them *for years*, wait until after the defendant's dismissal, and then seek to add those fact allegations when it fits his litigation and public relations strategy. *See, e.g.*, *State Trading Corp. of India, Ltd. v. Assurance foreningen Skuld*, 921 F.2d 409, 417–18 (2d Cir. 1990); *Martell Strategic Funding LLC v. Am. Hosp. Acad.*, 2017 WL 2937649, at *3–4 (S.D.N.Y. July 10, 2017) (Broderick, J.).

---

[2]  *Compare* Dkt. No. 50 at 14–15 (Oakley's counsel argued in May 2018 that video evidence showed Dolan "speaking at length to a security guard stationed near Plaintiff," "look[ing] back at Mr. Oakley," "signal[ing] the security guard's attention," "mak[ing] a very clear gesture with his right hand," and "taking [his hand] from his head and pointing down toward the ground," which led to the "violent[] confront[ation]" that Dolan later allegedly endorsed with "a thumbs-up gesture"), *with* Dkt. No. 83 at 1–2 (Oakley's counsel now cites in December 2020 same alleged facts as basis for proposed amendment).

**GIBSON DUNN**

December 17, 2020
Page 3

**Oakley's Proposed Claims Are Time-Barred**:  Oakley's proposed amendment would also be futile as time-barred.  All of the claims he seeks to raise are subject to a one-year statute of limitations that expired in February 2018.  *See, e.g.*, *Canosa v. Ziff*, 2019 WL 498865 at *13 (S.D.N.Y. Jan. 28, 2019) (Engelmayer, J.).  Nor do those claims "relate back" to the original pleading.  *Contra* Dkt. No. 83 at 2–3.  A claim only relates back when there has been a "mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  Here, Oakley cannot possibly claim that he made a "mistake" in failing to identify Dolan sooner—he made Dolan a centerpiece of his prior pleadings.  *See, e.g.*, Dkt. Nos. 1 ¶ 4; 36 ¶ 3 (alleging Dolan "directed" security to "forcibly remove" Oakley).  Indeed, the very case on which Oakley purports to rely states that "making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the *antithesis* of making a mistake concerning the proper party's identity."  *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010) (emphasis added).[3]

**Oakley's Proposed Claims Lack Merit**:  Finally, Oakley's legal claims would also fail as a matter of law.  *See Naughright v. Weiss*, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) (Sweet, J.) (aiding and abetting assault or battery requires, *inter alia*, "wrongful act producing an injury" and "the defendant's knowing and substantial assistance in the principal violation").  In addition to failing to allege an actionable injury,[4] Oakley's proposed aiding and abetting claims fail to allege substantial assistance.  *See generally Cifenhartz v. Cohen*, 562 N.Y.S.2d 500, 501 (1st Dep't 1990) (rejecting aiding and abetting assault claim because allegation that attorney "advised plaintiff's mother" to take actions was not an "overt act").  The most Oakley alleges is that Dolan had a conversation that precipitated Oakley's removal, but that alone cannot form the basis of liability, given the Second Circuit's instruction that what little is left of this case is not about why Oakley was removed but, rather, whether "*security guards* used excessive force in *accomplishing* the [lawful] removal."  *Oakley*, 2020 WL 6703527, at *3 (emphases added).  This same logic forecloses Oakley's concerted action theory, as does his failure to plead a "common plan" between Dolan and the security guards.[5]  *See generally Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 295 (1992).

For all of these independent reasons, this Court should deny Oakley's request for leave to amend.

Respectfully,

*/s/ Randy M. Mastro*

---

[3]   *Accord Hahn v. Cffice & Prcf'l Emps. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 385 (S.D.N.Y. 2015) (Koeltl, J.) (relation back does not apply where "[t]he plaintiff has sued [who he believes to be] the right defendant, and simply neglected to sue another defendant who might also be liable" (internal quotation marks omitted)).

[4]   Oakley's continuing failure to allege damages all but confirms that his case is a public relations stunt.

[5]   Oakley's cases all involved defendants who played much more central roles in the alleged underlying assaults.  *See, e.g.*, *Weldon v. Rivera*, 754 N.Y.S.2d 698 (3d Dep't 2003) (defendant "kiss[ed] plaintiff" during alleged rape, after "urging" her to "consume additional alcohol" and "procur[ing] a condom"); *Scollo ex re. Scollo v. Nunez*, 2007 WL 2228771, at *2 (Sup. Ct. Queens Cty. Aug. 3, 2007) (defendants had weapons and chased plaintiff); *McKiernan v. Vaccaro*, 2017 WL 4620705, at *1 (Sup. Ct. N.Y. Cty. Aug. 24, 2017) (defendant "honk[ed]," "yell[ed]" and "drove . . . within inches of plaintiff" before his passenger exited vehicle and assaulted plaintiff).

1

Kcmdoakc
                        Teleconference
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHARLES OAKLEY,

4              Plaintiff,                New York, N.Y.

5         v.                            17 Civ. 6903(RJS)

6    JAMES DOLAN, et al.,

7              Defendants.

8    ------------------------------x

9                                      December 22, 2020
                                       10:00 a.m.
10
     Before:
11
                   HON. RICHARD J. SULLIVAN,
12
                           Circuit Judge sitting by designation
13
          APPEARANCES (via Skype video/teleconference)
14
     WIGDOR LLP
15        Attorneys for Plaintiff
     BY:  DOUGLAS H. WIGDOR
16        RENAN F. VARGHESE
             – and –
17   PETRILLO KLEIN & BOXER LLP
          Attorney for Plaintiff
18   BY:  NELSON A. BOXER
          JOHN "JACK" ALLEN, Student Extern
19
     GIBSON, DUNN & CRUTCHER, LLP (NY)
20        Attorneys for Defendants
     BY:  RANDY M. MASTRO
21        DECLAN T. CONROY

22

23

24

25

**A-317**

Kcmdoakc
                          Teleconference

1              (Video/teleconference initiated at 9:00 a.m.)

2              (Discussion off the record regarding setup)

3              (Time noted at 10:16 a.m.)

4              THE CLERK:  Good morning, Judge Sullivan.

5              THE COURT:  OK.  Can you see and hear me?

6              UNIDENTIIED SPEAKER:  I can.

7              THE CLERK:  Yes.

8              THE COURT:  All right.  So I'm not sure what the

9     problem was but I'm here now after several failed attempts.

10             So let me just call the case.

11             This is Oakley v. Dolan, et al., 17 Civ. 6903.

12             Let me take appearances.  For the plaintiff?

13             MR. BOXER:  Good morning, your Honor.  Nelson Boxer,

14    Petrillo Klein & Boxer, and Doug Wigdor, from Wigdor LLP, for

15    the plaintiff.

16             THE COURT:  OK.  Mr. Boxer, Mr. Wigdor, good morning

17    to you.

18             Can you hear me and see me all right?

19             MR. BOXER:  I can.

20             MR. WIGDOR:  Good morning, Judge.

21             THE COURT:  Good morning.

22             All right.  And for the defendants?

23             MR. MASTRO:  Yes, your Honor.  Randy Mastro and Declan

24    Conroy from Gibson, Dunn & Crutcher.

25             A pleasure to see you, your Honor.

Kcmdoakc
                            Teleconference

1          THE COURT:  All right.  Mr. Mastro, Mr. Conroy, I can

2     see and hear you all right.  Can you see and hear me and

3     Mr. Wigdor and Mr. Boxer OK?

4          MR. MASTRO:  Yes, your Honor.

5          MR. CONROY:  Good morning, Judge.

6          THE COURT:  All right.  Let me just make sure we have

7     the court reporter on the line.

8          (Pause)

9          THE REPORTER:  Yes, your Honor.  I just had to come

10    off mute.

11         THE COURT:  OK.  Great.  Thank you.  Let us know if

12    you are having trouble hearing.

13         So, OK, without repeating sort of all the history in

14    this case, this case began back in 2017.  The initial complaint

15    was filed in September, I think it was, based on an incident

16    that occurred at Madison Square Garden in February of 2017.

17    The original complaint had a number of different causes of

18    action, leading with defamation.  I think there were three --

19    two or three defamation claims, a libel claim, a slander claim.

20    There was an assault claim, a battery claim.  There was a false

21    imprisonment claim.  There was also an abuse of process claim,

22    a denial of public accommodations, and violations of the

23    Americans with Disabilities Act claim.  There was a violation

24    of the New York State Human Rights Law claim.  I think that was

25    all of them or most of them.

4

Kcmdoakc
                              Teleconference

1        In any event, there was a motion to dismiss that led

2   to an amended complaint which had most of the same claims.  I

3   ultimately ruled on that motion.  I dismissed everything.

4   There was an appeal.  The Court of Appeals affirmed on

5   everything but the assault and battery.  They sent that back in

6   a short opinion.

7        And so following that, following the mandate for the

8   appeal, the defendants submitted a letter on

9   December 7th requesting a premotion conference to seek a motion

10  to -- let me start over.  They sought a premotion conference in

11  connection with a contemplated motion for summary judgment.

12       I then got a response to that letter on

13  December 11th from plaintiffs as well as a separate premotion

14  letter on December 11th from the plaintiffs seeking to amend

15  the complaint for a second time and attaching a proposed second

16  amended complaint.  On December 17th, I got a three-page letter

17  response.  All in keeping with my individual practices.

18       So not every district judge does it this way.  I

19  always did.  I thought premotion conferences were useful.  It's

20  just an attempt really to preview the arguments, see if we can

21  narrow the areas of dispute, see if there is the ability to

22  make the process more efficient.  I never tell a party they

23  can't make a motion, because parties generally have a right to

24  make a motion, but I think sometimes it is useful to be able to

25  discuss with the Court sort of what is the bases for the motion

Kcmdoakc
                              Teleconference

1    and to get a preview.

2           So with that spirit in mind, we will chat about these

3    motions today.  I think it probably makes sense to start with

4    the motion to amend first and then get to the summary judgment

5    argument.

6           So anybody disagree with that?

7           UNIDENTIIED SPEAKER:  Whatever is your preference,

8    your Honor.

9           THE COURT:  So, counsel, if you could state your name

10   each time you speak just because, you know, the court reporter

11   will not know your voices.  Maybe by the end of this he will

12   but at this point he doesn't.  So just state your name each

13   time.  That can seem a little repetitive but makes for a much

14   cleaner transcript, and that's in everyone's interest.  OK?

15          So let's then start with the motion to amend.  The

16   opposition basically talks about several bases for me to deny

17   that motion.  Maybe I'll ask -- who is carrying the ball here?

18   Mr. Boxer?

19          MR. BOXER:  I am, your Honor.

20          THE COURT:  OK.  So I guess the arguments articulated

21   in the December 17th letter from Mr. Mastro focus on law of the

22   case and res judicata, also the lack of any new evidence, and

23   then sort of a merit-based argument as to time bar and

24   failures -- you know, basically the failure to be able to prove

25   this based, I think, on the video.

6

Kcmdoakc
Teleconference

1    So, I think I'm less focused on law of the case, but I

2    guess I would like to know why it is defendant, who was named

3    in multiple counts, who was identified as the person who was

4    sort of the puppet master and directing the removal of

5    Mr. Oakley, wasn't named in the first two complaints.  It seems

6    to me there is no new evidence here.  You seem to be aware of

7    all of these facts that you are alleging in your proposed

8    amended complaint, which is where we were at a long time ago.

9    MR. BOXER:  This is Nelson Boxer.  That is precisely

10   the question I wanted to start with, your Honor.

11   At the time the amended complaint was filed, we did

12   not have videotape evidence of Mr. Dolan preceding and during

13   the incident with Mr. Oakley.  We had videotape evidence of

14   Mr. Oakley, and we had evidence of the security guards

15   approaching him.  I don't think it's definitive but we had

16   that.  But we did not have the videotape that was filed with

17   the defendants' motion to dismiss, which shows Mr. Oakley

18   walking down to a seat, apparently without incident, sitting,

19   no one in front of him turning around as if he's acting

20   boisterous -- I know they contend otherwise but that's our view

21   of the evidence -- and then a security officer walked over to

22   Mr. Dolan, who is sitting in the very first row, and they

23   confer, it appears, whispering for about 40 seconds.

24   THE COURT:  OK.  Wait a minute.  This is in the first

25   amended complaint.  Both the original and the first amended

7

Kcmdoakc
Teleconference

1    complaint allege that Dolan directed the security to forcibly

2    remove Mr. Oakley from the Garden and that the security guards

3    were carrying out defendant Dolan's orders.  So, why does the

4    fact of videotape alter this somehow?  This was the factual

5    allegations in the original complaint.

6            MR. BOXER:  There were.  But the videotape, the next

7    thing that happens is it shows two things:  Mr. Dolan giving a

8    hand signal, after which the security personnel approach and we

9    allege the assault and battery took place, and after that you

10   see Mr. Dolan showing two thumbs up, pointing in out at a

11   distance after Mr. Oakley is removed and dragged out of the

12   Garden.

13           So while the prior complaint alleged that he directed

14   them and he, as Executive Chairman of Madison Square Garden,

15   oversees ultimately the security personnel, what's new is the

16   evidence I just described.  And so while we understood

17   Mr. Dolan to be involved and responsible for what happens at

18   Madison Square Garden, we did not have in our possession the

19   evidence that we think circumstantially demonstrates that

20   Mr. Dolan acted as an aider and abettor or acted in concert

21   with the security personnel.  It was not in our -- the

22   40-second consultation and then the hand signal -- it is

23   actually a 40-second consultation and then a gathering of

24   troops off to the side of the court and then the hand signal,

25   the thumbs down, and the security personnel converge on

Kcmdoakc
                        Teleconference

1    Mr. Oakley.  We weren't able to allege that --

2            THE COURT:  Wait a minute.  You alleged the fact that

3    Dolan directed security to forcibly remove Oakley from the

4    Garden.  That is alleged.

5            MR. BOXER:  That is.

6            THE COURT:  That allegation is enough to assert an

7    aiding and abetting assault or a battery claim, right?

8            MR. BOXER:  I don't think without the videotape we

9    really had enough to actually state the claim.  I appreciate

10   that it is alleged, and it supports some of our other claims,

11   but without actually seeing what he did in the moment and the

12   conference and then the signal, I don't know that that would

13   have been an overt act that would have survived a motion to

14   dismiss for aiding and abetting.

15           THE COURT:  Directing security to remove him would not

16   have been sufficient?  I mean, I just don't --

17           MR. BOXER:  I take your point.

18           THE COURT:  Wait.  Wait.  Wait.  It doesn't help us in

19   cases where there isn't video.  It seems to me what you're

20   saying then is that plaintiffs don't get to bring these claims

21   because they don't have video that supports allegations that

22   they've otherwise made in a complaint.

23           MR. BOXER:  I'm not saying that.

24           THE COURT:  That is a tough argument, I've got to tell

25   you.

A-324

Kcmdoakc
                                Teleconference

1          MR. BOXER:  OK.  I appreciate that.

2          There is a second element here for us, which is we

3     haven't even started discovery.  We don't know what -- I

4     appreciate that's jumping ahead to part two today.  We don't

5     know what -- who said what to whom, who spoke to Mr. Dolan, who

6     Mr. Dolan instructed.  And our concern is that if we develop

7     further evidence about Mr. Dolan's aiding and abetting or

8     acting in concert during the course of discovery and we don't

9     move to amend at this point, we do run the risk of the defense

10    arguing that our claim related back to right now, after the

11    mandate, when we had the videotape that was produced in their

12    motion to dismiss and that we sat on that evidence and that we

13    are now out of court if we discover additional evidence to

14    further support those theories.  So it --

15         THE COURT:  Wait.  I mean, there is a second argument

16    made by Mr. Mastro that you're time-barred on this because the

17    one-year statute of limitations has run and there is no

18    relation back except for a narrow band of instances where there

19    is a mistake concerning the proper identity of the party.  And

20    there is no mistake here.  You alleged in the original

21    complaint who was pulling the strings -- Mr. Dolan.

22         So, why would this relate back?

23         MR. BOXER:  Because we were mistaken in the sense that

24    we didn't have the evidence on the videotape.  We were unaware

25    of the meeting right before it happened and the instruction he

Kcmdoakc
                    Teleconference
1    then gave to remove him at that time.  I think to generally

2    allege that he directs what occurs in Madison Square Garden and

3    those entities is different from what we're able to allege now

4    and we were unaware of then.

5           THE COURT:  But that's not what was alleged in the

6    original complaint.  It wasn't alleged that he generally

7    controls Madison Square Garden.  It's that he sent the security

8    folks to do what they did.  So, all right.

9           Well, I'm making all of Mr. Mastro's arguments for

10   him.

11          MR. MASTRO:  Yes.

12          THE COURT:  Let me give him a chance to respond, and

13   then I will let you respond after that.

14          MR. BOXER:  Thank you, your Honor.

15          THE COURT:  Mr. Mastro.

16          MR. MASTRO:  Thank you, your Honor.

17          I'll cut right to the point.  I think your Honor had

18   it exactly right.  The core of what they're claiming now is,

19   you know, exactly what they alleged and then argued before your

20   Honor in both the original complaint, the amended complaint, in

21   court argument, and in their opposition papers to the motion to

22   dismiss.

23          And, your Honor, I do find it extraordinary that it

24   was alleged that Dolan, quote-unquote, directed the removal of

25   Oakley.  It was in fact alleged, your Honor, in both the

Kcmdoakc
                          Teleconference

1    complaint and the amended complaint, that the security guards

2    were then sent, quote, to carry out defendant Dolan's orders,

3    end quote, and that Dolan was clearly attempting to publicly

4    humiliate Oakley, end quote.  Those are all direct quotes from

5    their original complaint and their amend complaint.

6           Your Honor, so it is extraordinary to me to say, by

7    Mr. Boxer, whom I have great respect for, that I appreciate

8    those allegations were made but somehow that wasn't enough to

9    state a claim when the core of the claim they're stating now is

10   exactly that.

11          I have to make one correction to Mr. Boxer, because

12   Mr. Wigdor admitted in contemporaneous emails in February, you

13   know, February 18th, that he admitted in contemporaneous emails

14   that -- I mean 2019 -- that they in fact had all of the

15   videotape evidence.  What did he say?  He said, We have both

16   the public videos and, quote, whatever you gave to the District

17   Attorney, end quote.

18          And then Jim Walden swore in his declaration -- this

19   is docket entry number 44, paragraphs 7 through 11 -- swore in

20   his declaration that, in fact, all of the internal arena cam

21   footage that was submitted to this Court was in fact given to

22   the DA's Office that Mr. Wigdor said, quote, whatever he gave

23   to the District Attorney we had.  Your Honor, I don't think it

24   ultimately turns on that.  It's just a fact that we turned all

25   of that same -- all of that cam footage over to the DA's

12

Kcmdoakc
                           Teleconference

1    Office, and Mr. Wigdor admitted, in contemporaneous e-mails and

2    it is docket number 43-15, that he in fact had whatever you

3    gave to District Attorney.

4              And at the end of the day, your Honor, I know your

5    Honor will recall from their motion papers what they said in

6    May of 2018.  I'm sorry, we're talking 2018 now.  He argued

7    that the video evidence showed Dolan -- this is in their

8    brief -- speaking at length to the security guards' station

9    near plaintiff, end quote, looking back at Mr. Oakley, end

10   quote, signaling the security guard's attention, quote, making

11   a very clear gesture with his right hand, end quote, and taking

12   his hands from his head and pointing down toward the ground,

13   end quote, which led to the, quote, violent confrontation, end

14   quote, that Dolan later allegedly endorsed with a, quote,

15   thumbs up gesture, end quote.  That was all their description

16   of events while we were involved in motion practice.  They

17   didn't submit an amended complaint then.  They didn't say they

18   had something to add then specifically about Dolan.  They knew

19   everything from February 2018 on.  They had the video footage.

20   They had the arena cam.  They made these arguments in court.

21   Some of these words mirror what's in their so-called amended

22   pleading now.

23             I just -- your Honor, I don't want to belabor the

24   point because I think it is so crystal clear.  At the end of

25   the day, whether they have the footage or not -- and they did

A-328

Kcmdoakc
                    Teleconference

1    have the footage and admitted it back in February 2018 -- they

2    had enough to make these accusations against Dolan, to make

3    him, as you put it, the puppet master or, as we put it, the

4    centerpiece of this, but they didn't include him in the assault

5    and battery and both because there is no new evidence here,

6    because they knew enough to make these outrageous allegations,

7    which are untrue, but nevertheless allegations that they made

8    going back to February 2018 and in the motion practice in

9    May 2018, they had all of that information.

10           They are time-barred.  They don't have any claim on

11   the merits.  And they can't claim they made a mistake or

12   shouldn't have realized that they could have made an allegation

13   like this.  And it goes even deeper than that, your Honor.  I

14   know you said you didn't really want to start with law of the

15   case or res judicata.  But when it comes to res judicata -- and

16   this is what the Second Circuit has counseled in the L-Tec

17   Elecs. case -- you have a defendant who is dismissed from the

18   case.  Even if other claims are continuing, unless there was

19   some fraud or affirmative covering up, game over on Mr. Dolan,

20   who has already been dismissed.  You can't go back later and

21   say, oh, Mr. Dolan got dismissed, now I want to assert

22   something new that was basically part of the core case to begin

23   with.

24           So, your Honor, I think that this is -- I'm not going

25   to use basketball analogies like slam dunks, but the fact of

Kcmdoakc
                        Teleconference

1   the matter is that there really is no basis for an amendment.

2   There are multiple independent reasons why your Honor should

3   reject it, as your Honor did before.

4           So, we respect your Honor's rulings.  We respect the

5   Second Circuit's ruling, which expressly affirmed the denial of

6   leave to amend.  And so, for all those reasons, your Honor, I

7   think it is, you know, game over on amending the complaint at

8   this point.

9           THE COURT:  OK.  I will give Mr. Boxer a chance to

10  respond to that.

11          MR. BOXER:  Thank you, your Honor.  This is Mr. Boxer.

12          Three points, your Honor.  To repeat what I was

13  arguing initially, directing the removal, that allegation is

14  not, in our view, enough to support an assault and battery

15  claim.  It is directing the removal.  What we now have from the

16  videotape is the 40-second meeting, the gathering of troops, so

17  to speak, the thumbs-down gesture, and then all those people

18  conferring on Mr. Oakley, so --

19          THE COURT:  You do not allege --

20          MR. BOXER:  I'm sorry.

21          THE COURT:  No, that is all right.

22          MR. BOXER:  No, you go ahead.

23          THE COURT:  You had that in February of 2018, right?

24          MR. BOXER:  I was getting to that.

25          We had that when -- and what Mr. Mastro was just

A-330

Kcmdoakc
Teleconference

1   describing, I believe, was Mr. Wigdor's response to the brief

2   and motion they filed to dismiss, where the videotape was

3   produced for the first time to Mr. Wigdor, and I'll get to that

4   last point in a second.

5          I went back and looked at all the court transcripts,

6   and Mr. Mastro just referred to it.  There was quite a colloquy

7   on whether or not and when the plaintiff should file an amended

8   complaint as of right.  And there was discussion as to whether

9   that should occur after the motion to dismiss was filed or

10  before.  And Mr. Wigdor certainly expressed a preference to do

11  it after, and there was back and forth with the Court as to the

12  advisability of doing it that way.

13         He chose to do it before, and then landed the motion

14  to dismiss with the video tape.  And precisely the dilemma that

15  Mr. Wigdor articulated at that conference in fact occurred,

16  because arguments were made and evidence was shown that we did

17  not have a chance as of right to incorporate into our

18  complaint.

19         THE COURT:  Right.  But in the opposition briefing,

20  there was a perfunctory throw-away line that, "And if we are

21  going to lose on this motion, we ask for an opportunity to

22  amend," with no amended complaint and no discussion as to what

23  the amendment would consist of.  Certainly by the time of the

24  opposition brief, you had the video, you had the ability to

25  make this argument, and you didn't make it, right?

A-331

Kcmdoakc
Teleconference

1    MR. BOXER:  At that point we did.  At that point we

2    did.  But now they're moving on the pleadings.  We've exercised

3    our amendment as of right, and we're litigating the motion to

4    dismiss.  And so when we lose, now we're out of court and we

5    don't have the ability to make a motion to amend.

6    THE COURT:  But you had an ability to make a motion --

7    you can make a motion to amend basically at any time.  And the

8    motion to amend, to file a second amended complaint, didn't

9    include any specific allegations, didn't say anything about,

10   ah, we now have this video so we've got to include Dolan in the

11   assault and battery causes of action.  There is nothing like

12   that.

13   MR. BOXER:  That's correct.  And I think that decision

14   was informed by the premotion conference on the motion to

15   dismiss and, for better or worse, that's what we did, but

16   that's the basis for why we argue it's new today.

17        Lastly, as far as Mr. Wigdor and things he wrote and

18   said, whatever he received in this case, he did not receive the

19   video that accompanied the motion to dismiss that showed

20   Mr. Dolan, as opposed to Mr. Oakley, until the motion to

21   dismiss.  And so we don't -- we understand what mistake, it

22   requires you to show, and we wouldn't have made the motion, or

23   we wouldn't have submitted a letter, I should say, unless we

24   were sure about that.  So I just wanted to correct those two

25   points, and with that I have nothing further to add, your

Kcmdoakc
                           Teleconference

1   Honor.

2           THE COURT:  OK.  All right.  So let's pause there and

3   I think pivot towards the defendants' contemplated motion for

4   summary judgment, because I guess what Mr. Mastro is saying is

5   that if I were to grant his motion for summary judgment, it

6   doesn't much matter whether Dolan is in this thing because that

7   would end the case on the sole remaining claims for assault

8   against any and all defendants.  Right, Mr. Mastro?

9           MR. MASTRO:  Yes, that's completely correct, your

10  Honor.

11          THE COURT:  Let's talk about your contemplated motion.

12          So I remember vividly, as you do, too, I'm sure, that

13  you wanted me to consider the video as part of the motion to

14  dismiss.

15          MR. MASTRO:  Yes.

16          THE COURT:  And I declined to do that.

17          Now, of course we're in a different posture.  So,

18  certainly I can consider a motion for summary judgment at any

19  time.  I expect -- and in fact I know that Mr. Boxer and

20  Mr. Wigdor are going to say, well, they need discovery to nail

21  down various things.

22          I guess one question I have is is there any dispute as

23  to the authenticity of the videos on which Mr. Mastro is

24  relying?  So Mr. Boxer or Mr. Wigdor, I want --

25          MR. BOXER:  There is in the sense that I don't think

Kcmdoakc
                              Teleconference

1  we have evidence of its authenticity, and there certainly is in

2  a sense of completeness, since we didn't receive a videotape of

3  Mr. Oakley prior to him sitting down.  But in the sense that I

4  am confident that Mr. Mastro would not present something to the

5  Court that wasn't what it purported to be, I think in practice,

6  I'm assuming it is what he says it is, but I don't think

7  they've proven it.  And I think there are bigger issues on the

8  discovery, but I don't want to jump ahead unless your Honor

9  wants me to go first.

10         THE COURT:  Well, it is Mr. Mastro's contemplated

11 motion so I will let him go first.  I mean, I think I

12 understand the argument.  I've known it was coming for awhile

13 because in the context of the motion to dismiss, I basically

14 said that sounds like a motion for summary judgment, so it's

15 not shocking to me that he's making that motion now.  He's

16 relying on the video.

17         I think the video, it seems to me, does contradict a

18 fair amount of what's in the complaint.  And, you know, I think

19 I made this point earlier, that to the extent that what's

20 alleged in the complaint turns out to be patently false and

21 contradicted by video, that would potentially be a basis for

22 sanctions.

23         So, anyway, Mr. Mastro, I'll give you the floor, and

24 then I'll give Mr. Wigdor or Mr. Boxer a chance to respond.

25         MR. MASTRO:  Thank you, your Honor.  I appreciate it.

A-334

Kcmdoakc
                              Teleconference

1       To answer you your Honor's first question, obviously

2   we produced all of the in-the-arena footage and then leading

3   Oakley out of the arena through the tunnels to where the police

4   took him away.  We obviously produced all of that.

5       THE COURT:  I guess the question is is there some

6   dispute that this is doctored or is there some dispute that

7   this is not everything, that there are angles that were

8   obscured, that there is stuff that happened before and after

9   that we need to know in order to resolve a summary judgment

10  motion?

11      MR. MASTRO:  Right.  And I am, as an officer of the

12  court, representing to the Court that we produced the arena cam

13  footage.  It's not -- it's a series of snaps, stills, in

14  succession; it is not video like some of the other video

15  evidence.  We produced all of that from Oakley's time in the

16  arena, sitting down, approached, taken out of the arena,

17  through the tunnels, out of Madison Square Garden.  And I don't

18  think there is any question that that's the case.  It was all

19  turned over to the DA's Office, and then it was turned over to

20  Oakley's counsel by both the DA's Office and by us.

21      Now, your Honor -- and I don't think they're really

22  contesting that, your Honor, at all.  Mr. Wigdor, in fact, at

23  the Second Circuit said the same thing that I did.  He said,

24  you should look at the video, in response to Judge Newman.  He

25  said, I'm happy for you to look at the video.  Those are his

A-335

Kcmdoakc
                          Teleconference

1   quotes.  There is no question that it's the authentic arena cam

2   footage.

3           There is also footage, publicly-available footage,

4   that Mr. Wigdor has also acknowledged exists and that they have

5   possession of.  One long clip posted on the New York Times,

6   another on YouTube.  ESPN was covering the game, you know, live

7   nationally at the time and caught part of the incident.  That

8   footage, there is no question that it is authentic footage, and

9   Mr. Wigdor has acknowledged having that public footage.  That

10  is straight video.  And, therefore, I think the Court now has

11  from several angles of, in terms of the arena cam and in terms

12  of The New York Times, the ESPN and the YouTube footage, the

13  Court has, you know, everything that, you know, you -- that

14  they should need, and they've never had an issue or expressed

15  an issue about the video footage.  In fact, they've encouraged

16  the courts to look at it after they left your courtroom, your

17  Honor, they encouraged the appellate court to look at the

18  footage.

19          Now having said that, your Honor, let's cut to the

20  heart of the matter.  All right?  And I think your Honor

21  already hit on it.  I said this when we made our motion to

22  dismiss, while we thought we had a valid motion, a meritorious

23  motion regardless.  The video footage proves that Oakley's

24  allegations are demonstrably false.  It belies them.  They are,

25  as we have said -- and I don't like to have to say this, we

A-336

Kcmdoakc
                              Teleconference

1    hoped it would never come to this, your Honor, but they're

2    fabrications.  Mr. Oakley has not told the truth about what

3    happened that night in his pleading and his many public

4    statements.

5         The fact of the matter is that the video footage puts

6    the lie to his assault and battery case.  It shows him to have

7    been the aggressor.  It shows him to have slipped to the

8    ground, not being thrown to the ground, ever.  It shows him --

9    unfortunately I have to say this -- using profanity, being

10   physically aggressive -- not defensive posture -- pushing,

11   shoving, hand, fist in face of a security guard so that he

12   literally reels backwards.  Another security guard, you know,

13   chopping down on his arms and then violently shoving him twice.

14        This is not a man in a defensive posture.  This is not

15   a man who is saying, you know, trying their words, peaceably

16   behave, not a man who was complying with a request to leave.

17   It shows him refusing to leave and then getting violent,

18   aggressive, and, frankly, offensive in the language he used.

19   And guess what, your Honor.  The video footage shows an NYPD

20   police officer, being the person closest to him immediately in

21   proximity to him, as he is refusing to leave, because this was

22   security guards and NYPD.

23        Now, your Honor, I think it's -- I think it's game

24   over when the videos are considered.  And Mr. Boxer's comment

25   that, oh, the discovery they need, your Honor knows what he's

A-337

Kcmdoakc
Teleconference

1   talking about.  It's the same kind of discovery that was

2   irrelevant on a motion to dismiss.  They want to show -- and

3   it's a false narrative but, nevertheless, it is their

4   narrative -- they want to show why it was that the security

5   guards approached Mr. Oakley.  What Mr. Dolan said, what

6   happened before he was approached, all of those things.

7           But as your Honor has held, and as the Second Circuit

8   made crystal clear, we're down to the short strokes.  It is a

9   revocable license.  It could be removed for any reason.  And

10  when he was told to leave, and refused to leave -- in his own

11  pleading, he says he turned to go back to his seat after being

12  asked to leave, in his own pleading -- they had the right to

13  remove him, use, you know, physical acts to remove him.  The

14  short stroke we're down to, your Honor, is whether the physical

15  force used to remove him was objectively unreasonable.  It's

16  his burden to prove that.  The videos totally belie any such

17  notion.

18          And as your Honor knows from your own cases, the

19  seminal Supreme Court case that your Honor has cited on

20  multiple occasions, Scott v. Harris, when you've got the video

21  evidence, let's go to the video.  In the words of the immortal,

22  you know, Scott v. Harris, when the video blatantly

23  contradicts, end quote, the allegations that have been made,

24  OK, when it is a visible fiction, as it is here, OK, it should

25  be reviewed and viewed in the facts in light of what's depicted

Kcmdoakc
                        Teleconference

1    on the video.  End of story.

2           And, your Honor, there have not only been multiple

3    case in the Second Circuit and the Southern District where

4    courts have granted summary judgment at the prediscovery stage

5    based on clear, dispositive evidence like this, there is even a

6    recent case in the Western District of Virginia based on video

7    evidence, a summary judgment motion at the outset of discovery,

8    and the court there dismissed based on the video evidence, and

9    that was the end of the case.

10          I respectfully suggest to your Honor that under these

11   circumstances, you should look at the video.  It is irrelevant

12   why -- they shouldn't be allowed to amend.  Mr. Dolan is out of

13   the case.  This is part of, unfortunately, your Honor, that

14   public relations game that your Honor told all parties to

15   please avoid.  OK?  They want Dolan back in the case.  And then

16   they want to try to depose him and find out what he said to the

17   security guards and what the security guards said to him and

18   what were the real reasons.  Your Honor knows, you've already

19   ruled, that doesn't matter.  The Second Circuit has ruled that

20   doesn't matter.

21          The Second Circuit couldn't have been clearer.  The

22   Second Circuit gave an exceedingly narrow path to what little

23   is left of this case, and expressly rejected Oakley's

24   contention that, quote, the act of removal was unreasonable,

25   end quote, and it said that the only question that remains

**A-339**

Kcmdoakc
                              Teleconference

1   here, the only question that remains here, is whether, quote,

2   the security guards used excessive force in accomplishing the

3   removal.

4           The videos, from multiple angles, show that this was

5   not objectively unreasonable force, and they show that Oakley's

6   behavior exacerbated the situation, that he was the aggressor,

7   that he was the one who compelled the need to use even more

8   physical force because he refused to leave.  And, again, in any

9   version of their pleading, including proposed, they never

10  alleged that Mr. Oakley suffered any injury whatsoever from the

11  removal -- ever.

12          But, your Honor, I would like to go to the videotape.

13  I have two short clips that will show you the core of the

14  incident from different angles and I would -- each are about a

15  minute, maybe one is a little over a minute -- I would like to

16  show them to the Court now, because I don't ever ask you to

17  just take my word for it, I present evidence.  And the videos

18  are the evidence.

19          THE COURT:  All right.  I don't mind -- well, I

20  wouldn't mind seeing them.  They've already been introduced, as

21  it were, in connection with the motion to dismiss.  I didn't

22  consider it for that purpose.

23          But I think it is useful, Mr. Boxer, for you to

24  respond to them.  OK?

25          MR. BOXER:  I actually object to him showing them at

Kcmdoakc
                          Teleconference

1   this point because I think your rules preclude showing exhibits

2   during these conferences, and we got notice of it about 20

3   minutes ago without sending them to us.  But I would like to

4   first respond to Mr. Mastro's presentation, and then I defer to

5   your Honor's judgment as to whether these two-minute videos are

6   worth seeing.  But there were two --

7            THE COURT:  Wait.  Wait a second.

8            You've seen these videos, you know what they are;

9   right.

10           MR. BOXER:  I don't know which portions he has cut and

11   pasted.

12           MR. MASTRO:  Your Honor, I'm not cutting and pasting.

13   I'm showing a complete segment for each about a minute, one

14   from the New York Times video and one from the YouTube video.

15           And, your Honor, I'll just say this.  OK?  There's

16   nothing left in the complaint to support unreasonableness.

17   When you look at these videos and see how they belie the

18   allegations in the complaint and proven them to be demonstrably

19   false, there is nothing left in this complaint, amended

20   complaint, that could possibly support a finding that Oakley

21   could meet his burden of objective unreasonableness in the

22   force that was used.  So, I think it would be helpful to the

23   Court to just see these short videos.

24           THE COURT:  All right.  So, Mr. Boxer, you think it

25   would be better to hear from you before the videos are shown or

Kcmdoakc
                          Teleconference

1     after?

2              MR. BOXER:  I would appreciate that, your Honor, if I

3     could.

4              THE COURT:  OK.

5              MR. BOXER:  There were two glaring omissions in

6     Mr. Mastro's presentation.  The first is what the Second

7     Circuit actually held, and it described the issue remaining

8     regarding the assault and battery claims as whether the use of

9     force was reasonable under the circumstances, which the Court

10    stated is generally best left for a jury to decide.

11             THE COURT:  Well, they seemed to be very impressed

12    with your complaint, which insisted that Mr. Oakley was thrown

13    onto the ground by six officials.  So, are you aware of any

14    video that shows that?

15             MR. BOXER:  Your Honor, the video shows what it shows.

16    I see him thrown to the ground on the video.

17             THE COURT:  Uh-uh-uh-uh.  Answer my question.

18             Are you aware of any video, anyplace, that showed

19    Mr. Oakley being grabbed by six officials and thrown to the

20    ground?

21             MR. BOXER:  I see him being grabbed and I see him

22    being thrown to the ground.  I can't say I have read it, I've

23    looked at it recently to count the number of people who were

24    doing the throwing.

25             THE COURT:  I think what's going to be very important

27

Kcmdoakc
                        Teleconference

1  in this motion for summary judgment is whether or not there is

2  any evidence that supports that characterization in paragraph

3  47 of the complaint, of the amended complaint.

4          MR. BOXER:  OK.

5          THE COURT:  So there is another point you wanted to

6  make, I think?

7          MR. BOXER:  Yes.  The Court even said in the criminal

8  context whether an arrest and a force used in an arrest is

9  reasonable depends on the severity of the crime that's charged.

10 So what happens before, what's known before, what's known when

11 an officer, a security personnel approaches a person to make an

12 arrest or in this case to remove somebody is all part of the

13 circumstances of whether or not their conduct was reasonable.

14 And in this case -- so, Mr. Mastro doesn't mention that.

15         But more telling is he keeps saying that he's produced

16 all of the footage in the arena so all that you need to look at

17 is what happened in those moments after Mr. Dolan gave the

18 signal to remove Mr. Oakley.  But in fact, the defendants have

19 already put in issue what happened before Mr. Oakley even got

20 to his seat on the question of whether the force they used was

21 reasonable under the circumstances.  And we haven't seen a

22 single video of him walking that the Garden, walking through

23 the hallways, and getting to his seat.

24         But two days after the incident, Mr. Dolan, on Michael

25 Kay's Show, said from the moment he stepped into the Garden, I

A-343

Kcmdoakc
                        Teleconference

1   mean the moment he walked through the first set of doors, he

2   began with this abusive and disrespectful behavior, and it

3   accelerated and accelerated all the way down to his seat.

4   According to what the Second Circuit held, those are

5   circumstances that are relevant to whether the use of force and

6   the number of security personnel was reasonable.  And maybe

7   they'll prove that.  Maybe in discovery they will show that he

8   was acting, Mr. Oakley, abusive behavior all the way down to

9   his seat so that when he gives the signal, Mr. Dolan, and six

10  or seven or however many people surround Mr. Oakley, that was

11  reasonable under the circumstances.

12          THE COURT:  Wait.  Wait.  Wait.

13          So your position now is that surrounding Mr. Oakley

14  constituted excessive force?

15          MR. BOXER:  No.  I'm saying that the whole

16  circumstance of how he was removed from his seat is all part of

17  the circumstances as to whether the conduct was reasonable.

18  And what we're left with here are some handpicked videos by the

19  defense to try to prove as a matter of law that under these

20  circumstances it was reasonable.  But even the videos, they

21  don't -- they sort of start after they already claim the

22  problem existed.

23          If it's true that Mr. Oakley was abusive and

24  disrespectful all the way down to his seat, and let's just say

25  arguably they knew that, then that heightens the amount of

A-344

Kcmdoakc
                        Teleconference

1    force that would be reasonable to remove him.  We have no sense

2    of that.

3              THE COURT:  Stop.  Stop.

4              The first inquiry I have is whether there was really

5    any kind of force used to remove him and what that consisted

6    of.  So to the extent that there is evidence that shows him

7    being thrown to the ground, I think that that needs to be

8    produced.  But it doesn't sound to me like there is any such

9    evidence.

10             To the extent that the guards refused Mr. Oakley's

11   repeated requests that he be allowed to stand up -- that's

12   paragraph 48 -- again, I'm not sure that there is video that

13   supports that.  Mr. Mastro says not, and what I've seen

14   suggests that that is not accurate either, that he wouldn't get

15   up and then he wouldn't leave.  He basically grabbed onto the

16   railing so that he wouldn't be removed from the Garden.

17             MR. BOXER:  I saw video when he was off to the side

18   where he was trying to stand up and they wouldn't allow it.

19   But even who said what to whom, even what any bystanders heard

20   Mr. Oakley said or didn't say, what the security personnel said

21   or didn't say, all of those are facts that are relevant to

22   whether the use of force was reasonable, and we're in a

23   situation where --

24             THE COURT:  It may or may not be.

25             MR. BOXER:  We're entitled to discovery on that.

Kcmdoakc
                            Teleconference

1        THE COURT:  No, you're not, even not necessarily.  If

2   it is discovery that wouldn't make a difference, you are not

3   entitled to it.

4        Now, look, it seems to me the way this goes is they

5   make their motion, you respond to it, and you respond to their

6   56.1 statement as to what facts you're disputing and the bases

7   for it.  And under 56(b), if you need additional discovery, you

8   articulate what it is you need and why it is you're not able to

9   respond to certain factual allegation or legal arguments.  And

10   I think that's a lot easier to do after you see what their

11   motion is.

12        But it is not the case that you're just entitled to

13   any discovery that you want at this point.  It has to be

14   discovery that is relevant to the lone standing cause of

15   action.  And if the video shows that there was no force, then

16   it doesn't much matter what conversations they had or didn't

17   have before that happened, it seems to me.

18        MR. BOXER:  Well, I think the video shows force.  But,

19   for example, when they're claiming that their justification --

20   of course they can remove him for any reason, he is a licensee,

21   but they haven't said that.  And they didn't say we sent two

22   people over to say can you please leave because we feel like

23   it.  What they've said, and they've said publicly, is that from

24   the moment he entered the gates, he was boisterous, he was

25   abusive, he was abusive with the support personnel, with the

**A-346**

Kcmdoakc
                          Teleconference

1   waitress, and that informed the reasonableness of what they

2   did.  And we should be able to test that, to see whether in

3   fact they did -- that's the whole essence of the claim that the

4   Second Circuit found, that the jury should decide whether under

5   all the circumstances the use of force, the alleged assault and

6   battery, was reasonable.  And what we're faced with now is

7   after all this time they're going to produce only video that

8   they have in the arena, even though they said everything before

9   that is relevant, and asking the Court to enter judgment

10  summarily without giving us a chance to even support our case.

11  And I don't think that's what is fair, and I don't think that's

12  what the Second Circuit was suggesting in its decision.

13          THE COURT:  Well, I mean, I'm not sure what they were

14  suggesting.  The decision is what it is.  But it is back here

15  now.  There is a motion for summary judgment being

16  contemplated.  And, you know, if there is no disputed issue of

17  fact that requires discovery, then there is no need for

18  additional discovery.

19          So, all right.  I mean, look, I think that's certainly

20  the law in this circuit.  It is the law of the land.

21          So, Mr. Mastro, you wanted to show your video?

22          MR. MASTRO:  Yes, your Honor.  Would you like me to

23  respond briefly to Mr. Boxer first before we show the videos?

24  Whatever you prefer.

25          THE COURT:  Whatever you want to do.

32

Kcmdoakc
                            Teleconference

1       MR. MASTRO:  Thank you, your Honor.  I really

2   appreciate it.

3       You know, Mr. Boxer said they can remove him for any

4   reason.  That's right.  What the Second Circuit actually held,

5   because I like to use their exact language, was that, Although

6   Oakley did contend incorrectly that the act of removal was

7   unreasonable, his additional and actionable claim was that the

8   security guards used excessive force in accomplishing the

9   removal, end quote.  That's on page 3.  And it's his burden to

10  show it was objectively unreasonable force.

11      I also heard Mr. Boxer say he thinks he saw Mr. Oakley

12  thrown to the ground.  OK?  Two points in the videos to focus

13  on -- the first one where he clearly trips and falls; the

14  second one where he slides to the floor and then he goes on to

15  resist.  You will see both.  The Times footage picks up as he's

16  first getting up but then shows clearly what happened as he's

17  being taken out of the arena and goes to the ground a second

18  time.  The YouTube video shows both and has a very clear view

19  of the fact that he trips and falls himself.  Nobody throws him

20  to the ground at any point.

21      I heard Mr. Boxer say, well, in a criminal case, the

22  police, they have more latitude, da-da-da-da.  You will see the

23  NYPD is there every step of the way, including right in front

24  of Mr. Oakley as he is yelling profanities at the NYPD officer

25  and the security guards, as he towers over them.

Kcmdoakc
                              Teleconference

1       And, your Honor, I would just, you know, conclude with

2    this before we show the videos.  It's totally irrelevant, now

3    that the Second Circuit has ruled and affirmed your Honor in

4    this regard, you know, the act of removal, they had the right

5    to remove him.  I heard Mr. Boxer say they could remove him for

6    any reason, and that's exactly what the Second Circuit said.

7    So all those preliminaries where he wants to go on fishing

8    expeditions and try and drag Mr. Dolan back in and who said

9    what to whom and how did Oakley act when he was out on the

10   street before he came into the Garden, totally irrelevant.  The

11   only issue now is was the force used not objectively -- was the

12   force used objectively unreasonable.  Oakley's burden.

13       It was not.  The video proves that.  That is the

14   definitive evidence.  And that's what court after court has

15   said, you know, and we can cite half a dozen more cases to your

16   Honor but we only had a three-page letter.  But from the

17   Supreme Court on down, that's the definitive word, when you

18   have conclusive video or audio evidence, and your Honor has

19   ruled that in other cases.

20       So, let's go to the videotape.  Let's start with the

21   New York Times and then we'll go to YouTube, and they're going

22   to show from different angles the two incidents.  The Times

23   picking up as Oakley is getting up the first time and what

24   happens from there and as he's being taken out, the second

25   video showing both how he trips and falls initially and then

Kcmdoakc
                          Teleconference

1    what happens on the second incident when he goes to the ground.

2              Declan, take it away.

3              (Pause)

4              THE COURT:  I don't hear you, Mr. Conroy.  I think

5    you're muted.

6              MR. CONROY:  Hi.  Can you hear me now?

7              THE COURT:  Yes.

8              MR. CONROY:  I think I am going to need Ms. Miller to

9    be a presenter on the settings so I can show the video.

10             THE COURT:  OK.  Can we do that?

11             MR. CONROY:  I think I just got it right now.

12             (Pause)

13             THE COURT:  Is there a glitch or how are we doing?

14             MR. CONROY:  It's loading currently.  The first video

15   is being posted.

16             THE COURT:  OK.

17             (Pause)

18             MR. CONROY:  We are done with the first video.

19             MR. MASTRO:  That was The New York Times, your Honor.

20   The next one is YouTube.

21             THE COURT:  OK.

22             MR. CONROY:  Just give me one second to load it.

23             THE COURT:  All right.  So when you say The New York

24   Times and YouTube, of course that's not who prepared the video,

25   that's just where it was loaded, right?

**A-350**

35

Kcmdoakc
                          Teleconference

1        MR. MASTRO:  Correct, your Honor.

2        THE COURT:  Mr. Boxer, while we're waiting, are you

3   disputing the authenticity of this video?

4        MR. BOXER:  The authenticity, no.  I trust that what

5   Mr. Mastro is presenting is what he says it is.  But I think

6   it's a snapshot.  And as I said, when the Circuit says whether

7   the use of force was reasonable under the circumstances and the

8   defendants are saying the reason for they did what they did is

9   what happened when he first walked into the Garden, I think

10  those are all relevant circumstances to whether the use of

11  force was reasonable.  So I'm sure that's an accurate --

12       THE COURT:  I really --

13       MR. BOXER:  I have no doubt it is what was on the New

14  York Times or the YouTube on that.

15       THE COURT:  I just worry that --

16       MR. BOXER:  As I said before --

17       THE COURT:  Can you hear me, Mr. Boxer?

18       MR. BOXER:  Yes.

19       THE COURT:  OK.  I just worry that the goal here is to

20  make this about the reasons as opposed to the force.

21       MR. BOXER:  Well --

22       THE COURT:  And I'm not doing this for the back page

23  of the papers and I'm not doing this for Page 6.  This is a

24  motion for summary judgment on the lone remaining causes of

25  action in this complaint, so --

A-351

Kcmdoakc
                              Teleconference

1          MR. BOXER:  Understood.  Understood.

2          And to be clear, we're not doing it for that purpose

3    either.  I brought up the police context because the Circuit

4    brought it up and said for the point that what an arresting

5    officer knows he's walking into based on what he's arresting

6    the defendant for bears on the reasonableness of the force they

7    can use.

8          THE COURT:  OK.  The reasonableness of this is that

9    the owner can remove anybody, any licensee, from the arena,

10   so --

11         MR. BOXER:  He can, but he can't use unreasonable

12   force.

13         THE COURT:  Yes.

14         MR. BOXER:  So on that question, it's not designed for

15   the back page or for any of those things.  By their own words

16   in public media, the circumstances that they reacted and then

17   used force included everything Mr. Oakley did as he walked into

18   the arena, and that's relevant.  And I'm not suggesting how

19   your Honor, hearing all that evidence and watching all the

20   videotapes, watching the videotape when he walks in the arena,

21   you know, what a jury would do with all of that, but we're out

22   of court if we don't even get a chance to explore those things.

23         THE COURT:  Well, I'm not sure that that's true.  If I

24   walk into Madison Square Garden and I just had a hat that the

25   owner objects to, I can be asked to leave.

**A-352**

Kcmdoakc
                            Teleconference

1          MR. BOXER:  Correct.

2          THE COURT:  But the fact that I orderly bought a

3     hotdog and a coke before then strikes me as irrelevant.  So --

4     and it seems to me also irrelevant to know why the owner took

5     such umbrage at my hat.  It seems to me that the focus has got

6     to be on the force.  And if the force is reasonable, then I

7     don't really need much to care about what happened at the

8     concession stand.

9          Anyway, back to the video.  I'm not deciding anything

10    today.

11         MR. BOXER:  OK.  I have a response to that but I will

12    keep it to myself.

13         THE COURT:  OK.  So let's go to the second video.

14    This is the so-called YouTube video.

15         MR. CONROY:  Yes.  This is docket 43-4.

16         THE COURT:  OK.  Thanks.

17         (Pause)

18         MR. MASTRO:  Thank you.

19         THE COURT:  OK.  All right.  I assume that will be

20    part of any submission on the motion for summary judgment.

21         MR. MASTRO:  Yes, your Honor.

22         THE COURT:  I will tell you, candidly, I didn't see

23    anything there that would support a characterization of

24    Mr. Oakley being thrown to the ground.

25         Mr. Boxer, did you think that reflected him being

**A-353**

Kcmdoakc
                          Teleconference

1    thrown to the ground?

2            (Pause)

3            Mr. Boxer, are you there?

4            (Pause)

5            Mr. Boxer, you are getting -- wait.  That's better.

6    Go ahead.  I can't see you but I can hear you.

7            MR. BOXER:  I'm sorry, I didn't -- (inaudible)

8            THE COURT:  Can you hear me, Mr. Boxer?

9            (Pause)

10           MR. BOXER:  Yes, but I must admit it is freezing a

11   little.  I don't know if that video impacted it at all.

12           Let me try one other thing.

13           Can you hear me now?

14           THE COURT:  Yeah, I can hear you.

15           MR. BOXER:  That's better.  I can hear you fine now.

16           I'm sorry.  I didn't hear what you said before.  I

17   apologize.

18           THE COURT:  I'm just asking, are you suggesting that

19   anything we saw in those two videos constituted Mr. Oakley

20   being thrown onto the ground?

21           MR. BOXER:  Well, at the end of the second video, it

22   appears -- I still couldn't count how many were around him,

23   whether it was six, but it didn't appear to me like he slipped,

24   and they were holding him and he fell.

25           THE COURT:  You think he was thrown to the ground.

Kcmdoakc
                              Teleconference

1          MR. BOXER:  Yeah, then he ends up on the ground.

2          THE COURT:  That's not what I asked, not what I asked.

3          MR. BOXER:  OK.

4          THE COURT:  I'll read you the statement:  "Mr. Oakley

5    was forcibly turned around so his back faced security, grabbed

6    by six officials and thrown onto the ground."

7          So is something that we just saw in your mind him

8    being thrown onto the ground, as reflected in paragraph 47 of

9    the complaint?

10         MR. BOXER:  I thought what we saw at the end of the

11   second video showed him being thrown to the ground.

12         THE COURT:  OK.

13         MR. BOXER:  I -- it went by fast.  I couldn't count

14   the people.  And it sort of highlights the point.  It is one

15   angle of what happened.  All those people there, what they say

16   happened, what they observed, I appreciate there is video, but

17   I don't think it settles the question of what happened.

18         THE COURT:  All right.  So let's now then talk about a

19   briefing schedule.

20         What I have in mind is parallel briefing on the two

21   motions.  So, each of you would file your motions and then the

22   other side would respond on the same date and replies on the

23   same date.  That's what I'm inclined to do.

24         So, how long do you think you need to file -- I think

25   probably a summary judgment motion requires a little more than

A-355

40

Kcmdoakc
                          Teleconference
1    a motion to amend.  So, Mr. Mastro, how long do you think you
2    need to file your motion for summary judgment?
3               MR. MASTRO:  Your Honor, I'd appreciate three to four
4    weeks.  It is the holidays.
5               THE COURT:  Sure.  That's fine with me.  What do
6    you -- you pick a date.  You tell me.
7               MR. MASTRO:  OK.  Perhaps I should ask Declan, the
8    brains of the operation.  How long do we need?
9               MR. CONROY:  I think four weeks.
10              MR. MASTRO:  OK.
11              THE COURT:  So four weeks puts us at -- what is today,
12   the 22nd -- one, two, three, four, the 19th of January; is that
13   OK?
14              MR. MASTRO:  That will be great, your Honor.  Thank
15   you very much.
16              THE COURT:  Do you want the Friday, the 22nd of
17   January?
18              MR. MASTRO:  Sure, your Honor.  That will be
19   fantastic.  Thank you.  I appreciate it.
20              THE COURT:  Mr. Boxer, Mr. Wigdor, that's OK for you
21   to do your opening brief on your motion to amend?
22              MR. BOXER:  That's fine, your Honor.
23              THE COURT:  OK.  So the 22nd.
24              And then, Mr. Boxer, I'll ask you, how long do you
25   think you need to respond to the motion for summary judgment?

**A-356**

Kcmdoakc
                          Teleconference

1    Look, candidly, I don't know that I need much more briefing on

2    the motion to amend.  That is pretty straightforward.  It's a

3    legal issue.  I've got the proposed complaint.  You're

4    certainly welcome to brief it but don't feel compelled.  I

5    mean, you know, only submit what you think will help.

6            MR. BOXER:  OK.  Understood.

7            THE COURT:  But in terms of responding to the summary

8    judgment, that is probably going to require a little more

9    effort on your part.  How long do you think you need to do

10   that.

11           MR. BOXER:  I was thinking three to four weeks to

12   respond, so let's say four weeks.  And if there is no reply,

13   then it would be fully submitted at that time.

14           THE COURT:  OK.  So the 19th of February?

15           MR. BOXER:  Thank you, your Honor.

16           MR. MASTRO:  Your Honor.

17           THE COURT:  Yes.

18           MR. MASTRO:  If I might?  I think it would be an aid

19   to the Court in a summary judgment motion in a major case if we

20   had the opportunity to put in a brief reply to their --

21           THE COURT:  I want a reply.  That's fine.  I think a

22   reply would be useful.  But I'm asking a different question

23   first.

24           I think four weeks is probably more than enough time

25   for you to respond to the motion to amend.

A-357

Kcmdoakc
                        Teleconference

1            Do you agree with that?

2            MR. MASTRO:  I do, your Honor.

3            THE COURT:  OK.

4            MR. MASTRO:  If you want us to respond, you know, in

5   two weeks, that's fine.

6            THE COURT:  Let's keep it on the same track.  I just

7   think it's easier.

8            MR. MASTRO:  No problem.

9            THE COURT:  OK.  So, OK.  So your opposition brief on

10  the motion to amend, by the 19th of February.  And then reply

11  briefs on the two motions -- nobody has to do a reply brief,

12  but if you want to, you can do it.

13           So, Mr. Mastro, how long do you think you need for a

14  reply?

15           MR. MASTRO:  If we could have another ten days, your

16  Honor?

17           THE COURT:  OK.  That puts us at March 1st or 2nd.

18           MR. MASTRO:  I think that's right, your Honor.  Could

19  we have Monday?

20           THE COURT:  Do you want Monday?  Tuesday?  I don't

21  care, Tuesday --

22           MR. MASTRO:  Tuesday is good.  Thank you, your Honor.

23           THE COURT:  Mr. Boxer, if you want to do a reply for

24  the motion to amend, you can also then get something in by

25  Tuesday, March 2nd.  OK?

Kcmdoakc
                        Teleconference

1           MR. BOXER:  Thank you, your Honor.

2           THE COURT:  All right.  So I'll issue an order that

3    just memorializes those dates.

4           I'm not prejudging this.  I think a preview like this

5    is helpful.  That's why I do it.  But, obviously, I'm going to

6    read the briefs, I am going to look at the attachments, I'm

7    going to consider all the arguments.

8           Mr. Mastro.

9           MR. MASTRO:  Your Honor, we had also requested in the

10   interim, pending disposition of the motion, a stay of

11   discovery.

12          THE COURT:  Yes, I am going to stay discovery, and

13   then that can be addressed in the opposition to your motion for

14   summary judgment.  That is built into the rule.  If Mr. Boxer

15   and Mr. Wigdor are arguing that they can't possibly respond to

16   your summary judgment motion without additional discovery, they

17   then will articulate that consistent with Rule 56(d).  OK?

18          MR. MASTRO:  Thank you very much, your Honor.  I

19   really appreciate it.

20          THE COURT:  That is all right.  That's why I do this.

21          So, I don't know, some people like these premotion

22   conferences, some people don't.  I find them helpful.  I think

23   it lets me hit the ground running once the motion is filed.

24          So with that, I will -- I'm prepared to adjourn unless

25   there is anything else we need to cover today.

44

Kcmdoakc

Teleconference

1          MR. BOXER:  Just briefly, your Honor.  If your Honor

2     is going to schedule an appearance before your Honor, I do have

3     some court commitments the week of March 8th and, in theory, a

4     trial the week of March 16th.  Who knows if that will happen.

5          THE COURT:  OK.

6          MR. BOXER:  So if that is going to happen later, I can

7     always consult with your deputy clerk.

8          THE COURT:  I'll tell you, what I would typically do

9     is see the briefs and then decide whether I need additional

10    argument beyond what we had today.

11         MR. BOXER:  Thank you.

12         THE COURT:  And if I think we do, then I will schedule

13    something, but I will probably have my judicial assistant,

14    Ms. Miller, contact you to see when you are available and then

15    I will issue an order setting forth that date.  OK?

16         MR. BOXER:  I appreciate that, your Honor.  Thank you.

17         THE COURT:  All right.  Good.

18         OK.  So, thank you all.  This was very, very helpful

19    to me.  Let me thank the court reporter.

20         If anyone needs a copy of this transcript, you can

21    take that up with the court reporter either now or later

22    through the website.

23         Let me wish everybody the happiest of holidays and the

24    healthiest of holidays.  And, who knows, someday maybe we'll be

25    in the same room again.  But in the interim, I thought this

A-360

Kcmdoakc
                        Teleconference

1   worked reasonably well, with a couple of little glitches, but

2   overall this was pretty good.  So, thanks.

3           MR. MASTRO:  Thank you, your Honor.  Happy holidays.

4           MR. BOXER:  You too, your Honor.  Happy and healthy

5   new year.

6           (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-361

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                        :
CHARLES OAKLEY,                                         :
                                                        :
                    Plaintiff,                          :
                                                        :
        v.                                              :
                                                        :     Case No. 17-cv-6903 (RJS)
JAMES DOLAN, in his individual and                      :
professional capacities, MSG NETWORKS,                  :
INC., THE MADISON SQUARE GARDEN                         :
COMPANY and MSG SPORTS &                                :
ENTERTAINMENT, LLC,                                     :
                                                        :
                    Defendants.                         :
                                                        :
--------------------------------------------------------x

### DECLARATION OF RANDY M. MASTRO

I, RANDY M. MASTRO, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.   I am a member of the bar of this Court and a partner at the law firm of Gibson, Dunn

& Crutcher LLP, counsel to Defendants in this action.   I submit this declaration in support of

Defendants' Rule 56 motion for summary judgment and accompanying Memorandum Of Law

and Rule 56.1 Statement of Undisputed Material Facts.

2.   Attached hereto as Exhibit 1 is a true and correct copy of the portion of the ESPN

national public broadcast of the February 8, 2017 New York Knicks game that captured the

February 8, 2017 incident.

3.   Attached hereto as Exhibit 2 is internal MSG Arena Camera footage capturing the

entire February 8, 2017 Knicks game and a "close up" video of this same footage zoomed into

the area in the arena where the February 8, 2017 incident unfolded.   Specifically:

A-362

    a.   Attached hereto as Exhibit 2.a is a true and correct copy of the internal MSG

Arena Camera footage of the entire February 8, 2017 Knicks game, converted to

MP4 format.[1]

    b.   Attached hereto as Exhibit 2.b is a true and correct copy of the "close up" video

of the internal MSG Arena Camera footage that is zoomed in on the relevant area

in the arena where the incident occurred.

4.   Attached hereto as Exhibit 3 is a true and correct copy of a publicly available video of part of the February 8, 2017 incident, published on *The New York Times*'s website that same day as part of an article, *Former Knick Charles Oakley Is Arrested After Altercation at Madison Square Garden*, N.Y. Times (Feb. 8, 2017)—the article with the video are publicly available at the following link: https://www.nytimes.com/2017/02/08/sports/basketball/charles-oakley-new-york-knicks.html?mtrref=www.google.com.

5.   Attached hereto as Exhibit 4 is a true and correct copy of a publicly available video of the February 8, 2017 incident, published on YouTube.  The video is publicly available at the following link: https://www.youtube.com/watch?v=LWpELvHeYd8.

6.   Attached hereto as Exhibit 5 is a true and correct copy of internal MSG post-incident security footage capturing Oakley after he is escorted out of the arena in handcuffs until he is taken into an NYPD van that transports him away from MSG.  The footage is contained on four separate videos, marked, respectively, as follows:  5.a, 5.b, 5.c, and 5.d.

---

[1]  Defendants previously filed a copy of the internal MSG Arena Camera footage of the entire February 8, 2017 Knicks game and the proprietary software program needed to play that footage with their Motion to Dismiss.  *See* Dkt. No. 43–2.a.  Exhibit 2.a is the same video converted to MP4 format to comply with this Court's December 23, 2020 Order.  *See* Dkt. No. 90.

A-363

7.     The internal MSG footage submitted here in Exhibits 2.a–b and 5.a–d constitutes all of the internal footage that MSG has covering the period when Oakley was present in the arena itself and then escorted out of the arena through the Garden to an NYPD van.

8.     Attached hereto as Exhibit 6 is a true and correct copy of a sample ticket containing the standard language that appears on the back of all tickets purchased for Knicks games at Madison Square Garden.  This language states that the ticket is a "license revocable in MSG's sole discretion."  In his Amended Complaint, Oakley expressly acknowledges that he "purchased" tickets to the Knicks games he attended at the Garden, including the February 8, 2017 game, at which the incident at issue here occurred.  Those tickets, like all purchased Knicks tickets, necessarily contained this same language on the back of the ticket.  Am. Compl. ¶ 2 (Oakley "purchase[d] his own tickets to attend games at the arena"); *id.* ¶¶ 26, 28 (stating that Oakley has "purchase[d] tickets to Knicks games out of his own pocket," including "a Knicks game . . . during the 2015-2016 season").

9.     On February 2, 2018, I sent a letter to Oakley's counsel, Douglas Wigdor, that included links to, and enclosed a CD containing, these publicly-available videos of the February 8, 2017 incident:  Exhibit 1 (the ESPN broadcast), Exhibit 3 (the video from the *New York Times*), and Exhibit 4 (the video from YouTube).  Wigdor then confirmed in email correspondence that "we obviously have (and have had)" these videos.  Dkt. No. 43–15 at 2.  He further admitted that the Manhattan District Attorney's Office provided Oakley's counsel with the internal MSG camera footage of the incident in 2017 as part of discovery in the criminal case against Oakley relating to the incident.  *See* Dkt No. 43–15 at 2.  In addition, all of these videos were attached as exhibits to Defendants' Motion to Dismiss, which was filed with this Court and served on Oakley's counsel on March 30, 2018.

A-364

Executed on this 22 day of January, 2021, in New York, New York.

_Randy M. Mastro_____
Randy M. Mastro

A-365

# EXHIBIT 1

**(Video Filed And Served In Hard Copy)**

A-366

# EXHIBIT 2.a–2.b.
**(Video Filed And Served In Hard Copy)**

A-367

# EXHIBIT 2.a-2.b.

**(Video Filed And Served In Hard Copy)**

A-368

# EXHIBIT 3

**(Video Filed And Served In Hard Copy)**

A-369

# EXHIBIT 4

**(Video Filed And Served In Hard Copy)**

A-370

# EXHIBIT 5.a-5.d.

**(Video Filed And Served In Hard Copy)**