# 21-2939-CV

## United States Court of Appeals

*for the*

## Second Circuit

───────────●───────────

CHARLES OAKLEY,

*Plaintiff-Appellant,*

– v. –

JAMES DOLAN, in his individual capacity, in his professional capacity,
MSG NETWORKS, INC., MADISON SQUARE GARDEN COMPANY,
MSG SPORTS & ENTERTAINMENT, LLC,

*Defendants-Appellees.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

NELSON A. BOXER
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
(212) 370-0330

– and –

DOUGLAS H. WIGDOR
RENAN F. VARGHESE
WIGDOR LLP
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF ISSUES ................................................................. 4

STATEMENT OF THE CASE ............................................................ 4

I.      OAKLEY ATTENDS THE FEBRUARY 8, 2017, KNICKS GAME AT
        THE GARDEN ..................................................................... 4

PROCEDURAL HISTORY ................................................................ 7

I.      DEFENDANTS' MOTION TO DISMISS ("OAKLEY I") ........................ 7

II.     THIS COURT'S REMAND ("OAKLEY II") ................................... 8

III.    DEFENDANTS' PRE-ANSWER, PRE-DISCOVERY MOTION FOR
        SUMMARY JUDGMENT ("OAKLEY III") ................................ 9

SUMMARY OF THE ARGUMENT ..................................................... 11

STANDARD OF REVIEW ................................................................ 12

ARGUMENT .................................................................................. 13

I.      THE SUMMARY JUDGMENT STANDARD ............................... 13

II.     THE DISTRICT COURT ERRED IN DISMISSING OAKLEY'S
        ASSAULT AND BATTERY CLAIMS ..................................... 14

        A.      The Evidence Viewed in the Light Most Favorable to Oakley .......... 14

        B.      The District Court Improperly Narrowed Oakley's Claims ................ 17

i

C.    Defendants' Video Clips Did Not "Blatantly Contradict" Oakley's Narrative .............................................................................21

      1.    The "Limited" and "Demanding" <u>Scott</u> Exception ..................22

      2.    <u>Scott</u> Does Not Apply to Oakley's Claims ...............................27

III.    THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S REQUEST FOR ANY DISCOVERY UNDER RULE 56(D)......................33

IV.    THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S MOTION TO AMEND ................................................................................40

CONCLUSION ......................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

1077 Madison St., LLC v. Daniels,
    954 F.3d 460 (2d Cir. 2020) .............................................................. 13

Aguirre v. City of San Antonio,
    995 F.3d 395 (5th Cir. 2021) .................................................. 21, 22, 30

Aldridge v. City of Warren Mich.,
    682 F. App'x 461 (6th Cir. 2017) ................................................ 37, 38

Amnesty Am. V. Town of W. Hartford,
    361 F.3d 113 (2d Cir. 2004) ........................................... 4, 17, 19, 21

Angulo v. Brown,
    978 F.3d 942 (5th Cir. 2020) ..................................................... 36, 37

Augusta v. Cmty. Dev. Corp. of Long Island,
    363 F. App'x 79 (2d Cir. 2010) ......................................................... 25

Barbagallo v. Americana Corp.,
    25 N.Y.2d 655 (1969) ........................................................................ 19

Berman v. Williams,
    No. 17 Civ. 2757 (JGK), 2019 WL 4450810 ................................... 26

Bradshaw v. City of New York,
    855 F. App'x 6 (2d Cir. 2021) .................................................... 25, 30

Brown v. Yaspan,
    256 A.D. 991 (2d Dep't 1939) ......................................................... 14

Ceara v. Deacon,
    916 F.3d 208 (2d Cir. 2019) ....................................................... 41, 43

Coble v. City of White House, Tenn.,
    634 F.3d 865 (6th Cir. 2011) ............................................................ 23

Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,
   271 F.3d 374 (2d Cir. 2001) ............................................................... 33

Contemporary Mission, Inc. v. U.S. Postal Serv.,
   648 F.2d 97 (2d Cir. 1981) ................................................................ 35

Cross v. United States,
   336 F.2d 431 (2d Cir. 1964) ............................................................... 29

Darden v. City of Fort Worth, Texas,
   880 F.3d 722 (5th Cir. 2018) ........................................................ 22, 36

D'Elia v. 58-35 Utopia Parkway Corp.,
   43 A.D.3d 976 (2d Dep't 2007)......................................................... 41

Est. of Lopez by & through Lopez v. Gelhaus,
   871 F.3d 998 (9th Cir. 2017) ............................................................. 36

Estevez v. City of New York,
   931 N.Y.S.2d 303 (1st Dep't 2011)................................................... 26

Gambrel v. Knox Cty., Kentucky,
   No. 20-6027, 2022 WL 369348 (6th Cir. Feb. 8, 2022).................... 23

Graham v. Connor,
   490 U.S. 386 (1989) ................................................................... 17, 19

Grullon v. City of New Haven,
   720 F.3d 133 (2d Cir. 2013) ............................................................. 13

Halberstam v. Welch,
   705 F.2d 472 (D.C. Cir. 1983).......................................................... 42

Halo v. Yale Health Plan,Dir. of Benefits & Recs. Yale Univ.,
   819 F.3d 42 (2d Cir. 2016) ............................................................... 12

Harris v. The City of New York,
   No. 286042011, 62 N.Y.S.3d 411, 413, 2015 WL 13662388 (Sup. Ct. July 07,
   2015) ................................................................................................ 26

Harwe v. Floyd,
    545 F. App'x 20 (2d Cir. 2013) ........................................................... 25

Hellstrom v. U.S. Dep't of Veterans Affs.,
    201 F.3d 94 (2d Cir. 2000) ................................................... 33, 34, 35

Hemphill v. Schott,
    141 F.3d 412 (2d Cir. 1998) .............................................................. 18

Keel v. Hainline,
    331 P.2d 397 (Okl. 1958) .................................................................. 42

Kessler v. Westchester,
    461 F.3d 199 (2d Cir. 2006) .............................................................. 22

Lucente v. Cty. of Suffolk,
    980 F.3d 284 (2d Cir. 2020) .............................................................. 13

MacLeod v. Town of Brattleboro,
    548 F. App'x 6 (2d Cir. 2013) ........................................................... 26

Markhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P.,
    662 F. App'x 33, (2d Cir. 2016) ........................................................ 26

McDowell v. Sheerer,
    374 F. App'x 288 (3d Cir. 2010) ....................................................... 30

McKiernan v. Vaccaro,
    168 A.D.3d 827, (2d Dep't 2019) ...................................................... 42

McKinnon v. Bell Sec.,
    268 A.D.2d 220 (1st Dep't 2000) ...................................................... 18

Meloff v. New York Life Ins. Co.,
    51 F.3d 372 (2d Cir. 1995) ............................................................... 34

Miller v. Wolpoff & Abramson, L.L.P.,
    321 F.3d 292 (2d Cir. 2003) .............................................................. 33

N.M. v. City of New York,
  96 N.Y.S.3d 856 (1st Dep't. 2019)........................................................ 26

Noonan v. Luther,
  206 N.Y. 105 (1912)........................................................... 17, 18, 20

Oakley v. Dolan,
  833 F.App'x 896 (2d Cir. 2020) ............................................................ 8

Oakley v. Dolan,
  980 F.3d 279 (2d Cir. 2020) ....................................................... *passim*

Oakley v. Dolan,
  No. 17 Civ. 6903 (RJS), 2020 WL 818920 (S.D.N.Y. Feb. 19, 2020) ............... 7

Oakley v. MSG Networks,
  17 Civ. 6903, 2021 WL 5180229 (S.D.N.Y. Nov. 8, 2021) ...................... *passim*

Patterson v. City of Wildwood,
  354 F. App'x 695 (3d Cir. 2009)................................................... 22, 30

Pietrangelo v. Alvas Corp.,
  487 F. App'x 629 (2d Cir. 2012)..................................................... 25

Porter v. Goord,
  467 F. App'x 21 (2d Cir. 2012)...................................................... 21

Pratt v. Nat'l R.R. Passenger Corp.,
  709 F. App'x 33 (2d Cir. 2017)...................................................... 25

Ramirez v. Martinez,
  716 F.3d 369 (5th Cir. 2013) ........................................................ 21

Rastelli v. Goodyear Tire & Rubber Co.,
  79 N.Y.2d 289 (1992)............................................................... 41

Rothman v. City of New York,
  No. 19 Civ. 0225 (CM), 2019 WL 3571051 (S.D.N.Y. Aug. 5, 2019).............. 15

Scollo ex rel. Scollo v. Nunez,
  847 N.Y.S.2d 899 (Sup. Ct. 2007) ...................................................................... 42

Scollo v. Nunez,
  60 A.D.3d 840 (2009) ......................................................................................... 42

Scott v. Harris,
  550 U.S. 372 (2007) .................................................................................. *passim*

Scotto v. Almenas,
  143 F.3d 105 (2d Cir. 1998) ................................................................................. 4

Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,
  391 F.3d 77 (2d Cir. 2004) ................................................................................. 13

Smith v. United States,
  843 F.3d 509  (D.C. Cir. 2016) ..................................................................... 37, 38

Stern v. Trustees of Columbia Univ.,
  131 F.3d 305 (2d Cir. 1997) ............................................................................... 13

Sutera v. Schering Corp.,
  73 F.3d 13 (2d Cir. 1995) ................................................................................... 33

Terry v. Aschcroft,
  336 F.3d 128 (2d Cir. 2003) ............................................................................... 13

Tomassi v. Insignia Financial,
  478 F.3d 111 (2d Cir. 2007) ............................................................................... 22

Toner v. Vill. of Elkton,
  547 F. App'x 720 (6th Cir. 2013) ....................................................................... 27

United Nat. Ins. Co. v. Waterfront New York Realty Corp.,
  994 F.2d 105 (2d Cir. 1993) ......................................................................... 14, 15

Walker v. The City of New York,
  No. 150009/14, 50 N.Y.S.3d 320, 321, 2016 WL 1069936 (N.Y. Sup. Ct. Mar.
  16, 2016) ............................................................................................................. 26

Walters v. Prince George's Cty., Md.,
  438 F. App'x 208 (4th Cir. 2011) .................................................. 20, 30

Westfall v. Luna,
  903 F.3d 534 (5th Cir. 2018) ........................................................... 19

Witt v. W. Virginia State Police, Troop 2,
  633 F.3d 272 (4th Cir. 2011) ........................................................... 22

Woodward v. D'Onofrio,
  674 F. App'x 563 (6th Cir. 2017) ...................................................... 20

Zantiz v. Seal,
  602 F. App'x 154 (5th Cir. 2015) ...................................................... 27

## Other Authorities

6 N.Y.Jur.2d – Assault § 3, at 197 (1997) ............................................. 14

28 U.S.C. § 1291 ....................................................................... 3

28 U.S.C. § 1332 ....................................................................... 3

Cross-Examining Film,
  8 U. Md. L.J. Race, Religion, Gender & Class 17 (2008) ................................ 24

Fed. R. Civ. P. 15(a) ................................................................. 43

Fed. R. Civ. P. 56(c) ................................................................. 13

Fed. R. Civ. P. 56(d) .............................................................. 13, 37

In the Eyes of the Law: Perception Versus Reality in Appraisals of Video
  Evidence,
  24 Psychol, Pub. Pol'y and Law 93, 96-97 (2018) ...................................... 24

Snap Judgment: Recognizing the Propriety and Pitfalls of Direct Judicial Review
  of Audiovisual Evidence at Summary Judgment,
  83 Fordham L. Rev. 3343 (2015) ....................................................... 24

The Image Cannot Speak for Itself: Film, Summary Judgment, and Visual
  Literacy,
  48 Val. U. L. Rev. 1 (2013) .................................................................................. 24

## PRELIMINARY STATEMENT

This is the second time this matter has come before this Court. On September 25, 2020, this Court reversed that portion of a February 20, 2020 judgment of the District Court for the Southern District of New York (Sullivan, J.) dismissing Plaintiff Charles Oakley's ("Oakley") claims for assault and battery against Defendant-Appellees MSG Networks, Inc., the Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "Defendants"). This Court found that Oakley, a former star basketball player for the New York Knicks, sufficiently alleged that he was the victim of assault and battery when Defendants' security guards used unreasonable force to eject him from Madison Square Garden ("MSG" or the "Garden") while he was peacefully, and without incident, watching a basketball game. This Court emphasized that Oakley's claims were of an "intensely factual nature" and "generally best left for a jury to decide."

On remand, the District Court did not, in fact, leave these fact issues to a jury. Remarkably, it did not even permit Plaintiff to take discovery or require Defendants to file an answer. Rather, relying on <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the District Court disregarded Oakley's sworn first-hand account and granted summary judgment to Defendants because, in the District Court's view, Oakley's narrative was "blatantly contradicted" by Defendants' self-curated video

clips, one of which was, according to the District Court, "[l]ow resolution, silent security footage."

Once again, the District Court erred by assuming the role of factfinder. The evidence viewed in the light most favorable to Plaintiff supports his claims of assault and battery. The evidence shows Oakley entering the arena, watching the game unobtrusively and interacting cordially with fans and arena staff. There is no indication that Oakley is creating any disturbance (contrary to Defendants' later false explanation that Oakley had to be removed because he was intoxicated and acting belligerently). Nonetheless, at the apparent direction of Knicks' owner James Dolan ("Dolan"), at least half-a-dozen security personnel gather in the aisle next to Oakley. Dolan suddenly makes an aggressive downward pointing gesture, apparently directing the guards to "take Oakley down." The guards immediately march toward and surround the seated Oakley on three sides, in an obvious show of force. According to Oakley, the guards demand that Oakley leave the Garden. He does not refuse but asks why. The guards respond by berating Oakley, demanding to know why Oakley is seated so close to Dolan. A physical altercation ensues.

In Oakley's telling, (and as confirmed by the video clips) as he stands, one of the guards pushes him in the chest while the others grab and pull him backwards. When Oakley raises his arms up in a universal sign of non-aggression

and proceeds towards the stairs, which is evidence of Oakley's effort to comply with Defendants' orders, the guards push him to the ground. As Oakley gets to his feet, he is again grabbed by several guards and is roughly pushed and/or pulled towards the exit (despite not resisting their efforts), at which point they again drag him to the ground.

Defendants failed to present any testimony from the participants to the assault denying Oakley's account, including that Oakley was, among other things, twice pushed to the ground. The District Court nevertheless assumed the role of factfinder and rejected Oakley's telling based on its own interpretation of the video clips. According to the District Court, Oakley "tripped" or fell on his own, even though Oakley's legs and feet are not visible in the video clips, which show the guards making contact with Oakley as Oakley goes to the ground. Apparently, it was mere coincidence that Oakley—a former world class athlete—twice ended up on the ground in the span of minutes after Dolan's "take him down" gesture.

As fully set forth below, the District Court's dismissal of Oakley's claims, refusal to permit discovery and subsequent denial of Plaintiff's request to amend his complaint amounted to reversible error.

## STATEMENT OF JURISDICTION

The District Court had original jurisdiction pursuant to 28 U.S.C. § 1332. This Court's jurisdiction is based upon 28 U.S.C. § 1291, as this is an appeal from

a final decision of the District Court. The District Court's judgment was entered

on November 22, 2021. SPA-11. Plaintiff timely noticed an appeal on November

24, 2021. A-549.

## STATEMENT OF ISSUES

I.      Did the District Court err in granting Defendants' motion for summary judgment?

II.     Did the District Court err in holding that the videos submitted by Defendants showed, as a matter of law, that the amount of force used against Oakley was not objectively unreasonable?

III.    Did the District Court err in preventing Oakley taking discovery to adduce evidence in support of his assault and battery claims?

IV.    Did the District Court err in refusing to grant Oakley leave to amend his complaint?

## STATEMENT OF THE CASE

## I.    OAKLEY ATTENDS THE FEBRUARY 8, 2017, KNICKS GAME AT THE GARDEN

The facts recited below are in the light most favorable to Oakley, the

nonmovant, with all ambiguities and reasonable inferences resolved in his favor.

See Amnesty Am. V. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004)

(Sotomayor, J.) (citing Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

On February 8, 2017, Oakley attends a Knicks game at Madison Square

Garden ("MSG" or the "Garden"). A-495.[1] He is neither intoxicated nor

---

[1]     "A-" refers to pages of the Appendix.

otherwise behaving inappropriately.  Id.  Instead, Oakley proceeds to his seat

without incident.  Id.  Once seated, Oakley continues to behave unobtrusively,

genially interacting with fans and MSG employees as he watches the game.  A-

367 at 0:38-4:26, 4:55-5:40, A-473-475, 495, 496.

During a stoppage in play, a security guard approaches Dolan, who is

seated one row in front of Oakley, and speaks to Dolan at length.  A-367 at 6:18-

7:14, A-475.  Shortly thereafter, the guard approaches Oakley's row, stops and

touches his ear, indicating that he is communicating through an earpiece.  A-367

at 7:14-16, A-476.  Additional security guards then emerge from a nearby tunnel

and a group of guards assemble at the end of the aisle in which Oakley is seated.

A-367 at 7:17-25, A-476.

Suddenly, Dolan signals the guards with an aggressive downward-pointing

motion, apparently directing them to "take Oakley down."  A-367 at 7:33-44, A-

476.  The guards immediately march in almost military-like formation towards

Oakley, surrounding him on three sides.  A-367 at 7:44-8:01, A-476, 496.  One

guard stands in the aisle immediately to Oakley's right; a few stand in front of

Oakley; and several stand towards the end of the aisle to Oakley's left.  Id.  They

demand that he leave the arena.  A-496.

Understandably confused because he had done nothing to warrant ejection,

Oakley asks the guards why he is being required to leave.  A-496.  Rather than

provide an explanation, the guards berate him about why he is sitting so close to "Dolan." Id. Oakley remains seated during this conversation, with his hands in his lap, as the guards hover over and around him. A-367 at 8:02-18, A-476, 496. The guard blocking the aisle to Oakley's right appears to make a gesture with his hands indicating that Oakley should stand. Id.

Oakley subsequently stands and is pushed backward by one of the guards, while the other guards pull Oakley backwards. A-367 at 8:12-28, A-445-446, 477, 487, 496. Oakley proceeds to raise his arms in a sign of non-aggression and walks in the direction of the stairs (and the exit). A-367 at 8:26-41, A-369 at 0:06-16, A-448-449, 477, 486-487, 496. He then feels one of the guards push him from behind, causing him to fall to the ground. A-367 at 8:35-41, A-369 at 0:06-16, 448-449, 477, 486-487, 496. Oakley gets to his feet worried that he will be attacked again and consequently pushes away the guards who attempted to grab him. A-369 at 0:26-1:05, A-477, 497. Thereafter, several guards grab Oakley and drag him out of the Garden, even though he does not resist their attempts. A-497. As Oakley is being dragged, he cannot move on his own and is subsequently pulled or thrown to the ground near the exit ramp. A-365 at 0:22-26, A-367 at 9:28-36, A-368 at 0:40-51, A-369 at 1:01-25, A-460-461, 478-479, 488, 497.

# PROCEDURAL HISTORY

## I.    DEFENDANTS' MOTION TO DISMISS ("OAKLEY I")

On September 12, 2017, Plaintiff filed this action alleging, among other

things, assault and battery.  A-16-36.  On March 30, 2018, Defendants moved to

dismiss pursuant to Rule 12(b)(6).[2]  Oakley v. Dolan, No. 17 Civ. 6903, Dkt. No.

42 (S.D.N.Y.).  According to Defendants, the video clips demonstrated that

Oakley instigated the altercation and therefore their own use of force was justified.

Id., Dkt. No. 42, at pp. 5-8, 13-14, 32-34.   Defendants sought a stay of discovery,

which the District Court granted over Oakley's objection.  Id., Dkt. No. 38.

On February 19, 2020, the District Court granted Defendants' motion to

dismiss.  Oakley v. Dolan, No. 17 Civ. 6903 (RJS), 2020 WL 818920, at *17

(S.D.N.Y. Feb. 19, 2020) ("Oakley I").  According to the District Court,

Defendants had the right to use reasonable force to expel Oakley once Oakley

refused to leave the arena.  Id. at 13.  Moreover, in the District Court's view,

Plaintiff failed to "allege that the guards intended to injure him," that they

"gratuitously punched or kicked him or that any of the physical contact was

---

[2]    The District Court gave Defendants the opportunity to move for summary
judgment based on the video clips but they refused to do so.  A-66, 84-85.  After
this Court reinstated Plaintiff's assault and battery claims, Defendants moved for
summary judgment based on the exact same evidence and arguments available to
them when they initially moved to dismiss, effectively getting a second bite at the
apple.  The District Court should have denied Defendants' motion for summary
judgment on this basis alone.

unnecessary or malicious," or "that the force used by Garden officials was unreasonable." Id. at 13-14.

## II.    THIS COURT'S REMAND ("OAKLEY II")

On November 16, 2020, this Court reversed the District Court and reinstated Oakley's assault and battery claims. Oakley v. Dolan, 980 F.3d 279 (2d Cir. 2020) ("Oakley II").[3] This Court found that the District Court appeared to have "somewhat misunderstood" Oakley's claim. Id. at 283. Plaintiff's assault and battery claims were not premised on the idea that "any act of removal was unreasonable." Id. at 283. Instead, Plaintiff properly alleged that the guards "used excessive force in accomplishing the removal." Id. For instance, Oakley alleged that the guards "grabbed him, pushed him to the ground and forcibly shoved him to the ground;" that when Oakley "got back to his feet, he was grabbed by six officials and thrown onto the ground;" and that these actions "greatly exceeded the amount of force that was necessary" and "clearly exceeded the bounds of reasonable behavior." Id. (internal quotations and citations omitted). According to this Court, a determination of whether the amount of force used is reasonable is an "intensely factual" determination that "is generally best left for a jury to decide." Id. at 284.

---

[3]    In an accompanying Summary Order, this Court affirmed the District Court's dismissal of Plaintiff's defamation, discrimination and false imprisonment claims. Oakley v. Dolan, 833 F.App'x 896 (2d Cir. 2020).

This Court also found that the District Court erred in relying on <u>Kalfus v. N.Y. Presbyerian Hosp.</u>, 476 App'x 877 (2d Cir. 2012), because that case was "significantly different." <u>Id.</u> at 283-284. First, <u>Kalfus</u> was decided "on a motion for summary judgment." <u>Id.</u> at 284. Second, <u>Kalfus</u> involved the use of force in a criminal context where the defendants were attempting to "handcuff [the plaintiff] during an arrest," which must necessarily "take[] into account 'the severity of the crime' for which the arrest is being made." <u>Id.</u> By contrast, "the Garden security officers who threw Oakley to the ground were not trying to handcuff a person whom they had the authority to arrest." <u>Id.</u> Rather, they were merely "trying to remove a person [Oakley] whose license to remain on private property has been revoked." <u>Id.</u> The amount of force permissible in this "civil context" is not necessarily the same. <u>Id.</u> Finally, this Court ruled that "[e]ven in the arrest context, the reasonableness of the force used is often a jury question." <u>Id.</u>

## III. DEFENDANTS' PRE-ANSWER, PRE-DISCOVERY MOTION FOR SUMMARY JUDGMENT ("OAKLEY III")

On remand, Defendants immediately requested permission to move for summary judgment relying, once again, on the video clips. A-252-254. Plaintiff (1) opposed the request because he had not had any opportunity to conduct discovery and on the merits and (2) requested permission to add Dolan as an individual Defendant. A-255-257, 258-312.

On November 8, 2021, the District Court (1) refused to permit Oakley to take any discovery; (2) granted Defendants' motion for summary judgment; and (3) denied Oakley permission to amend his complaint. Oakley v. MSG Networks, 17 Civ. 6903, 2021 WL 5180229, at *4 (S.D.N.Y. Nov. 8, 2021) (hereinafter "Oakley III"). According to the District Court, the "sole issue to adjudicate in Oakley's remaining assault and battery claims was whether 'the security guards used excessive force in accomplishing [Oakley]'s removal.'" Id. at *2 (quoting Oakley II, 980 F.3d at 283). In the District Court's view, because a property owner has the right to remove anyone from his property for any reason, Defendants' "rationale for removing Oakley is not an issue." Id.

Relying on Scott v. Harris, 550 U.S. 372 (2007), the District Court found that the video clips "blatantly contradicted" Plaintiff's allegations. Oakley III, 2021 WL 5180229 at *4. According to the District Court, the video clips show that Oakley alternatively "trips" and "loses his footing" on the two occasions he alleged that he was pulled, pushed and/or dragged to the ground. Id. at *6. As a result, the District Court found that Defendants did not use unreasonable force, granting summary judgment in its entirety. Id. at *8.

Finally, the District Court denied Plaintiff's motion to amend on the basis that Plaintiff failed to prove that Defendants committed the underlying assault and battery such that Dolan could also be found liable for this conduct. Id.

Judgment was entered on November 22, 2021, and Oakley timely appealed on November 24, 2021. SPA-11, A-541-542.

## SUMMARY OF THE ARGUMENT

The District Court's decision to grant summary judgment was based on a series of legal and factual errors. First, the District Court ignored settled jurisprudence that, at the summary judgment stage, a court must view the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences in its favor. Viewed from this perspective, Plaintiff presented sufficient evidence from which a jury could conclude that he was the victim of an assault and battery. Oakley's affirmation, substantially confirmed by the video clips, stated that Oakley was watching a basketball game unobtrusively from his seat; was approached and surrounded by at least six large guards who demanded that he leave; Oakley did not refuse but merely asked for an explanation; after which Oakley was, among other things, pushed, pulled and twice thrown to the ground.

Second, the District Court erroneously relied on Scott v. Harris, 550 U.S. 372 (2007), to make factual determinations that were the exclusive province of the jury. Scott is a "limited" and "demanding" exception to traditional summary judgment procedures that does not apply where, as here, the issues to be resolved are fact intensive, and the video clips are unclear and incomplete. In short, Scott

does not permit a court to interpret, draw inferences and fill in gaps in select pieces of evidence to the exclusion of all other evidence, including a plaintiff's sworn testimony. By way of example only, the District Court concluded that Oakley was not pushed to the ground but "tripped" on his own. But Oakley's legs and feet are not visible in the video clips, making it impossible to draw this conclusion without improperly viewing the evidence from Defendants' perspective.

Third, many of the factual issues, such as *inter alia,* Defendants' intent in using force, whether Oakley's behavior justified the use of any force at all, and the amount of force Defendants used, could only have been properly considered after both sides had the opportunity to take discovery. Or, in the parlance of <u>Scott</u>, to fully "tell [their] two different stories." <u>Id.</u> at 380.

Finally, the District Court erred by refusing Plaintiff's motion to amend to add assault and battery claims against Dolan, who is shown in the video clips signaling the assault on Oakley.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a district court's grant of summary judgment. <u>Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.</u>, 819 F.3d 42, 47 (2d Cir. 2016) ("We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against

which summary judgment was granted and drawing all reasonable inferences in its favor") (internal citations omitted). This Court reviews a district court's refusal to permit additional discovery under Fed. R. Civ. P. 56(d) for abuse of discretion. 1077 Madison St., LLC v. Daniels, 954 F.3d 460, 463 (2d Cir. 2020). This Court reviews a district court's refusal to grant leave to amend a complaint for abuse of discretion. Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013).

## ARGUMENT

## I. THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "The burden is on the moving party to establish the absence of any material factual issues." Terry v. Aschcroft, 336 F.3d 128, 137 (2d Cir. 2003). Moreover, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against who summary judgment is sought." Id. (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997)). In short, if "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is inappropriate." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004) (quotation omitted); Lucente v. Cty. of Suffolk, 980 F.3d 284, 296 (2d Cir. 2020) ("Summary judgment dismissing a claim is inappropriate when the admissible

materials in the record make it arguable that the claim has merit") (internal

quotation omitted).

## II.    THE DISTRICT COURT ERRED IN DISMISSING OAKLEY'S ASSAULT AND BATTERY CLAIMS

The District Court erred in holding that Oakley could not, as a matter of law,

prove his assault and battery claims because no material facts were in dispute.

### A.    The Evidence Viewed in the Light Most Favorable to Oakley

Though often brought together, civil assault and battery are separate claims.

A plaintiff is assaulted where the defendant places him "in fear of imminent

harmful or offensive contact."  United Nat. Ins. Co. v. Waterfront New York

Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993).  Importantly, the plaintiff need

not show the actual use of force, only that the defendant's conduct placed him in

fear that such force would be used.  Brown v. Yaspan, 256 A.D. 991 (2d Dep't

1939).  In other words, "[t]here may be an assault without the striking of a blow or

other physical contact."  Id.

A plaintiff suffers a battery where the defendant initiates "intentional

wrongful physical contact . . . without consent."  United Nat. Ins. Co., 994 F.2d at

108.  Even "the slightest unlawful touching of the person of another is sufficient"

to prove a battery.  Id. (quoting 6 N.Y.Jur.2d – Assault § 3, at 197 (1997)).

Here, the evidence viewed in the light most favorable to Oakley was more

than sufficient for a reasonable factfinder to conclude that Oakley had been

assaulted. Oakley is neither intoxicated nor behaving inappropriately at the basketball game. A-495-96. He proceeds to his seat, where he watches the game unobtrusively and interacts cordially with fans and arena employees. A-367 at 0:38-4:26, 4:55-5:40, A-473-475, 495. As he does so, a group of least six guards assemble at an adjoining exit ramp. A-367 at 7:17-25, A-476. Suddenly, Dolan signals to the guards using an aggressive downward point gesture, causing the guards to march towards and surround Oakley as he remains seated. A-367 at 7:42-8:14, A-476, 496. The guards demand that Oakley leave, without providing any explanation. A-496. Confused, Oakley asks why he is being forced to leave since he had done nothing wrong, as anyone in his position would have. Id. One of the guards berates Oakley, demanding to know why he was seated so close to Dolan. Id. This sudden and hostile show of physical force can certainly lead a reasonable factfinder to conclude that Oakley had been placed "in fear of imminent harmful or offensive contact." United Nat. Ins. Co., 994 F.2d at 108; see Rothman v. City of New York, No. 19 Civ. 0225 (CM), 2019 WL 3571051, at *17 (S.D.N.Y. Aug. 5, 2019) (finding plaintiff sufficiently alleged he was in fear of imminent contact to state assault claim).

Oakley also presented sufficient evidence that he suffered a battery. As Oakley stands up from his seat, one guard pushes him while others grabs him from behind, pulling him backwards. A-367 at 8:02-8:28, A-445-446, 476-477,

487, 496.  Oakley moves his arms to escape their hold.  A-367 at 8:26-8:41, A-369 at 0:06-16, A-448-449, 477, 486-487, 496.  Oakley then raises his arms—a universal pose of non-aggression—and walks towards the stairs only to be pushed from behind, causing him to fall to the ground.  Id.  After Oakley gets to his feet, the guards again surround him.  A-367 at 8:26-8:41, A-369 at 0:06-16, A-448-449, 477, 486-487, 496, 497.  Afraid, Oakley slaps one of the guard's arms to avoid further physical contact.  A-369 at 0:26-1:05, A-477, 497.  The guards proceed to grab Oakley by the arms, chest and back, pushing and pulling him out of the arena.  A-365 at 0:23-26, A-368 at 0:40-46, A-369 at 1:01-10, A-478, 497.  Oakley does not resist.  A-369 at 1:02-1:10, A-478, 497.  The guards continue to push and pull Oakley to the exit ramp, causing him to fall once again.  A-365 at 0:21-24, A-367 at 9:31-36, A-368 at 0:40-51, A-369 at 1:01-25, A-463-464, 478-479, 488, 497.  Oakley asks to be able to stand as the guards loom over him.  A-369 at 1:12-25, 1:46-2:21, A-479, 497.  Oakley then grabs the railing of the ramp, as another guard attempts to pry his fingers loose.  A-497-498.  Once again, a reasonable factfinder could conclude from this testimony, which the District Court was required to credit, that Oakley was the victim of a battery and continued assault.

### B.    The District Court Improperly Narrowed Oakley's Claims

In dismissing Oakley's claims, the District Court reasoned that the "sole issue" to be decided was whether the guards used "excessive force" in removing Oakley because Defendants had the right to demand that Oakley leave the arena. Oakley III, 2021 WL 5180229 at *4.  As a result, the District Court limited its inquiry to only those "critical moments" when the guards actually applied force on Oakley.  Id. at *5.  The District Court's reasoning on both issues was wrong.

It is true that a property owner has the right to ask a licensee to leave, and "to use reasonable force to eject [the licensee]" where the licensee refuses. Noonan v. Luther, 206 N.Y. 105, 108 (1912).  But this does not permit a factfinder—or the court on summary judgment—to disregard the context in which the use of force occurred.  Quite the contrary, "circumstances" matter, Oakley II, 980 F.3d at 284 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)), and a factfinder "must" consider "the totality of the circumstances" in deciding whether the use of force was reasonable.  Amnesty America, 361 F.3d at 123.

For instance, police officers "handcuffing a person being arrested" are afforded particular deference[4] because the "circumstances . . . are tense, uncertain and rapidly evolving."  Oakley II, 980 F.3d at 284.  Even here, however, a

---

[4]    By contrast, the same level of force "is not necessarily reasonable in the civil context to remove a person whose license to remain on private property has been revoked."  Oakley II, 980 F.3d at 284.

factfinder must consider the "severity of the crime" (i.e., the reason for the ejection), among other things, in assessing whether the force used was reasonable. Id.; see Hemphill v. Schott, 141 F.3d 412, 417 (2d Cir. 1998) (the court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight").

Here, the District Court refused to consider any of the requisite "circumstances," surrounding Defendants' use of force, instead limiting its analysis to what it deemed to be the "critical moments" when the force was applied. Oakley III, 2021 WL 5180229 at *4-5. But these circumstances, which are akin to the "severity of the crime" analysis in the excessive force context, are unquestionably relevant to Plaintiff's assault and battery claims. For instance, evidence of Oakley's pre-assault conduct (peacefully watching the game, calmly engaging with fans and arena staff) is critical to assessing whether Defendants' initial show of force, and the subsequent quanta of force used, was reasonable. See Noonan, 206 N.Y. at 108 (defendants may use "reasonable" force only if "after having afforded her a reasonable opportunity to leave, or while she was behaving in a disorderly manner, she refused to go") (emphasis added); McKinnon v. Bell Sec., 268 A.D.2d 220, 221 (1st Dep't 2000) (reversing summary judgment because "the trier of fact must determine whether plaintiff's

demeanor and behavior aggressively precipitated the confrontation, to the extent of relieving defendant of responsibility"); Barbagallo v. Americana Corp., 25 N.Y.2d 655, 656 (1969) (evidence of the plaintiff's behavior prior to the assault and of the defendant's state of mind relevant in determining whether force was justified).  In other words, the District Court was required to, but did not, consider what Oakley did to justify the use of force—the purported "severity of [Oakley's] crime." Oakley II, 980 F.3d at 284; see Amnesty America, 361 F.3d at 123 (determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue") (quoting Graham, 490 U.S. at 396).[5]

Likewise, the reason Dolan amassed a small army to surround and confront a seated Oakley is critical to making the intensely factual determination of how much force was appropriate to effectuate Oakley's removal from the Garden.  See

---

[5]    Contrary to the District Court's analysis, Oakley was not trying to "relitigate" the justification for his ejection. Oakley III, 2021 WL 5180229 at *5. Rather, he argued that because his behavior was not improper (despite Dolan's later attempt to claim otherwise), the amount of force Defendants' guards used against him was unreasonable.  In other words, there is a fundamental difference between the reasons that Defendants asked Oakley to leave (which is ultimately not at issue in this case) and the reasons that Defendants believed that they needed to use force to effectuate his removal (which is at issue here).  For example, in the criminal context, an arrestee need not challenge the basis for his arrest but may nonetheless argue that the amount of force used to effectuate his arrest was excessive because he was only suspected of a non-violent, minor crime.  Westfall v. Luna, 903 F.3d 534, 548 (5th Cir. 2018) (amount of force used was unreasonable given that the plaintiff's crime was a "minor offense").

Noonan 206 N.Y. at 108 (explaining that the defendant "could not inflict violence to [the plaintiff] for punishment or through passion, but simply for the purpose of removing her. Therefore, his intent in using force, which he conceded he used to some extent, was the first thing for him to establish") (emphasis added); Walters v. Prince George's Cty., Md., 438 F. App'x 208, 210 (4th Cir. 2011) (denying summary judgment because "material issues" such as "intent of the officers" and "the extent of the danger [the plaintiff] posed" could not be determined from the video); Woodward v. D'Onofrio, 674 F. App'x 563, 565 (6th Cir. 2017) (summary judgment inappropriate where videos did not "establish D'Onofrio's intent at the time of impact").

Further, the District Court assumed that Defendants "afforded [Oakley] a reasonable opportunity to leave" the Garden despite the issue being in dispute. Noonan, 206 N.Y. at 108. Less than thirty seconds elapsed between the time Defendants surrounded Oakley at Dolan's direction and when Oakley was first pushed or pulled backwards as he rose from his seat. A-367 at 7:14-8:28, A-476-477, 496. According to Oakley, he did not refuse to leave the Garden, but merely wanted to know why he was being ejected. A-496. A factfinder certainly could have credited Oakley's testimony (as the District Court was required to given that there is nothing in the record to contradict it) and concluded that Defendants' subsequent use of force in response to Oakley's questions was unreasonable under

20

New York law.[6] See, e.g., Porter v. Goord, 467 F. App'x 21, 23 (2d Cir. 2012) (finding that summary judgment inappropriate where video did not fully capture incident and the plaintiff denied provoking the defendants); Aguirre v. City of San Antonio, 995 F.3d 395, 411 (5th Cir. 2021) (summary judgment inappropriate on excessive force case where video did not show that the plaintiff was "was resisting, struggling, or at all uncooperative when the Officers walked him over to the hood of the car"); Ramirez v. Martinez, 716 F.3d 369, 374 (5th Cir. 2013) (denying summary judgment where the video did not clearly demonstrate the circumstances that led to the use of force).

### C.    Defendants' Video Clips Did Not "Blatantly Contradict" Oakley's Narrative

Relying on Scott v. Harris, 550 U.S. 372 (2007), the District Court dismissed Oakley's claims on the merits without the opportunity for any discovery or even an Answer by the Defendants, based on two relatively short video clips. Oakley III, 2021 WL 5180229 at *6-7. According to the District Court, these

---

[6]    That Oakley questioned the reason for his ejection is hardly a refusal to leave and certainly did not give Defendants license to physically assault Oakley. Indeed, this Court has found it necessary to impanel a jury even where the unrebutted evidence showed that, unlike here, the arrestees actively refused to leave and "purposefully made themselves more difficult to arrest or carry by chaining themselves together and covering their hands with maple syrup to impede the use of handcuffs." Amnesty America, 361 F.3d at 124.

clips "blatantly contradicted" Oakley's version of the event.  Id.  This, too, was error.

### 1.     The "Limited" and "Demanding" <u>Scott</u> Exception

As explained above, "the judge's function [on summary judgment] is not. . . to weigh the evidence and determine the truth of the matter."  <u>Kessler v. Westchester</u>, 461 F.3d 199, 206 (2d Cir. 2006).  Rather, the judge must resolve all ambiguities and draw all inferences in favor of the non-moving party (in this case, Oakley).  <u>Tomassi v. Insignia Financial</u>, 478 F.3d 111, 116 (2d Cir. 2007).  A court may deviate from this near universal practice and disregard a party's version of events only where the non-movant's narrative is so "blatantly contradicted by the record, so that no reasonable jury could believe it."  <u>Scott</u>, 550 U.S. at 380. However, this is a "limited exception," <u>Patterson v. City of Wildwood</u>, 354 F. App'x 695, 697 (3d Cir. 2009), that imposes a "demanding" burden on the movant.  <u>Darden v. City of Fort Worth, Texas</u>, 880 F.3d 722, 730 (5th Cir. 2018); <u>see</u> <u>also</u> <u>Aguirre</u>, 995 F.3d at 410-411.  It applies only where "the video evidence provides so much clarity that a reasonable jury could not believe [the non-movant's] account."  <u>Id.</u>

Importantly, the narrow <u>Scott</u> exception does not permit a court to "reject a plaintiff's account . . . whenever documentary evidence, such as a video, offers <u>some</u> support for [the movant's] version of events."  <u>Witt v. W. Virginia State</u>

Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (emphasis in original).

Instead, "[e]ven if a part of [the plaintiff's] testimony is blatantly contradicted by

[a] recording, that does not permit the district court to discredit his entire version

of the events. We allow cases to proceed to trial even though a party's evidence is

inconsistent." Coble v. City of White House, Tenn., 634 F.3d 865, 870 (6th Cir.

2011); see also Gambrel v. Knox Cty., Kentucky, No. 20-6027, 2022 WL 369348,

at *7 (6th Cir. Feb. 8, 2022) (refusing to reject the plaintiff's version of events

even where the defendants' evidence "starkly conflicts" with his evidence).

The dangers of misusing the narrow Scott exception are particularly acute

where, as here, a court purports to interpret and contextualize audio-video

recordings. As one commentator aptly explained:

> [J]udges educated in the law have been taught to interpret
> and dissect briefs and oral arguments and therefore
> approach these tools of advocacy with a healthy
> skepticism and with legal knowledge of their own. Yet
> when it comes to an audiovisual record, it is very difficult
> to overcome the deeply ingrained adages that "seeing is
> believing," and the power of seeing through one's "own
> eyes" or hearing with one's "own ears" is approached with
> little suspicion.

Denise K. Barry, Snap Judgment: Recognizing the Propriety and Pitfalls of Direct

Judicial Review of Audiovisual Evidence at Summary Judgment, 83 Fordham L.

Rev. 3343, 3385 (2015). In other words, "courts and legal actors lack a critical

vocabulary of the visual, and without visual literacy, they are more likely to be

unduly credulous in the face of images."  Naomi Mezey, <u>The Image Cannot Speak for Itself: Film, Summary Judgment, and Visual Literacy</u>, 48 Val. U. L. Rev. 1, 3 (2013).

Even well-meaning jurists are susceptible to the fiction that videos are a type of "super evidence" that is conclusive and can therefore resolve all factual disputes.  <u>See</u> Jessica Silbey, <u>Cross-Examining Film</u>, 8 U. Md. L.J. Race, Religion, Gender & Class 17, 26 (2008) ("Film makes spectators feel as though they are witnessing the event or object as the event or object existed when filmed. However, film re-presents the event or object as something never before seen"). But all videos are curated by both the camera and operator.  For example, the placement of the camera angle is likely to influence the opinion of the viewer. <u>See</u> Yael Granot, <i>et. al</i>., <u>In the Eyes of the Law: Perception Versus Reality in Appraisals of Video Evidence</u>, 24 Psychol, Pub. Pol'y and Law 93, 96-97 (2018) ("research finds that camera angles that show events from another's perspective may increase empathy with that person, whether the person is a victim or a perpetrator"); Mezey, 48 Val. U. L. Rev. 1, 8 (judges who fail to consider factors such as "the position of the camera, the angle and the way the images are framed" can "forget that cameras frame the images they capture and render unseen those things outside the frame; that they always situate the viewer relative to the image;

that film and video narrate as well as depict; and that images have different meanings in different contexts to people with different ways of seeing").

As such, courts, including this one, typically rely on <u>Scott</u> to decide simple, discrete facts that require virtually no interpretation.  <u>See</u> <u>Bradshaw v. City of New York</u>, 855 F. App'x 6, 10 (2d Cir. 2021) (video evidence showed that plaintiff was not, in fact, punched in the face); <u>Pratt v. Nat'l R.R. Passenger Corp.</u>, 709 F. App'x 33, 34 (2d Cir. 2017) (video evidence demonstrated that train horn blew before impact with decedent); <u>Pietrangelo v. Alvas Corp.</u>, 487 F. App'x 629, 632 (2d Cir. 2012) (plaintiff's allegation that his free speech was restricted because he was directed to "picket on a strip of grass adjacent to the sidewalk rather than on the sidewalk itself" was "blatantly contradicted by the photographs of the area . . . which reveal that the strip of grass is virtually identical to the sidewalk in a relevant respects, including visibility to pedestrians and vehicles"). And often, it is the plaintiff's own testimony, in combination with other evidence, that allows a court to meet the demanding <u>Scott</u> requirements.  <u>See</u> <u>Harwe v. Floyd</u>, 545 F. App'x 20, 22 (2d Cir. 2013) ("from plaintiff's themselves and their cell phone records, as well as police department records," court concluded that stop lasted only half hour); <u>Augusta v. Cmty. Dev. Corp. of Long Island</u>, 363 F.

App'x 79, 80 (2d Cir. 2010) ("plaintiff's own testimony" contradicted his claims).[7]

Moreover, in virtually all cases, including Scott itself, courts make the determination after both sides have had at least some opportunity to conduct discovery. See MacLeod v. Town of Brattleboro, 548 F. App'x 6, 8 (2d Cir. 2013) (citing deposition testimony); Berman v. Williams, No. 17 Civ. 2757 (JGK), 2019 WL 4450810, at *5, n. 2 (S.D.N.Y. Sept. 17, 2019) (referring to plaintiff's deposition testimony); N.M. v. City of New York, 96 N.Y.S.3d 856 (1st Dep't. 2019) ("NM acknowledged that he resisted the officers' attempts to handcuff him"); Harris v. The City of New York, No. 286042011, 2015 WL 13662388, at *2 (Sup. Ct. July 07, 2015), aff'd 62 N.Y.S.3d 411, 413 (2d Dep't 2017) (referring to plaintiff's testimony); Walker v. The City of New York, No. 150009/14, 2016 WL 1069936, at *2 (N.Y. Sup. Ct. Mar. 16, 2016), aff'd 50 N.Y.S.3d 320, 321 (1st Dep't 2017) (same); Estevez v. City of New York, 931 N.Y.S.2d 303, 303 (1st Dep't 2011) (referring to the defendant's testimony).

---

[7]     Documents, or their absence, can also at times meet the Scott exception. see Markhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P., 662 F. App'x 33, 35, (2d Cir. 2016) ("overwhelming documentary evidence" and the absence of any "evidence of a fee arrangement," "retainer or contract" contradicted plaintiff's allegation of an attorney-client relationship, dooming his legal malpractice claim).

## 2. <u>Scott</u> Does Not Apply to Oakley's Claims

The District Court here ignored these critical guardrails. First, <u>Scott</u> does not permit a court to reject a plaintiff's version of events merely because defendant's evidence (video or otherwise) somewhat—or even probably—contradicts the plaintiff's narrative. Rather, the contradiction must be so "blatantly" clear that no rational jury could possibly find in the plaintiff's favor. <u>Scott</u>, 550 U.S. at 380. Where there is any doubt, the fundamental rules of summary judgment apply and the resolution of any disputes must be left to the fact finder. See <u>Toner v. Vill. of Elkton</u>, 547 F. App'x 720, 724 (6th Cir. 2013) ( "where plaintiff's testimony is only partially contradicted by audio and video recordings, that does not permit the district court to discredit his entire version of the events.") (internal quotations omitted); <u>Zantiz v. Seal</u>, 602 F. App'x 154, 161 (5th Cir. 2015) (<u>Scott</u> does not apply where the video only partially or somewhat contradicts the plaintiff's version of events).

Here, substantial portions Defendants' video clips corroborate Oakley's narrative and, in some cases, "blatantly contradict" *Defendants'* version of events. The video clips show that Oakley enters the arena; sits down and watches the game without incident (disproving Dolan's false allegations that Oakley was expelled from the arena for being drunk and verbally abusive to fans and stadium staff, A-102-104); numerous guards assemble in an aisle near Oakley for no

apparent reason; Dolan signals the guards; who then march towards and surround Oakley who remains seated. A jury could certainly conclude from these corroborative facts that Defendants—who obviously contrived a justification for ejecting Oakley—were not simply exercising a property owner's legitimate right to use force to remove a disruptive patron, but were instead intent on physically intimidating (assault) and forcibly ejecting (battery) Oakley irrespective of how he responded to their demand that he leave.

Second, unlike the cases cited above, see supra at p. 25, the video clips in this matter do not speak to the resolution of simple, objective facts such whether a punch was thrown or when a horn blew. Instead, the District Court relied on the video clips to inappropriately characterize events in a way that either minimized or justified Defendants' conduct. For example, the District Court found that the "the video footage conclusively shows the MSG guards giving Oakley ample opportunity to leave the arena peaceably, under his own power." Oakley III, 2021 WL 5180229 at *5. But this factual finding is not facially supported by the video clips. These clips are silent as to what was said in the moments during which the guards initially confront Oakley, making it impossible to determine, without testimony, what the guards and Oakley say to each other. Instead, the clips show that less than thirty seconds elapsed between the time that the guards confront Oakley and the first time they push or pull Oakley backwards when he rises from

his seat.  A-367 at 7:42-8:28, A-476-477, 496.  There is nothing in the video clips that conclusively demonstrates Oakley was given "ample opportunity to leave," as the District Court found.

As another example, the District Court described one guard as "lightly placing his open hand" on Oakley and another as "grasping Oakley's left bicep, trying to pull him toward the exit aisle."  <u>Oakley III</u>, 2021 WL 5180229 at \*2.  But the amount of force used or the purpose of a guard's grasp of Oakley are conclusions that were not within the District Court's personal knowledge and could not be determined at this early stage.  <u>See</u> <u>Cross v. United States</u>, 336 F.2d 431, 433 (2d Cir. 1964) (district courts should not draw inferences about intent at summary judgment).  Naturally, these improper characterizations by the District Court, among others, ultimately led the District Court to draw fact-based conclusions, such as that Oakley "escalates the physical confrontation."  <u>Oakley III</u>, 2021 WL 5180229 at \*2.

Third, the District Court filled in critical gaps with its own version of events where important details were obscured or inconclusive in the video clips.  Most notably, the District Court concluded that, during the confrontation, Oakley turns toward his seat, but "<u>trips</u> and falls to the ground."  <u>Id.</u> (emphasis added); <u>see</u> <u>id.</u> at \*6 ("the video footage clearly shows that Oakley trips").  But the video clips

hardly provide the necessary "clarity" for the District Court to draw this conclusion, to the exclusion of all other possibilities. <u>Aguirre</u>, 995 F.3d at 410.

To "trip" is "to catch the foot against something so as to stumble." <u>Trip</u>, Merriam-Webster.com, <u>https://www.merriam-webster.com/dictionary/trip</u>. However, Oakley's feet are not visible in the video for the District Court to have reached this fact-based conclusion without drawing inferences in Defendant's favor and against Oakley. Indeed, Oakley, who has first-hand knowledge, submitted a sworn affidavit (unlike Defendants) stating that he did not trip but rather fell to the ground as a result of being pushed by the guards. A-496-497. Certainly, nothing in the video clips "blatantly contradict" Oakley's version of events. <u>See</u> <u>Walters</u>, 438 F. App'x at 210 (denying summary judgment where the plaintiff's feet were not visible in the video); <u>Bradshaw</u>, 855 F. App'x at 10 (reversing summary judgment where site of the plaintiff's injury was "obscured during portions of the video submitted by defendants"); <u>Patterson</u>, 354 F. App'x at 698 (refusing to apply the "limited exception" in <u>Scott</u> because the videotape did not "capture the whole incident"); <u>McDowell v. Sheerer</u>, 374 F. App'x 288, 292-93 (3d Cir. 2010) (plaintiff's version is not "blatantly contradict[ed]" because his body is "completely obstructed" in the video).

Later, the District Court draws the conclusion that "Oakley loses his footing as the guards steer him toward the exit." Oakley III, 2021 WL 5180229 at *6. But again, Oakley's feet are obscured in the video clips, making it impossible to reach this conclusion without improperly drawing an inference in Defendants' favor. And, once again, Oakley submitted a sworn affidavit denying that he fell to the ground on his own and stating Defendants caused him to fall by pushing, pulling and/or dragging him to the ground. A-497. Indeed, the video clips corroborate Oakley's version of events as they show six large men holding Oakley and dragging him towards the exit while Oakley's arms are once again raised in a non-aggressive posture, and he does not appear to be struggling. A-365 at 0:23-26, A-368 at 0:40-46, A-369 at 1:01-12, A-478-479, 497. A jury could easily look at this evidence and determine that Oakley was subjected to unreasonable force.

To plug these gaps, the District Court reasoned that "the footage shows no intentional pushing, throwing or dragging of Oakley to the ground." Oakley III, 2021 WL 5180229 at *6 (emphasis added). But this purported lack of "intention" is only true if the District Court (1) disregards Oakley's first-person account and (2) impermissibly substitutes its own beliefs for the guards' intent without any testimony, or even an opportunity to take testimony, from the guards. See infra at pp. 33-35.

To be sure, a jury could draw the same conclusions as the District Court based on the video. But it is by no means required to do so. A jury could also conclude that, as Oakley was being dragged out of the Garden, he was pushed and/or pulled by no fewer than five guards, all of whom had a firm hold on Oakley's arms, torso and back. A-365 at 0:23-26, A-368 at 0:40-46, A-369 at 1:01-10, A-478. The jury could conclude further that as the guards proceeded to turn onto the exit ramp, they pushed and/or dragged Oakley to the ground, utilizing unreasonable force. A-369 at 1:02-12, A-478, 497. In doing so, a jury could reject Defendants' argument that Oakley—a former world class athlete— twice "tripped" or "fell" to the ground coincidently after Dolan's "take him down" gesture to the guards.

If a court must fill in gaps in the evidence in order to grant summary judgment, as the Court did here in interpreting the video clips, then it is clearly exercising a role that can only be filled by the jury at trial, and the video clips cannot be said to "blatantly contradict" Oakley's version of events. Scott does not provide that the mere presence of some video footage will automatically form the basis for rejecting a plaintiff's claims, especially where, as here, the video footage is ambiguous, and Plaintiff has not even had the opportunity to take discovery.

## III. THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S REQUEST FOR ANY DISCOVERY UNDER RULE 56(D)

The District Court erred in refusing Plaintiff's request to take any discovery prior to adjudicating Defendants' summary judgment motion.

"[S]ummary judgment should only be granted if <u>after discovery</u>, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." <u>Hellstrom v. U.S. Dep't of Veterans Affs.</u>, 201 F.3d 94, 97 (2d Cir. 2000) (emphasis in original and internal quotations omitted). In fact, "only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." <u>Id.</u>; <u>see</u> <u>also</u> <u>Sutera v. Schering Corp.</u>, 73 F.3d 13, 18 (2d Cir. 1995) ("A party opposing a motion for summary judgment must have had the opportunity to discover information that is essential to his opposition to the motion") (internal quotations omitted). Accordingly, district courts "should defer decision of the motion" for summary judgment where the non-moving party "reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion." <u>Miller v. Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 304 (2d Cir. 2003) (quoting <u>Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.</u>, 271 F.3d 374, 386 (2d Cir. 2001)).

This is not a particularly high bar that the non-movant can clear with an affidavit explaining:

> (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

This is not one of those "rarest of cases" where summary judgment should have been granted without discovery. Hellstrom, 201 F.3d at 97. Plaintiff submitted the requisite affidavit setting forth the specific discovery that he required, including evidence concerning (1) Oakley's behavior from when he entered the Garden to when he assumed his seat; (2) Oakley's behavior prior to being approached by Defendants' security personnel; (3) Defendants' knowledge and intent in approaching Oakley in the first instance; (4) what Defendants' security personnel said to Oakley during the altercation and what he said in response; (5) the amount of force that Defendants used during the altercation; and (6) Defendants' reason for ejecting Oakley from MSG. A-485-489. Plaintiff further explained that the District Court entered a stay of discovery, preventing him from obtaining this evidence and subsequently refused to lift the stay, even after this Court's remand. A-489-490.

The District Court nonetheless denied Plaintiff's request for discovery because, in its view, Oakley presented nothing more than mere "speculation about what discovery might uncover." Oakley III, 2021 WL 5180229 at *7 (quoting Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981)). But this is wholly untrue. Oakley was assaulted in an arena packed with spectators and likely lined with cameras. There are likely dozens of witnesses who have relevant first-hand knowledge about the circumstances under which Defendants' guards used force and the amount of force that was used. And these cameras can provide visual evidence of the scene from different angles. To rely on a subset of video clips carefully selected by Defendants (one of which consists of "[l]ow- resolution, silent security footage" and another which begins after the events at issue), without any consideration, or even opportunity to consider, these other obvious sources of first-hand information impermissibly stacks the deck in Defendants' favor and denies Oakley a fair opportunity to prove his case. See Hellstrom, 201 F.3d at 97 (district court erred in "den[ying] [plaintiff] the opportunity to conduct discovery of any sort," "precluding [him] from taking depositions" and forcing him to rely on "information . . . compiled exclusively by" defendant).

No doubt, the District Court presumed that this additional first-hand proof would be consistent with the District Court's own beliefs about what the video

clips showed. That is not, however, the function of a court. Its role is not to determine when enough information has been exchanged and a decision can be reached. Rather, in an adversary system such as ours, it is the parties' function to exchange relevant information and a jury's function to determine what conclusions to draw from the evidence in an "intensely factual" scenario such as this one. Oakley II, 980 F.3d at 284. Even with video, such alternative evidence is required before a decision can be reached as to whether the evidence "blatantly contradicts" Oakley's version of events. See, e.g., Darden, 880 F.3d at 730 (explaining that witness testimony of the plaintiff's behavior can be used to contradict video); Est. of Lopez by & through Lopez v. Gelhaus, 871 F.3d 998, 1009 (9th Cir. 2017) (finding summary judgment inappropriate in an excessive force case, even in the presence of video evidence, where "inconsistencies" in the defendant's testimony, made it possible for a jury to find in the plaintiff's favor).

The District Court further justified its decision to block Plaintiff's access to relevant information because, in its view, "many excessive force cases involve granting or affirmance of summary judgment, prior to discovery, based on video evidence." Oakley III, 2021 WL 5180229 at *7, n.2. In support of its finding, the District Court cited three cases, all of which differ materially from Oakley's situation. All three are criminal cases, which this Court has already found permits the use of more force than the case at bar. See Angulo v. Brown, 978 F.3d 942,

950-951 (5th Cir. 2020) (evaluating use of force in the "context" of a "international border crossing" where the government's interest "is at its zenith" and were officers suspected that plaintiff was engaged in "serious criminal activity"); <u>Aldridge v. City of Warren Mich.</u>, 682 F. App'x 461, 464 (6th Cir. 2017) (plaintiff arrested for "trying to break into a residence"); <u>Smith v. United States</u>, 843 F.3d 509, 512-13 (D.C. Cir. 2016) (plaintiff arrested for "assault with a deadly weapon" for striking an officer with his car and driving away). Moreover, none of these cases addressed the issue of whether discovery was required under Fed. R. Civ. P. 56(d) where the amount of force used by the defendants, and the circumstances of that force, was at issue.

First, in <u>Angulo</u>, the plaintiff did not oppose summary judgment by explaining why he needed discovery pursuant to Fed. R. Civ. P. 56(d). Instead, the plaintiff merely stated that "summary judgment is improper because material fact disputes exist as to the verbal exchanges between the parties that the video evidence cannot dispel." <u>Angulo v. Brown</u>, 18 Civ. 0050, Dkt. No. 43 at p. 28 (S.D. Texas, Brownsville Division).

Second, in <u>Aldridge</u>, the court denied the plaintiff's request for discovery because, unlike here, the plaintiff "failed to file an affidavit with the [c]ourt pursuant to Rule 56(d)." 682 F. App'x at 463 (internal quotation omitted). <u>Aldridge</u> is further distinguishable because the court did not use the video

evidence to make a fact-intensive determination of whether the defendants' use of force was excessive. Rather, the court found that the plaintiff's arrest was "uneventful" (i.e., he was not assaulted) and that he subsequently "suffered an injury to his face during a fight with his cellmate." Id. In other words, the court found that the video showed that the defendants did not use force on plaintiff in the first instance – "what Aldridge alleged in his complaint simply could not have happened." Id. (internal quotation omitted).

Third, Smith was not an excessive force case at all. Rather, Smith sued for false arrest and intentional infliction of emotional distress. 843 F.3d at 512-513. The court relied on video evidence to conclude "that the defendant officers had probable cause to arrest [plaintiff] for assault with a deadly weapon and assault on a police officer." Id. at 513. Moreover, Smith was given substantial discovery. He "had already been provided with the police reports and documents, statements, photographs, and audio and video recordings in connection with the [underlying criminal] case." Id. Further, Smith argued that he wanted to depose a non-party witness to the incident. However, this witness had already viewed the video evidence and "stated that it fairly reflected what she had seen." Id.

The District Court also denied Plaintiff any discovery because it believed that the reason Oakley was removed from the Garden was irrelevant. Oakley III, 2021 WL 5180229, at *4. As explained above, however, the reasons that

38

Defendants used force at all and the "severity of [Oakley's] crime" are certainly relevant to properly assessing whether the amount of force used against him was reasonable.  See supra at pp. 17-19.

Rather than acknowledge that certain key issues could only be determined after the parties had an opportunity to take discovery, the District Court forged ahead and made factual assessments that were the province of the jury.  If the District Court's decision is allowed to stand, it would create a dangerous precedent that would inure to the detriment of plaintiffs in any case where the amount of force used against a plaintiff is at issue.  In such cases, whether it is police body cams or private surveillance video, it is the defendants that will have access to the video footage purporting to depict the event.  They will then have the ability to selectively disclose the portions of the video that they believe support their defenses while refusing to introduce video that supports the plaintiff's allegations.  If they are able to obtain summary judgment in such circumstances, before discovery, the plaintiff will never be able to even learn of the existence of evidence that, had it been disclosed, would have warranted a trial.  Defendants will effectively be able to prevail on a case merely by putting its "best foot forward" and cherry-picking their most favorable evidence.

A full and fair discovery process was designed specifically to guard against only one party being able to present evidence in this manner.  Indeed, there is no

reason that the District Court's holding needs to be limited to unreasonable force cases or where video evidence is available. It is easy to imagine a defendant in a discrimination case claiming that an e-mail demonstrates that its decision was taken for legitimate reasons. Similarly, a defendant in a products liability case could point to studies it commissioned to demonstrate the supposed safety of its products. The District Court's decision would have far-reaching ramifications that would undermine plaintiffs in a wide variety of cases and should not be allowed to stand.

## IV. THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S MOTION TO AMEND

Finally, the District Court denied Plaintiff's motion to file a Second Amended Complaint ("SAC") seeking, *inter alia*, to name James Dolan as an individual defendant as to his assault and battery claims because it would be "futile" in light of the decision to grant summary judgment to Defendants on those claims. See Oakley, 2021 WL 5180229, at *8. However, Plaintiff sought to amend his complaint to also add an allegation that he was pushed and/or pulled backwards when he first rose out of his seat after being first approached by Defendants' security guards. A-426. This is further evidence in support of Plaintiff's assault and battery claims that the District Court simply ignored. Plaintiff was unaware of the evidence supporting this allegation at the time he filed his Complaint and his Amended Complaint. Especially given the fact that

this case has not even entered the discovery phase, the law is clear that such an amendment should have been permitted. Ceara v. Deacon, 916 F.3d 208, 214–15 (2d Cir. 2019).

Moreover, for the reasons set forth above, summary judgment should be reversed on Plaintiff's assault and battery claims against Defendants. Accordingly, Plaintiff has also sufficiently alleged that Dolan himself should be liable for the assault and battery to which he was subjected under both a concerted action and aiding and abetting theories of liability.

A concerted action theory of liability "provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act." Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (1992) (internal quotations omitted). To allege sufficient facts for a concerted action theory of liability, a plaintiff needs to allege that the individual defendant was acting in conjunction with the individual committing the assault and battery, or otherwise ratified the tortfeasor's actions. See D'Elia v. 58-35 Utopia Parkway Corp., 43 A.D.3d 976, 978 (2d Dep't 2007) (finding that defendants liable under concerted action theory for assault even where there was "no evidence was adduced at trial that either of those defendants struck the blows that caused D'Elia's most significant injury").

Similarly, to be liable for an assault under an aiding and abetting theory, a defendant must have committed some overt act, either by words or conduct, in furtherance of the assault.  McKiernan v. Vaccaro, 168 A.D.3d 827, 830, (2d Dep't 2019).  The elements of an aiding and abetting violation for assault and/or battery under New York law are "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's knowing and substantial assistance in the principal violation."  Scollo ex rel. Scollo v. Nunez, 847 N.Y.S.2d 899 (Sup. Ct. 2007), aff'd sub nom. Scollo v. Nunez, 60 A.D.3d 840 (2009) (citation omitted).  Moreover, "the contributing activity itself need not be so obviously nefarious as cheering a beating or prodding someone to drive recklessly."  Halberstam v. Welch, 705 F.2d 472, 482 (D.C. Cir. 1983) (citing Keel v. Hainline, 331 P.2d 397 (Okl. 1958)).

Here, Plaintiff's proposed SAC alleges sufficient facts to hold Dolan liable under either a concerted action or aiding and abetting theory of liability.  As alleged in the SAC, shortly after Oakley takes his seat, Dolan speaks with a security guard for close to a minute.  A-425.  Thereafter, Dolan catches the attention of the same security guard and signals to him with a downward pointing gesture with his right index finger.  A-425.  *Within seconds*, the security guard converges on Oakley with several other members of Defendants' security

personnel.  A-425.  The fact that the security guards approach Oakley as a direct and immediate response to Dolan's signal sufficiently alleges that they were acting in concert with Dolan.  After Dolan's own employees, over whom he exercised control, begin to attack Oakley, in full view of all of the fans at the Garden and himself, Dolan fails to take any action to stop this violent and unreasonable use of force.  Rather, he allows his security personnel to continue to assault Oakley and refused to intervene.  Once his security guards complete their violent assault of Mr. Oakley, Dolan gives a thumbs up gesture, signaling that the security guards, in using unreasonable force, successfully followed Dolan's instructions. A-427.

Given the liberal amendment standards mandated by Fed. R. Civ. P. 15(a), see Ceara, 916 F.3d at 214–15 ("Rule 15(a)") provides that the Court "should freely give leave [to amend a pleading] when justice so requires"), it is clear that Plaintiff has alleged sufficient facts to warrant the filing of his proposed SAC and the District Court's refusal to allow that amendment was in error. Plaintiff therefore respectfully requests that the District Court's decision denying his motion to amend be likewise reversed.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Oakley respectfully requests that this Court reverse the District Court's decision granting Defendants' motion for summary judgment and denying Plaintiff's motion to amend.

Dated: March 8, 2022
     New York, New York            Respectfully submitted,

**WIGDOR LLP**


By:   /s/ Douglas H. Wigdor
      Douglas H. Wigdor
      Renan F. Varghese

      85 Fifth Avenue
      New York, NY 10003
      Telephone: (212) 257-6800
      Facsimile: (212) 257-6845
      dwigdor@wigdorlaw.com
      rvarghese@wigdorlaw.com

**PETRILLO KLEIN & BOXER LLP**


By:   /s/ Nelson A. Boxer
      Nelson A. Boxer
      John Allen

      655 3rd Avenue, #22
      New York, NY 10017
      Telephone: (212) 370-0330
      nboxer@pkbllp.com
      jallen@pkbllp.com

      *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I, Douglas H. Wigdor, counsel for Appellant, hereby certify that the foregoing brief complies with the type-volume limitations set forth in Second Circuit Local Rule 32.1(a)(4)(A) because it contains 10, 332 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font.

/s/ Douglas H. Wigdor
Douglas H. Wigdor

**SPECIAL APPENDIX**

**i**

## TABLE OF CONTENTS

                                                           **Page**

Opinion and Order, filed November 8, 2021 ............    SPA-1

Judgment of the United States District Court,
   Southern District of New York, filed
   November 22, 2021 ...............................................    SPA-11

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 17-cv-6903 (RJS)

---

CHARLES OAKLEY,

*Plaintiff,*

*v.*

MSG NETWORKS, *ET AL.*,

*Defendants.*

---

OPINION AND ORDER
November 8, 2021

---

RICHARD J. SULLIVAN, Circuit Judge:

After being forcibly removed from a Knicks basketball game at Madison Square Garden in February 2017, Plaintiff Charles Oakley brought a litany of claims against Defendants MSG Networks, Inc.; the Madison Square Garden Company; MSG Sports and Entertainment, LLC (collectively, "MSG"); and James Dolan, the executive chairman of MSG. On February 19, 2020, the Court granted Defendants' motion to dismiss each of Oakley's claims. The Second Circuit subsequently affirmed the Court's decision in all respects but one.

Following the Second Circuit's remand, Oakley's sole remaining claim is that MSG is liable for assault and battery because MSG security guards used excessive force to remove Oakley from the stadium. Extensive video footage documents the altercation, and MSG moves for summary judgment on that basis, arguing that the footage conclusively shows its employees did not use excessive force. For his part, Oakley seeks leave to file a second amended complaint adding James Dolan as an individual defendant on the remaining claims.

For the following reasons, Defendants' motion for summary judgment is GRANTED, and Oakley's motion to amend is DENIED.

## I. BACKGROUND

### A. Facts

Charles Oakley, a former star power forward for the New York Knicks, attended a Knicks game at Madison Square Garden

(the "Garden") on February 8, 2017.[1] (Doc. No. 120 ¶ 80.) During the game, Oakley was approached by MSG security guards and New York City Police Department ("NYPD") officers, who physically removed him from the arena, purportedly because of his inappropriate behavior. (Doc. No. 111 ¶ 146.) After the incident, the Knicks organization and owner James Dolan made public statements claiming that Oakley was expelled for being drunk and verbally abusive to fans and stadium staff. (*Id.* ¶¶ 145–46.) Oakley denied that he behaved inappropriately. (*Id.* ¶ 147.)

Oakley's removal was captured on video by ESPN, the Garden's stadium cameras, and nearby attendees in the audience. (Doc. No. 104, Exs. 1–5.) Low-resolution, silent security footage shows the beginning of the incident: eight security personnel assemble in the row where Oakley is seated. (Doc. No. 104, Ex. 2b (hereinafter *Stadium Vid.*) 7:44–8:01.) The parties agree that one of the guards requested that Oakley leave the building (Doc. No. 120 ¶ 117), and the footage shows the guard and Oakley conversing for several seconds before Oakley stands up. (*Stadium Vid.*, 8:01–8:16.)

Surrounding fans, presumably sensing something amiss from the presence of security, also filmed the altercation. One of those fans made a high-resolution phone recording, which included audio, from a distance of roughly 10 yards away. (Doc. No. 104, Ex. 4 (hereinafter *Fan Vid.*), available as submitted by Defendants at https://nysd.uscourts.gov/sites/default/files/2 021-11/4. YouTube - Charles Oakley Fight Meltdown NY Knicks Whole 3 minute video.mp4.) The fan recording begins about 30 seconds after Oakley is initially approached. (*Compare Fan Vid.*, 0:00, *with Stadium Vid.*, 8:18.)

As the fan recording begins, Oakley is standing, surrounded by security personnel. One MSG guard ("Guard 1") is grasping Oakley's left bicep, trying to pull him toward the exit aisle; another ("Guard 2") lightly places his open hand, alternately, on Oakley's upper back and his torso. (*Fan Vid.*, 0:08–0:12.) Oakley remains able to turn freely and walk. Oakley then shrugs off Guard 2 and turns toward his seat, but trips and falls to the ground, pulling Guard 1 (still grasping Oakley's bicep) forward. (*Fan Vid.*, 0:13–0:14.) Within seconds, Oakley rises without assistance. (*Fan Vid.*, 0:15–0:22.)

After getting up, Oakley again attempts to move back toward his seat, but is obstructed by the guards. Guard 1 has positioned himself between Oakley and the seat. With an open hand on Oakley's upper arm, Guard 1 motions toward the exit aisle. (*Fan Vid.*, 0:25–0:29.) Oakley puts both hands in the air, and Guard 1 immediately removes his hand from Oakley's arm. (*Fan Vid.*, 0:29.) Guard 2, still stationed behind Oakley, places an open hand on Oakley's torso. (*Fan Vid.*, 0:40.)

---

[1] The following facts are taken from the Rule 56.1 Statements filed by Defendants (Doc. No. 105) and Oakley (Doc. No. 111), as well as Defendants' Counterstatement to Oakley's submission (Doc. No. 120). The Court also relies on the video exhibits appended to defense counsel's Declaration in Support of Defendants' Motion for Summary Judgment (Doc. No. 104), which contain footage captured by the Garden's security cameras, ESPN, and audience members who attended the Knicks game. The Court has also considered the parties' briefs in support of and in opposition to Defendants' Motion for Summary Judgment (Doc. Nos. 103, 110, 118) and Oakley's Motion for Leave to File a Second Amended Complaint (Doc. Nos. 107, 109, 117).

Oakley then escalates the physical confrontation: he steps toward Guard 1 with a finger in the guard's face (*Fan Vid.*, 0:41), chest-bumps him (*Fan Vid.*, 0:42), and then appears to push Guard 1's face with his hand, causing Guard 1's head to snap backward. (*Fan Vid.*, 0:49.) In response, Guard 2 grasps Oakley's upper bicep and attempts to pull him backward. (*Fan Vid.*, 0:49–0:51.) Oakley turns, chops downward on the arm holding his bicep, and then twice forcefully shoves Guard 2, causing the guard to stumble back several paces and prompting nearby fans to gasp. (*Fan Vid.*, 0:53–0:58.) At this point, several other security personnel finally step in and grab both of Oakley's arms. (*Fan Vid.*, 0:59–1:01.) The group hoists, pushes, and pulls Oakley toward the exit aisle, with Oakley initially remaining on his feet amidst the huddle of security personnel. (*Fan Vid.*, 1:01–1:06.)

After being guided several yards and onto the exit ramp, Oakley again falls – despite at least one guard's effort to keep him upright – this time in the aisle below the railing where the fan videographer is standing. (*Fan Vid.*, 1:10.) From an angle directly above the scene, the video shows security personnel crowd around Oakley and repeatedly tell him to "get up" and "stand up." (*Fan Vid.*, 1:15–1:35.) Several security personnel try to grab Oakley's wrists to pull him up, but he retracts his arms against his body to resist their efforts. (*Fan Vid.*, 1:15–1:40.) At one point, Oakley audibly states, "I don't want to stand up." (*Fan Vid.*, 1:34.) While lying in the aisle, Oakley protests to the guards that he did not do anything wrong; he also rebuffs their efforts to help him up, repeating several times, "I don't need no help." (*Fan Vid.*, 2:22–2:27.) After more than 75 seconds on the ground, Oakley eventually pulls himself up using the stadium railing. (*Fan Vid.*, 2:31.) But he then refuses to accompany the

guards toward the exit and continues to clasp the railing with both hands to maintain his position. After approximately 20 seconds, during which an NYPD officer twice pries Oakley's hands from the railing (*Fan Vid.*, 2:47–2:59), he is finally ushered out of the stadium.

## B. Procedural History

### 1. District Court

On September 12, 2017, Oakley filed a complaint asserting defamation, slander, abuse of process, and denial of public accommodation claims against both Dolan and MSG. (Doc. No. 1 ¶¶ 77–83, 89–93, 104–20.) This original complaint also asserted assault and battery claims against MSG alone, alleging that stadium guards used physical force without Oakley's consent to eject him from the premises. (*Id.* ¶¶ 94–99.)

On February 9, 2018, Oakley filed an amended complaint (Doc. No. 36), which left unchanged most allegations relating to assault and battery but inserted additional details that alleged the guards used excessive force in removing him. (*Id.*) The Court stayed discovery pending resolution of Defendants' motion to dismiss, which was filed on March 30, 2018. (Doc. No. 41.)

On February 19, 2020, the Court issued an opinion and order granting Defendants' motion to dismiss all of Oakley's claims. *See Oakley v. Dolan*, No. 17-cv-6903 (RJS), 2020 WL 818920, at *1 (S.D.N.Y. Feb. 19, 2020). Regarding Oakley's assault and battery claims, the Court held that "[t]he law is clear that the MSG Defendants had the right to expel Oakley from the Garden and that his refusal to leave justified their use of reasonable force to remove him. . . ." *Id.* at *13. The Court explained that the only issue

with respect to assault and battery was "whether Defendants used unnecessary force or intended to injure [Oakley]." *Id.* Presuming the truth of Oakley's allegations, as required at that stage of the proceedings, *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993), and without consulting extrinsic evidence such as the videos, the Court nevertheless held that Oakley's allegations of excessive force were conclusory and did not support a plausible inference of unnecessary force or injurious intent. *Oakley*, 2020 WL 818920, at \*13–14. In the same opinion and order, the Court also denied Oakley leave to amend his complaint for a second time, as he "offer[ed] no basis for his request[,] . . . nor [did] he attach a proposed amended complaint." *Id.* at \*16.

### 2. On Appeal

Oakley timely appealed. (Doc. No. 70.) In an opinion and a separate summary order, the Second Circuit affirmed this Court's decision in all respects except for its dismissal of Oakley's assault and battery claims. *See Oakley v. Dolan*, 980 F.3d 279, 280 (2d Cir. 2020); *Oakley v. Dolan*, 833 F. App'x 896, 898 (2d Cir. 2020).

With respect to those claims, the Second Circuit concluded that the *act* of Oakley's removal was not itself unreasonable, but held that Oakley's claim that "security guards used excessive force in *accomplishing* the removal" was sufficient, on its face, to survive dismissal. *Id.* at 283 (emphasis added). The Second Circuit emphasized those portions of Oakley's amended complaint "that allege[d] that he was 'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary' and 'clearly exceeded the bounds of reasonable behavior,' and that he 'has suffered and continues to suffer harm[.]'" *Id.*

Moreover, the Second Circuit noted that, "[b]ecause of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide," *id.* at 284 (quoting *Holland v. City of Poughkeepsie*, 935 N.Y.S.2d 583, 588 (2d Dep't 2011)), and that "[e]ven in the arrest context, the reasonableness of the force used is often a jury question," *id.* (citing *Hernandez v. Denny's Corp.*, 114 N.Y.S.3d 147, 152 (4th Dep't 2019)).

The Second Circuit remanded the case to this Court for further proceedings on the assault and battery claim.

### 3. On Remand

On December 7, 2020, Defendants submitted a letter indicating that they would move for summary judgment based solely on the video footage documenting Oakley's removal from the Garden. (Doc. No. 75.) On December 11, 2020, Oakley submitted a letter that again requested leave to file a second amended complaint. (Doc. No. 83.) The Court held a pre-motion conference on December 22, 2020, addressing both anticipated motions.

On January 22, 2021, Defendants filed their motion for summary judgment (Doc. No. 102), and Oakley filed his motion for leave to file a second amended complaint. (Doc. No. 106.) The motions were fully briefed on March 9, 2021.

## II. Motion for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only "disputes over facts that

might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[C]hoices between conflicting versions of the [facts] are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The factual dispute, however, must be "*genuine.*" Fed. R. Civ. P. 56(a) (emphasis added). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In particular, "when there is reliable objective evidence – such as a recording – the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012); *see also id.* (holding that an audio recording "indisputably" refuted the plaintiffs' contention that "their behavior toward the [arresting] officers [was] cordial[] and . . . compliant," which supported granting summary judgment in favor of the defendant officers on the plaintiffs' Fourth Amendment claim).

## B. Scope of the Issue

The sole issue to adjudicate in Oakley's remaining assault and battery claims is whether "the security guards used excessive force in accomplishing [Oakley's] removal." *Oakley*, 980 F.3d at 283. The rationale for removing Oakley is not at issue; under New York state law, property owners have the right to remove licensees, such as ticketholders like Oakley, from their property for any reason or no reason at all. *See, e.g.*, *Impastato v. Hellman Enters., Inc.*,

537 N.Y.S.2d 659, 661 (3d Dep't 1989) ("[A] ticket to a place of public amusement is merely a license which is revocable, without cause, at the will of the proprietor."); *see also Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947). The Second Circuit's opinion affirms that the decision to remove Oakley was permissible, foreclosing further litigation on the issue. *Oakley*, 980 F.3d at 283 (noting that Oakley contended "incorrectly" that "the act of removal was unreasonable").

Under New York state law, if a licensee refuses to leave private property, a property owner "ha[s] the right to use reasonable force to eject [the licensee]." *Noonan v. Luther*, 206 N.Y. 105, 108 (1912). The standard for determining the reasonableness of the force applied is effectively identical in both New York state tort claims and Fourth Amendment excessive force claims brought pursuant to 42 U.S.C. § 1983. *See Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991) (noting that "the essential elements" of Fourth Amendment excessive force claims and their "state law tort counterpart," assault and battery, are "substantially identical"). A plaintiff alleging excessive force must demonstrate that "the amount of force used was objectively unreasonable." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (citation and quotation marks omitted). To succeed on his claims, Oakley must therefore establish that the MSG security guards used "objectively unreasonable" force to remove him from the Garden. *Id.* (citation omitted).

## C. Additional Discovery

As a preliminary matter, Oakley argues that additional discovery is needed to resolve whether MSG security guards gave him a "reasonable" opportunity to leave

before using force. (Doc. No. 110 at 2 (quoting *Noonan*, 206 N.Y. at 108)); *see also* Jon W. Bruce & James W. Ely, Jr., The Law of Easements & Licenses in Land § 11:6 (May 2021 update) ("Upon revocation of a license, the licensee must be afforded a reasonable opportunity to leave the land[.]"). In situations where "facts essential to justify . . . opposition" to summary judgment are unavailable to the non-movant, a court "may" allow time to take discovery. Fed. R. Civ. P. 56(d). But no such additional discovery is necessary in this case.

Surveillance videos from the stadium, though silent and low-resolution, capture every moment from Oakley's arrival at his seat to his final exit. (*See* Doc. No. 104, Exs. 2a, 2b.) And video taken by fans in the vicinity of the altercation captures the key moments of Oakley's removal, in high resolution, with audio. (*See* Doc. No. 104, Ex. 3; *Fan Vid.*) The entire sequence of events during which Oakley alleges Defendants' security personnel used unreasonable force is thus captured in the videos submitted in connection with Defendants' motion for summary judgment. Oakley does not claim, for instance, that he was assaulted off-camera in the hallways outside the arena but while still on MSG property. Rather, the critical moments regarding his assault and battery claims – *i.e.*, that "he was 'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary' and 'clearly exceeded the bounds of reasonable behavior,'" *Oakley*, 980 F.3d at 283 – necessarily appear in the videos now before the Court. Importantly, Oakley does not dispute the authenticity of the videos.

As described above, the video footage conclusively shows the MSG guards giving Oakley ample opportunity to leave the arena

peaceably, under his own power; the same video also shows that Oakley ignored the guards' entreaties and repeated attempts to direct him toward the exit. (*Fan Vid.*, 0:01–0:59.) In fact, the video reveals that it was Oakley who unilaterally escalated the confrontation, leading to his eventual forcible removal. (*Fan Vid.*, 0:01–0:59.) Accordingly, no further discovery is needed to explore whether MSG security "afforded [Oakley] a reasonable opportunity to leave." *Noonan*, 206 N.Y. at 108.

Moreover, while Oakley argues that additional discovery is needed to uncover evidence concerning "the reasons for the decision . . . to eject Mr. Oakley," as well as to gather evidence about "Mr. Oakley's behavior from the period between when he first entered [the Garden] to when Defendants' video shows him walking towards his seat" (Doc. No. 110 at 8, 13), this is merely a backdoor attempt to relitigate the issue of whether Defendants were *entitled* to eject Oakley from the Garden. As the Court explained in its previous decision, and as the Second Circuit affirmed on appeal, the law is crystal clear on this point: Defendants were not required to supply a reason for expelling Oakley – a ticketholder licensee at the Knicks game – from Madison Square Garden. *See, e.g.*, *Impastato*, 537 N.Y.S.2d at 661; *see also Oakley*, 980 F.3d at 283.

Thus, it makes no difference that "Oakley appears to have acted unoffensively" and was "pleasantly communicating with spectators nearby" before he was approached by Defendants' security guards, as Oakley asserts in his brief. (Doc. No. 110 at 14.) Defendants needed no reason at all to eject him from the premises. What *does* matter is the sequence of events once security personnel asked Oakley to leave, which is entirely captured

on video. In short, everything needed to determine the reasonableness of the force employed by the MSG security guards is contained in the videos now before the Court, and that video footage "speak[s] for itself." *Marcavage*, 689 F.3d at 110. While Oakley cites several cases generally standing for the proposition that "summary judgment should not be granted [against a party who] is denied reasonable access to potentially favorable information," he offers no explanation as to how the information he seeks to discover concerning his conduct *before* he was asked to leave the arena might be even "potentially" helpful to his position in the remaining legal dispute. (Doc No. 110 at 7 (quoting *Robinson v. Transworld Airlines, Inc.*, 947 F.2d 40, 43 (2d Cir. 1991).) The Court therefore proceeds to consider Defendants' motion for summary judgment.

D. Video Footage

Turning to the merits of Oakley's assault and battery claims, the Court has no difficulty concluding that Defendants are entitled to summary judgment. There is no interpretation of the video footage that could lead a reasonable jury to conclude that the degree of force used by MSG security guards to remove Oakley from the Garden was "objectively unreasonable." *Lowth*, 82 F.3d at 573 (citation omitted).

Critically, each of the key factual allegations in Oakley's complaint that the Second Circuit identified as supporting Oakley's assault and battery claims is thoroughly contradicted by the video evidence. *See Oakley*, 980 F.3d at 283 (highlighting Oakley's allegations that MSG security guards "grabbed him" and "forcibly shov[ed] [him] to the ground"; that "when he got back to his feet, . . . he was grabbed by six officials and thrown onto the

ground"; and that guards "instigated a physical altercation where there otherwise was no need for such violent conduct") (quotation marks omitted) (citing Doc. No. 36 ¶¶ 42, 43, 44, 47).

For instance, in his opposition brief, Oakley insists that his initial fall was a result of being "pushed to the ground near his seat." (Doc. No. 110 at 16.) But the video footage clearly shows that Oakley trips, nearly dragging an MSG guard down with him. (*Fan Vid.*, 0:13–0:14.)

Oakley next contends that the guards' use of physical force to escort him into the aisle was excessive because he "passively submitted to Defendants' actions." (Doc. No. 110 at 16.) That, too, mischaracterizes the encounter captured on video. In fact, the video footage shows MSG guards resorting to force only after *Oakley* physically escalates the situation by chest-bumping and poking in the face one guard and twice shoving another. (*Fan Vid.*, 0:42–0:58.) Indeed, the time Oakley refers to as a period of "passive[]" submission is the roughly 10 seconds immediately after he shoves the second MSG guard, thereby eliminating any inference that this brief moment of physical separation signals Oakley's cooperation.

Oakley next asserts that his second fall resulted when MSG guards "push[ed], thr[e]w, and/or drag[ged] [him] to the ground." (Doc. No. 110 at 17.) But the video clearly contradicts that characterization of events. At the point that Oakley loses his footing as the guards steer him toward the exit, the footage shows no intentional pushing, throwing, or dragging of Oakley toward the ground – and certainly nothing that can be deemed unreasonable force. (*Fan Vid.*, 1:10.) Indeed, in the moments before this second fall, security personnel can be seen moving Oakley at a

reasonable pace, with Oakley initially keeping up. (*Fan Vid.*, 1:04–1:10.) When Oakley falls, security personnel soften his landing and then immediately attempt to lift him back to his feet; it is then Oakley who resists, at one point audibly stating, "I don't want to stand up." (*Fan Vid.*, 1:15–1:35.) Tellingly, as Oakley lies prone on the ground complaining about his unfair ejection from the arena, he makes no accusation or complaint that anyone tripped him.

After Oakley rises to his feet once more, he clings to the railing and refuses to let go. (*Fan Vid.*, 2:35–2:58.) Far from "not resisting Defendants' efforts to drag him out of MSG," Oakley engages in a last-ditch effort to remain in the Garden, forcing the MSG guards to pry his hands free before they finally manage to escort him from the arena. (Doc. No. 110 at 20.)

In sum, while the parties "tell two different stories" about what happened in the Garden on February 8, 2017, *Scott*, 550 U.S. at 380, the video footage conclusively rebuts Oakley's version of events – and vindicates Defendants' version.

E. Remaining Arguments

Oakley raises two final arguments in his opposition brief, but neither alters the Court's conclusion that summary judgment in favor of Defendants is warranted. First, Oakley argues that summary judgment based on *any* video evidence is improper where, as here, there has been no additional discovery. (Doc. No. 110 at 20– 23.) But neither the Second Circuit nor the Supreme Court has ever articulated such a rule; indeed, many excessive force cases involve the granting or affirmance of summary judgment, prior to discovery, based on video

evidence.[2]   And the Second Circuit has explained that "a plaintiff cannot defeat a motion for summary judgment . . . only with speculation about what discovery might uncover." *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981). Oakley's bare assertions that he wishes to discover different videos of the incident, taken from other angles or at different times, will not prevent entry of summary judgment, especially since Oakley cannot explain what relevant information such videos, if they exist, might reveal. *See Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991) ("[P]laintiffs only speculate as to what evidence, if any, further discovery would produce.").

Oakley additionally argues that evaluations of reasonable force should be left to the jury, relying on the Second Circuit's observation that "[b]ecause of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Oakley*, 980 F.3d at 284. This proposition is of course generally true – any *genuine* dispute of a factual nature should be left to the jury as factfinder. This maxim is not, however, an ironclad rule, and the Second Circuit's observation did not amount to a directive

---

[2] *See, e.g., Angula v. Brown*, 978 F.3d 942, 949–52 (5th Cir. 2020) (affirming pre-discovery grant of summary judgment on excessive force claims where video evidence "blatantly contradicted" plaintiff's allegations); *Aldridge v. City of Warren*, 682 F. App'x 461, 463–65 (6th Cir. 2017) (affirming pre-discovery grant of summary judgment on excessive force claims where video offered by defendants "undercut[]" plaintiff's version of events); *Smith v. United States*, 843 F.3d 509, 512–16 (D.C. Cir. 2016) (affirming pre-discovery grant of summary judgment in light of video and audio recordings that "contradicted [plaintiff's] complaint").

that a jury must decide the excessive force claims in this particular case.

In fact, courts in this Circuit routinely resolve excessive force claims at the summary judgment stage. *See, e.g.*, *MacLeod v. Town of Brattleboro*, 548 F. App'x 6 (2d Cir. 2013); *Kalfus v. N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458 (S.D.N.Y. 2010), *aff'd*, 476 F. App'x 877 (2d Cir. 2012); *Berman v. Williams*, No. 17-cv-2757 (JGK), 2019 WL 4450810, at *7 (S.D.N.Y. Sept. 17, 2019) (granting summary judgment where video evidence "undermines the plaintiff's claim that the defendants used excessive force"); *Lin v. City of New York*, No. 1-cv-9994 (PAE), 2016 WL 7439362, at *11–12 (S.D.N.Y. Dec. 21, 2016) (granting summary judgment where video evidence "refutes" plaintiff's allegations of excessive force). And since Oakley's remaining claim is a state-law claim for assault and battery, it bears noting that New York state courts also frequently resolve such cases on summary judgment. *See, e.g.*, *N.M. v. City of New York*, 96 N.Y.S.3d 856 (1st Dep't 2019); *Harris v. City of New York*, 62 N.Y.S.3d 411, 413–14 (2d Dep't 2017); *Walker v. City of New York*, 50 N.Y.S.3d 320 (1st Dep't 2017); *Estevez v. City of New York*, 931 N.Y.S.2d 303 (1st Dep't 2011).

The Second Circuit in this case also alluded to a distinction between excessive force claims arising in the *criminal* context, "in circumstances that are tense, uncertain, and rapidly evolving," and unreasonable force claims arising in the *civil* context. *Oakley*, 980 F.3d at 284 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Second Circuit explained that the quantum of force reasonable to effect arrest might "not necessarily [be] reasonable" to effect civil removal. *Id.* Regardless, acknowledging that the *threshold* level for

unreasonable force might be lower in the civil context does not mean that Oakley has raised a genuine issue of fact as to whether that threshold has been met. He has not. The video footage unambiguously demonstrates that the force used to remove Oakley was by no possible assessment "objectively unreasonable." *Lowth*, 82 F.3d at 573 (citation omitted).

Because "no reasonable jury could," in light of the videos, determine that MSG guards used unreasonable force to remove Oakley from the premises, the Court grants Defendants' motion for summary judgment on Oakley's assault and battery claims. *Scott*, 550 U.S. at 380.

### III. MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Finally, Oakley requests permission to add James Dolan as a defendant on the remaining assault and battery claims, under either a concerted action theory or an aiding and abetting theory of liability.[3] But even assuming that Dolan instigated the altercation and directed the guards to remove Oakley from the premises, the fact remains that both theories of liability require that the underlying tort – assault and battery – actually occurred. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012); *Segal v. Firtash*, No. 13-cv-7818 (RJS), 2014 WL 4470426, at *7 (S.D.N.Y. Sept. 9,

---

[3] Under a concerted action theory of liability, a defendant may be liable for "having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act." *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 295 (1992) (citation and quotation marks omitted). An aiding-and-abetting claim requires demonstrating that a defendant knowingly and substantially assisted in a wrongful act that inflicted an injury. *See Scollo ex rel. Scollo v. Nunez*, 847 N.Y.S.2d 899, at *4 (Sup. Ct. 2007), *aff'd sub nom. Scollo v. Nunez*, 874 N.Y.S.2d 380 (2d Dep't 2009).

2014).   Because the Court has granted
summary judgment in favor of Defendant
MSG on the assault and battery claims, there
is no underlying tort to which Oakley's
proposed claims against Dolan can apply.
Accordingly, Oakley's motion for leave to
amend is denied as futile.  *See* Fed. R. Civ.
P. 15(a)(2) (requiring the Court's leave to
amend a complaint); *see also Chunn v.
Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019)
(denying as futile a request to add an
additional defendant when the new claim
"turns on the same" issues as the meritless
claim "and fails for the same reasons").

IV.   CONCLUSION

For the past three years, much ink has
been spilled describing and characterizing
what transpired between Charles Oakley and
the security guards tasked with escorting
him from Madison Square Garden during a
Knicks game in February 2017.   These
descriptions and characterizations have had
their place in the pleadings, in the
Defendants' motions to dismiss, and on
appeal.   But at this stage of the proceedings,
the case is no longer about words.   It's about
evidence.     And the undisputed video
evidence conclusively demonstrates that the
Garden's security guards did not use
excessive force as they escorted Oakley
from the arena.   To the contrary, the video
clearly shows that:   (1) the guards asked
Oakley to leave; (2) they gave him a chance
to leave; and (3) when he refused to leave,
and in fact escalated the confrontation, they
removed him from the Garden by using a
degree of force that was indisputably
reasonable and appropriate under the
circumstances.     No rational jury could
conclude   otherwise,   and   Oakley's
previously offered versions of the events are
"so blatantly contradicted by the [video]
record . . . that no reasonable jury could
believe [them]."  *Scott*, 550 U.S. at 380.

Therefore, for the reasons stated above,
IT   IS   HEREBY   ORDERED   THAT
Defendants' motion for summary judgment
is   GRANTED.       IT   IS   FURTHER
ORDERED THAT Oakley's request for
leave to file another amended complaint is
DENIED.   The Clerk of Court is respectfully
directed to terminate the motions pending at
docket numbers 102 and 106 and to close
this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: November 8, 2021
New York, New York

*   *   *

Plaintiff Charles Oakley is represented
by Douglas H. Wigdor, Renan F. Varghese,
and Kenneth D. Walsh of Wigdor LLP, 85
Fifth Ave., 5th Fl., New York, New York
10003; and Nelson A. Boxer of Petrillo
Klein & Boxer LLP, 655 Third Ave., 22nd
Fl., New York, New York 10017.

Defendants   James   Dolan,   MSG
Networks, Inc., The Madison Square Garden
Company,   and   MSG   Sports   &
Entertainment, LLC are represented by
Randy M. Mastro, Akiva Shapiro, Grace E.
Hart, and Declan T. Conroy of Gibson,
Dunn & Crutcher LLP, 200 Park Ave., New
York, New York 10166; and James Walden
and Milton L. Williams of Walden Macht &
Haran LLP, 250 Vesey St., 27th Fl., New
York, New York 10281.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CHARLES OAKLEY,

                            Plaintiff,                    17 **CIVIL** 6903 (RJS)

        -against-                        **JUDGMENT**

MSG NETWORKS, *ET AL.*,

                            Defendant.
------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated November 8, 2021, Defendants' motion for

summary judgment is GRANTED. IT IS FURTHER ORDERED THAT Oakley's request for leave

to file another amended complaint is DENIED; accordingly, this case is closed.

**Dated:** New York, New York
        November 22, 2021

                                    **RUBY J. KRAJICK**
                                      **Clerk of Court**
               BY:                                  
                                        **Deputy Clerk**