### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

Docket Number(s): 21-2939 _____   _____ Caption [use short title] _____

Motion for: Leave to File Brief of Amicus Curiae

_____

_____

Set forth below precise, complete statement of relief sought:

Leave to file brief of amicus curiae on behalf of the

New York State Trial Lawyers Association ("NYSTLA".)

Oakley v. Dolan, et al.

_____

_____

_____

_____

MOVING PARTY: Amicus Curiae NYSTLA          OPPOSING PARTY: Defendants-Appellees

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner          ☐ Appellee/Respondent

MOVING ATTORNEY: Derek Sells, Esq.          OPPOSING ATTORNEY: Randy M. Mastro, Esq.

[name of attorney, with firm, address, phone number and e-mail]

Derek S. Sells, Esq.          Randy M. Mastro

55 Broadway, 23rd Floor, New York, New York 10006          200 Park Avenue, New York, NY 10166

(212) 553-9120, dsells@cochranfirmny.com          (212) 351-3825, rmastro@gibsondunn.com

Court- Judge/ Agency appealed from: Southern District of New York, Judge Richard J. Sullivan

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☑ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☑ No
Has this relief been previously sought in this court?   ☐ Yes ☑ No
Requested return date and explanation of emergency: _____
_____
_____
_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date:_____

**Signature of Moving Attorney:**

_Derek Sells_____ Date: 3/14/2022____   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

UNITED STATES COURT OF APPEALS FOR THE
SECOND CIRCUIT
-----------------------------------------------------------------X
CHARLES OAKLEY,

                    Plaintiff,              Case No.:  21-2939-cv

       -against-

JAMES DOLAN, in his individual and professional
capacities, MSG NETWORKS, INC. THE MEDISON
SQUARE GARDEN COMPANT, and MSG SPORTS &
ENTERTAINMENT, LLC,

                  Defendants.

-----------------------------------------------------------------X

**AFFIRMATION IN SUPPORT OF MOTION BY NEW YORK STATE TRIAL LAWYERS ASSOCIATION TO FILE ⊂Ο ΚΕWU'ΕWΤΚⅭG BRIEF**

        **DEREK SELLS**, an attorney duly admitted to practice law in the State of New

York, affirms, pursuant to New York CPLR § 2106, the following under the penalty of

perjury:

        1.      I am the Chairman of the law firm THE COCHRAN FIRM N.Y. and

represent the New York State Trial Lawyers Association ("NYSTLA") for the purposes of

filing the *amicus curiae* brief attached hereto.  On behalf of NYSTLA, I submit this

affirmation in support of the motion for leave to file the attached brief as *amicus curiae* in

support of Plaintiffs-Respondents.

        2.      Our proposed *amicus curiae* brief is appended hereto as **EXHIBIT A**.

        3.      NYSTLA is a bar association, formed by and on behalf of plaintiffs' attorneys,

whose critical mission is to ensure access to civil justice for individuals who have been

wrongfully injured, and to support representation of the public by ethical and well-trained

attorneys.

4.      To that effect, NYSTLA makes this motion in further support of the Brief for

Plaintiffs-Appellant because the central issues on this appeal – the ability for litigants to have

access to discovery and the proper role of judge and jury in making factual determinations –

are matters of great interest and concern to NYSTLA.

5.      Specifically, we have filed this amicus brief because the District Court granted

summary judgment on Mr. Oakley's assault and battery claims before any discovery in this

matter was permitted or Defendants MSG Networks Inc., The Madison Square Garden

Company and MSG Sports & Entertainment, LLC (together, "Defendants") filed an

Answer in this case.  Instead, the District Court ruled as a matter of law that Defendants

used reasonable force when they physically removed Mr. Oakley from Madison Square

Garden ("MSG") based solely on a subset of videos self-servingly chosen by Defendants for

the District Court to review.  In determining this factual dispute without allowing discovery,

the District Court ignored the evidence provided by Mr. Oakley in the form of his sworn

affidavit.  By doing so, the District Court disregarded bedrock principles of federal litigation

regarding discovery being freely given and exceeded the authority of the Supreme Court

precedent it purported to follow, Scott v. Harris, 550 U.S. 372 (2007).  This decision cannot

be allowed to stand.

6.      For these reasons, NYSTLA respectfully seeks the Court's permission to file

the attached *amicus curiae* brief.

2

Dated:     New York, New York
              March 11, 2022

s/ Derek Sells

_____

Chairman
The Cochran Firm N.Y.
55 Broadway, 23rd Fl.
New York, New York 10006

3

# Exhibit A

# 21-2939-CV

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



CHARLES OAKLEY,

*Plaintiff-Appellant,*

*v.*

JAMES DOLAN, in his individual capacity, in his professional capacity,
MSG NETWORKS, INC., MADISON SQUARE GARDEN COMPANY,
MSG SPORTS & ENTERTAINMENT, LLC,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court,
Southern District of New York*

## BRIEF FOR *AMICUS CURIAE*
## THE NEW YORK STATE TRIAL LAWYERS ASSOCIATION

Derek S. Sells, Esq.
THE COCHRAN FIRM
*Attorneys for* Amicus Curiae
  *The New York State
  Trial Lawyers Association*
55 Broadway, 23rd Floor
New York, New York 10006
212-553-9120

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

DISCLOSURE STATEMENT ..................................................................1

STATEMENT OF INTEREST ..................................................................1

PRELIMINARY STATEMENT ................................................................3

PROCEDURAL BACKGROUND ............................................................5

I.     LEGAL STANDARD ...................................................................8

II.    THE VIDEO FOOTAGE IN THIS CASE DOES NOT
SUPPORT THE DISTRICT COURT'S GRANT OF
SUMMARY JUDGMENT .........................................................10

III.   POLICY CONSEQUENCES OF THE DISTRICT COURT'S
DECISION ..................................................................................19

CONCLUSION ......................................................................................29

CERTIFICATE OF COMPLIANCE ......................................................30

# TABLE OF AUTHORITIES

**Page(s)**

Cases

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)............................................................8

Bradshaw v. City of New York,
855 F. App'x 6 (2d Cir. 2021)...........................................11

Cioffi v. Averill Park Central School District
Board of Education,
444 F.3d 158 (2d Cir. 2006) ..............................................8

Coble v. City of White House, Tenn.,
No. 3:08-0314, 2009 WL 2850764
(M.D. Tenn. Aug. 29, 2009),
rev'd, 634 F.3d 865 (6th Cir. 2011) ..................................20

Graham v. Connor,
490 U.S. 386 (1989)....................................................10, 13

Hellstrom v. U.S. Dep't of Veterans Affs.,
201 F.3d 94 (2d Cir. 2000) ................................................9

Hernandez v. Denny's Corp.,
177 A.D. 3d 1372 (4th Dep't 2019)..................................12

Masson v. New Yorker Magazine,
501 U.S. 496 (1991)............................................................9

Maxwell v. City of New York,
380 F. 3d 106, 108 (2d Cir. 2004),
supplemented, 108 F. App'x 10 (2d Cir. 2005) ..................9

McKinnon v. Bell Sec.,
268 A.D.2d 220 (1st Dep't 2000) .......................................9

Noonan v. Luther,
206 N.Y. 105 (1912) ....................................................10, 13

Oakley v. MSG Networks,
   No. 17 Civ. 6903 (RJS), 2021 WL 5180229 (S.D.N.Y. Nov. 8,
   2021) ............................................................................................*passim*

Renfroe v. Parker,
   No. 18 Civ. 609 (DPJ) (LRA), 2019 WL 2410084
   (S.D. Miss. June 7, 2019),
   amended in part, No. 18 Civ. 609 (DPJ) (LRA), 2019 WL 3806641
   (S.D. Miss. Aug. 13, 2019),
   aff'd, 974 F.3d 594 (5th Cir. 2020),
   and aff'd, 974 F.3d 594 (5th Cir. 2020) .............................................21

Rucks v. City of New York,
   96 F. Supp. 3d 138 (S.D.N.Y. 2015) ....................................................9

Sanders v. Madison Sq. Garden, L.P.,
   525 F. Supp. 2d 364 (S.D.N.Y. 2007) .................................................17

Scott v. Harris,
   550 U.S. 372 (2007).......................................................................*passim*

United States v. Filani,
   74 F.3d 378 (2nd Cir. 1996) ...............................................................24

Zalewski v. Cicero Builder Dev., Inc.,
   754 F.3d 95 (2d Cir. 2014) .................................................................11

**Statutes**

Fed. R. Civ. P. § 56(c)...............................................................................8

**Other Authorities**

Adam Benforado, Frames of Injustice: The Bias We Overlook,
   85 Ind. L.J. 1333, 1349 (2010) ...........................................................26

Dan M. Kahan, *et al.*, Whose Eyes Are You Going to Believe?
   Scott v. Harris and the Perils of Cognitive Illiberalism,
   122 Harv. L. Rev. 837, 838 (2009)................................................22, 23

Forrest Plesko (Im)balance and (Un)reasonableness: High-Speed
   Police Pursuits, the Fourth Amendment, and Scott v. Harris,
   85 Denv. U. L. Rev. 463, 475 (2007) ..................................................25

iii

Harvard Law Review ................................................................22

Howard M. Wasserman, Video Evidence and Summary Judgment:
 The Procedure of Scott v. Harris, 91 Judicature 180 (2008) ........................25, 26

Naomi Mezey, The Image Cannot Speak for Itself:
 Film, Summary Judgment, and Visual Literacy,
 48 Val. U. L. Rev. 1, 8 (2013) ....................................................26, 27

Richard S. Walinski, The ABA's New Vision of the
 Jury's Function: An Opposing View, Litigation,
 Spring 2006 ....................................................................24

iv

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, New York State Trial Lawyers Association, by and through its undersigned attorney, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

> s/ Derek Sells_____
>
> Chairman
>
> The Cochran Firm N.Y.
>
> 55 Broadway, 23rd Fl.
>
> New York, New York 10006
>
> *Attorneys for The New York State Trial Lawyers Association*
>
> 82 Nassau Street
>
> New York, New York 10038
>
> (212)-349-5890

## STATEMENT OF INTEREST[1]

As Trial Lawyers who make up the New York State Trial Lawyers Association ("NYSTLA"), we fight on a daily basis to ensure that our clients get their day in Court and have their cases decided by trial finders of fact after a fair

---

[1] No party's counsel authored this brief in whole or in part. No party or its counsel contributed financial support intended to fund the preparation or submission of this brief. No individual or organization other than NYSTLA contributed financial support intended to fund the preparation or submission of this brief.

and robust discovery period. It is this drive that compels our organization to argue, as *Amici*, in favor of Mr. Oakley's appeal. Spurred on by our mission "[t]o promote a safer and healthier society, to assure access to the civil justice system by those who are wrongfully injured and to advance representation of the public by ethical, well-trained lawyers," to "assure that the wrongfully injured will have full access to the civil justice system" and ensure "that obstacles are not placed in the way of litigating all meritorious actions," we write to overturn the dismissal of Mr. Oakley's complaint. That decision rests on a clear determination of facts by the District Court**,** who instead of issue spotting made factual findings related to video evidence without viewing that evidence in the light most favorable to Mr. Oakley and without allowing Mr. Oakley to obtain any discovery or even receive an answer to his complaint in the case.

Specifically, we have filed this amicus brief because the District Court granted summary judgment on Mr. Oakley's assault and battery claims before *any* discovery in this matter was permitted or Defendants MSG Networks Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "Defendants") filed an Answer in this case. Instead, the District Court ruled as a matter of law that Defendants used reasonable force when they physically removed Mr. Oakley from Madison Square Garden ("MSG") based solely on a subset of videos self-servingly chosen by Defendants for the District

Court to review.  In determining this factual dispute without allowing discovery, the District Court ignored the evidence provided by Mr. Oakley in the form of his sworn affidavit.  By doing so, the District Court disregarded bedrock principles of federal litigation regarding discovery being freely given and exceeded the authority of the Supreme Court precedent it purported to follow, Scott v. Harris, 550 U.S. 372 (2007).  This decision cannot be allowed to stand.

## PRELIMINARY STATEMENT

The District Court's decision misapplied the fundamental holding in Scott which, the Supreme Court made clear, rested on both sides having the ability to support their respective allegations with discovery before a motion for summary judgment could be granted, even where video evidence is available.  Specifically, the Supreme Court stated:

> ***When opposing parties tell two different stories***, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380.

Mr. Oakley, unlike the plaintiff in Scott, was denied any opportunity to develop a full record in support of the allegations he has made in his Complaint. Instead, the District Court relied solely on a selection of videos submitted by Defendants and did not give Mr. Oakley a right to receive an answer before

3

proceeding to summary judgment. Plaintiff was also denied discovery of videos which showed different angles, or that captured views that were not shown in the hand-selected videos presented by Defendants, depositions, witness statements or communications among and between security personnel who threw Mr. Oakley out of MSG. Evidence of Mr. Oakley's behavior when he first entered MSG, and whether that behavior warranted the use of any force at all was effectively precluded. Similarly, the District Court ignored the affidavit submitted by Mr. Oakley himself, which affirmatively stated that he *never* tripped on his own and was instead pushed/pulled/dragged to the ground. Viewed fairly and in the light most favorable to Mr. Oakley, the evidence simply does not establish Defendants' right to a dismissal as a matter of law.

If ratified, the District Court's decision would invite judges to bypass pleadings, interrogatories, and document discovery and take over the fact-finding function of an impartial jury in cases where video evidence is involved. With the growing prevalence of body-worn cameras, this decision would impact a substantial number of excessive force, police shooting and other police brutality cases. These cases, which often turn on intent and motive, should not be decided based on a judge's interpretation of video evidence. As such, the decision to dismiss Mr. Oakley's case on summary judgment without the benefit of a full record must be reversed.

## **PROCEDURAL BACKGROUND**

Mr. Oakley commenced this action on September 12, 2017. Oakley v. Dolan, No. 17 Civ. 6903, Dkt. No. 1. The District Court granted Defendants' motion to dismiss on February 19, 2020, holding incorrectly that Mr. Oakley failed to allege MSG security guards used unreasonable force in ejecting him from the game, despite the plain words of the Amended Complaint alleging that Defendants unreasonably "grabbed him and pushed him to the ground." Id., Dkt. No. 68 at p. 16 (quoting Am. Compl, Dkt. No. 36 at p. 8). On November 16, 2020, this Court reversed the District Court ruling that the "District Court appear[ed] to have somewhat misunderstood Oakley's allegations." Id., No. 20-642, Dkt. No. 83-1 at p. 10. As a result, this Court held that the Amended Complaint properly alleged claims for assault and battery and reinstituted the Amended Complaint as to these two claims. Id. at p. 12.

On remand, the District Court did not require Defendants to answer the allegations of the reinstituted complaint or engage in discovery. Rather the Court permitted Defendants to file a motion for summary judgment on January 22, 2021. Oakley v. Dolan, No. 17 Civ. 6903, Dkt. No. 102.

Mr. Oakley opposed summary judgment arguing that he should be allowed discovery and that the video evidence raised substantial issues of fact including that one video lacked sound. Oakley v. Dolan, No. 17 Civ. 6903, Dkt. No. 112 at

5

p. 3.  Mr. Oakley also argued that the videos were incomplete as one lacked sound

and another one picked up only after the security guards had already approached

him.  They therefore did not contain footage that showed the lead up to the

approach or any discussions between the security guards and Mr. Oakley after he

was approached.  Id., Dkt. No. 110 at pp. 13-17.  None of the videos showed a

complete depiction (including with sound) of everything that Mr. Oakley

experienced after he entered MSG, or even from the moment he was first

approached by Defendants' security guards.

Mr. Oakley argued alternatively that viewing videos alone would not

provide sufficient proof as a matter of law to dispose of his claims.  Id., Dkt. No.

104-2b at 0:00-07:00.  The evidence showed when Mr. Oakley was approached by

a first guard, he reasonably sought to understand why he was being forced to leave

MSG.  Id., Dkt. No. 114 at p. 2.  Thereafter, several security guards surrounded

him simultaneous with a request to leave MSG.  Id., Dkt. No. 104-2b at 7:17-42.

Mr. Oakley affirmed that one guard pushed him back, id., Dkt. No. 104-2b at 8:02-

18, Dkt. No. 114 at p. 2, and that after being pushed he attempted to put up his

hands and walk away from the group who had gathered around him, id. at 8:26-40.

At this point, as Mr. Oakley affirmed, he felt one of the guards pushing him from

behind, causing him to fall. Id., Dkt. No. 104-2b at 8:39-41, Dkt. No. 114 at p. 2.

After getting back to his feet, he was grabbed by the guards and pulled

aggressively away.  Id., Dkt. No. 104-3 at 0:36-40.  Six guards participated in this

maneuver.  Id., Dkt. No. 104-3 at 0:40-0:44; Dkt. No. 104-4 at 1:01-06; Dkt. No.

104-1 at 0:23-26.  Mr. Oakley argued that viewing video evidence alone would not

allow the District Court to rule as a matter of law the amount of force to which he

was being subjected.  Mr. Oakley certainly made no attempt to resist.  Id., Dkt. No.

104-3 at 0:44-51.  Finally, Mr. Oakley affirmed that as they dragged him out, the

guards pulled Mr. Oakley to the ground.  Id., Dkt. No. 104-4 at 1:07-11; Dkt. No.

114 at p. 3.

The District Court relied upon the video evidence of Mr. Oakley's expulsion

from MSG in making its summary judgment decision, finding that "Surveillance

videos . . . though silent and low-resolution, capture every moment" and "video

taken by fans in the vicinity of the altercation captures the key moments of

Oakley's removal."  Oakley v. MSG Networks, No. 17 Civ. 6903 (RJS), 2021 WL

5180229, at *5 (S.D.N.Y. Nov. 8, 2021).  Relying on Scott, the District Court held

that it had a complete video record of events before it, such that it could rule on

Defendants' summary judgment motion without allowing Plaintiff to obtain any

discovery.  The District Court granted summary judgment, determining that the

video showed as a matter of law that Mr. Oakley "trips and falls to the ground,"

Oakley, 2021 WL 5180229 at *2, thereby ignoring Mr. Oakley's sworn affidavit

that he was pushed to the ground and that the video evidence did not show Mr.

7

Oakley's feet at the time he fell. It is important that the District Court made no finding regarding what it was that it believed Mr. Oakley tripped over or how the trip occurred or what part of the video blatantly contradicted Mr. Oakley's sworn affidavit that he was pushed and did not trip. The District Court also found the security guards' actions reasonable in part because Mr. Oakley had "unilaterally escalated the confrontation," id. at *5, without explaining the discrepancy shown on the video record between Mr. Oakley's peaceable entry and behavior that night prior to being approached by the security guards, or citing to any evidence that spoke to the guard's intent in confronting Mr. Oakley as an initial matter.

## I.   **LEGAL STANDARD**

Summary judgment should only be granted when, construing the facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The role of the court is to determine whether there is a genuine issue of fact for trial, not to determine the truth of a matter or weigh evidence. Cioffi v. Averill Park Central School District Board of Education, 444 F.3d 158 (2d Cir. 2006). When deciding a summary judgment motion, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor," Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), including "questions of credibility and the weight to be accorded to particular evidence."

Masson v. New Yorker Magazine, 501 U.S. 496 (1991). Significantly, "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Hellstrom v. U.S. Dep't of Veterans Affs., 201 F.3d 94, 97 (2d Cir. 2000).

New York law treats assault and battery as two separate claims. "[A]n assault is an intentional placing of another person in fear of imminent harmful or offensive contact," and "a battery is intentional wrongful physical contact with another person without consent." Rucks v. City of New York, 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015). In evaluating whether a property owner has used reasonable force to remove a licensee whose license has been revoked, the court must review all circumstances of the assault and battery claim and cannot rely merely on those related to the exact time of the removal. See Maxwell v. City of New York, 380 F. 3d 106, 108 (2d Cir. 2004), supplemented, 108 F. App'x 10 (2d Cir. 2005) ("application of force is excessive, . . . if it is objectively unreasonable in light of the facts and circumstances confronting [the defendants]") (internal quotations omitted); see, e.g., McKinnon v. Bell Sec., 268 A.D.2d 220, 221 (1st Dep't 2000) ("the trier of fact must determine whether plaintiff's demeanor and behavior aggressively precipitated the confrontation, to the extent of relieving defendant of responsibility.").

Since Mr. Oakley's removal did not involve police officers, Defendants cannot rely on the greater latitude to use force in the criminal context outlined by the Supreme Court in Graham v. Connor, 490 U.S. 386, 396-97 (1989), ("circumstances that are tense, uncertain, and rapidly evolving,") as no New York court has utilized that standard in a situation involving private property owners. In fact, New York courts have consistently held that a private property owner is required to give an invitee "reasonable" opportunity to depart following a request to leave in order for use of force to be justified. Noonan v. Luther, 206 N.Y. 105, 108 (1912).

## II. THE VIDEO FOOTAGE IN THIS CASE DOES NOT SUPPORT THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT

The District Court relied on Scott to justify dismissing Mr. Oakley's case without first providing discovery to him and in order to refute the facts alleged in his complaint that this Court previously found alleged a valid claim for excessive force. Specifically, the District Court erred when it relied on Scott and analyzed the summary judgment motion "in the light depicted by the videotape" instead of in the light most favorable to the non-movant. Scott, 550 US at 380.

At issue in Scott was dashboard footage from a police cruiser as it was involved in a long high-speed chase with plaintiff that clearly contradicted the plaintiff's version of events. Id. at 374–75. Because the Supreme Court found that "[t]he videotape quite clearly contradict[ed] the version of the story told by

10

respondent" it held that in deciding summary judgment, the district court could view the record "in the light depicted by the videotape," rather than in the light most favorable to the nonmovant.  Id. at 378, 380.

Obviously, there are some cases where video footage can be used to grant summary judgment under Scott and its progeny.  But those decisions should be reserved for the clearest cases, where the video footage is so incontrovertible that a plaintiff's claims would be impossible.  See, e.g., Bradshaw v. City of New York, 855 F. App'x 6, 10 (2d Cir. 2021) ("Bradshaw alleged and testified that Loesch punched him after he was handcuffed, but the video footage of the event conclusively shows that Loesch did not punch him, such that there is no genuine issue of material fact in this regard."); see also Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 106 fn. 20 (2d Cir. 2014) (record established beyond doubt that plaintiff designed homes in a "colonial" style, which could not be copyrighted, precluding a copyright violation claim).  In the context of an excessive force or battery case, a video might show, for instance, that the defendant never made physical contact with the plaintiff.

**This is not one of those cases.**  The video evidence in this summary judgment record does not provide the level of certainty in cases like Bradshaw, which turned on questions of discrete fact obviously perceptible from the footage. The District Court found that Mr. Oakley "trips and falls to the ground," without

11

any video evidence showing what it was that he tripped over or even showing his feet at the moment he supposedly tripped.  Oakley, 2021 WL 5180229 at *2.  This is not a case, for instance, where the video footage shows, *inter alia*, Mr. Oakley knocking his foot against an uneven sidewalk and falling with no one around him, such that it can be said to completely contradict his allegations that he was pushed or pulled to the ground.  In that scenario, dismissing his battery claims might be warranted.  In contrast, the District Court's trip-and-fall judgment is exactly the sort of interpretation that should *not* be up to a judge.  See Oakley v. Dolan, 980 F.3d 279, 284 (2d Cir. 2020) ("Because of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide."); Hernandez v. Denny's Corp., 177 A.D. 3d 1372, 1375 (4th Dep't 2019) (whether peace officers used unreasonable force in arresting restaurant customer who belligerent was question for jury).

Here, there is no question that Mr. Oakley was surrounded by several security guards and that they had their hands on him when he fell.  A two-dimensional video, that does not depict all the necessary angles, in an altercation involving several individuals, cannot and should not definitively be used to determine how much force these individuals used on Plaintiff.

A critical viewing of the selectively chosen video clearly demonstrates evidentiary gaps that raise questions of fact for a jury.  First, the video closest to

the action and with the highest resolution picks up *after* Mr. Oakley was already

approached by security and on his feet, though the other videos establish, and Mr.

Oakley's affidavit confirms, that he had been enjoying the game quietly and had

peacefully remonstrated with another security guard immediately beforehand. In

this video, there is no indication as to what Mr. Oakley did to warrant being

approached by a group of large men in the first instance. Without this context, the

District Court could not reasonably find that Mr. Oakley "unilaterally escalated the

confrontation." Oakley, 2021 WL 5180229, at *5. Rather, Noonan required the

District Court to consider whether Defendants initially gave Mr. Oakley a

reasonable chance to leave on his own, a question of fact that must be considered

in light of several factors the District Court failed to consider, including his

peaceable behavior up until then; testimony about what the guards said to Mr.

Oakley (not currently in the record); and the fact that any reasonable sports fan in

Mr. Oakley's position would have remonstrated on being told to vacate an

expensive, lawfully held seat. The Defendants' security guards were not, in short,

peace officers making a dangerous arrest, who might be owed some deference

under Graham and accordant cases. They were mostly private employees,

unknown to Mr. Oakley, acting precipitately, and, to his view, inexplicably, to

deprive him of the value of a service he had purchased.

This footage is from behind Mr. Oakley, but two security guards are seen confronting Mr. Oakley, who is pushed back by one of the guards.  Oakley v. MSG Networks, No. 17 Civ. 6903, Dkt. No. 104-2b at 8:02-18, Dkt. No. 114 at p. 2.  Mr. Oakley then attempts to put up his hands and walk away from the group who had gathered around him.  Id. at 8:26-40.  The first guard pushes him, causing him to fall.  Id., Dkt. No. 104-2b at 8:39-41.  Then, after Mr. Oakley stands up, he is grabbed by several security guards and is clearly dragged to the exit ramp, where he falls again, pulled to the ground by the guards.  Id., Dkt. No. 104-4 at 1:07-11; Dkt. No. 114 at p. 3.  The District Court found that Mr. Oakley tripped this second time as well, but if looked at in the light most favorable to Mr. Oakley, he passively allows himself to be escorted when without justification, security guards drag him to the ground as they turn a corner.  Id., Dkt. No. 104-3 at 0:44-51.  In addition, the video footage is incomplete because it does not contain any audio of what Defendants' security personnel said or did when they first approached Mr. Oakley.

In sum, the video raises far more questions than it can be said to definitively answer.  The District Court never queried, for instance, why a former professional athlete would simply fall on his own (twice), and, even while making this determination, showed no concern that the videos hid Mr. Oakley's feet which would show definitively whether Mr. Oakley tripped on his own.  Filling in that

gap—what happened out of the camera's view—requires factual interpretation, and such factual interpretation is the province of a jury, not the District Court.

Moreover, in this case, there is a question of fact that cannot be answered by the video related to the amount of force exerted upon Mr. Oakley during the expulsion. Indeed, the video evidence does not show the amount of force used against Mr. Oakley. Instead, the video shows that he was unquestionably touched by the Defendants' agents. The only people that know how much force the guards used are Mr. Oakley and the guards themselves. Mr. Oakley asserts that the force used was excessive and unreasonable which at this stage must be taken as true since it is not blatantly contradicted by the video and because Defendants have not offered any testimony from the guards. The District Court's conclusion that Mr. Oakley was not subjected to excessive force by Defendants is clearly erroneous. This is especially true because the only evidence in the record about the amount of force used against Mr. Oakley is supplied by Mr. Oakley's own affidavit. The District Court improperly ignored this affidavit instead of accepting it as true.

In this fashion, the decision raises issues of impartiality that we at NYSTLA are compelled to address. For background, in granting Defendants' motion to dismiss, the District Court held that "the mere allegation that the guards subsequently 'grabbed [him] and pushed him to the ground' is not enough to demonstrate unreasonable force." Oakley v. Dolan, No. 17 Civ. 6903 (RJS), 2020

15

WL 818920, at *13 (S.D.N.Y. Feb. 19, 2020). The District Court thus concluded that Mr. Oakley's pled allegations did not make out a claim for an unreasonable use of force. This Court, however, reversed the District Court on that point and sent the case back ostensibly to go through the discovery process after Defendants answered the well-pled complaint, explaining that "the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." Oakley v. Dolan, 980 F.3d 279, 284 (2d Cir. 2020) (internal quotations omitted).

Upon remand, however, by allowing the Defendants to move for summary judgment without having to answer Plaintiff's complaint or engage in discovery, the District Court has seemingly doubled down on its initial, erroneous legal conclusion under the guise of interpreting evidence. Add in the gratuitous comment made by the District Court that "from its inception, this case has had the feel of a public relations campaign" and it raises a significant question about the impartiality of the District Court. Id. at *17. From this openly hostile comment, it appears that the District Court had a clear and uncontrollable disdain toward Mr. Oakley since it called into question Mr. Oakley's true purpose in bringing his case without justification. There is nothing that Mr. Oakley did to generate that comment and the motivation behind the comment has not been made clear by the record. For example, the District Court did not mention anything about

16

Defendants Dolan and MSG's motives in possibly intentionally violating Mr. Oakley's rights as a former employee since they already have been found to have violated the rights of at least one other MSG employee whose case generated substantial negative publicity in the past. Sanders v. Madison Sq. Garden, L.P., 525 F. Supp. 2d 364 (S.D.N.Y. 2007). Comments such as these raise concerns about whether the District Court acted in a way that has at least raised the appearance of impropriety in its decision making.

Regardless of the motivation, the District Court failed to review whether the Defendants satisfied the requirement under New York law of providing Mr. Oakley with a reasonable opportunity to leave MSG once he was requested to do so and before they used force. Specifically, taken in the light most favorable to Mr. Oakley, the record shows that before he was surrounded by security personnel and put into fear, he acted in a lawful and peaceful manner. As such, the District Court's failure to find a question of fact about whether the Defendants' conduct was assaultive was erroneous. The burden was on the Defendants to justify that their approach to and swarming of Mr. Oakley was legally permissible. Instead of looking at this aspect of the record in the light most favorable to Mr. Oakley, the Court simply concluded based on its video interpretation that Mr. Oakley needlessly escalated the situation. This conclusion ignores the facts Mr. Oakley alleged regarding the assault and invites this Court to interpret video selectively

17

instead of spot issues of fact. Put differently, it is clear that the video evidence relied upon by the District Court did not blatantly show that the facts alleged by Mr. Oakley were false. The video evidence on this record shows that Mr. Oakley acted in a peaceful manner upon his entry into MSG before being assaulted by a swarm of officers and not given a reasonable time to leave before being pushed and battered.

Similarly, the District Court erroneously stated the law so that it fit with its selective use and interpretation of the video. For example, the District Court stated that a licensee who has paid for a ticket and is acting lawfully, must immediately leave the arena upon a first request. Oakley, 2021 WL 5180229, at *4-5. This is a misstatement of the law as it ignores those instances where law abiding, reasonably acting ticket holders are assaulted merely for questioning, in a peaceful fashion, why they are being asked to leave. By stating as a matter of law that Mr. Oakley was acting unreasonably when he lawfully questioned the first guard who approached about the decision to remove him, the District Court wrongly decided a clear question of fact that should have been determined by a jury. Whether the subsequent escalation and assault was caused by Defendants' excessive reaction to this lawful request looked at in the light most favorable to Mr. Oakley clearly presents a jury question.

18

### III.  POLICY CONSEQUENCES OF THE DISTRICT COURT'S DECISION

This case, if left undisturbed, represents a substantial extension of <u>Scott</u>, and an unjustified denial to the right of a jury trial.  The District Court here, after being reversed by this Court and told that Mr. Oakley's Complaint pled a claim for unreasonable force, did the following:  1) denied an answer from the Defendants to the well pled complaint; 2) denied discovery to Plaintiff;  3)  allowed Defendants instead to file a summary judgment motion;  4) allowed Defendants to selectively supply video evidence to support it; and 5) made findings of fact that were not supported by the video evidence.  The decision of the District Court has undermined the right of a litigant to have his day in Court after that litigant has pled a valid claim and raised triable issues of fact.  Future defendants armed with selective video will move for dismissal at the outset of cases and ask the courts to decide cases based on video evidence alone.  The idea of discovery being freely given will fall victim to the predilection of those district court judges who would be tempted to substitute their own judgments of video evidence instead of a jury's. That is not what the justice system envisions or requires.

<u>Scott</u>, the case upon which the District Court relied upon to make its pre-discovery, pre-answer determinations, involved a case that was only decided on summary judgment *after* discovery.  To preserve the separate spheres of judge and jury, the courts must continue to disfavor such wide deviations from the regular

19

process of discovery and summary judgment, and nothing about the <u>Scott</u> decision suggests otherwise. As discussed above, the procedure of <u>Scott</u> is intended for situations where both sides have told their story and the subsequent record conclusively and as a matter of law contradicts one side's story. Here, neither side has had the opportunity to tell their "story."

Both parties should have been allowed to proceed to discovery to develop the case before the District Court determined that Plaintiff's version of events was "blatantly contradicted" by the video footage. If the District Court's decision is permitted to stand, defendants in other cases will be able to argue that a single piece of evidence "blatantly contradicts" a plaintiff's claims, warranting summary judgment, before an answer is filed and before any discovery is taken. Although this case and <u>Scott</u> involve video footage, there is nothing stopping other courts from determining cases prior to trial based on evidence that is not as clear as video, *i.e.* photographs, text messages, *etc.*, that also "blatantly contradict" the plaintiff's claims as to warrant dismissal. A troubling trend is already beginning in the district courts of granting summary judgment based on such plainly inadequate, obviously limited evidence. For example, one district court relied on <u>Scott</u> to hold that an *audio recording* is sufficient to grant summary judgment on an excessive force claim. <u>Coble v. City of White House, Tenn.</u>, No. 3:08-0314, 2009 WL 2850764, at *11 (M.D. Tenn. Aug. 29, 2009), <u>rev'd,</u> 634 F.3d 865 (6th Cir. 2011).

20

Another relied on <u>Scott</u> to accept that "the jostling of [a] camera" supported the defendant's account that he was physically attacked, warranting summary judgment. <u>Renfroe v. Parker</u>, No. 18 Civ. 609 (DPJ) (LRA), 2019 WL 2410084, at *4 (S.D. Miss. June 7, 2019), <u>amended in part,</u> No. 18 Civ. 609 (DPJ) (LRA), 2019 WL 3806641 (S.D. Miss. Aug. 13, 2019), <u>aff'd,</u> 974 F.3d 594 (5th Cir. 2020), and <u>aff'd,</u> 974 F.3d 594 (5th Cir. 2020).

The District Court here, by focusing *purely* on the moments after Mr. Oakley was approached and surrounded by Defendants' security force, has further highlighted the disturbing trend of judicial overreach in the name of <u>Scott</u>. Since <u>Scott</u> was decided, commentators have rightly criticized it as an example of judicial overreach, requiring the assumption that a video always impartially portrays events when, in reality, a video will often tend to support the perspective of its creator.

To reiterate, the majority in <u>Scott</u> claimed that the video footage, which showed a police cruiser pushing Scott off the road in the midst of a highspeed chase, "blatantly contradicted" the plaintiff's claims that he was a victim of unreasonable force such that his version of events was a "visible fiction." Consequently, the Supreme Court held, no reasonable juror could find for the plaintiff. <u>Id.</u> at 381.

21

A noted academic study following the <u>Scott</u> decision demonstrated why judges should not decide cases based on video footage. Specifically, as part of a study published in the Harvard Law Review, legal professors showed the video in <u>Scott</u> to a large group of people across a variety of socio-economic backgrounds. Dan M. Kahan, *et al.*, <u>Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism</u>, 122 Harv. L. Rev. 837, 838 (2009). The study found that people from different backgrounds understood the video differently. Specifically, people's view of the video, and the reasonableness of the police officer's actions, turned on factors such as their race, economic status, political beliefs and background. <u>Id.</u> at 851-54 ("Beliefs about the extent to which the police in general abuse their authority (particularly against minorities), and correspondingly the relative preponderance of licit and illicit reasons for attempting to avoid police encounters, vary across sociodemographic and political groups. Identity-protective cognition thus suggests that people are likely to construe the facts depicted in the tape in a way that reinforces the beliefs that predominate among their peers") (internal citations omitted). Based on these individuals' backgrounds, they interpreted the video in <u>Scott</u> differently than did

the Supreme Court's majority, showing that videos, like any other piece of

evidence, is open to interpretation.[2]  As the study explained:

> Individuals who hold egalitarian and communitarian
> views, whose politics are liberal, who are well educated
> but likely less affluent, and whose ranks include
> disproportionately more African Americans and women,
> in contrast, were significantly more likely to form pro-
> plaintiff views and to reject the conclusion that the police
> acted reasonably in using deadly force to terminate the
> chase.

Id. at 879.  The authors referred to this phenomenon as "cognitive illiberalism"—

the ability to recognize the biases in people who hold contrary views but the

inability to recognize such biases in one's own views, which are instead considered

objectively accurate.  Scott invites cognitive illiberalism, by allowing judges to

side uncritically with the perspective of a video's creator under the illusion that a

video is always capable of portraying events objectively.

Juries, by contrast, guard against the bias of any one decision maker,

because they are pulled from a broad range of the population from different

backgrounds.  Therefore, the bias of any individual juror is mitigated through the

deliberation process of the whole.  It is worth discussing, in this regard, that the

entire American justice system expresses a degree of skepticism about the

---

[2]  Indeed, in spite of the Scott Court's pretense that it was taking the only reasonable view of the evidence, the Eleventh Circuit had previously found plaintiff's driving to be safe, responsible, and of no risk to others, as did the dissent in Scott itself.  Id. at 472-76.

impartiality of judges.  If judges were infallible, there would be no need for juries, and, for that matter, no need for appeals.  Every human action could be taped, and every stripe of social controversy could be safely submitted to individual judges for accurate, objective adjudication.  However, that is not how the justice system in America is designed to operate.  Every individual person sees the world from a perspective shaped by race, socioeconomic status, gender, politics and experience, and judges are no different.  It is for that reason that we do not leave any important decision solely to any one judge—and we do not leave it to any judge to tell us what the facts are.  Other systems, for instance, in civil law jurisdictions, leave far more discretion to magistrates, who "[w]hen presented with civil or criminal complaints . . . have the obligation to conduct independent investigations" and who have "the primary responsibility for developing the evidence."  Richard S. Walinski, The ABA's New Vision of the Jury's Function: An Opposing View, Litigation, Spring 2006, at 5, 58 (quoting United States v. Filani, 74 F.3d 378, 383 (2nd Cir. 1996)).

The fact that the District Court in this case relied on the self-selected videos submitted by Defendants does not change this analysis, nor does it insulate the grant of summary judgment from judicial review.  It may be tempting to believe that video footage is unimpeachable and always accurate, a sentiment well-captured by the famous broadcasting slogan, "Let's go to the video tape."  But

making a complex factual judgment about a legal concept is very different from watching a slow-motion video of a sports play to see if a ball crossed a line or if two players came into contact (decisions that are often difficult enough even for teams of professionals who view similar videos on a daily basis after having received substantial training in the process).  As one commentator has pointed out in discussing <u>Scott</u>:

> to recognize how all film manifests a distinct point of view (and not others) and how it is inevitably framed (by the size of the camera and the length of the film) to exclude what other witnesses to the event would have seen is a grave error on the part of a fact-finder—or a film critic. Films never speak for themselves; they require interpretation.

Forrest Plesko, <u>(Im)balance and (Un)reasonableness: High-Speed Police Pursuits, the Fourth Amendment, and Scott v. Harris</u>, 85 Denv. U. L. Rev. 463, 475 (2007).

Social scientists have been aware of such perceptional biases for decades. As another commentator has explained:

> Video of an event is not the event itself, but merely evidence of the event. Video, like any representational form, must be interpreted, and its specific language and its way of constructing meaning must be accounted for. Factfinders must interpret and judge a film's message, just as they interpret and judge all evidence and testimony; just as no witness is infallible, no film is singular in its meaning or significance.

Howard M. Wasserman, <u>Video Evidence and Summary Judgment: The Procedure of Scott v. Harris</u>, 91 Judicature 180, 182 (2008) (internal quotations omitted).

There is also the fact that the perspective from which the video footage is recorded could influence the viewer's perception of who is at fault. Adam Benforado, Frames of Injustice: The Bias We Overlook, 85 Ind. L.J. 1333, 1349 (2010) ("In other words, different points of view (i.e., the different frames) mean that different things draw our focus and it is those conspicuous elements to which we tend to overattribute causality"); see also Naomi Mezey, The Image Cannot Speak for Itself: Film, Summary Judgment, and Visual Literacy, 48 Val. U. L. Rev. 1, 8 (2013) ("the sight captured in the image produces at least one way of seeing-- though often more--and excludes others, and our viewing of the image produces at least another way of seeing--though often more--and excludes others"). As Professor Benforado has written, "the way we make attributions of causation, responsibility, and blame are powerfully influenced by how facts, images and stories are revealed to us." Benforado at 1347. For instance, studies have shown that people observing filmed events of a single actor will tend to view the actor's actions in terms of surrounding circumstances, while those viewing the same events from the actor's point of view will tend to place less emphasis on surrounding circumstances. Id. at 1349. Other studies have found that people who view a taped interrogation are more likely to find a confession coerced when the questioning detective is filmed from the prisoner's point of view, and more likely

to find a confession voluntary when the same interaction is viewed from the detective's point of view.  Id. at 1350.

Justice Stevens, in his dissent to Scott, touched upon the concept of perceptional bias in his critique of the majority's viewing of the police chase, which was filmed entirely from the perspective of the pursuing police cruiser.  For instance, while the majority found that the video showed the plaintiff running red lights, Justice Stevens pointed out that the footage showed only the police cruiser running red lights, and, since the plaintiff was actually driving significantly ahead of the police cruiser, it did not actually show whether the plaintiff had done so as well.  Wasserman at 183.  Thus, if interpreted maximally, as Professor Plesko points out, the Scott decision threatens to change the summary judgment standard in deadly force cases to whether the violation is "so egregious that it is unquestionable."  Plesko at 477.

As the above commentators on Scott v. Harris have observed, different people, from different backgrounds, could view a tall Black man being approached by several large security guards differently.  Having watched the video footage ourselves, the NYSTLA believes that Mr. Oakley has raised a question of fact regarding whether he was unreasonably pushed to the ground that requires a jury's determination.  When looked at in the light most favorably to Mr. Oakley, he was without question pushed to the ground and NYSTLA believes he should be

27

allowed to complete discovery and have a trial before fair and impartial decision makers.

Amplification of the record in a case involving video footage is necessary because video evidence standing alone, can be deceptive and therefore problematic as some viewers tend to confidently approach video proof as being objective. Because it invites "cognitive illiberalism," and because video is just as prone to subjectivity as any other evidence, Scott should be interpreted as narrowly as possible in favor of jury fact-finding. It is overreaching to wield that case, as the District Court did here, first, *to narrow the range of video evidence*, and then, looking only at one piece of the video, to draw adverse inferences that could, logically, depend on unseen action, like the assumptions the majority used to conclude that Scott ran redlights which Justice Stevens highlighted in the Scott decision. Here, the video footage does not show Mr. Oakley's feet, nor does it conclusively disprove his claim that he was pushed to the ground. As such, the facts drawn by the District Court as a matter of law, came not from the video evidence alone but were also derived from inferences the District Court chose to use in the non-movants' favor. For example, one could rightfully question whether Mr. Oakley, a once famous basketball player still fit and in good health, actually tripped on his own, without provocation *twice* or whether the District Court's decision on this point exemplified the perceptional bias described by some of those

28

who question the underpinnings of the <u>Scott</u> decision.  No matter the answer, on this record, Mr. Oakley deserves his day in Court and his right to have a trial by jury.

## <u>**CONCLUSION**</u>

Allowing defendants to obtain an early dismissal, as Defendants obtained in this case, would ensure that victims are not able to adjudicate their claims on the merits, denying them the opportunity to take full advantage of their rights under the justice system.  This is antithetical to the NYSTLA's mission and warrants reversal of the District Court's decision in this case.

Dated:    New York, New York
           March 11, 2022

\s\ Derek S. Sells
Derek S. Sells, Esq.
The Cochran Firm
55 Broadway, 23rd Floor
New York, New York 10006
212-553-9120
dsells@cochranfirmny.com

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Dated:   New York, New York
             March 11, 2022

                                  Respectfully submitted,

                                  \s\ Derek S. Sells
                                  Derek S. Sells, Esq.
                                  The Cochran Firm
                                  55 Broadway, 23rd Floor
                                  New York, New York 10006
                                  212-553-9120
                                  dsells@cochranfirmny.com