# 21-2939-cv

## United States Court of Appeals

### for the

## Second Circuit

CHARLES OAKLEY,

*Plaintiff-Appellant,*

*v.*

JAMES DOLAN, in his individual capacity, in his professional capacity,
MSG NETWORKS, INC., MADISON SQUARE GARDEN COMPANY, and
MSG SPORTS & ENTERTAINMENT, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR DEFENDANTS-APPELLEES

Randy M. Mastro
Akiva Shapiro
Declan T. Conroy
Alexandra Perloff-Giles
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 351-2427
rmastro@gibsondunn.com

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee MSG Sports & Entertainment, LLC states that it is now named MSG Entertainment Group, LLC.  It is wholly owned by its parent company, Madison Square Garden Entertainment Corp. (NYSE: MSGE).  Madison Square Garden Entertainment Corp. does not have a parent corporation, and no publicly traded company owns 10% or more of the company.  Defendant-Appellee The Madison Square Garden Company states that it is now named Madison Square Garden Sports Corp. Madison Square Garden Sports Corp. is a publicly traded company (NYSE: MSGS).  It does not have a parent corporation, and no publicly traded company owns 10% or more of Madison Square Garden Sports Corp.  Defendant-Appellee MSG Networks Inc. states that it is wholly owned by its parent company, Madison Square Garden Entertainment Corp. (NYSE: MSGE).

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED............................................6

COUNTERSTATEMENT OF THE CASE................................................7

    I.    Factual Background............................................................7

    II.    Procedural History............................................................12

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW ...................................................................20

ARGUMENT ...................................................................................21

    I.    The District Court Correctly Granted Summary Judgment in Defendants' Favor Based on Dispositive Video Evidence ................21

        A.    The Uncontroverted Video Evidence Establishes That Defendants Did Not Use Objectively Unreasonable Force in Removing Oakley ................................................21

        B.    Oakley's Arguments to the Contrary Are Unavailing ..............34

    II.    The District Court's Denial of Oakley's Request for Discovery Was Not an Abuse of Discretion........................................44

    III.    The District Court Did Not Abuse Its Discretion in Denying Oakley's Motion for Leave to Further Amend His Complaint..........48

CONCLUSION ................................................................................54

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abraham v. Am. Home Mortg. Servicing, Inc.*,
947 F. Supp. 2d 222 (E.D.N.Y. 2013) ...................................................49

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ...................................................50

*Aldridge v. City of Warren*,
682 F. App'x 461 (6th Cir. 2017) ........................................................45

*Allianz Ins. Co. v. Lerner*,
416 F.3d 109 (2d Cir. 2005) ..........................................................5, 42

*Alphonse Hotel Corp. v. Tran*,
828 F.3d 146 (2d Cir. 2016) ...............................................................45

*Am. Infertility of N.Y., P.C. v. Verizon N.Y. Inc.*,
70 Misc. 3d 1001 (N.Y. Cnty. Sup. Ct. 2020) ...................................41

*Amnesty America v. Town of West Hartford*,
361 F.3d 113 (2d Cir. 2004) ...............................................................37

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
757 F.2d 523 (2d Cir. 1985) ...............................................................26

*Benitez v. Healy*,
2017 WL 9673721 (S.D.N.Y. June 7, 2017) .....................................34

*Bigio v. Coca-Cola Co.*,
675 F.3d 163 (2d Cir. 2012) ...............................................................49

*Blackwood v. Omorvan*,
2018 WL 816839 (S.D.N.Y. Feb. 8, 2018) ........................................53

*Ceara v. Deacon*,
916 F.3d 208 (2d Cir. 2019) ...............................................................51

*Cho v. Blackberry Ltd.*,
991 F.3d 155 (2d Cir. 2021) ...............................................................52

*Chunn v. Amtrak*,
916 F.3d 204 (2d Cir. 2019) ..............................................49

*Cnty. of Washington v. Cntys. of Warren & Washington Indus. Dev. Agency*,
2 F. App'x 71 (2d Cir. 2001) ..............................................51

*Conn. Nat'l Bank v. Trans World Airlines, Inc.*,
762 F. Supp. 76 (S.D.N.Y. 1991) ..............................................46

*Contemp. Mission, Inc. v. U.S. Postal Serv.*,
648 F.2d 97 (2d Cir. 1981) ..............................................45, 48

*Crescent Beach Club LLC v. Indian Harbor Ins. Co.*,
468 F. Supp. 3d 515 (E.D.N.Y. 2020) ..............................................45

*Crump v. QD3 Ent., Inc.*,
2011 WL 446296 (S.D.N.Y. Feb. 3, 2011) ..............................................46

*Demery v. Extebank Deferred Comp. Plan (B)*,
216 F.3d 283 (2d Cir. 2000) ..............................................46

*Doe ex rel. Doe v. Whelan*,
732 F.3d 151 (2d Cir. 2013) ..............................................20

*Dore v. Wormley*,
690 F. Supp. 2d 176 (S.D.N.Y. 2010) ..............................................41

*Duna v. City of New York*,
2019 WL 4735354 (S.D.N.Y. Sept. 27, 2019) ..............................................31

*EDP Med. Comp. Sys., Inc. v. United States*,
480 F.3d 621 (2d Cir. 2007) ..............................................52

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009) ..............................................45, 46

*In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*,
391 F.3d 401 (2d Cir. 2004) ..............................................53

Page(s)

*Feaster v. City of Middletown*,
2016 WL 10570984 (S.D.N.Y. Nov. 28, 2016).....................................21

*Foye v. Sewell*,
1888 WL 2486 (N.Y. Com. Pl. 1888).................................................41

*Franks v. City of New York*,
2017 WL 1194500 (E.D.N.Y. Mar. 31, 2017)....................................31

*Gambrel v. Knox County, Kentucky*,
25 F.4th 391 (6th Cir. 2022) ............................................................37

*Graham v. Connor*,
490 U.S. 386 (1989).........................................................32, 41, 43

*Gualandi v. Adams*,
385 F.3d 236 (2d Cir. 2004) ............................................................47

*H. L. Moore Drug Exch., Inc. v. Smith, Kline & French Lab'ys*,
384 F.2d 97 (2d Cir. 1967) ..............................................................44

*Halebian v. Berv*,
869 F. Supp. 2d 420 (S.D.N.Y. 2012) ..............................................46

*Haran v. Dow Jones & Co.*,
216 F.3d 1072 (2d Cir. 2000) ..........................................................46

*Health-Chem Corp. v. Baker*,
915 F.2d 805 (2d Cir. 1990) ............................................................50

*Impastato v. Hellman Enters., Inc.*,
147 A.D.2d 788 (3d Dep't 1989).....................................................40

*Kalfus v. N.Y. & Presbyterian Hosp.*,
476 F. App'x 877 (2d Cir. 2012) ...............................................24, 35

*Kalfus v. N.Y. & Presbyterian Hosp.*,
706 F. Supp. 2d 458 (S.D.N.Y. 2010) ..........................................3, 33

*L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*,
198 F.3d 85 (2d Cir. 1999) .......................................................52, 53

Page(s)

*United States ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016) ..........................................................20, 48

*Ladoucier v. City of New York*,
    2011 WL 2206735 (S.D.N.Y. June 6, 2011) ...............................5, 43

*Lin v. City of New York*,
    2016 WL 7439362 (S.D.N.Y. Dec. 21, 2016) ....................................34

*Lowth v. Town of Cheektowaga*,
    82 F.3d 563 (2d Cir. 1996) ........................................................21, 31

*Lucente v. Int'l Bus. Machs. Corp.*,
    310 F.3d 243 (2d Cir. 2002) ................................................................49

*Lunts v. Rochester City Sch. Dist.*,
    515 F. App'x 11 (2d Cir. 2013) ..........................................................45

*Madden v. Queens Cnty. Jockey Club, Inc.*,
    296 N.Y. 249 (1947) ..........................................................................40

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012) .........................................................3, 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................20

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ......................................................49, 50

*Mitchell v. N.Y. Univ.*,
    2014 WL 123255 (N.Y. Cnty. Sup. Ct. Jan. 8, 2014) .................31, 41

*Noonan v. Luther*,
    206 N.Y. 105 (1912) ..........................................................................41

*Oakley v. Dolan*,
    2020 WL 818920 (S.D.N.Y. Feb. 19, 2020) ................................13, 52

*Oakley v. Dolan*,
    833 F. App'x 896 (2d Cir. 2020) ......................................................13

*Oakley v. Dolan,*
   980 F.3d 279 (2d Cir. 2020) ........................................................*passim*

*Paddington Partners v. Bouchard,*
   34 F.3d 1132 (2d Cir. 1994) ...............................................................45

*Posr v. Doherty,*
   944 F.2d 91 (2d Cir. 1991) ...............................................21, 32, 41

*Pratt v. Nat'l R.R. Passenger Corp.,*
   709 F. App'x 33 (2d Cir. 2017) ...................................................3, 34

*Raspardo v. Carlone,*
   770 F.3d 97 (2d Cir. 2014) ................................................................36

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.,*
   2008 WL 4962985 (S.D.N.Y. Nov. 20, 2008).....................................52

*Roper v. City of New York,*
   2017 WL 462270 (S.D.N.Y. Jan. 25, 2017) .......................................52

*Ryan v. City of New York,*
   2018 WL 3364580 (N.Y. Cnty. Sup. Ct. July 5, 2018) .....................31

*Scott v. Harris,*
   550 U.S. 372 (2007)...............................................................*passim*

*Segal v. Firtash,*
   2014 WL 4470426 (S.D.N.Y. Sept. 9, 2014) .....................................49

*Smith v. United States,*
   843 F.3d 509 (D.C. Cir. 2016).............................................................45

*Tardif v. City of New York,*
   2017 WL 571016 (S.D.N.Y. Feb. 6, 2017) .........................................25

*Tardif v. City of New York,*
   991 F.3d 394 (2d Cir. 2021) ........................................................42, 43

*United States v. Williams,*
   475 F.3d 468 (2d Cir. 2007) ...............................................................40

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................5

*Willis v. City of New York*,
    2004 WL 555685 (S.D.N.Y. Mar. 19, 2004)....................................31

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ........................................................20, 44

*Zahra v. Town of Southold*,
    48 F.3d 674 (2d Cir. 1995) .............................................................50

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ...........................................................37

## Statutes

42 U.S.C. § 1983 ................................................................................21, 42

## Other Authorities

Denise K. Barry, *Snap Judgment: Recognizing the Propriety and
    Pitfalls of Direct Judicial Review of Audiovisual Evidence at
    Summary Judgment*, 83 Fordham L. Rev. 3343, 3385 (2015) ....................38, 39

## INTRODUCTION

For the past five years, plaintiff Charles Oakley has put out a counter-factual narrative—to courts and the media—about his February 2017 removal from Madison Square Garden. But dispositive video evidence capturing this entire incident conclusively established his narrative to be false and his case to be over. After this Court affirmed the dismissal of almost all of Oakley's claims on the pleadings—remanding only his assault and battery claims—the narrow issue remaining in the case was straightforward: whether Oakley could meet his burden of establishing that the force used to remove him from Madison Square Garden was objectively unreasonable. After the district court reviewed five separate videos taken from multiple angles and recording the entirety of Oakley's removal, the district court granted Defendants' motion for summary judgment and dismissed Oakley's sole remaining assault and battery claims. Judge Sullivan, who retained the case after joining this Court, was clear that "the undisputed video evidence conclusively demonstrates that the Garden's security guards did not use excessive force as they escorted Oakley from the arena," and "no rational jury could conclude otherwise." (SPA-10.) While Oakley's appeal tries to sidestep this undisputed video evidence, Judge Sullivan put it succinctly: "[T]his case is no longer about words. It's about evidence." (SPA-10.) And because "the video footage conclusively rebuts Oakley's version of events—and vindicates Defendants' version" (SPA-8)—this

1

Court should affirm the dismissal on summary judgment of Oakley's few remaining claims.

The undisputed video evidence submitted in this case proved that Oakley's allegations about the force used to effectuate his removal—allegations repeated here on appeal—are false, and that no rational jury could possibly conclude that the force used by MSG security guards was unreasonable. For example, as Judge Sullivan correctly found, the video evidence definitively shows that Oakley was not "grabbed," "pushed," or "forcibl[y] shove[d] . . . to the ground" (SPA-7; *contra* A-98, Pl.'s Br. 2, 6, 16); he was not "physically grabb[ed]" and thereby forced to use "self-defense" (SPA-7; *contra* A-98, Pl.'s Br. 6, 16); he was not later "thrown onto the ground" or "drag[ged] . . . to the ground" for a second time (SPA-7–8; *contra* A-98, Pl.'s Br. 3, 6, 16); he was not "imped[ed]" or otherwise prevented from returning to his feet after he fell (SPA-8; *contra* A-99, Pl.'s Br. 16); and he was not "roughly thr[own]" or "dragged" "out of the Garden" (SPA-8; *contra* A-99, Pl.'s Br. 6). Instead, the video evidence demonstrates that it was Oakley who "escalated" the situation (SPA-7), including by (i) repeatedly refusing to comply with lawful requests to leave; (ii) initiating and engaging in violent conduct after being asked to leave; (iii) screaming profanities at an NYPD officer and MSG employees; and (iv) physically attacking multiple MSG security guards. (SPA-2–3.) The video evidence also reveals critical details regarding the context of Oakley's removal—which

Oakley notably fails to mention on this appeal—including that one or more uniformed NYPD officers were present at all times and assisted at all stages of Oakley's removal, and, in fact, handcuffed Oakley during the removal (*see*, *e.g.*, A-369 2:23), making this case directly comparable to those Oakley seeks to distinguish on grounds they involved police officers, *see*, *e.g.*, *Kalfus v. N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458, 472–73 (S.D.N.Y. 2010), *aff'd*, 476 F. App'x 877 (2d Cir. 2012).

In light of the dispositive video evidence, the district court correctly concluded that the limited force used to effectuate Oakley's removal—which resulted in no injuries to Oakley—was not objectively unreasonable. Reliance on such video evidence to dismiss allegations of excessive force at the summary judgment stage finds ample support in the case law, including before this Court. *See*, *e.g.*, *Kalfus*, 476 F. App'x at 880–81 (affirming summary judgment where video evidence established that patrolmen "used only objectively reasonable force under the circumstances" when arresting plaintiff); *accord Pratt v. Nat'l R.R. Passenger Corp.*, 709 F. App'x 33, 34 (2d Cir. 2017); *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012).

Oakley's legal and factual arguments to the contrary are meritless. For instance, Oakley argues that his self-serving affidavit should be afforded more weight than video evidence that captures the entire incident from multiple angles

and exposes the falsity of his allegations.  (*See* Pl.'s Br. 21–26.)  But binding Supreme Court precedent is clear:  Where "videotape quite clearly contradicts the version of the story told by" a plaintiff, a court  "should . . . view[] the facts in the light depicted by the videotape" and grant summary judgment for the defendant.  *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]").  Likewise, as this Court already found on Oakley's initial appeal, "the reason" for Oakley's ejection is irrelevant because, in this Court's own words, the only remaining question is whether "the security guards used excessive force in *accomplishing*" Oakley's removal.  *Oakley v. Dolan*, 980 F.3d 279, 283 (2d Cir. 2020) (emphasis added).  Again, the district court's holding is inescapable:  "[t]here is no interpretation of the video footage that could lead a reasonable jury to conclude that the degree of force used . . . was 'objectively unreasonable.'"  (SPA-7.)

Oakley's additional bases for appeal are equally deficient.  Oakley asserts that the district court abused its discretion by refusing to permit him to seek discovery prior to granting summary judgment to Defendants.  However, like the rest of

Oakley's brief, that argument ignores the dispositive video evidence that forecloses his claims. And the authenticity of that video evidence is undisputed.[1]

Nor is there any merit to Oakley's argument that the district court abused its discretion in not allowing Oakley to file a proposed Second Amended Complaint on the eve of his case's dismissal, after Oakley had already amended his complaint once before, and after this Court already affirmed a prior denial of leave to amend. Oakley's proposed amendment—which is premised on a theory of derivative liability that necessarily fails because of the dismissal of his underlying assault and battery claims—is not only futile, but also barred by *res judicata* and the applicable statute of limitations.

More than five years have now passed since Oakley's removal from MSG. At the summary judgment stage, Oakley can no longer evade the truth, revealed in these dispositive videos. And the truth, as Judge Sullivan correctly found, is that

---

[1] Oakley also now argues for the first time on this appeal that his claimed fear of imminent harm is sufficient to establish assault and therefore should preclude summary judgment. He is wrong as a matter of law under the circumstances presented here. Since Defendants had a right to use reasonable force to remove Oakley, he cannot assert a claim for mere purported *fear* of harm. *See*, *e.g.*, *Ladoucier v. City of New York*, 2011 WL 2206735, at *6 (S.D.N.Y. June 6, 2011) (explaining that, under New York law, an assault claim in the parallel context of a lawful arrest requires a "*reasonable* fear" of "*unreasonable* wrongful physical contact"). And just as importantly, he has waived any such claim by failing to raise it previously. *See*, *e.g.*, *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005).

Defendants removed Oakley from the Garden on February 7, 2017, "by using a degree of force that was indisputably reasonable and appropriate under the circumstances." (SPA-10.) Accordingly, this Court should affirm the district court's judgment dismissing what little remained of Oakley's case.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.      Did the district court properly grant Defendants summary judgment on Oakley's sole remaining claims of assault and battery, when it found that multiple dispositive videos of Oakley's removal from Madison Square Garden, taken from multiple angles and capturing the entire incident, wholly undermine Oakley's allegations and establish that Defendants did not use objectively unreasonable force to effectuate Oakley's removal?

2.      Did the district court abuse its discretion in determining that no further discovery was necessary before granting summary judgment, where the dispositive video footage captured Oakley's removal from multiple angles and covered the entirety of the incident, and where Oakley has failed to articulate what further factual discovery could reasonably be expected to create any genuine issue of material fact?

3.      Did the district court abuse its discretion in declining to give Oakley a third bite at the apple to file yet another amended pleading where, as here, the new theory he wants to assert would necessarily fail because it seeks to impose derivative

liability relating to his legally deficient assault and battery claims, and where he waited years to raise it, even though all relevant facts were long known to him?

## COUNTERSTATEMENT OF THE CASE

### I.    Factual Background

#### A.    Oakley Attends the February 8, 2017 Knicks Game at MSG, Refuses to Comply with Requests to Leave, and Attacks a Security Guard

On February 8, 2017, Plaintiff Charles Oakley, a 6'8" former basketball player with the New York Knicks, attended a Knicks game at Madison Square Garden.  (A-96.)  During the course of the game, Oakley was approached by MSG security guards and a uniformed NYPD officer.  (A-367 7:55–8:15.)  One of the MSG security guards who approached Oakley asked him to leave the Garden.  (A-97.)  Oakley refused to comply with the request to leave.  (A-97; A-367 7:55–9:25.)

Instead of leaving, Oakley exchanged words with the MSG security guards while remaining in his seat.  (A-367 7:55–8:14.)  Oakley then rose from his seat and lunged at that security guard.  (A-367 8:14.)  The MSG security guard leaned away and raised two open hands, to which Oakley responded by extending his right arm at the security guard.  (A-367 8:14–18.)

At this point, the uniformed NYPD officer and a separate MSG security guard restrained Oakley, and a third MSG security guard stepped in between Oakley and the first guard.  (A-367 8:16–19.)  Oakley responded to this by extending his right arm at the second security guard's neck, causing the guard's head to violently snap

7

backwards.  (A-367 8:19–22.)  In response, the uniformed NYPD officer and an MSG security guard once again attempted to restrain Oakley from behind.  (A-367 8:22–27.)

### B. Oakley Falls to the Ground, Continues to Resist Removal, and Attacks Two More MSG Security Guards

After these initial exchanges with MSG security guards and an NYPD officer, Oakley continued to refuse to leave MSG.  Once he was released by the NYPD officer and MSG security guard, Oakley tried to move away from them.  (A-367 8:35–42; A-369 0:10–16.)  Once Oakley reached the end of the row where the steps for that section are located, Oakley fell to the ground.  (*Id.*)  Prior to Oakley's fall, neither the MSG security guards nor the NYPD officer applied any meaningful force to Oakley's body (*see id.*), and in fact one MSG security guard tried to grab Oakley's arm in an apparent effort to *prevent* him from falling (A-369 0:13–14).

Upon returning to his feet, Oakley immediately began screaming "that's some bullsh*t" at the uniformed NYPD officer and an MSG security guard.  (A-368 0:03–06.)  The MSG security guard responded by asking Oakley to "please walk."  (A-368 0:06–14.)  Oakley did not comply.  Instead, Oakley stated that he was "good right here" and that he was "not talking to [the MSG security guard]," and once again yelled at the NYPD officer, "that's some bullsh*t."  (A-368 0:08–17.)

At this point, Oakley turned back to the MSG security guard and told him to "get the f**k out of my face."  (A-368 0:17–20.)  The security guard said "no

8

problem" and tried to walk around Oakley, but Oakley prevented the security guard from leaving. (A-368 0:18–22.) Instead, Oakley stuck a finger in the security guard's face (A-368 0:19–22), bumped the guard's chest as the guard tried to walk away (A-368 0:23–27), and shouted "I said it to your motherf**king face, motherf**ker" (*id.*). Then, in plain view of the NYPD officer, Oakley struck the security guard in the forehead, forcing the man's head backwards and evoking audible gasps from the crowd. (A-368 0:29–34; A-369 0:48–50.)

Following Oakley's attack on the MSG security guard, a different MSG security guard placed one hand on Oakley's arm and an open hand on Oakley's back. (A-368 0:30–34.) Oakley responded by chopping down on that security guard's arm and screaming "get off of me." (A-368 0:34–36; A-369 0:52–54.) Oakley then twice shoved the second security guard into a row of seats. (A-365 0:09–11; A-368 0:36–40.)

### C. Oakley Is Escorted from the Seating Area by MSG Security Guards and an NYPD Officer, Falls for a Second Time, and Physically Resists Removal

After these attacks on MSG security personnel, an MSG security guard asked the NYPD officer to "do something." (A-368 0:38–41; A-369 0:58–59.) At this point, the NYPD officer and MSG security guards who had witnessed Oakley's violent conduct physically restrained Oakley and began to escort him out of the arena. (A-365 0:15–21; A-368 0:40–50; A-369 0:58–1:07.)

As Oakley was being led to the exit, he initially remained on his feet, walking alongside the NYPD officer and MSG security guards at a steady pace. (A-365 0:15–21; A-368 0:45–50; A-369 1:02–07.) However, as the group approached the tunnel that leads away from the seating area, Oakley attempted to turn himself around to face the opposite direction from the exit to which he was being led. (A-365 0:18–22; A-368 0:48–51; A-369 1:06–09.) In so doing, Oakley fell backwards to the floor. (A-365 0:21–25; A-368 0:50–54; A-369 1:07–24.) Once again, video footage from multiple sources and multiple angles confirms that neither the MSG security guards nor the uniformed NYPD officer pushed or otherwise threw Oakley to the ground at this point in his removal. (*See id.*)

Once on the ground, Oakley refused to get up—this time for approximately 80 seconds. (A-369 1:09–2:29.) When Oakley was specifically asked to "get up" and "stand up" (A-369 1:15–25), he responded by yelling at the NYPD officer and MSG security guards to "get the f**k off of me" (A-369 1:13–15, 1:23–28)— notwithstanding the fact that nobody was on Oakley or otherwise restraining him— and plainly stated that "I don't want to stand up" (A-369 1:33–34). Oakley continued to resist his removal even after a second uniformed NYPD officer joined the group attempting to escort Oakley out of the arena, and even after he was explicitly advised that he was "not cooperating." (A-365 0:30–32; A-368 1:06–10; A-369 1:28–2:13.)

### D. Oakley Continues to Resist Removal, Is Handcuffed by an NYPD Officer, and Is Escorted from MSG in an NYPD Van

Once Oakley returned to his feet, an NYPD officer handcuffed Oakley's right wrist. (A-369 2:23–30.) Oakley responded by telling the police officer "you ain't tough" and attempting to strike that officer with his left fist. (A-369 2:29–31.) Oakley then grabbed a railing with both hands, and declared that his removal was "bulls*t." (A-369 2:32–54.) Oakley refused to let go of the railing even after being repeatedly instructed to "walk." (A-369 2:40–42.) As a result, the NYPD officers and an MSG security guard had to physically pry Oakley's hands from the railings. (A-369 2:50–57.) Oakley reacted to this effort by trying to strike one of the MSG security guards in the face. (A-369 2:50–52.)

After the NYPD officers and MSG security guards pried Oakley's hands from the railings, they were able to walk him off of the arena floor. (A-369 2:57–3:00.) At this point, the two NYPD officers completed handcuffing Oakley. (A-370 0:14–25.) Those two NYPD officers—who were later joined by additional NYPD officers—then walked Oakley through a back-of-house area and down a vehicle ramp. (A-370 0:28–36; A-371 0:05–4:08; A-372 0:10–50.) The group waited at the bottom of the ramp until an NYPD van arrived. (A-373 0:30–15:30.) The NYPD van then drove Oakley out of MSG and to the nearest NYPD precinct. (A-373 16:28–18:43.)

11

## II.    Procedural History

On September 12, 2017, Oakley filed a 10-count complaint against James Dolan, MSG Networks, Inc., The Madison Square Garden Company, and MSG Sports & Entertainment, LLC.  (A-16.)  In response, Defendants filed a pre-motion letter on November 13, 2017 identifying various fatal defects in Oakley's legal theories.  *Oakley v. Dolan*, No. 17-cv-6903, Dkt. 19 (S.D.N.Y.).  The parties then attended a lengthy pre-motion conference before Judge Richard Sullivan during which Defendants and the court addressed each of these defects.  (*See* A-37–90.) Oakley accordingly filed an Amended Complaint on February 9, 2018.  (A-91.)

On March 30, 2018, Defendants moved to dismiss Oakley's Amended Complaint in full.  *Oakley*, No. 17-cv-6903, Dkt. 42.  Defendants argued in their motion that each of the claims in the Amended Complaint failed as a matter of law. *See id.*  In the alternative, Defendants argued that the district court could consider dispositive video evidence that Defendants filed in connection with their motion— the same evidence on which Defendants would later rely in support of their summary judgment motion—to dismiss Oakley's claims.  *See id.*[2]

---

[2]  Oakley argues in passing that, because "[t]he District Court gave Defendants the opportunity to move for summary judgment based on the video clips" at the motion to dismiss stage of the proceedings but they "refused to do so," "[t]he District Court should have denied Defendants' [later] motion for summary judgment."  (Pl.'s Br. 7.)  Oakley cites no legal support for this contention, and it should not be credited:  being advised in a pre-motion conference of the right

12

The district court granted Defendants' motion to dismiss in full on February 19, 2020. *Oakley v. Dolan*, 2020 WL 818920, at *17 (S.D.N.Y. Feb. 19, 2020). In his opinion, Judge Sullivan noted that he had not considered Defendants' video evidence, but found that each of Oakley's claims failed as a matter of law. *See id.* at *5–15. Judge Sullivan's opinion also denied a request for leave to amend that Oakley had included in his opposition to the motion to dismiss. *See id.* at *16–17.

Following Oakley's appeal of the dismissal of nine of his ten causes of action, this Court affirmed the dismissal of seven of those causes of action, and also affirmed the district court's denial of leave to amend. *See Oakley v. Dolan*, 833 F. App'x 896, 898 & n.3 (2d Cir. 2020). With respect to Oakley's claims for assault and battery, this Court credited—as it was required to at the motion to dismiss stage— Oakley's allegation that he had been "'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary,'" and found that those and related allegations were enough to "defeat a motion to dismiss the assault and battery claims." *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020). This Court emphasized, however, that the only question remaining in the case moving forward was whether "the security guards used excessive force in *accomplishing*" Oakley's removal. *Id.* at 283 (emphasis added). This Court expressly rejected as "incorrect[]" Oakley's

---

to bring a motion for summary judgment, and declining to do so at that time, does not foreclose a party from later bringing a motion for summary judgment.

contention that "the *act* of removal was unreasonable," reaffirming that MSG had an absolute legal right to remove Oakley from its property. *See id.* (emphasis added).

After the Second Circuit issued its mandate, on December 7, 2020, Defendants filed a pre-motion letter seeking permission to file a motion for summary judgment on the sole remaining issue in the case: whether the force used to effectuate Oakley's removal was objectively unreasonable. (A-252.) Four days later, Oakley filed a letter opposing this request, and a separate pre-motion letter seeking permission to file a Second Amended Complaint that would have re-added dismissed defendant James Dolan as a defendant in the case in order to add two new derivative claims (concerted action and aiding and abetting) against Dolan. (A-255; 258.) Oakley's letter specifically asked the Court to re-add Dolan as a defendant on the theory that Dolan purportedly made a hand gesture to MSG security guards before and after Oakley's removal, and did not intervene when the MSG security guards and NYPD officer escorted Oakley from the arena. (A-258.) Judge Sullivan held a pre-motion conference on December 22, 2020 in which the court and the parties discussed the merits of both proposed motions, as well as the Defendants' request for a stay of discovery, which Oakley opposed. (A-316–360.) The court then permitted the parties to file and brief both of the proposed motions, and stayed discovery during the pendency of those motions. (A-354–358.)

On November 8, 2021, the district court granted Defendants' motion for summary judgment and denied Oakley's motion for leave to file a Second Amended Complaint. (SPA-1.) The district court found that the video footage submitted by Defendants in support of their motion "conclusively rebuts Oakley's version of events—and vindicates Defendants' version," such that there was "no interpretation of the video footage that could lead a reasonable jury to conclude that the degree of force used by MSG security guards to remove Oakley was 'objectively unreasonable.'" (SPA-7–8.) In so finding, the district court first noted that the "entire sequence of events during which Oakley alleges Defendants' security personnel used unreasonable force" was "captured in the videos submitted in connection with Defendants' motion for summary judgment." (SPA-6.) The district court then detailed how "each of the key factual allegations in Oakley's complaint" was "thoroughly contradicted by the video evidence," finding, *inter alia*, that (i) Oakley's "initial fall" was because he "trip[ped]," not because he was pushed (SPA-7); (ii) MSG security guards used force "only after Oakley physically escalate[d] the situation by chest-bumping and poking in the face one guard and twice shoving another" (SPA-7); (iii) there was "no intentional pushing, throwing, or dragging of Oakley toward the ground" prior to his second fall, and that the guards and NYPD officer had instead been moving Oakley "at a reasonable pace" (SPA-7–8); and (iv) once on the ground for a second time, it was "Oakley who resist[ed]," "cling[ing] to

the railing and refus[ing] to let go" as part of a "last-ditch effort to remain in the Garden" (SPA-8). The district court thus concluded that Oakley had been given "ample opportunity to leave the arena peaceably," but had instead "ignored the guards' entreaties and repeated attempts to direct him toward the exit," and had "unilaterally escalated the confrontation." (SPA-6.)

The district court likewise rejected Oakley's request for discovery prior to the issuance of summary judgment, holding that "no further discovery is needed to explore whether MSG security afforded [Oakley] a reasonable opportunity to leave." (SPA-6.) The district court emphasized that (i) the video footage in the record was "conclusive[]," (ii) the video footage documented the "critical moments regarding [Oakley's] assault and battery claims," most notably that Oakley was the one who "unilaterally escalated the confrontation, leading to his eventual forcible removal," (iii) Oakley did not claim that "he was assaulted off-camera," and (iv) Oakley did not "dispute the authenticity of the videos." (SPA-6.) The district court further found that Oakley's insistence that he needed discovery concerning "the reasons for . . . [his] eject[ion]" was "merely a backdoor attempt to relitigate the issue of whether Defendants were entitled to eject Oakley from the Garden"—on which "the law is crystal clear." (SPA-6.)

Finally, the district court denied Oakley's motion for leave to file a Second Amended Complaint as "futile," as it hinged on the same discredited factual

allegations, and meritless assault and battery claims, at issue in the summary judgment motion, meaning there was "no underlying tort to which Oakley's proposed claims against Dolan [for derivative liability] can apply." (SPA-10.)

## SUMMARY OF ARGUMENT

This appeal is squarely foreclosed by Supreme Court precedent: In *Scott v. Harris*, the Supreme Court made clear that dispositive video evidence blatantly contradicting the plaintiff's version of the facts compels summary judgment in favor of defendants. Here, the video evidence shows unambiguously that Defendants used reasonable force to remove Oakley from Madison Square Garden. None of Oakley's arguments to the contrary are availing.

*First*, Oakley's attempt to rewrite the factual narrative in this case should not be credited in the face of the five videos which depict, from various angles, every second of Oakley's removal. As the videos demonstrate, Oakley was not pushed, pulled, grabbed, dragged to the ground, or otherwise subjected to unreasonable force. Instead, after Defendants rescinded Oakley's license to be on their property (as this Court has already agreed was well within their legal rights), Oakley screamed profanities, physically attacked multiple security guards, and made it abundantly clear through related verbal and physical actions that he would not voluntarily leave the arena. When Oakley's actions finally forced MSG security guards to resort to physical force to effectuate Oakley's removal, the force they used was limited and

not objectively unreasonable, and the guards were assisted, throughout the process, by a uniformed NYPD officer. Insofar as Oakley's version of events differs from that shown in the videos, the video evidence trumps Oakley's self-serving narrative under *Scott v. Harris* and its progeny, and compels the dismissal of his claims.

*Second*, Oakley's attacks on *Scott v. Harris* are meritless. Whether certain courts have been unable to decide factual issues where the video evidence is non-existent or fails to capture the critical events has no bearing on this case, as the video evidence available here clearly captures the events in question and blatantly contradicts Oakley's self-serving allegations and affidavit. Indeed, this Court and district courts in this circuit routinely grant summary judgment where no reasonable fact-finder, viewing an objective recording, could find a genuine dispute of material fact. Armed with five videos of the incident that capture all of Oakley's removal from different angles, the district court properly granted summary judgment to Defendants.

*Third*, Oakley's concocted factual dispute over Defendants' subjective intent is irrelevant to the assessment of whether the force used was objectively reasonable. New York law is clear that property owners may revoke a license to be on their property at any time, with or without cause. Further, when a license is revoked, the licensee becomes a trespasser whom the property owner may forcibly eject. Defendants were well within their rights to ask Oakley to leave, and, following his

refusal to comply with lawful instructions, to use reasonable force to effectuate his removal.

*Fourth*, because issues like "the reason for the ejection" and "Defendants' intent in using force" (Pl.'s Br. 12, 18) are not relevant to the excessive force inquiry, discovery into such issues is unnecessary, and the district court appropriately exercised its discretion to deny further discovery before granting summary judgment. Oakley notably does not and cannot identify what material facts he would have sought through discovery, or how those facts would be reasonably expected to create a genuine issue of material fact in light of the dispositive video evidence.

*Finally*, the district court's denial of leave to amend was proper. Oakley's proposed amendments, including his efforts to re-introduce dismissed defendant James Dolan to this case on a derivative liability theory, are futile in light of Oakley's inability to establish any underlying tort, and in any event are barred by *res judicata* following this Court's affirmance of the denial of his prior motion for leave to amend, and by the statute of limitations. Moreover, that Oakley strategically waited for years after he had the information necessary for his proposed amendment to seek leave to amend—until his case was facing imminent dismissal—only further confirms that the district court did not abuse its discretion in refusing to let Oakley further prolong this litigation on a counter-factual theory of liability.

## STANDARD OF REVIEW

The Court reviews *de novo* the district court's grant of summary judgment, and "affirm[s] when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doe ex rel. Doe v. Whelan*, 732 F.3d 151, 155 (2d Cir. 2013) (citing Fed. R. Civ. P. 56(a)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court reviews for abuse of discretion the district court's "discovery rulings," including decisions not to permit additional discovery before granting a defendant's summary judgment motion. *See*, *e.g.*, *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 51 (2d Cir. 2004). Likewise, the Court reviews for abuse of discretion the district court's denial of leave to amend the complaint. *See*, *e.g.*, *United States ex rel. Ladas v. Exelis, Inc*., 824 F.3d 16, 28 (2d Cir. 2016).

## ARGUMENT

## I. The District Court Correctly Granted Summary Judgment in Defendants' Favor Based on Dispositive Video Evidence

### A. The Uncontroverted Video Evidence Establishes That Defendants Did Not Use Objectively Unreasonable Force in Removing Oakley

As this Court made clear in Oakley's prior appeal, the *only* remaining question in this case is whether "the security guards used excessive force in *accomplishing* [Oakley's] removal." *Oakley*, 980 F.3d at 283. Notably, and as emphasized by Judge Sullivan below, the standard for determining the reasonableness of the force applied in this context "is effectively identical in both New York state tort claims and Fourth Amendment excessive force claims brought pursuant to 42 U.S.C. § 1983" (SPA-5 (citing *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991))). *See also*, *e.g.*, *Feaster v. City of Middletown*, 2016 WL 10570984, at *3 (S.D.N.Y. Nov. 28, 2016) (explaining that Fourth Amendment excessive force claims and "assault and battery claims under New York law" are evaluated on the "same standard" and require plaintiffs to demonstrate "that the amount of force used was objectively unreasonable"). Thus, in order to defeat summary judgment on his assault and battery claims, Oakley was required to show that there was a genuine issue of material fact as to whether the physical force used to effectuate his removal was "objectively unreasonable." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996); *see also Feaster*, 2016 WL 10570984, at *3.

Here, Judge Sullivan correctly found that Oakley could not carry that burden because "the undisputed video evidence conclusively demonstrates that the Garden's security guards did not use excessive force as they escorted Oakley from the arena." (SPA-10.)  In other words, not only does the video evidence in this case discredit each of the material allegations in the Amended Complaint, but it entirely forecloses *any* form of relief for Oakley on an assault or battery claim.  This Court should affirm the district court's judgment on the basis of this conclusive evidence.

      i.      *The uncontroverted video evidence disproves Oakley's key allegation that he was thrown to the ground twice.*

First, the district court correctly found that Oakley could not meet his burden because "each of the key factual allegations in Oakley's complaint that the Second Circuit identified as supporting Oakley's assault and battery claim is thoroughly contradicted by the video evidence."  (SPA-7.)  Specifically, this Court previously highlighted two allegations in the Amended Complaint that this Court believed could, if proven true, potentially support an inference that Defendants had used unreasonable force to effectuate Oakley's removal:  (i) that MSG security guards "grabbed" Oakley and "pushed him to the ground,"[3] and (ii) that, when Oakley "got back to his feet," he was "grabbed by six officers and thrown onto the ground."  *See*

---

[3] This Court's prior opinion also notes Oakley's allegation that he was "forcibly shov[ed]" to the ground.  *Oakley*, 980 F.3d at 283.  That allegation refers to the same initial purported push.  (*See* A-98 ¶¶ 42–43.)

*Oakley*, 980 F.3d at 283 (quoting A-97–98). Both allegations are thoroughly discredited by the video evidence.

With respect to the first fall, the video evidence unequivocally demonstrates, from multiple angles, that Oakley was not "grabbed" or "pushed . . . to the ground." (*See* A-367 8:35–42; A-369 0:10–16; *contra* A-98 ¶¶ 42–43.) Indeed, the video evidence does not show *any* MSG security guard applying *any* meaningful physical force to Oakley in the seconds before Oakley falls to the ground, and certainly not in a way that would have caused Oakley to fall. (*See* A-367 8:25–42; A-369 0:00–16.)[4] Nor does Oakley react—such as by flinching, expressing surprise, or suddenly moving in a direction opposite that from which he was touched—in a way that would suggest he was pushed to the ground by MSG security. (*See* A-367 8:35–42; A-369 0:10–16.) Instead, the video evidence shows that Oakley attempted to move away from the MSG security officers who had asked him to leave and then, upon reaching the steps at the end of his row, fell to the ground on his own—a sequence of events

---

[4] Notably, the video evidence reveals that one security guard attempted to grab and hold Oakley's arm as he began to fall, in an apparent attempt to *prevent* Oakley from falling. (A-369 0:13–14.) The only other physical contact between MSG security officers and Oakley in the seconds before his fall involved that same security officer placing an open hand on Oakley's back and then a hand on Oakley's arm, and a separate security guard briefly placing an open hand on Oakley's torso. (A-369 0:06–14.)

consistent with Oakley tripping. (*See id.*)[5] In short, because the video evidence documents, frame by frame, the events leading up to Oakley's first fall and disproves that anyone pushed him or otherwise used force to cause him to fall, Oakley's first fall cannot serve as a basis for assault or battery liability.

Judge Sullivan was also right to conclude that the video evidence "clearly contradicts" Oakley's allegation that Oakley's "second fall resulted when MSG guards 'push[ed], thr[e]w, and/or drag[ged] [him] to the ground.'" (SPA-7.) Once again, the video evidence captures Oakley's second fall from multiple angles, and disproves that any MSG security guard (or the NYPD officer, who at that point was assisting the guards in removing Oakley) pushed or threw Oakley to the ground. (A-365 0:18–25; A-368 0:48–54; A-369 1:06–20.) Instead, Oakley's fall was precipitated by the fact that, while being led out of MSG, he attempted to turn

---

[5] Oakley dedicates multiple pages of his brief to attacking the district court's conclusion that he "tripped." (*See* Pl.'s Br. 3, 30–31.) As a preliminary matter, this argument fails on its own terms, as one does not need to see Oakley's feet to necessarily conclude that he fell. *See, e.g.*, *Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012) (video "not so obscured . . . as to preclude an assessment of the reasonableness of the force employed"); *contra* Pl.'s Br. 31. Other available indicators—such as Oakley's balance, body language, body motion, and physical location (*e.g.*, next to a step)—can and do prove that Oakley tripped. (*See* A-367 8:35–42; A-369 0:10–16; *see also* A-365 0:18–25; A-368 0:48–54; A-369 1:06–20.) But in any event, this is a red herring. Whether Oakley tripped, or simply fell, is immaterial: what matters is that the video evidence conclusively *disproves* that Oakley was pushed, or that his fall was otherwise the result of an unreasonable use of force by MSG security guards.

24

himself around to face the opposite direction from that in which he was being led. (A-365 0:18–22; A-368 0:48–51; A-369 1:06–09.)  As with the first fall, the video evidence refutes any suggestion that Oakley's second fall was the product of an unreasonable use of force[6]—and certainly was not the result of any pushing or throwing, as alleged in the Amended Complaint.  Accordingly, this basis for relief must also fail.  With both key factual allegations definitively rebutted by the video evidence,[7] the district court was correct to hold that there is no genuine issue of fact for trial.

> ii. *The video evidence proves, in multiple ways, that the circumstances surrounding Oakley's removal justified the limited amount of force used to effectuate his removal.*

That the video evidence disproves Oakley's operative allegations of assault and battery is a sufficient basis for affirming the district court's judgment in this case. *See*, *e.g.*, *Tardif v. City of New York*, 2017 WL 571016, at *12 (S.D.N.Y. Feb. 6, 2017) ("Since the undisputed evidence disproves the plaintiff's allegations of assault and battery against Creer, summary judgment in favor of Creer, on the assault

---

[6] As explained below, the limited force that the MSG security guards and NYPD officer were using to remove Oakley at this point was not objectively unreasonable, particularly in light of the fact that Oakley had, at this point, repeatedly resisted removal and physically attacked multiple MSG security guards.

[7] As explained below, the purported factual disputes and contradictions to which Oakley points in his brief are all immaterial and not a sufficient basis to reverse the district court's well-reasoned opinion. (*Contra* Pl.'s Br. 27–32.)

and battery claims, is warranted."). However, the video evidence also proves, in multiple ways, that there *could not* be any basis on which Oakley could succeed on his assault and battery claims based on his removal from the Garden. Specifically, the video evidence reveals multiple case-determinative facts about the nature and circumstances of Oakley's removal, including that (i) Oakley repeatedly ignored and resisted requests to leave; (ii) Oakley unilaterally escalated the situation by physically and verbally attacking MSG security guards; and (iii) when MSG security guards did resort to force, that force was limited, and the MSG security guards were assisted by uniformed NYPD officers.

First, the video evidence proves that Oakley repeatedly and consistently refused to comply with requests to leave. Oakley acknowledges in his Amended Complaint that MSG security guards "ordered him to leave the arena" and that, instead of complying, he "turn[ed] around" and "return[ed] to his seat." (A-97–98.)[8] These allegations are supported by the video evidence, which shows that, after Oakley was initially approached by MSG security guards, he exchanged words with those guards (A-367 7:55–8:14), lunged at and extended his arms at those guards (A-367 8:14–18, 8:19–22), and then moved away from those guards (at which point

---

[8] As this Court has made clear, allegations in a complaint are "judicial admission[s]" by which a plaintiff, like Oakley, is "bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

he fell) (A-367 8:35–42; A-369 0:10–16)—*i.e.*, he was *not* complying with requests to leave.  Additionally, after Oakley rose from his feet for the first time and was asked to "please walk" by an MSG security guard, Oakley refused to comply, and instead shouted profanities at the security guard before physically attacking him. (*See infra.*)  And Oakley's noncompliance was, if anything, even *more* pronounced after his second fall:  when multiple individuals asked Oakley to "get up" and "stand up," Oakley remained on the ground for approximately 80 seconds, explicitly stating at one point "I don't want to stand up," and telling the two surrounding NYPD officers to "take me to jail." (*See* A-369 1:09–2:29.)  Oakley then physically latched onto a railing, forcing NYPD officers and an MSG security guard to physically pry his hands from the railing to effectuate his removal.  (A-369 2:32–57.)  Oakley's allegation that he "did not . . . refuse to leave the Garden at the time" (A-98)—one that he repeats even in this appeal (Pl.'s Br. 6)—is risible:  Oakley repeatedly and emphatically refused to comply with lawful requests to leave, which left MSG security guards with no choice but to use force to effectuate his removal.[9]

---

[9] Oakley repeatedly points on appeal to a moment at which guards purportedly "push[ed] or pull[ed] [him] backwards when he rises from his seat," and argues that the less than "thirty seconds" that elapsed between his being approached by the MSG security guards and this purported attack was not sufficient time for Oakley to leave on his own. (*See, e.g.*, Pl.'s Br. 28–29.)  Putting aside that Oakley does not allege this use of force as a basis for relief in his Amended Complaint, this argument fails because the video evidence conclusively reveals that Oakley was not pushed or pulled when he first stood up.  (*See* A-367 7:55–8:42.)  Instead,

Second, as Judge Sullivan found, "MSG security guards resort[ed] to force only after *Oakley* physically escalate[d] the situation." (SPA-7.) Indeed, before the MSG security guards used *any* force to effectuate Oakley's removal, Oakley took the following actions:

- Oakley rose out of his seat and lunged at an MSG security guard after initially being approached by MSG security guards and an NYPD officer (A-367 8:14–18);

- Oakley violently extended his right arm in the direction of an MSG security guard (A-367 8:14–18);

- Oakley extended his arm at the neck of a different MSG security guard, causing the guard's head to snap backwards (A-367 8:19–22);

- Oakley repeatedly screamed profanities at the MSG security guards, the NYPD officer, and the crowd, including "that's some bullsh*t" (A-368 0:03–17);

- Oakley told an MSG security guard to "get the f**k out of my face" (A-368 0:17–20);

- When that security guard said "no problem" and tried to walk away, Oakley prevented him from doing so, stuck a finger in his face, bumped the guard in the chest, and said "I said it to your motherf**king face, motherf**ker" (A-368 0:18–27);

_____

because MSG security guards did not use any meaningful force against Oakley until after Oakley returned to his feet and attacked multiple guards, the relevant window of time between when Oakley was first approached by MSG guards and when those guards first used force is approximately 90 seconds—which was certainly "ample opportunity to leave," as the district court rightly found. (*See* A-367 7:55–9:25.)

- Oakley struck that MSG security guard in the forehead (A-368 0:29–34; A-369 0:48–50);

- Oakley chopped down on the arm of a different MSG security guard while screaming "get off of me" (A-368 0:34–36; A-369 0:52–54); and

- Oakley twice shoved that MSG security guard into a row of seats (A-365 0:09–11; A-368 0:36–40).[10]

Only after *all* of these actions did the MSG security guards and NYPD officer resort to force to effectuate Oakley's removal. (*See*, *e.g.*, A-368 0:40–50.)[11] Accordingly, Oakley's original allegations that he acted in "self-defense" and that it was the MSG security guards who "escalated the confrontation"—and his parallel contentions on appeal that he was acting "peacefully" or otherwise "not resisting [] efforts" to remove him—are blatantly contradicted by the evidence. (A-98; Pls. Br. 3.)

Finally, the video evidence confirms that, when MSG security guards did eventually resort to force to remove Oakley (after exhibiting restraint during

---

[10] In citing multiple of these facts in its opinion, the district court made clear that it was not simply "assum[ing] that Defendants 'afforded [Oakley] a reasonable opportunity to leave,'" as Oakley contends in his brief. (*See* Pl.'s Br. 20.)

[11] At certain points before Oakley's removal, MSG security guards placed open hands on Oakley's back or arm. (*See* A-369 0:06–14.) Oakley was also briefly restrained after he attempted to strike an MSG security guard. (*See* A-367 8:14–27.) The video evidence makes clear that these actions were not a meaningful use of force because, among other things, they did not lead to any reaction from Oakley (*e.g.*, falling, flinching, etc.). Likewise, the question of whether the district court used the right adjective when it described events such as a guard "*lightly* placing his open hand" on Oakley is not material where the video evidence reveals that the force at issue was not meaningful, and certainly not unreasonable. (*Contra* Pl.'s Br. 29.)

29

Oakley's verbal and physical attacks), that force was limited, and they were assisted by uniformed NYPD officers in removing Oakley from the Garden. After Oakley twice shoved an MSG security guard into a row of seats, a voice can be heard asking the uniformed NYPD officer witnessing these attacks to "do something." (A-368 0:38–41.) At that point, that NYPD officer and multiple MSG security guards used limited force to remove Oakley: three MSG security guards and an NYPD officer held Oakley by the arms and torso and walked him toward the exit. (A-365 0:15–21; A-368 0:40–50; A-369 0:58–1:07.) And after Oakley returned to his feet following his second fall, the MSG security guards—now assisted by a second uniformed NYPD officer—continued to use minimal force, holding Oakley by the arms and torso as they walked him at a steady pace out of the arena. (A-369 2:57–3:00.) Revealingly—though not surprisingly, in light of the video evidence—the force used to effectuate Oakley's removal resulted in zero physical injuries to Oakley, underscoring that the force used was minimal and proportional.

iii. *The limited force used to effectuate Oakley's removal was not objectively unreasonable.*

Taken as a whole, the video evidence fully supports Judge Sullivan's conclusion that, not only are "each of the key factual allegations" in Oakley's complaint "thoroughly contradicted," but "[t]here is no interpretation of the video footage"—and thus of Oakley's removal—that "could lead a reasonable jury to conclude that the degree of force used by MSG security guards . . . was 'objectively

30

unreasonable.'" (SPA-7 (quoting *Lowth*, 82 F.3d at 573).) Even taking the removal in isolation, the district court's holding finds ample support from case law concerning force used by private security guards against trespassing individuals. *See*, *e.g.*, *Ryan v. City of New York*, 2018 WL 3364580, at *1 (N.Y. Cnty. Sup. Ct. July 5, 2018) (dismissing assault and battery claims where "plaintiff was trespassing on [New York Presbyterian Hospital's] property" and the hospital's security guards "use[d] such force as [was] necessary to eject him"); *Mitchell v. N.Y. Univ.*, 2014 WL 123255, at *1 (N.Y. Cnty. Sup. Ct. Jan. 8, 2014) (dismissing assault and battery claims where university's security officers "forcefully removed [plaintiff] from class and then the building"). However, when the full context is considered—that MSG security guards were removing a defiant trespasser who had physically resisted removal and attacked several security guards—there can be no doubt that the force used to remove Oakley was not objectively unreasonable. *See*, *e.g.*, *Duna v. City of New York*, 2019 WL 4735354, at *5 (S.D.N.Y. Sept. 27, 2019) ("forcibl[e]" removal of the plaintiff from a subway turnstile by "twist[ing] Plaintiff's arm" and "pushing him through the turnstile" "not unreasonable under the circumstances"); *Willis v. City of New York*, 2004 WL 555685, at *2–3 (S.D.N.Y. Mar. 19, 2004) (emphasizing plaintiff's "refus[al] to comply" with a request to leave and "hostil[ity]" in determining that officers did not use "objectively unreasonable" force); *see generally Franks v. City of New York*, 2017 WL 1194500, at *3–4 (E.D.N.Y. Mar.

31, 2017) (finding "it was *objectively reasonable*" to use force against a plaintiff who "not only resisted arrest, but exhibited violent behavior towards the police officers who were attempting to restrain him" (emphasis added)).

Moreover, that the video evidence shows that MSG security guards worked with and deferred to uniformed NYPD officers in effectuating Oakley's removal only further confirms that the use of force was not objectively unreasonable. As this Court emphasized in Oakley's first appeal, "the force reasonably needed to initiate the criminal process by handcuffing a person being arrested, 'in circumstances that are tense, uncertain, and rapidly evolving,' [] is not necessarily reasonable in the civil context to remove a person whose license to remain on private property has been revoked." *Oakley*, 980 F.3d at 284 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, (1989)).[12] While this Court, in crediting Oakley's self-serving allegations during the prior appeal, was required to accept that "the Garden security officers who threw Oakley to the ground were not trying to handcuff a person whom they had authority to arrest," the video evidence proves the opposite is true: MSG

---

[12] The key word in this Court's prior statement is *necessarily*. As Judge Sullivan found, and as this Court has previously made clear, "[t]he standard for determining the reasonableness of the force applied is effectively identical in both New York state tort claims and Fourth Amendment excessive force claims." (SPA-5 (citing *Posr*, 944 F.2d at 94–95).) Thus, while certain Fourth Amendment excessive force claims may be factually distinguishable, they are still instructive, under New York law, in determining the line for reasonableness.

security guards worked in concert with NYPD officers when removing Oakley, and one of the NYPD officers in fact handcuffed Oakley's right wrist while he was still on the arena floor (*see* A-369 2:23–30). Thus, the video evidence confirms that Oakley's removal was, in fact, a police intervention.[13] When evaluated against this additional backdrop—in which excessive force cases involving police officers are not only instructive, but *directly comparable*—Oakley's claims even more clearly fail. *See*, *e.g.*, *Kalfus v. N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458, 472–73 (S.D.N.Y. 2010), *aff'd*, 476 F. App'x 877 (2d Cir. 2012) (finding force used against the plaintiff was "only objectively reasonable force" where plaintiff was "clearly resisting arrest throughout the entire time that physical force was used").

---

[13] Ironically, in faulting the district court for purportedly ignoring the context of Oakley's removal, Oakley notes that "police officers 'handcuffing a person being arrested' are afforded particular deference because the 'circumstances . . . are tense, uncertain and rapidly evolving.'" (Pl.'s Br. 17 (quoting *Oakley*, 980 F.3d at 284); *see also* Pl.'s Br. 18 (noting that a court must consider "whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest") (internal citation omitted).) It is certainly true that there is more deference afforded to security guards or police officers in situations where an individual is being "handcuff[ed]," "threat[ening] . . . the safety of . . . officers or others," or "resisting arrest"—and the video evidence conclusively shows that all of those factors are present here. Quite clearly, it is *Oakley* who ignores the relevant context by failing to acknowledge any of those factors, and actively trying to write them out of existence.

### B. Oakley's Arguments to the Contrary Are Unavailing

#### i. *Oakley's attacks on* Scott v. Harris *are unavailing*

Oakley's opposition to Defendants' motion for summary judgment rests on the derisive suggestion that judges are incapable of interpreting video clips because they "lack a critical vocabulary of the visual" (Pl.'s Br. 23), and that this case must therefore go to a jury. That argument is squarely foreclosed by the Supreme Court's decision in *Scott v. Harris*, which held that, when video evidence flatly contradicts plaintiff's account, the court must "view[] the facts in the light depicted by the videotape" and grant summary judgment to defendants. 550 U.S. 372, 381 (2007).

This Court and other courts in this circuit routinely apply *Scott* and conclude that "objective video . . . evidence . . . [is] sufficient to overcome all contrary . . . testimony and preclude any genuine dispute of material fact." *Pratt v. Nat'l R.R. Passenger Corp.*, 709 F. App'x 33, 34 (2d Cir. 2017); *see also Benitez v. Healy*, 2017 WL 9673721, at *7 (S.D.N.Y. June 7, 2017) (granting summary judgment to defendants where "[t]he Video also contradicts almost all of plaintiff's description of the level of force used by defendants"), *adopted by* 2018 WL 1444218 (N.D.N.Y. Mar. 22, 2018); *Lin v. City of New York*, 2016 WL 7439362, at *11 (S.D.N.Y. Dec. 21, 2016) (concluding, based on video evidence, that officers used "a reasonable and unremarkable amount of force as they firmly but nonviolently maneuvered [the plaintiff's] hands behind her back"). Thus, "[a]lthough on summary judgment the

evidence must be viewed in the light most favorable to Plaintiffs as the non-moving parties, when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage*, 689 F.3d at 110.

For example, in *Kalfus v. New York and Presbyterian Hospital*, this Court affirmed summary judgment to defendants on plaintiff's excessive force claim, rejecting the plaintiff's contention that the hospital security video was too "obscured" to allow for "an assessment of the reasonableness of the force employed" and holding that, based on the video evidence, "[n]o reasonable factfinder could conclude that [the officers'] actions were excessive in the circumstances." 476 F. App'x 877, 880–81 (2d Cir. 2012). So too here: no reasonable fact-finder, after reviewing all of the video clips submitted, could find that there is a genuine issue of material fact that the force used was objectively unreasonable.

Largely ignoring this precedent, Oakley argues that courts rely on *Scott* only in cases involving "simple, discrete facts that require virtually no interpretation." (Pl.'s Br. 25.) But this limiting principle is pure fabrication, as is clear from Oakley's failure to cite a single case in support of this assertion. Further, the facts at issue in *Scott* were far from simple. *Scott* concerned the reasonableness of a police officer's decision to apply his push bumper to the plaintiff's vehicle, rather than employing the so-called "Precision Intervention Technique" maneuver, in order to stop a fleeing vehicle in a late-night "Hollywood-style car chase." *Scott*, 550 U.S. at 375, 379–80.

And the dissent in *Scott* notably emphasized that the majority was making decisions about whether the police officer's actions eliminated the risk of harm to the public "based on its interpretation of events on the videotape." *Id.* at 393 n.5. There is thus no precedent or other legal requirement that would have "required" the district court to "credit" Oakley's counter-factual testimony (*contra* Pl.'s Br. 16). And in any event, the critical fact here to which the video evidence pertains—*i.e.*, whether Oakley was pushed or not—*is* simple and discrete.

Further, contrary to Oakley's suggestion that "the plaintiff's own testimony" is somehow required to corroborate the video evidence "to meet the demanding Scott requirements," (Pl.'s. Br. 25), *Scott* itself stands for precisely the *opposite* proposition: *Scott* instructs that, when video evidence "clearly contradicts the version of the story told by" the plaintiff, courts must *reject* the plaintiff's account and "view[] the facts in the light depicted by the videotape." 550 U.S. at 378–80. This Court has repeatedly applied this straightforward directive from the Supreme Court, squarely foreclosing Oakley's position on appeal. *See*, *e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 126 n.27 (2d Cir. 2014) (on summary judgment, the Court "need not accept plaintiffs' allegations where they are contradicted by the record"). In sum, "[i]ncontrovertible evidence relied on by the moving party [on summary judgment], such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's

version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

In a futile attempt to avoid the application of *Scott* and its Second Circuit progeny, Oakley litters his brief with citations to case law—largely out-of-circuit—that bears little relationship to the facts at issue here. For example, Oakley cites *Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 396 (6th Cir. 2022) (cited in Pl.'s Br. 23), and *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 119 (2d Cir. 2004) (cited in Pl.'s Br. 21 n.6), neither of which involved *any video evidence at all*.[14] Oakley likewise cites *Patterson v. City of Wildwood*, a non-precedential decision holding that summary judgment was not warranted because "the videotape . . . did not capture the incident and could not therefore contradict, let alone 'blatantly contradict,' the record as to what occurred." 354 F. App'x 695, 697 (3d Cir. 2009) (cited in Pl.'s Br. 22). These and similar cases cited by Oakley are entirely inapposite.[15] Here, as in *Scott*, there *is* a video—in fact, there are five—and the

---

[14] Indeed, the Second Circuit in *Amnesty America* expressly noted that "videotapes or photographs," had they been placed into evidence, would have "obvious probative value." *Amnesty Am.*, 361 F.3d at 119 n.2.

[15] For example, in *Darden v. City of Fort Worth, Texas* (cited in Pl.'s Br. 22), to which Oakey also cites, the events at issue were "totally obscured" in the video, which also omitted twenty-five critical seconds, such that the recording "d[id] not favor one account over the other and d[id] not provide the clarity necessary to resolve the factual dispute." 880 F.3d 722, 726, 730 (5th Cir. 2018). Similarly, in *Witt v. West Virginia State Police, Troop 2* (cited in Pl.'s Br. 22–23), the single

video footage depicts the entirety of the critical events in a way that conclusively contradicts Oakley's account and establishes the material facts unambiguously in Defendants' favor.

With no pertinent legal authority to support his position, Oakley is forced to invoke law review articles to make two related arguments regarding video evidence, but neither is convincing. First, in an apparent effort to call into question the district court's crediting of the video evidence here and the Defendants' request that this Court affirm that holding, Oakley contends that judges are more accustomed to "dissect[ing] briefs and oral arguments" than images and audiovisual material. (*See* Pl.'s Br. 23–24 (quoting Denise K. Barry, *Snap Judgment: Recognizing the Propriety and Pitfalls of Direct Judicial Review of Audiovisual Evidence at Summary Judgment*, 83 Fordham L. Rev. 3343, 3385 (2015)).) But trial judges routinely confront visual and audiovisual evidence ranging from photographs and charts to security camera video or dashcam footage. The implication that doing so is improper or suspect is irreconcilable with the central holding of *Scott v. Harris*

---

video "lack[ed] sound," "fail[ed] to capture seven important seconds of the incident," and was of "unreliable quality" such that it "provide[d] little assistance in resolving the parties' disputes as to the facts." 633 F.3d 272, 277 (4th Cir. 2011). And in *Coble v. City of White House, Tennessee* (cited in Pl.'s Br. 23), "none" of the critical "events were captured on videotape because they did not occur in front of the patrol car." 634 F.3d 865, 866 (6th Cir. 2011).

and its progeny that courts may rely on video evidence when such evidence blatantly contradicts the plaintiff's version of events.

In fact, the article Oakley cites *acknowledges* that "appellate judges' review of and reliance on audiovisual evidence is firmly based in precedent—from *Arnstein* [*v. Porter*, 154 F.2d 464 (2d Cir. 1946)] through *Scott*." Barry, *Snap Judgment*, at 3381. That article further notes that "[t]he *Scott* decision was a natural progression from courts' consistent use of musical and visual records"; that *Scott* "made it easier to decide these cases pre-trial, because it gave courts a permission to view the video directly"; and that, under *Scott*, the "'objective reasonableness' of an officer's conduct is a question of law reserved for the court." *Id*. at 3384. Oakley's own authorities thus recognize that summary judgment based on video evidence *is* appropriate, including in cases involving allegations of excessive force.

Second, Oakley argues that video evidence is inherently misleading because videos may be "curated by both the camera and operator" and "the placement of the camera angle is likely to influence the opinion of the viewer." (Pl.'s Br. 24.) But such visual theory truisms have gotten no traction in the Supreme Court, this Court, or the district courts in this circuit, which have all granted summary judgment time after time based on video evidence. Such truisms did not preclude the Supreme Court from deciding *Scott* based on a single videotape, and should not preclude this Court from affirming the grant of summary judgment based on *five* different videos

of the same incident. Indeed, even if Oakley's argument had any legal resonance—

and it does not—much of the video evidence is from security cameras that passively

recorded Oakley's removal and were not being actively controlled by any operator

at the time of the incident, and the key events in question are captured from *multiple*

camera angles.

      ii.      *The Defendants had an absolute right to remove Oakley from MSG, and Oakley's attempts to relitigate this issue are contrary to clear precedent.*

Oakley also attempts to undermine the district court's opinion by

manufacturing factual disputes about *why* he was removed from MSG. These efforts

should not be credited. This Court already determined that Defendants' decision to

remove Oakley was permissible. *See Oakley*, 980 F.3d at 283 (rejecting Oakley's

contention that "the act of removal was unreasonable" as "incorrect[]"). That

determination is the law of the case. *See, e.g.*, *United States v. Williams*, 475 F.3d

468, 471 (2d Cir. 2007) ("[T]he law of the case doctrine forecloses reconsideration

of issues that were decided—or that could have been decided—during prior

proceedings."). Indeed, as Judge Sullivan recognized, "under New York state law,

property owners have the right to remove licensees, such as ticketholders like

Oakley, from their property for any reason or no reason at all." (SPA-5 (citing

*Impastato v. Hellman Enters., Inc.*, 147 A.D.2d 788, 789 (3d Dep't 1989); *Madden*

*v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947)); *see also, e.g.*, *Am.*

*Infertility of N.Y., P.C. v. Verizon N.Y. Inc.*, 70 Misc. 3d 1001, 1004 (N.Y. Cnty. Sup. Ct. 2020), *aff'd*, 195 A.D.3d 460 (1st Dep't 2021) ("The owner or landlord of real property may revoke a license at will and without cause."); *Dore v. Wormley*, 690 F. Supp. 2d 176, 184–85 (S.D.N.Y. 2010) (license is "cancelable at will, and without cause") (citations omitted).)  And Oakley's refusal to leave Madison Square Garden when asked to do so gave Defendants "the right to use reasonable force to eject" him from the premises.  *Noonan v. Luther*, 206 N.Y. 105, 108 (1912); *accord Mitchell*, 2014 WL 123255, at *1 ("[A] property owner has the right to use reasonable force to eject a trespasser from its premises."); *Foye v. Sewell*, 1888 WL 2486, at *23–24 (N.Y. Com. Pl. 1888) ("A refusal to depart upon request is sufficient to justify the owner of premises to forcibly eject the trespasser.").

In light of these time-honored precedents, none of the purported facts Oakley points to—for example, whether Oakley began the evening sitting and watching the game, purportedly "without incident," or whether guards assembled in an aisle "for no apparent reason," Pl.'s Br. 27–28—are germane.  Defendants had the absolute right to revoke Oakley's ticket with or without cause.  Further, as in the "substantially identical" Fourth Amendment context, *see Posr*, 944 F.2d at 94–95, the determination of what force is permissible in the context of a state law tort "is an objective one," *Graham v. Connor*, 490 U.S. 386, 397 (1989).  As such, "subjective motivations . . . simply have no bearing on whether the particular degree of force

used is unreasonable and excessive under the Fourth Amendment or New York law."

*Tardif v. City of New York*, 991 F.3d 394, 413–14 (2d Cir. 2021).

<blockquote>

iii.     *Oakley's reliance on expansive definitions of assault and battery are waived, contrary to law and, in any event, do not provide a basis for relief.*

</blockquote>

Finally, Oakley likewise attempts to muddy the waters by invoking expansive definitions of assault and battery from outside the trespasser context (*see* Pl.'s Br. 14), and then arguing that mere "fear that [physical] force would be used" by MSG security guards is a sufficient basis to defeat summary judgment on his assault claim (Pl.'s Br. 14). These efforts should not be credited.

As a preliminary matter, Oakley failed to raise this argument below, and it is therefore waived. *See*, *e.g.*, *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (noting the "well-established general rule that an appellate court will not consider an issue raised for the first time on appeal" (internal quotation marks omitted)). Oakley's argument also fails because his definitions of assault and battery are, in the trespasser context, contrary to law: as Judge Sullivan correctly held, "[u]nder New York state law, if a licensee refuses to leave private property, a property owner has the right to use reasonable force to eject the licensee" and the "standard for determining the reasonableness of the force applied is effectively identical in both New York state tort claims and Fourth Amendment excessive force claims brought pursuant to 42 U.S.C. § 1983." (SPA-5); *see also Tardif*, 991 F.3d

at 410 (reaffirming that the standard for liability in such cases is "objective reasonableness"). Because Defendants were entitled to use force to remove Oakley as a trespasser when he refused to leave the venue, Oakley would need to establish a "*reasonable* fear" of "*unreasonable* wrongful physical contact," which he does not allege or argue. *See*, *e.g.*, *Ladoucier v. City of New York*, 2011 WL 2206735, at *6 (S.D.N.Y. June 6, 2011) (emphases added). And finally, this argument, like Oakley's other arguments, is contrary to the video evidence, which squarely refutes the notion that Oakley was "placed in fear of imminent harmful or offensive contact." (*Contra* Pl.'s Br. 14–15.) Instead, the video evidence conclusively shows that Oakley was never harmfully or offensively contacted (nor threatened with such contact), and in fact, it was *Oakley* who initiated offensive physical contact. *See supra* Section I.A.[16]

*    *    *    *    *

In short, try as Oakley might to create a material factual issue, the video evidence leaves no genuine dispute that Defendants did not use objectively

---

[16] Oakley's parallel contention that MSG security guards were "intent on physically intimidating . . . Oakley" is even further afield, as Defendants' intentions are again irrelevant. *See Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

unreasonable force to effectuate Oakley's removal. Summary judgment was appropriate and should be affirmed. *See Scott*, 550 U.S. at 380–81.

## II. The District Court's Denial of Oakley's Request for Discovery Was Not an Abuse of Discretion

"[T]he discovery rules vest broad discretion in the trial court which should not be overruled without" "a clear showing of an abuse of discretion." *H. L. Moore Drug Exch., Inc. v. Smith, Kline & French Lab'ys*, 384 F.2d 97, 97 (2d Cir. 1967); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 51 (2d Cir. 2004). Here, the district court appropriately exercised its discretion in denying Oakley's request for discovery prior to ruling on Defendants' motion for summary judgment based on the video evidence. In the face of conclusive video evidence, additional discovery cannot be reasonably expected to create a genuine issue of material fact, and the list of general topics identified in Oakley's Rule 56(d) affidavit falls far short of showing why any specific fact that may be elicited through discovery is essential to its opposition or would alter the outcome. Moreover, Oakley does not and cannot identify any prohibition on granting summary judgment prior to discovery, and a clear line of precedent forecloses Oakley's insistence that this Court should effectuate such a prohibition.

As this Court has explained, "[a] party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials 'must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence

supporting a plaintiff's allegation is in the hands of the defendant is insufficient.'" *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)). At a minimum, a Rule 56(d) affiant must "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation." *Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016). "[V]agu[e] generalities," *Aldridge v. City of Warren*, 682 F. App'x 461, 464 (6th Cir. 2017), or "speculation about what discovery *might* uncover," *Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) (emphasis added), are insufficient.[17]

Contrary to Oakley's argument that affirmance would "create a dangerous precedent" that defendants can "cherry-pick[] their most favorable evidence" (Pl.'s Br. 39), New York courts have recognized that "there is nothing in the Federal Rules of Civil Procedure precluding summary judgment—in an appropriate case—prior to discovery." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 346 (S.D.N.Y. 2009). This Court and courts in this circuit have, on

---

[17] *See also*, *e.g.*, *Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, 468 F. Supp. 3d 515, 535 (E.D.N.Y. 2020) (denying Rule 56(d) request because plaintiffs "failed to explain with any specificity how the facts sought" would "create a genuine issue of material fact"); *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 14 (2d Cir. 2013) (plaintiffs were not entitled to discovery based on "conclusory allegations of incomplete discovery" and where they failed to "identif[y] any potentially discoverable evidence that would have raised a genuine issue of material fact as to any of their claims").

*numerous* occasions, granted or affirmed summary judgment prior to discovery where the plaintiff failed to show that discovery was reasonably expected to create a genuine issue of material fact, and there is no dispute that courts have the discretion to do so. *See*, *e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000) (affirming grant of summary judgment prior to discovery); *Haran v. Dow Jones & Co.*, 216 F.3d 1072, at *3 (2d Cir. 2000) (same); *Halebian v. Berv*, 869 F. Supp. 2d 420, 437 (S.D.N.Y. 2012) (granting summary judgment prior to discovery); *Emigra Grp.*, 612 F. Supp. 2d at 346 (same); *Conn. Nat'l Bank v. Trans World Airlines, Inc.*, 762 F. Supp. 76, 79 (S.D.N.Y. 1991) (same); *Crump v. QD3 Ent., Inc.*, 2011 WL 446296, at *5 (S.D.N.Y. Feb. 3, 2011) ("[T]he grant of summary judgment is appropriate even before discovery has commenced."). The "claim that the District Court erred in deciding the motion for summary judgment without providing [plaintiff] with an opportunity to conduct discovery . . . lacks merit." *Haran*, 216 F.3d at *3.

Here, Oakley offered only a vague list of topics on which he wished to seek discovery, such as "discovery concerning the amount of force used by Defendants," "discovery to explain to the jury the inherent biases present in video testimony," and "discovery concerning the basis for James Dolan's" statements that Oakley "appeared to be impaired" and was "looking for a fight." (*See* A-487–489.) And Oakley made *no* attempt to specify "what facts are sought" or "how those facts are

reasonably expected to create a genuine issue of material fact" to preclude summary judgment, as required by Rule 56(d). *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004).[18] As Judge Sullivan properly found, "Oakley's bare assertions that he wishes to discover different videos of the incident" do not entitle him to discovery, "especially since Oakley cannot explain what relevant information such videos, if they exist, might reveal." (SPA-8.)

On appeal, Oakley attempts to identify purported issues into which he would seek discovery, but none of those issues are actually relevant to whether Defendants used reasonable force. Most notably, Oakley is simply wrong when he asserts that "the reasons that Defendants used force at all and the 'severity of [Oakley's] crime' are certainly relevant to properly assessing whether the amount of force used against him was reasonable." (Pl.'s Br. 38–39.) As explained above, Defendants' subjective intent is irrelevant in assessing the reasonableness of the force used. *See supra,* Argument Section I.A. Indeed, although Oakley's brief lists, as one of the six topics on which he wants discovery, "evidence concerning . . . Defendants' reason for ejecting Oakley from MSG," he elsewhere *admits* that "the reasons that Defendants

---

[18] Though Oakley speculated that there might be additional "visual evidence of the scene from different angles" (Pl.'s Br. 35), he did not say anything about how any such video footage would differ from the conclusive and consistent video footage submitted to the district court or otherwise prevent the court from granting summary judgment in favor of Defendants.

asked Oakley to leave . . . [are] ultimately not at issue in this case." (*Compare* Pl.'s Br. 34, *with* Pl.'s Br. 19 n.5.)  Accordingly, neither discovery into Oakley's behavior up until the time he was asked to leave, nor discovery into Defendants' reasons for ejecting Oakley, could create an issue of material fact or permit Oakley to defeat summary judgment in light of the dispositive video evidence in this case.

As Oakley's brief makes clear, Oakley has offered nothing more than "hope that further evidence may develop prior to trial." *Contemp. Mission, Inc.*, 648 F.2d at 107.  Such vague hopes are not a sufficient basis to warrant a fishing expedition or to justify the denial of summary judgment.

## III. The District Court Did Not Abuse Its Discretion in Denying Oakley's Motion for Leave to Further Amend His Complaint

"A district court has broad discretion in determining whether to grant leave to amend," and this Court "review[s] such determinations for abuse of discretion." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (internal citation omitted).  Here, the district court did not abuse that discretion by denying Oakley leave to amend his complaint for a second time, in order to re-introduce James Dolan as an individual defendant on a derivative theory of liability premised on the underlying assault and battery allegations.  As the district court correctly held, Oakley's proposed amendment is futile because "there is no underlying tort" to which Oakley's proposed derivative liability claims against Dolan could apply. (SPA-10.)  Oakley's proposed amendment was also unduly delayed—being based

on evidence known to him since March 30, 2018—and barred by *res judicata* and the statute of limitations. The denial of leave can be affirmed for these independent reasons as well. *See generally McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007) (leave to amend may be denied based on, *inter alia*, "futility, bad faith, [or] undue delay").

A proposed amendment is futile if it "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp*., 310 F.3d 243, 258 (2d Cir. 2002). As the district court correctly recognized, both a concerted action theory and an aiding and abetting theory "require that the underlying tort—assault and battery—actually occurred." (SPA-9 (citing *Bigio v. Coca-Cola Co*., 675 F.3d 163, 172 (2d Cir. 2012); *Segal v. Firtash*, 2014 WL 4470426, at *7 (S.D.N.Y. Sept. 9, 2014)).) Oakley implicitly concedes as much on appeal, suggesting that reversal of summary judgment for Defendants is a prerequisite to the viability of Oakley's proposed claims against Dolan. (Pl.'s Br. 41.) But, as explained above, no assault or battery occurred when Defendants used reasonable force to eject Oakley from their premises. Because Oakley's proposed claims against Dolan "turn on the same" issues as the meritless claims against Defendants, they necessarily "fail[] for the same reasons." *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019); *see also*, *e.g.*, *Abraham v. Am. Home Mortg. Servicing, Inc*., 947 F. Supp. 2d 222, 237 (E.D.N.Y. 2013) ("If all of the underlying torts of which defendants are accused are dismissed,

a claim for concerted-action liability must also fail as a matter of law." (internal quotations omitted)); *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 186 (S.D.N.Y. 2009) ("existence of a primary tort" required "[f]or an aiding and abetting claim to survive"). Because "there is no merit in the proposed amendments," leave to amend was properly denied. *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).

The district court's denial of leave can also be affirmed for multiple independent reasons. First, Oakley's request for leave to further amend was filed on January 22, 2021, more than three years after Oakley was first granted leave to amend his original complaint (A-83), and more than two years after Judge Sullivan denied his original request for leave to further amend his Amended Complaint—a ruling that this Court expressly affirmed on appeal. Such undue delay alone, absent good cause, compels the denial of leave to amend. *See*, *e.g.*, *McCarthy*, 482 F.3d at 202 (affirming denial of motion to amend based on "inordinate delay" of "nearly two years . . . since the filing of the original complaint"); *Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir. 1995) (affirming denial of leave to amend based on undue delay).

Notably, throughout most of this delay, Oakley was aware of the purportedly new evidence he claims justifies his motion for leave to amend. (*Contra* Pl.'s Br. 40.) Indeed, in both Oakley's original complaint and the Amended Complaint, he

alleged the very facts he now seeks to "add" to support his "new" theory of liability against Dolan: that "Defendant Dolan directed security to forcibly remove Mr. Oakley," that "the security guards had been sent to carry out Defendant Dolan's orders," and that Dolan specifically directed MSG security to "humiliate him in front of the Knicks fans that had attended the game." (A-23 (Compl. ¶ 40); A-91–92 (Am. Compl. ¶ 3); *accord* A-17 (Compl. ¶ 4); A-23 (Compl. ¶ 41); A-97 (Am. Compl. ¶¶ 36–37).) And, at the time he last sought leave to amend in May 2018, Oakley had possession of the arena camera footage that he (falsely) claims shows that he was "pushed and/or pulled backwards when he first rose out of his seat." (*See* A-330–331 (Dec. 22, 2020 Tr. at 15:23–16:2); A-121 (MSG Arena Camera footage); *contra* Pl.'s Br. 40.) Here, that Oakley nevertheless strategically waited to again seek leave to amend until his case faced imminent dismissal provides independent cause to affirm. *See Cnty. of Washington v. Cntys. of Warren & Washington Indus. Dev. Agency*, 2 F. App'x 71, 75 (2d Cir. 2001) (affirming denial of motion for leave to amend where plaintiff waited years to file the motion based on facts of which it "had been aware . . . since the outset of th[e] litigation").[19]

---

[19] Citing *Ceara v. Deacon*, 916 F.3d 208, 214–15 (2d Cir. 2019), Oakley argues that amendment must be permitted when a case has not yet entered discovery. But *Ceara* offers no legal support for that proposition; that case involved a motion for summary judgment brought after discovery, and addressed whether an amended complaint related back to the original complaint for purposes of the statute of limitations. If efficiency considerations justify staying discovery, *see,*

51

Oakley's second request for leave to amend is also now barred by the doctrine of *res judicata*, because this Court previously affirmed Judge Sullivan's denial of leave to amend. "Under the doctrine of *res judicata*, or claim preclusion, a final judgment on the merits of an action precludes the parties . . . from relitigating issues that were or could have been raised in that action." *EDP Med. Comp. Sys., Inc. v. United States*, 480 F.3d 621, 625 (2d Cir. 2007) (internal quotations and alterations omitted). While the doctrine more often arises in the context of successive actions against the same defendants, it applies with equal force to bar subsequent claims in the same action, following a final judgment on the merits on some claims. *See Cho v. Blackberry Ltd.*, 991 F.3d 155, 168–70 & n.11 (2d Cir. 2021) (applying *res judicata* to dismiss subsequent claims by plaintiffs in the same action).

*L-Tec Electronics* is instructive. In that case, the district court dismissed claims against individual defendants on the basis that there could be no "personal liability for individual officers on obligations undertaken in the name of a dissolved corporation once its corporate status was restored." *L-Tec Elecs. Corp. v. Cougar*

<hr>

e.g., *Roper v. City of New York*, 2017 WL 462270, at *2 (S.D.N.Y. Jan. 25, 2017), they also weigh against giving plaintiffs repeated opportunities to replead, *see Oakley*, 2020 WL 818920, at *16 (observing that pleading is not "an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges") (quoting *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008)).

*Elec. Org., Inc.*, 198 F.3d 85, 86 (2d Cir. 1999). The plaintiff moved to amend to include "different legal theories" against the individual defendants. *Id.* at 86, 88. Both the district court and this Court found that leave to amend was "precluded by principles of *res judicata*": "[a]ll of the new claims ar[o]se out of the same factual predicate as the original claims" and therefore "could have been raised in the original complaint." *Id.* at 87–88. That same reasoning compels the denial of leave to amend here.[20]

Finally, Oakley's proposed claims are also time-barred, yet another basis on which this Court can affirm the district court's exercise of its discretion. Under New York law, assault and battery claims are subject to a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see also*, *e.g.*, *Blackwood v. Omorvan*, 2018 WL 816839, at *3 (S.D.N.Y. Feb. 8, 2018). Because Oakley's claims arise from events on February 8, 2017, they are far outside of the limitations period, and they cannot be saved by the relation-back doctrine. *See*, *e.g.*, *In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d 401, 405 n.2 (2d Cir. 2004) (finding relation-back doctrine

---

[20] On appeal, Oakley argues that he was "unaware of the evidence supporting" the "allegation that he was pushed/and or pulled backwards." (Pl.'s Br. 40.) But if Oakley had indeed been "pushed and/or pulled backwards," he himself would have known and could have alleged as much from the start. And again, Oakley and his counsel had all relevant video evidence since at least March 30, 2018, yet actively elected *not* to seek further leave to amend the complaint until Defendants filed their motion for summary judgment.

"inapplicable" where plaintiffs did not omit a plaintiff "by mistake" but rather "chose not to name [the defendant] in their original complaint").

## CONCLUSION

For the foregoing reasons, the district court's decision granting Defendants' motion for summary judgment, denying Oakley's request for additional discovery, and denying Oakley's second motion for leave to amend should be affirmed.

Dated: June 3, 2022
      New York, NY                 Respectfully submitted,

                               By: /s/ Randy M. Mastro

                                   Randy M. Mastro
                                   Akiva Shapiro
                                   Declan T. Conroy
                                   Alexandra Perloff-Giles
                                   GIBSON, DUNN & CRUTCHER LLP
                                   200 Park Avenue
                                   New York, New York 10166-0193
                                   (212) 351-4000

                                   *Attorneys for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the length limits of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,863 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.      This brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word from the Microsoft Office Professional Plus 2016 suite in 14-point Times New Roman font.

/s/ Randy M. Mastro
Randy M. Mastro